# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

IN RE MICROSOFT CORP.
ANTITRUST LITIGATION

This Document Relates to:
*Novell, Inc.* v. *Microsoft Corporation*,
Civil Action No. JFM-05-1087

MDL Docket No. 1332
Hon. J. Frederick Motz

Oral Argument Requested

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO NOVELL'S RENEWED MOTION FOR SUMMARY JUDGMENT ON MICROSOFT'S AFFIRMATIVE DEFENSES AND IN SUPPORT OF MICROSOFT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052
Phone:  (425) 706-8080
Facsimile:  (425) 936-7329
rwallis@microsoft.com
steveaes@microsoft.com

Mark M. Bettilyon
RAY QUINNEY & NEBEKER
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145
Phone:  (801) 532-1500
Facsimile:  (801) 532-7543
mbettilyon@rqn.com

G. Stewart Webb, Jr.
(Fed. Bar. No. 00828)
VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, Maryland 21202
Phone:  (410) 244-7565
Facsimile:  (410) 244-7742
gswebb@venable.com

David B. Tulchin
Steven L. Holley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone:  (212) 558-4000
Facsimile:  (212) 558-3588
tulchind@sullcrom.com
holleys@sullcrom.com

*Attorneys for Microsoft Corporation*

November 13, 2009

## **TABLE OF CONTENTS**

**Page**

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................3

    A.    Novell's Sale of Antitrust Claims to Caldera .........................................3

    B.    Caldera's Lawsuit Against Microsoft ..................................................11

        1.    The Claims Asserted by Caldera ...........................................11

        2.    Novell's Participation in the *Caldera* Litigation .......................14

        3.    The Settlement of the *Caldera* Litigation ................................16

    C.    Novell's Claims in this Action ...........................................................17

    D.    Microsoft's Motion to Dismiss Counts I and VI on the Ground that Novell Sold Them to Caldera ...........................................................................19

    E.    Novell's 2008 Motion for Summary Judgment and Microsoft's Motion to Compel ............................................................................................20

    F.    Novell's Present Motion ...................................................................21

ARGUMENT .........................................................................................................22

    I.    The Standard for Granting Summary Judgment ....................................22

    II.    Novell Sold Its Present Claims to Caldera and Is Not a Real Party in Interest ........................................................................................23

        A.    The Asset Purchase Agreement Unambiguously Assigned Novell's Present Claims to Caldera ........................................................23

        B.    Alternatively, Extrinsic Evidence Shows that the Asset Purchase Agreement Assigned Novell's Present Claims to Caldera ....................28

        C.    This Court Is Not Barred from Considering Microsoft's Interpretation of the Asset Purchase Agreement ......................................36

    III.    Alternatively, Novell's Present Claims Are Barred by *Res Judicata* ...................37

        A.    Novell and Caldera Were in Privity with Respect to the *Caldera* Litigation ...........................................................................39

            1.    The Substantive Legal Relationship Between Novell and Caldera Establishes Privity ..................................................39

            2.    Novell Was Adequately Represented in the *Caldera* Litigation .......:.................................................................40

            3.    Judicial Estoppel Does Not Bar Microsoft from Establishing Novell's Role in the *Caldera* Litigation ...........................................41

**TABLE OF CONTENTS**
(*Continued*)

**Page**

B.    Novell's Present Claims Arise out of the Same Cause of Action
Asserted in the *Caldera* Litigation ............................................................43

CONCLUSION.........................................................................................................................49

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Anyanwutaku* v. *Fleet Mortgage Group, Inc.*,
   85 F. Supp. 2d 566 (D. Md. 2000) ..................................................................44, 48

*Arizona* v. *California*,
   530 U.S. 392 (2000) ...........................................................................................38

*Brinkley* v. *Harbour Recreation Club*,
   180 F.3d 598 (4th Cir. 1999) ..............................................................................22

*Café Rio, Inc.* v. *Larkin-Gifford-Overton, LLC*,
   207 P.3d 1235 (Utah 2009) ............................................................................24, 28

*Caldera, Inc.* v. *Microsoft Corp.*,
   181 F.R.D. 506 (D. Utah 1998) ...........................................................................15

*Caldera, Inc.* v. *Microsoft Corp.*,
   72 F. Supp. 2d 1295 (D. Utah 1999) ......................................................................3

*Crystal Import Corp.* v. *AVID Identification Sys., Inc.*,
   582 F. Supp. 2d 1166 (D. Minn. 2008) ................................................................48

*Harnett* v. *Billman*,
   800 F.2d 1308 (4th Cir. 1986) ............................................................................44

*Hunt* v. *Enzo Biochem, Inc.*,
   2009 WL 1683990 (S.D.N.Y. June 15, 2009) ......................................................40

*In re Maco Homes, Inc.*,
   180 F.3d 163 (4th Cir. 1999) ..............................................................................23

*In re Microsoft Corp. Antitrust Litig.*,
   237 F. Supp. 2d 639 (D. Md. 2002) .......................................................................5

*Indian Coffee Corp.* v. *Procter & Gamble Co.*,
   752 F.2d 891 (3d Cir. 1985) ...........................................................................37-38

*Int'l Tel. & Tel. Corp.* v. *Gen. Tel. & Elecs. Corp.*,
   369 F. Supp. 316 (M.D.N.C. 1973) .....................................................................44

*Joplin Enters.* v. *Allen*,
   1992 U.S. Dist. LEXIS 20762 (W.D. Wash. Dec. 15, 1992) ...............................37

*Keith* v. *Aldridge*,
   900 F.2d 736 (4th Cir. 1990) ..............................................................................38

# TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

*KKSN, Inc.* v. *Rogers,*
1993 U.S. Dist. LEXIS 7059 (D. Or. May 26, 1993) ...........................................37

*Nationwide Mut. Fire Ins. Co.* v. *George V. Hamilton, Inc.,*
571 F.3d 299 (3d Cir. 2009) .............................................................40

*New Hampshire* v. *Maine,*
532 U.S. 742 (2001) ......................................................................42

*Novell, Inc.* v. *Canopy Group, Inc.,*
92 P.3d 768 (Utah Ct. App. 2004) ....................................10, 16, 39, 40

*Novell, Inc.* v. *Microsoft Corp.,*
2005 WL 1398643 (D. Md. June 10, 2005) ...........................17, 19, 20

*Novell, Inc.* v. *Microsoft Corp.,*
505 F.3d 302 (4th Cir. 2007) .....................................................*passim*

*Ohio Valley Environmental Coalition* v. *Aracoma Coal Co.,*
556 F.3d 177 (4th Cir. 2009) .........................................................38, 43

*OSRecovery, Inc.* v. *One Groupe Int'l, Inc.,*
380 F. Supp. 2d 243 (S.D.N.Y. 2005) ....................................22, 28, 37

*Pelt* v. *Utah,*
539 F.3d 1271 (10th Cir. 2008) .........................................................39

*Pittston Co.* v. *United States,*
199 F.3d 694 (4th Cir. 1999) ........................................................43, 48

*Pueschel* v. *United States,*
369 F.3d 345 (4th Cir. 2004) .....................................................*passim*

*Sears* v. *Riemersma,*
655 P.2d 1105 (Utah 1982) .............................................................36

*Spectrum Sports, Inc.* v. *McQuillan,*
506 U.S. 447 (1993) ......................................................................45

*Taylor* v. *Sturgell,*
128 S. Ct. 2161 (2008) ................................................................39, 40

*United States* v. *Microsoft,*
253 F.3d 34 (D.C. Cir. 2001) ...........................................................47

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*United States* v. *Mooney,*
  497 F.3d 397 (4th Cir. 2007) ................................................22

*Waldman* v. *Village of Kiryas Joel,*
  207 F.3d 105 (2d Cir. 2000) ................................................38

*Wash. Metro. Area Transit Auth.* v. *Potomac Inv. Props., Inc.,*
  476 F.3d 231 (4th Cir. 2007) ................................................23, 35

*Zinkand* v. *Brown,*
  478 F.3d 634 (4th Cir. 2007) ................................................42

### RULES

Fed. R. Civ. P. 17 ................................................23

Fed. R. Civ. P. 56 ................................................1, 22

### OTHER AUTHORITIES

IIA Philip E. Areeda et al., ANTITRUST LAW ¶ 362a (3d ed. 2007) ................................................23

11 Richard A. Lord, WILLISTON ON CONTRACTS § 31:1 (4th ed. 2009) ................................................36

4 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 17.11 (3d ed. 2009) ................................................23

20 Charles A. Wright et al., FEDERAL PRACTICE & PROCEDURE DESKBOOK § 75 (2002) ................................................22

RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2001) ................................................24

RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981) ................................................36

RESTATEMENT (SECOND) OF JUDGMENTS § 24 (1982) ................................................48

RESTATEMENT (SECOND) OF JUDGMENTS § 55 (1982) ................................................37

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

<table>
<tr>
<td>

IN RE MICROSOFT CORP.
ANTITRUST LITIGATION

This Document Relates to:
*Novell, Inc.* v. *Microsoft Corporation*,
Civil Action No. JFM-05-1087

</td>
<td>

MDL Docket No. 1332
Hon. J. Frederick Motz

Oral Argument Requested

</td>
</tr>
</table>

## MICROSOFT'S MEMORANDUM IN OPPOSITION TO NOVELL'S RENEWED MOTION FOR SUMMARY JUDGMENT ON MICROSOFT'S AFFIRMATIVE DEFENSES AND IN SUPPORT OF MICROSOFT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Microsoft

Corporation ("Microsoft") respectfully submits this memorandum in opposition to the Renewed

Motion for Summary Judgment on Microsoft's Affirmative Defenses filed by Novell, Inc.

("Novell") and in support of Microsoft's cross-motion for summary judgment dismissing the

remaining counts (I and VI) of Novell's complaint.

Novell's motion for summary judgment—seeking to eliminate Microsoft's

real-party-in-interest defense as well as its affirmative defenses, including *res judicata*—is

without merit.  In 1996, Novell sold to Caldera, Inc. ("Caldera") "any and all claims or causes of

action" that were "associated directly or indirectly" with DR DOS, Novell's personal computer

("PC") operating system.  (Asset Purchase Agreement between Novell, Inc. and Caldera, Inc.,

July 23, 1996 ("Asset Purchase Agreement") § 3.1, attached as Ex. 1 to the Affidavit of Steven

L. Holley in Support of Microsoft's Cross-Motion for Summary Judgment, sworn to on

November 10, 2009 ("Holley Aff.").)  The unambiguous language of the Asset Purchase

Agreement encompasses Novell's present claims, which arise out of conduct that allegedly

harmed DR DOS and which concern products (WordPerfect and Quattro Pro) that Novell closely

linked to DR DOS during the relevant time period.  Moreover, extrinsic evidence demonstrates

that Novell and Caldera intended the assignment to encompass all claims arising out of

Microsoft's allegedly anticompetitive conduct in the exact market—PC operating systems—in

which DR DOS competed.  Thus, Novell sold its present claims in 1996 to Caldera, which

asserted those claims in a lawsuit that it settled in 2000, providing a substantial recovery to

Novell and giving Microsoft a broad release covering "the Novell Claims and all claims asserted,

or that could have been asserted, in the Action."  (Settlement Agreement between Microsoft

Corporation and Caldera, Inc., January 7, 2000 ("Caldera Settlement Agreement") ¶ 2, attached

as Ex. 2 to Holley Aff.)  Because Novell no longer owns the remaining claims in this action, they

should be dismissed.

Even if Novell's present claims had not been assigned to Caldera in 1996, the

doctrine of *res judicata* would bar Novell from asserting those claims today.  Novell, as the

principal architect and a substantial beneficiary of Caldera's lawsuit against Microsoft, was a

privy to that litigation and cannot now assert claims against Microsoft arising from the same core

of operative facts.  Novell and Caldera were in privity with respect to the prior lawsuit for two

reasons.  *First*, Novell maintained a contractual relationship with Caldera—the nature of which

was hidden from Microsoft and the court at the time—by which Caldera was obligated to sue

Microsoft and share the spoils of that lawsuit with Novell.  *Second*, Novell's interests were

adequately represented by Caldera, which was not only contractually obligated to sue Microsoft

on Novell's behalf but purported to settle Novell's claims along with its own.  Thus, having been

a privy to Caldera's lawsuit against Microsoft and recovered damages for harm to DR DOS

arising from Microsoft's alleged monopolization of the PC operating system market, Novell

cannot bring suit separately for purported damages to WordPerfect and Quattro Pro based on the same cause of action. The present case is an impermissible attempt by Novell to split a single cause of action.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.     Novell's Sale of Antitrust Claims to Caldera**

On June 24, 1994, Novell acquired WordPerfect and Quattro Pro (two software applications products) from WordPerfect Corporation and Borland International, Inc., respectively. (Novell, Inc., Form 10-Q, September 13, 1994, attached as Ex. 3 to Holley Aff.) According to Novell's counsel and its testifying expert on antitrust economics in this case, Novell purchased these office productivity applications as complements to DR DOS (later known as "Novell DOS"), a PC operating system that Novell acquired through its merger with Digital Research, Inc. ("DRI") in 1991. (Transcript of Oral Argument on Microsoft's Motion to Dismiss Novell's Complaint, June 7, 2005 ("June 7, 2005 Tr.") at 39-41, attached as Ex. 4 to Holley Aff.; Declaration of Novell's expert on antitrust economics Roger G. Noll, May 1, 2009 ("Noll Report") at 7-8, 89, attached as Ex. 5 to Holley Aff.; *Caldera, Inc.* v. *Microsoft Corp.*, 72 F. Supp. 2d 1295, 1301-02 (D. Utah 1999).) Novell "intended to distribute" WordPerfect and Quattro Pro with DR DOS (Reply Report of Roger G. Noll, July 24, 2009 ("Noll Reply Report") at 59, attached as Ex. 6 to Holley Aff.), and believed that they were "key franchise" applications that would enhance the value of DR DOS. (*See* June 7, 2005 Tr. at 39 (counsel for Novell claiming that "when Novell bought WordPerfect," it could market DR DOS to original equipment manufacturers on the basis that it had a version of WordPerfect and a spreadsheet that were "compatible with [its] operating system"), attached as Ex. 4 to Holley Aff.; *id.* at 40-41.)

In 1994, not long after it acquired WordPerfect and Quattro Pro, Novell came to believe that it could bring "a major antitrust action" for harm to those products and to DR DOS arising out of Microsoft's conduct in the PC operating system market. (Memorandum from David R. Bradford to the Novell board of directors, November 18, 1994 at 1, attached as Ex. 7 to Holley Aff.) This lawsuit would allege that Microsoft "lock[ed] out Novell and DRI from the desktop operating system market" and in turn "unlawfully leveraged its operating monopoly to achieve an unfair competitive advantage in the applications market." (*Id.* at 2.) As Novell General Counsel David Bradford then observed, aggregating claims for harm to DR DOS, WordPerfect and Quattro Pro could present Novell with a significant tactical advantage: "Were a jury to find against Microsoft in the desktop operating system monopoly they are very likely to piggyback their decision for the applications market as well." (*Id.* at 3.)

In April 1995, in anticipation of filing such a suit, Novell had its outside counsel, Stephen Hill of Snow, Christensen & Martineau ("Snow Christensen"), prepare a draft complaint against Microsoft. (Declaration of Stephen J. Hill, *Novell, Inc.* v. *Canopy Group, Inc.*, May 2, 2002 ("Hill Decl.") ¶ 2, attached as Ex. 8 to Holley Aff.; Memorandum from David R. Bradford to the Novell board of directors, April 12, 1995 ("Bradford April 12 Memo") at 1, attached as Ex. 9 to Holley Aff.) This draft complaint alleged, among other things, that Microsoft monopolized the PC operating system market, causing harm to both DR DOS and to Novell's applications, including WordPerfect. (Draft complaint captioned *Novell, Inc.* v. *Microsoft Corp.* (D. Utah) ("Novell Draft Compl.") ¶ 38 (describing WordPerfect as one of the Novell products "at issue"), attached as Ex. 10 to Holley Aff.; *id.* ¶¶ 39-40, 72-76. 79-83.) Notably, section IX of the draft complaint, captioned "Microsoft's Use of its PC Operating System Monopoly to the Competitive Disadvantage of Novell in Other Software Markets," argued that "Microsoft,

through the unlawful exercise of its monopoly power, has deprived Novell of a competitive PC operating system product [DR DOS], leaving Novell dependent on Microsoft to permit the continuing compatibility of Novell products with the desktop PC operating system." (*Id.* ¶ 76.)

In an April 1995 memorandum to the Novell board of directors, Mr. Bradford explained that the draft complaint reflected "a proposed legal strategy to limit Microsoft's power (both current and future) and to obtain damages from Microsoft for their anti-competitive conduct as it relates to its monopolization of the desktop operating system market." (Bradford April 12 Memo at 1, attached as Ex. 9 to Holley Aff.) Mr. Bradford informed the board that in addition to claiming monetary damages, the draft complaint "looks to the future, seeking injunctive relief that would limit Microsoft's ability to leverage its desktop PC monopoly position in a manner that gives it an unfair advantage in the network operating system and desktop PC applications markets." (*Id.* at 1; *see also* Memorandum from David R. Bradford to the Novell board, April 27, 1995 at 1 (referring to a potential lawsuit "for Microsoft's monopoly in the desktop operating system together with relief to protect Novell in the future against further anti-competitive conduct"), attached as Ex. 11 to Holley Aff.) Thus, the draft complaint requested "disclosure of all Microsoft operating system API's [application programming interfaces] as a mechanism for leveling a playing field that Microsoft has skewed by its illegal monopolization of the desktop." (Bradford April 12 Memo at 1, attached as Ex. 9 to Holley Aff.; *see* Novell Draft Compl. at 33, attached as Ex. 10 to Holley Aff.) As the Court is aware, APIs are the mechanism that applications use to call upon functionality supplied by a PC operating system. *See In re Microsoft Corp. Antitrust Litig.*, 237 F. Supp. 2d 639, 641 (D. Md. 2002) (Motz, J.).

In the same memorandum, Mr. Bradford alerted the board to a potential problem with Novell's contemplated lawsuit. Some of the allegedly anticompetitive conduct against DR DOS had happened much earlier, meaning that "any further delay could increase the risk" that Microsoft could successfully assert a statute of limitations defense. (Bradford April 12 Memo at 2, attached as Ex. 9 to Holley Aff.) This was of great concern because, as Mr. Bradford explained, "the destruction of DR DOS provides . . . the best platform from which to insist on injunctive relief that can protect Novell's interests in the future." (*Id.*) In considering the merits of selling Novell's antitrust claims to a third party, Mr. Bradford also cautioned that such a sale might jeopardize Novell's ability to seek injunctive relief to protect its applications business from Microsoft's conduct in the PC operating system market. (*Id.*) He warned that "a third party not in the applications or network operating system business may lack standing to ask for relief that would be of benefit to Novell, particularly early disclosure of APIs." (*Id.*) For these reasons, Mr. Bradford suggested that "Novell should not lightly give up control of the litigation," and concluded that "Novell should file its Antitrust claim against Microsoft." (*Id.* at 2-3.)

Two weeks later, Mr. Bradford suggested to Novell CEO Robert Frankenberg that, rather than suing immediately, Novell might use the threat of an antitrust lawsuit "to assure leverage in a negotiation with Microsoft." (Memorandum from David R. Bradford to Bob Frankenberg, April 27, 1995 at 1, attached as Ex. 12 to Holley Aff.; *see also* Memorandum from David R. Bradford to Bob Frankenberg et al., May 10, 1995 at 1 ("[W]e should ask Microsoft for several things in exchange for our willingness to forego suing them for violations of antitrust law."), attached as Ex. 13 to Holley Aff.) Thus, in June 1995, Mr. Frankenberg sent a letter to Microsoft CEO Bill Gates in which he threatened to bring a lawsuit against Microsoft for monopolizing the "desktop operating systems market" and "leverag[ing] its dominant OS

[operating system] position in the applications market," which Mr. Frankenberg also referred to

as "the Word Processing and Spreadsheet markets." (Letter from Robert J. Frankenberg to

William H. Gates, June 23, 1995 at 2, attached as Ex. 14 to Holley Aff.)  As an example of

Microsoft's alleged anticompetitive conduct, Mr. Frankenberg cited "Microsoft's refusal to fix

certain bugs in Windows '95," which he said "cause[d] Novell applications to be incompatible

with Windows '95."  (*Id.*)

        In exchange for forgoing a lawsuit, Mr. Frankenberg demanded that Microsoft

"make available to Novell those [operating system] interfaces (including application

programming interfaces, service provider interfaces, binary interfaces etc.), calls, hooks,

features, documentation or code of any type which might interact with Novell's software

products at the same time and same level of specificity as those things are made available to

Microsoft's own applications programmers." (*Id.* at 3.)  After Mr. Gates replied that Novell's

allegations were meritless (Letter from William H. Gates to Robert J. Frankenberg, July 20, 1995

at 2, attached as Ex. 15 to Holley Aff.), Mr. Frankenberg warned that "Novell continues to have

a strong antitrust claim against Microsoft that it will not forsake," and again demanded that

Novell's applications developers receive "equal access" to Microsoft's operating system

interfaces. (Letter from Robert J. Frankenberg to William H. Gates, August 21, 1995, attached

as Ex. 16 to Holley Aff.)

        In March 1996, Novell completed its sale of WordPerfect and Quattro Pro to

Corel Corporation (Novell, Inc., Form 10-Q, March 12, 1996, attached as Ex. 17 to Holley Aff.),

retaining "the antitrust claims for harm that Microsoft caused" to those products. (Memorandum

of Law in Support of Novell's Renewed Motion for Summary Judgment on Microsoft's

Affirmative Defenses, October 7, 2009 ("Novell Mem.") at 5.)  Yet despite the earlier threats,

Novell's board of directors decided that they had "no interest in pursuing a lawsuit against Microsoft nor being in any way associated with" such litigation. (E-mail from David Bradford to Robert Frankenberg, May 9, 1996, attached as Ex. 18 to Holley Aff.) Accordingly, the company explored the possibility of "sell[ing] its DOS business to someone who will prosecute its cause of action against Microsoft." (Memorandum from Novell Vice President Rob Hicks to David Bradford, April 23, 1996 at 1, attached as Ex. 19 to Holley Aff.)

At a May 23, 1996 meeting of Novell's board of directors, Mr. Bradford made a presentation on the sale of Novell's DOS business and the potential antitrust lawsuit against Microsoft. (Minutes of Novell board of directors meeting, May 23, 1996 at 3, attached as Ex. 20 to Holley Aff.) In advance of that meeting, Novell's outside counsel, Stephen Hill of Snow Christensen, faxed Mr. Bradford a memorandum in which he shared his "thoughts regarding presentation of the DOS business sale to the Board." (Memorandum from Stephen Hill to David Bradford, May 23, 1996 at 1, attached as Ex. 21 to Holley Aff.) Handwritten notes on that memorandum, apparently written by Mr. Bradford in preparation for the board presentation, begin, "Most of you are familiar w/ Novell's case against M/S for monop of the P.C. O.S. market." (*Id.*) After discussing the merits of bringing this "case against Microsoft for monopolization of the PC operating system market," the board "declined to take legal action on this matter." (Ex. 20 to Holley Aff. at 3.)

Instead, Mr. Bradford was directed to sell the company's DOS business and the associated antitrust lawsuit (*id.*), and in doing so "to balance three main — and potentially competing — objectives:  1. Avoid or minimize adverse publicity to Novell[,] 2. Avoid or minimize the risks of a shareholder derivative suit, and 3. Return value to the stockholders in the event the buyer brings an action against MS and such litigation is successful." (Memorandum

from David Bradford to Bob Frankenberg, July 23, 1996, attached as Ex. 22 to Holley Aff.)  To

achieve these goals, Novell decided to sell the DOS business and Novell's antitrust claims

against Microsoft to Caldera, Inc. ("Caldera"), a company owned by Ray Noorda.

(Memorandum from David Bradford to Bob Frankenberg, Mary Burnside and Jim Tolonen, July

10, 1996, attached as Ex. 23 to Holley Aff.)  Mr. Noorda was the founder of Novell and in 1996

was still its largest shareholder.  (Deposition of former Caldera CEO Bryan Sparks, *Canopy*

*Group*, September 10, 2001 ("Sparks Dep.") at 188, attached as Ex. 24 to Holley Aff.)  The

transaction was structured so that Novell would "participate in any suit recoveries" while

keeping its role in the litigation hidden so as to "minimiz[e] any negative consequences."  (Ex.

23 to Holley Aff. at 2; *see also* Deposition of Robert Frankenberg, March 25, 2009

("Frankenberg Dep.") at 146 ("Our concern was that we not be the people who brought the suit.

And we did not want the terms of our deal with Caldera publicized . . . ."), attached as Ex. 25 to

Holley Aff.)

         The written contracts effectuating the assignment of antitrust claims from Novell

to Caldera were drafted in an intentionally vague manner so as to accommodate Novell's desire

to hide its participation in Caldera's lawsuit against Microsoft.  Bryan Sparks, the former CEO of

Caldera, testified that the written contract between Novell and Caldera "isn't the entire

agreement" and that the parties deliberately omitted Caldera's obligation to sue Microsoft so as

to "hide the fact" that Novell was "participating in the lawsuit [against Microsoft]."  (Sparks

Dep. at 188, attached as Ex. 24 to Holley Aff.; *see also id.* at 68, 180; Deposition of Novell Vice

President Ransom Love, *Canopy Group*, August 1, 2001 ("Love Dep.") at 83 ("They did not

want people to know Novell was going to be involved."), attached as Ex. 26 to Holley Aff.)  As

Mr. Bradford explained in a July 10, 1996 memorandum, "[l]egal documents relating to the

Caldera transaction are being drafted so as to limit discoverability in the lawsuit Caldera may

bring against Microsoft." (Ex. 23 to Holley Aff. at 3.) For example, Novell deleted from the

final written contracts all explicit references to an antitrust lawsuit against Microsoft.

(Deposition of Novell in-house lawyer Greg Jones, *Canopy Group*, February 20, 2002 at 41

("Q. So you intentionally omitted any reference to – a specific reference to the potential antitrust

lawsuit against Microsoft? A. Yes."), attached as Ex. 27 to Holley Aff.; *id.* at 51.) A court in

Utah expressly found that Novell tried to hide the truth about its assignment of its antitrust

claims against Microsoft, noting that "[t]he main purposes of this sale were to obligate Canopy

[Caldera's successor] to bring suit against Microsoft, to allow Novell to share in the recovery,

and at the same time to obfuscate Novell's role in the action against Microsoft." *Novell, Inc.* v.

*Canopy Group, Inc.*, 92 P.3d 768, 770 (Utah Ct. App. 2004).

On July 23, 1996, Novell and Caldera executed an asset purchase agreement by

which Novell transferred to Caldera "all of Novell's right, title, and interest in and to *any and all*

*claims or causes of action* held by Novell at the Closing Date and *associated directly or*

*indirectly* with any of the DOS Products or Related Technology." (Asset Purchase Agreement

§ 3.1 (emphasis added), attached as Ex. 1 to Holley Aff.) The term "DOS Products" was defined

to include Novell's PC operating systems DR DOS and Novell DOS, among other products. (*Id.*

§ 2.6.) "Related Technology" was defined as technology "that is necessary to the performance

by the DOS Products of their intended functions or purposes." (*Id.* § 2.11.)

The parties intended the Asset Purchase Agreement to transfer to Caldera all

causes of action that Novell believed it had against Microsoft arising out of Microsoft's allegedly

anticompetitive conduct in the PC operating system market (which Novell sometimes referred to

as the "desktop operating system market"). As Mr. Bradford made clear in an August 16, 1996

- 10 -

letter to one of the outside lawyers who helped prepare Novell's draft complaint, the lawsuit that

Caldera obtained from Novell was "for Microsoft's conduct to monopolize the Desktop

Operating System market." (Letter from David R. Bradford to Gary Reback, August 16, 1996,

attached as Ex. 28 to Holley Aff.) Mr. Bradford further explained that "[a]s part of the Asset

Purchase Agreement, Novell has promised to provide Caldera with our documents and files

related in any way to *any cause of action Novell may have had against Microsoft in this market*."

(*Id.* (emphasis added); *see also* Asset Purchase Agreement § 2.4, attached as Ex. 1 to Holley

Aff.) At his deposition in this action, Mr. Frankenberg similarly testified that Novell assigned to

Caldera the right to bring an antitrust lawsuit based on Microsoft's "activities" in "the operating

system marketplace." (Frankenberg Dep. at 46-47, attached as Ex. 25 to Holley Aff.)

**B.      Caldera's Lawsuit Against Microsoft**

      **1.      The Claims Asserted by Caldera**

          Caldera filed suit against Microsoft on July 23, 1996, the same day it purchased

Novell's antitrust claims. Caldera was represented by a team of law firms that Novell had

assembled, including Snow Christensen, the same firm that had prepared Novell's draft

complaint. (Love Dep. at 35 (Novell General Counsel David Bradford "had even gone so far as

to line up the entire legal team" that would represent Caldera), attached as Ex. 26 to Holley Aff.;

Hill Decl. ¶ 4 ("When Novell decided it could not bring the antitrust case against Microsoft,

Mr. Bradford suggested that the three law firms contact Caldera . . . ."), attached as Ex. 8 to

Holley Aff.) Indeed, Caldera's complaint was based on the Novell draft complaint. (*Compare*

Complaint, *Caldera* (D. Utah July 23, 1996), attached as Ex. 29 to Holley Aff., *with* Novell Draft

Compl, attached as Ex. 10 to Holley Aff.) Although the complaint filed by Caldera omitted the

references to Novell's applications that were in the Novell draft complaint, Stephen Hill, the

lawyer who drafted both complaints, testified that the two complaints "state the same claims."

(Hill Decl. ¶ 5, attached as Ex. 8 to Holley Aff.)  On February 12, 1998, Caldera filed an

amended complaint.  In the amended complaint, Caldera added allegations relating to

Windows 95. (*See, e.g.*, First Amended Complaint, *Caldera* (D. Utah February 12, 1998)

("Caldera Amended Compl.") ¶ 61, attached as Ex. 30 to Holley Aff.)

Caldera alleged that Microsoft violated sections 1 and 2 of the Sherman Act, and

sought to recover damages for Microsoft's allegedly anticompetitive conduct in the PC operating

system market.[1]  Caldera claimed that Microsoft (i) gave internal applications developers "early

access" to APIs exposed by Microsoft's new PC operating systems (Caldera Amended Compl.

¶ 67(b), attached as Ex. 30 to Holley Aff.); (ii) "chang[ed] APIs, or refus[ed] to support certain

APIs" in Microsoft's PC operating systems to render competitors' complementary products

technologically incompatible (*id.* ¶ 67(c)) and (iii) made it difficult for PC manufacturers (known

in the industry as original equipment manufacturers, or "OEMs") to license software products

offered by Microsoft competitors. (*Id.* ¶¶ 3(a)-(e), 67(d); *see also* p. 27, *infra.*)  One of Caldera's

most significant allegations was that Microsoft's release of Windows 95 was, in and of itself,

---

[1]     Although Caldera's amended complaint refers to a purported "DOS Market" (Caldera
Amended Compl. ¶ 1, attached as Ex. 30 to Holley Aff.), that market is the same as the PC
operating system market at issue in this action. (*Compare id.* ¶ 1 (defining "DOS Market" as
"MS-DOS operating system software and functionally-equivalent software . . . designed to run
on personal computers using Intel x86 or Intel x86-compatible microprocessors"), *with*
Complaint ¶ 25 (defining the relevant market as "operating systems . . . designed to control PCs
that feature microprocessors designed and manufactured by Intel Corporation ('Intel') or other
companies whose processors are compatible with Intel's"), attached as Ex. 31 to Holley Aff.)
Indeed, this Court has noted that "DOS was a competitor" in the Intel-compatible PC
operating system market (Order of August 26, 2008, attached as Ex. 32 to Holley Aff.), and
Mr. Frankenberg, Novell's former CEO, testified that DR DOS, MS-DOS and Windows 95 all
competed in the same market. (Frankenberg Dep. at 50-51, attached as Ex. 25 to Holley Aff.)
Even the complaint in the 1994 DOJ action, which Novell argues formed the basis of the
*Caldera* litigation, defines the relevant market as "personal computer operating systems for the
x86 class of microprocessors (hereinafter the 'PC operating system market')." (Complaint,
*United States* v. *Microsoft Corp.* (D.D.C. July 15, 1994) ¶ 13, attached as Ex. 33 to Holley Aff.)

anticompetitive because that new operating system technologically tied MS-DOS and Windows. (Caldera Amended Compl. ¶ 61.)  Caldera's complaint alleged that Microsoft's anticompetitive conduct spanned from 1992 through February 1998 (when Caldera's amended complaint was filed).  (*Id.* ¶ 59 (alleging "predatory practices throughout 1992 and up to the present day").)  In addition to damages, Caldera sought injunctive relief, including a court order requiring that Microsoft disclose "all APIs for any operating system it produces, as well as any modifications, enhancements, updates, or new versions of such operating systems at the time that such products are released for beta testing." (*Id.* at 31-32; *see also* pp. 31, 44, *infra.*)

Caldera also alleged (as Novell now does) the existence of an applications barrier to entry that protected Microsoft's monopoly in the PC operating system market.  Among several "interrelated barriers to entry and expansion" that protected Microsoft's PC operating system monopoly, Caldera identified "the absence of a variety of high quality applications that run on a new operating system, and the difficulty of convincing independent software . . . vendors to develop such applications," and "the lack of a sizable installed base of users" for new operating systems.  (Caldera Amended Compl. ¶ 68, attached as Ex. 30 to Holley Aff.)  Caldera claimed that these factors "magnify and reinforce each other" because "ISVs . . . tend to develop applications for operating systems with a large installed base of users, and consumers gravitate towards operating systems with a large base of applications." (*Id.* ¶ 69.)  This is the same applications barrier to entry that is alleged in this action. *See Novell, Inc.* v. *Microsoft Corp.*, 505 F.3d 302, 306 (4th Cir. 2007) ("[T]he 'applications barrier to entry'—stems from two characteristics of the software market: (1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base.").

**2.      Novell's Participation in the *Caldera* Litigation**

Novell's involvement in the *Caldera* litigation did not end upon filing of the

complaint.  Snow Christensen, Novell's regular outside counsel and the law firm Caldera hired at

Novell's request to prosecute its claim against Microsoft, continued to communicate with Novell

about the *Caldera* litigation.  In an e-mail exchange in February 1997, Novell General Counsel

David Bradford and Stephen Hill of Snow Christensen strategized about how to respond to

Microsoft's discovery requests in that action.  (E-mail from David Bradford to Stephen Hill,

February 28, 1997, attached as Ex. 34 to Holley Aff.)  Mr. Bradford also consulted on other

aspects of litigation strategy, on several occasions suggesting witnesses who could provide

helpful testimony for Caldera.  (*See* Letter from David R. Bradford to Stephen J. Hill, March 31,

1998, attached as Ex. 35 to Holley Aff.; Fax from Sherise Crosby of Novell to Steve Hill, August

9, 1996 at 1 (handwritten note from "David B." to "Steve" suggesting that a Novell employee

"would be a good one to speak to"), attached as Ex. 36 to Holley Aff.; *see also* Fax from Renata

M. Sos to Stephen J. Hill, August 21, 1996 at 3 (noting, as to a potential witness to be

interviewed by Caldera's lawyers, that "David Bradford says don't start with her"), attached as

Ex. 37 to Holley Aff.)  In one instance, Mr. Bradford told Mr. Hill that a particular witness

"would be very useful for the cause of Caldera (and Novell)."  (Ex. 35 to Holley Aff.)

Novell also provided Caldera with assistance from its employees with the lawsuit.

In a May 1998 e-mail to Novell employee Henry Huang, Mr. Bradford wrote that "Novell

Corporate is supportive of Caldera's efforts" in the litigation and told Mr. Huang, "I would

encourage you to meet with these lawyers and provide the necessary assistance."  (E-mail from

David Bradford to Geoff Boorman, Henry Huang and Ralph Liu, May 11, 1998, attached as Ex.

38 to Holley Aff.; *see also* E-mail from David Bradford, September 3, 1998, attached as Ex. 39

to Holley Aff.)  Upon learning that Mr. Huang's supervisor had approved his time away from the

office to meet with Caldera's lawyers, Mr. Bradford thanked the supervisor and remarked, "Confidentially, this one will pay off big for Novell someday." (Ex. 38 to Holley Aff.)

When Novell moved to intervene in the *Caldera* action to claim work product protection over certain documents requested by Microsoft from Caldera, it finally disclosed its interest in both the monetary and injunctive relief sought against Microsoft. At oral argument before the magistrate judge, Caldera's lawyer, speaking for Novell,[2] conceded that "Novell has a substantial financial stake in the outcome of this lawsuit." (Transcript of Oral Argument on Novell's Motion to Intervene, *Caldera*, July 16, 1998 ("July 16, 1998 Tr.") at 4, attached as Ex. 40 to Holley Aff.) Counsel further claimed that Novell had "an interest in the injunctive relief because it affects their business as a competitor of Microsoft, and I mean *in the software applications business*." (*Id.* at 21 (emphasis added).) The magistrate judge acknowledged Novell's economic interest in the litigation but, apparently under the impression that "the litigation feature of the sale is not the most prominent or substantial part of the relationship between Caldera and Novell" (*id.* at 19), found that "Novell has only the most tangential, residual, economic interest in the outcome of the litigation." *Caldera, Inc.* v. *Microsoft Corp.*, 181 F.R.D. 506, 507 (D. Utah 1998). Mr. Bradford disagreed with the court's decision, writing to Mr. Hill, "If I know anything about the law, sounds like the judge was flat out wrong— particularly since we DO have a very real financial interest in the case." (E-mail from David Bradford to Stephen Hill, July 29, 1998, attached as Ex. 41 to Holley Aff.) In any event, the magistrate judge's statement was based on what was publicly known in 1998 about Novell's role

---

[2]   Caldera's lawyer represented both Caldera and Novell at oral argument. (*See* Transcript of Oral Argument on Novell's Motion to Intervene, *Caldera*, July 16, 1998 at 3 (Caldera's lawyer argued Novell's motion to intervene, telling the court, "I've been asked to speak by Novell's counsel"), attached as Ex. 40 to Holley Aff.)

in the *Caldera* litigation. Subsequent events, particularly testimony in the *Canopy Group*

litigation, demonstrate that Novell played a critical role in the lawsuit, and indeed that the

*purpose* of the sale to Caldera was to initiate the antitrust lawsuit against Microsoft while

obfuscating Novell's role in it. *Canopy Group*, 92 P.3d at 770.

### 3.    The Settlement of the *Caldera* Litigation

Novell's involvement in the *Caldera* litigation extended as far as the settlement

negotiations with Microsoft. In response to a news article reporting that "Novell has been privy

to the settlement talks" and that "the sides are pretty close to agreement," Mr. Bradford

commented that the journalist's "[i]nsight on a potential settlement is not far off." (E-mail from

David Bradford to Novell employee Peter Troop, January 7, 2000 at 1-2, attached as Ex. 42 to

Holley Aff.) When the litigation was settled in January 2000, Caldera released Microsoft from

all claims and liability "associated directly or indirectly" with the PC operating system business

that Caldera had purchased from Novell and any liability "relate[d] directly or indirectly to the

facts alleged in" the *Caldera* litigation. (Caldera Settlement Agreement ¶ 6, attached as Ex. 2 to

Holley Aff.) This broad release covered "the Novell Claims and all claims asserted, or that could

have been asserted, in the [*Caldera*] Action." (*Id.* ¶ 2.)

Microsoft paid $280 million to Caldera to settle the case, and $35.5 million of the

settlement proceeds were provided by Caldera to Novell as a so-called "royalty." (Complaint,

*Canopy Group* (4th Judicial District Court, Utah County, filed June 16, 2000) ¶¶ 16, 26-28,

attached as Ex. 43 to Holley Aff.; Ruling on Novell's motion for partial summary judgment,

*Canopy Group* (August 14, 2002) at 2, attached as Ex. 44 to Holley Aff.) Dissatisfied with that

amount, Novell filed suit in June 2000 against Caldera (succeeded by The Canopy Group),

alleging that Novell was entitled to even more. *Canopy Group*, 92 P.3d at 770-71. Novell

ultimately prevailed, adding $17.7 million to its share of the monies paid by Microsoft to

Caldera, for a total of more than $53 million. (Judgment, *Canopy Group* (filed February 10, 2003) at 1, attached as Ex. 45 to Holley Aff.)

**C.      Novell's Claims in this Action**

Novell filed this action in November 2004, seeking to recover from Microsoft for alleged harm to WordPerfect and Quattro Pro. (Complaint ("Novell Compl."), attached as Ex. 31 to Holley Aff.) Novell's complaint originally contained six counts. Counts II through V were based on allegations of anticompetitive conduct by Microsoft in putative markets for word processing and spreadsheet applications. Those counts were dismissed by this Court in 2005 as untimely, and in 2007 that dismissal was affirmed on appeal. *Novell, Inc.* v. *Microsoft Corp.*, 2005 WL 1398643 (D. Md. June 10, 2005), *aff'd*, 505 F.3d 302 (4th Cir. 2007). Counts I and VI allege anticompetitive conduct by Microsoft in "the market for Intel-compatible PC operating systems" (Novell Compl. ¶ 24, attached as Ex. 31 to Holley Aff.), the same market that was the subject of Caldera's lawsuit against Microsoft. (*See* pp. 45-46, *infra*.)

Count I alleges that "Microsoft willfully and wrongfully obtained and maintained its monopoly power in the Intel-compatible operating systems market" in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, *i.e.*, the same cause of action asserted in the first count of the Caldera complaint.[3] (Novell Compl. ¶ 153, attached as Ex. 31 to Holley Aff.; Caldera Amended Compl. ¶¶ 72-75, attached as Ex. 30 to Holley Aff.) To do so, Novell alleges that Microsoft "engag[ed] in anticompetitive conduct designed to thwart the development of products that

_____

[3]     Count I of the complaint in this action is styled "Monopolization of the Intel-Compatible Operating System Market." (Novell Compl. at 62, attached as Ex. 31 to Holley Aff.) The first count of the *Caldera* complaint was styled "Monopolization of DOS Market (Violation of Sherman Act, Section 2)." (Caldera Amended Compl. at 25, attached as Ex. 30 to Holley Aff.) In each case the allegedly monopolized market is the same: the market for Intel x86-compatible PC operating systems. (*See* pp. 45-46, *infra*.)

threatened to weaken the applications barrier to entry" (Novell Compl. ¶ 153, attached as Ex. 31 to Holley Aff.)—specifically, that Microsoft took various actions in connection with development of Windows 95 that "delayed" and "degraded the functionality" of the versions of WordPerfect and Quattro Pro that Novell was developing for use with Windows 95. (*Id.* ¶ 78.)

Count VI alleges that Microsoft entered into exclusionary contracts with OEMs in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, *i.e.*, the same cause of action asserted in the third count of the Caldera complaint. (Novell Compl. ¶¶ 174-77, attached as Ex. 31 to Holley Aff.; Caldera Amended Compl. ¶¶ 86-92, attached as Ex. 30 to Holley Aff.) In particular, Novell alleges that Microsoft entered into "agreements with OEMs and others not to license or distribute Novell's office productivity applications or to do so only on terms that materially disadvantaged these products." (Novell Compl. ¶¶ 175, attached as Ex. 31 to Holley Aff.) According to Novell's expert on antitrust economics, Professor Roger Noll, although "OEMs had not been an important distribution channel for WordPerfect Corporation," they were important for Novell's office productivity applications when Windows 95 was released because "Novell intended to distribute office productivity software with DR DOS." (Noll Reply Report at 58-59, attached as Ex. 6 to Holley Aff.)

Novell asserts that its present claims arise out of a "single continuous campaign" by Microsoft "in pursuit of a single anticompetitive objective, namely the destruction of Novell" in order "to maintain its monopoly in the PC operating systems market." (Novell Compl. ¶ 22, attached as Ex. 31 to Holley Aff.) This supposed campaign to "slaughter" Novell "dates to at least the early 1990s" (*id.* ¶ 22) and encompasses Microsoft's alleged anticompetitive conduct against DR DOS. For example, Novell alleges that in furtherance of its campaign, Microsoft "increas[ed] Novell's reliance on Windows" by "suppress[ing] . . . competing and potentially

- 18 -

competing operating systems (such as Novell's own DR-DOS . . . )," thereby "depriv[ing] Novell of alternative platforms for its office productivity applications." (*Id.* ¶ 144.)  Professor Noll claims that DR DOS, WordPerfect and Quattro Pro were part of an "array of software products" that allowed Novell to "pose[] a serious potential threat[] to Microsoft's monopoly power in PC operating systems."  (Noll Report at 7-8, attached as Ex. 5 to Holley Aff.)  According to Professor Noll, Microsoft made Novell "a target" because of this combined threat.  (*Id.* at 89.)

**D.**     **Microsoft's Motion to Dismiss Counts I and VI on the Ground that Novell Sold Them to Caldera**

On January 7, 2005, Microsoft moved to dismiss the complaint.  As to counts I and VI, which concern competition in the PC operating system market, Microsoft argued that Novell did not own those claims, having sold them to Caldera in 1996, and therefore was not the real party in interest in this action.[4]  (Brief of Appellant Microsoft Corporation, April 13, 2006 ("Microsoft Fourth Circuit Brief") at 5-6, attached as Ex. 46 to Holley Aff.)  On June 10, 2005, the Court declined to dismiss on that ground, holding that Microsoft had not yet "presented" evidence that "simply because DOS competed in the operating system market," Novell's present claims are among the claims "associated directly or indirectly" with DR DOS that were sold to

---

[4]     Microsoft also moved to dismiss counts I and VI on the ground that Novell lacked antitrust standing to assert claims for harm to competition in the PC operating system market (because Novell's word processing and spreadsheet applications did not compete in that market). (Microsoft Fourth Circuit Brief at 2, attached as Ex. 46 to Holley Aff.)  The Court denied Microsoft's motion on this ground, and the Fourth Circuit affirmed, noting that Novell's theory for counts I and VI was that Microsoft's conduct in relation to word processing and spreadsheet applications was "intended to and did restrain competition in the PC operating-system market by keeping the barriers to entry into that market high." *Novell, Inc.* v. *Microsoft Corp.*, 505 F.3d 302, 316 (4th Cir. 2007).  Microsoft also argued that count VI was barred by the statute of limitations, but this Court held that it was not. *Novell, Inc.* v. *Microsoft Corp.*, 2005 WL 1398643, at *1 (D. Md. June 10, 2005).

Caldera.[5] *Novell, Inc.* v. *Microsoft Corp.*, 2005 WL 1398643, at *1 (D. Md. June 10, 2005).  Of course, there had been no discovery at that time.

### E.    Novell's 2008 Motion for Summary Judgment and Microsoft's Motion to Compel

On July 15, 2008, Novell moved for summary judgment on Microsoft's real-party-in-interest, estoppel, waiver, accord-and-satisfaction, *res judicata* and collateral estoppel defenses.  On August 8, 2008, Microsoft filed a motion to compel Novell "to produce documents responsive to Microsoft's requests concerning Novell's 1996 sale of antitrust claims . . . to Caldera" (Microsoft's Memorandum in Support of its Motion to Compel Production of Documents, August 8, 2008 at 1, attached as Ex. 47 to Holley Aff.), and on August 22, 2008, Microsoft filed its opposition to Novell's motion for summary judgment, arguing in part that Novell's motion was premature in light of the need for further discovery on the issues raised by Novell's motion.  (Microsoft's Memorandum in Opposition to Novell's Motion for Summary Judgment on Six Defenses, August 22, 2008 at 2-3, attached as Ex. 48 to Holley Aff.)

On August 26, 2008, this Court granted Microsoft's motion to compel, ordering discovery on the sale of Novell's claims to Caldera.  In its discussion, the Court observed:

> Counts I and VI assert claims for harm allegedly caused by Microsoft to Novell's application software products for the purpose of obtaining and maintaining Microsoft's monopoly power in the Intel-compatible operating systems market.  DOS was a competitor in that market, and it too may thus also have been harmed by Microsoft's alleged anti-competitive conduct against Novell's application software products.  Therefore, depending

---

[5]    The Court's opinion on the motion to dismiss refers only to count I in its analysis of whether Novell sold its PC operating system claims to Caldera, presumably because Novell's brief on the motion to dismiss did not argue that count VI pertained to that market.  The first time Novell described count VI as claiming harm to competition in the PC operating system market was at oral argument in June 2005, at which point Microsoft's counsel immediately responded that if that were so, then count VI should be dismissed on the ground that Novell does not own the claim.  (*See* June 7, 2005 Tr. at 20-21, attached as Ex. 4 to Holley Aff.)

> upon how the term "indirectly" in the assignment from Novell to
> Caldera is construed, it may be that the claims asserted by Novell
> in Counts I and VI are "associated directly or indirectly with any of
> the DOS Products or Related Technology."

(Order of August 26, 2008, attached as Ex. 32 to Holley Aff.)  The Court, "having ordered

discovery on the issues raised by Novell's motion for partial summary judgment," denied

Novell's summary judgment motion "without prejudice to being renewed after discovery on the

issues has been completed."  (Order of August 28, 2008, attached as Ex. 49 to Holley Aff.)

**F.      Novell's Present Motion**

    In its renewed motion for summary judgment, Novell argues that Microsoft's

real-party-in-interest defense fails because Novell's 1996 assignment of its antitrust claims to

Caldera—for anticompetitive conduct in and monopolization of the PC operating system

market—encompassed only claims for harm to the DR DOS business and excluded claims for

harm to Novell's applications, such as WordPerfect and Quattro Pro.  (Novell Mem. at 14.)

Novell further argues that Microsoft's *res judicata* defense fails because (i) Novell does not fall

under one of the recognized exceptions for nonparty claim preclusion (*id.* at 23) and (ii) the

claims asserted in the *Caldera* action do not arise out of the same cause of action as Novell's

remaining claims in this action.  (*Id.* at 27.)  These arguments are dead wrong.  As demonstrated

below, Novell assigned to Caldera all of its claims arising out of Microsoft's conduct that had an

effect on DR DOS and, more broadly, all of its claims arising out of anticompetitive conduct in

the PC operating system market.  Even if Novell had not assigned its present claims to Caldera, it

would be prevented as a matter of law from asserting them now, having impermissibly split its

cause of action by virtue of the partial assignment.

**ARGUMENT**

## I.  The Standard for Granting Summary Judgment

Although Novell is correct that Microsoft bears the burden of establishing its affirmative defenses, including *res judicata* (Novell Mem. at 11 (citing *United States* v. *Mooney*, 497 F.3d 397, 408 n.2 (4th Cir. 2007))), a real-party-in-interest defense is not an affirmative defense, and thus Novell bears the burden of showing that it is the real party in interest. *OSRecovery, Inc.* v. *One Groupe Int'l, Inc.*, 380 F. Supp. 2d 243, 246 (S.D.N.Y. 2005) ("The plaintiff bears the burden of 'show[ing] that he has a substantive right to recover and thus is the real party in interest.'" (quoting 20 Charles A. Wright et al., FEDERAL PRACTICE & PROCEDURE DESKBOOK § 75 (2002))).  Novell cannot meet that burden, and certainly has not done so in its renewed motion for summary judgment.

Summary judgment should be granted where "there is no genuine issue as to any material fact" and the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The defendant may prevail on its motion for summary judgment and establish an affirmative defense when it has produced 'credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial.'" *Brinkley* v. *Harbour Recreation Club*, 180 F.3d 598, 614 (4th Cir. 1999) (citation omitted). "When the defendant produces such evidence supporting its affirmative defense, the burden of production shifts back to the plaintiff who 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (citation omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not significantly probative.'" *Id.* (citation omitted).

On a matter of contract interpretation, such as the question of whether Novell's asset purchase agreement with Caldera assigned the claims asserted in counts I and VI, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Wash. Metro. Area Transit Auth.* v. *Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007).

II.     **Novell Sold Its Present Claims to Caldera and Is Not a Real Party in Interest**

Having sold its antitrust claims relating to the PC operating system market to Caldera, Novell is not a real party in interest under Fed. R. Civ. P. 17(a), and accordingly is precluded from bringing those claims again here. *See In re Maco Homes, Inc.*, 180 F.3d 163, 165-66 (4th Cir. 1999) (holding that plaintiff who had assigned away its legal interest in the action was not a real party in interest); IIA Philip E. Areeda et al., ANTITRUST LAW ¶ 362a (3d ed. 2007) ("[T]he assignor [of an antitrust claim] gives up its right to sue to the extent of the assignment."); 4 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE § 17.11[1][a] (3d ed. 2009) ("Under a valid assignment, the assignee of a claim becomes the real party in interest for that claim. . . . The assignor cannot sue on the claim.").

A.     **The Asset Purchase Agreement Unambiguously Assigned Novell's Present Claims to Caldera**

By contract, Novell transferred to Caldera "all of Novell's right, title, and interest in and to *any and all claims or causes of action* held by Novell at the Closing Date and *associated directly or indirectly* with any of the DOS Products or Related Technology." (Asset Purchase Agreement § 3.1 (emphasis added), attached as Ex. 1 to Holley Aff.)  The term "DOS Products" was defined to include DR DOS and Novell DOS, Novell's two PC operating systems. (*Id.* § 2.6.)  The claims remaining in this case, which allege that Microsoft engaged in anticompetitive conduct in the same market during the same time period—and which arise out of

conduct that allegedly harmed the same product—as that at issue in the *Caldera* litigation, are

quite plainly encompassed by this language. *See Café Rio, Inc.* v. *Larkin-Gifford-Overton, LLC*,

207 P.3d 1235, 1240 (Utah 2009) ("Where the language within the four corners of the contract is

unambiguous, the parties' intentions are determined from the plain meaning of the contractual

language . . . .").[6] Any other interpretation of the assignment would ignore the import of the

phrase "directly or indirectly," which precludes the narrow reading advocated by Novell. *See id.*

(court must consider contract provisions "with a view toward giving effect to all and ignoring

none"). Novell asserts that "any natural reading" of the assignment encompasses only "the right

to bring claims for harms to" the DR DOS business (Novell Mem. at 14), yet fails to explain how

such a claim could be anything other than "associated directly" with DR DOS. Novell thus fails

to proffer a reasonable interpretation of the assignment that gives independent meaning to the

term "indirectly." *Cf. Café Rio*, 207 P.3d at 1240 ("ambiguity exists in a contract term or

provision if it is capable of more than one reasonable interpretation").

Once the term "indirectly" is taken into account, the meaning of the assignment

becomes apparent. The word "indirect" means "coming or resulting otherwise than directly or

immediately, *as effects or consequences*." RANDOM HOUSE WEBSTER'S UNABRIDGED

DICTIONARY (2d ed. 2001) (emphasis added). Thus, claims "associated indirectly" with

DR DOS must include—at a minimum—all claims arising out of conduct that had an effect on

DR DOS. (*Cf.* Order of August 26, 2008 (noting that the assigned claims may include counts I

and VI if DR DOS was "harmed by Microsoft's alleged anti-competitive conduct against

---

[6]     Utah law governs the interpretation of the Asset Purchase Agreement. (Asset Purchase
Agreement § 10.1, attached as Ex. 1 to Holley Aff.)

Novell's application software products"), attached as Ex. 32 to Holley Aff.)  By Novell's own

admission, counts I and VI meet that standard.

According to Novell, its present claims arise out of a "single continuous

campaign" by Microsoft to destroy Novell in order to maintain its PC operating system

monopoly.  (Novell Compl. ¶ 22, attached as Ex. 31 to Holley Aff.)  Novell's expert Roger Noll

asserts that Microsoft "target[ed]" Novell because of the threat to its monopoly posed by an

"array" of Novell software products that included DR DOS, WordPerfect and Quattro Pro.

(Noll Report at 7-8, 89, attached as Ex. 5 to Holley Aff.)  Counts I and VI allege that in order to

combat that threat, Microsoft engaged in anticompetitive conduct that harmed WordPerfect and

Quattro Pro, which in turn strengthened the applications barrier to entry that protected

Microsoft's PC operating system monopoly.  (Novell Compl. ¶¶ 42, 130, 153, attached as Ex. 31

to Holley Aff.; *see Novell*, 505 F.3d at 306.)  As the Fourth Circuit explained Novell's theory:

> Because of the network effects that favor already popular
> applications, Novell's applications' loss of market share could in
> turn lead to a decrease in demand for the competing operating
> systems that support these applications. Thus, WordPerfect and
> Quattro Pro's loss of market share would reduce the potential for
> Novell's products to enable an alternative operating system to
> surmount the applications barrier to entry and compete with
> Windows.

505 F.3d at 309.  This is the exact same applications barrier to entry that was alleged in the

*Caldera* litigation.  (*See* p. 13, *supra*.)  Moreover, it demonstrates that counts I and VI were

included in the assignment:  By Novell's own theory, the Microsoft conduct that allegedly

harmed WordPerfect and Quattro Pro reduced the potential for those products to enable DR DOS

to compete with Windows, and therefore also harmed DR DOS.  Indeed, Professor Noll claims

that Novell "intended to distribute" WordPerfect and Quattro Pro with DR DOS (Noll Reply

Report at 59, attached as Ex. 6 to Holley Aff.), and Novell's counsel acknowledged to this Court

that "when Novell bought WordPerfect," that enabled Novell to market DR DOS to OEMs on

the basis that Novell had versions of WordPerfect and Quattro Pro that were "compatible with

[its] operating system." (June 7, 2005 Tr. at 49, attached as Ex. 4 to Holley Aff.)  As Novell's

own antitrust economics expert implicitly asserts, the harm to WordPerfect and Quattro Pro

arising from Microsoft's alleged anticompetitive conduct would have hindered Novell's ability

to do so.  (*See* Noll Reply Report at 58-59 (OEMs were going to be "an important distribution

channel" for WordPerfect and Quattro Pro because Novell was going to distribute them as

complements to DR DOS), attached as Ex. 6 to Holley Aff.)  It is therefore clear that Novell's

present claims encompass conduct that—according to Novell's own theory—harmed DR DOS,

thus making those claims, at the very least, "associated indirectly" with DR DOS.

Beyond the fact that they arise out of conduct that harmed DR DOS, Novell's

present claims are associated with DR DOS in other ways.  For one, it is incongruous for Novell

to allege that its claims for harm to WordPerfect and Quattro Pro arise out of the same "single

continuous campaign" by Microsoft that also harmed DR DOS (Novell Compl. ¶ 22, attached as

Ex. 31 to Holley Aff.) while simultaneously contending that those claims are not "indirectly"

associated with DR DOS.  Moreover, Novell alleges that Microsoft's "suppression" of

DR DOS—presumably, by virtue of the conduct alleged in the *Caldera* litigation—"deprived

Novell of alternative platforms for its office productivity applications, increasing Novell's

reliance upon Windows." (Novell Compl. ¶ 144, attached as Ex. 31 to Holley Aff.)  It was this

reliance upon Windows that, Novell claims, allowed Microsoft to favor its own applications to

the detriment of WordPerfect and Quattro Pro.  (*Id.* ¶ 147.)  In other words, but for Microsoft's

allegedly anticompetitive conduct toward DR DOS, Microsoft would not have been in a position

to inflict the harm to WordPerfect and Quattro Pro alleged in counts I and VI. Those claims are thus "associated indirectly"—or even "directly"—with DR DOS.

A comparison of Novell's complaint in this action with the *Caldera* amended complaint further demonstrates why it is impossible to disassociate the claims asserted in counts I and VI from DR DOS. Novell's complaint here is primarily concerned with Windows 95, the same PC operating system that played a central role in the *Caldera* litigation. (*See, e.g.*, Novell Compl. ¶¶ 65-95, attached as Ex. 31 to Holley Aff.; Caldera Amended Compl. ¶ 61, attached as Ex. 30 to Holley Aff.) In addition, the anticompetitive conduct engaged in by Microsoft in the PC operating system market was, in each case, practically identical.

Novell here alleges, just as Caldera did in 1996, that Microsoft (i) changed APIs or removed them from its PC operating systems to render them incompatible with Novell's products (Novell Compl. ¶ 76, attached as Ex. 31 to Holley Aff.; Caldera Amended Compl. ¶ 67(c), attached as Ex. 30 to Holley Aff.); (ii) withheld technical information from Novell about Microsoft's new PC operating systems that prevented Novell's complementary products from being released in a timely fashion (Novell Compl. ¶ 79; Caldera Amended Compl. ¶ 3(g)); (iii) gave its own applications developers access to technical information about its PC operating systems that was unavailable to Novell or other developers (Novell Compl. ¶ 81; Caldera Amended Compl. ¶ 67(b)); and (iv) entered into contracts with OEMs that prevented them from installing Novell's products on their new PCs. (Novell Compl. ¶¶ 113-20; Caldera Amended Compl. ¶¶ 87-88.) On top of that, the time period at issue in both cases encompasses the same June 1994 to March 1996 period—when Novell owned WordPerfect and Quattro Pro and when Microsoft released Windows 95. (Novell Compl. ¶¶ 8, 37, 150; Caldera Amended Compl. ¶ 59.) Again, the close connection between the present claims and DR DOS is manifest. The Asset

Purchase Agreement unambiguously assigned counts I and VI to Caldera, and Novell cannot

meet its burden of showing otherwise. *See OSRecovery*, 380 F. Supp. 2d at 246.

> **B.     Alternatively, Extrinsic Evidence Shows that the Asset Purchase Agreement
> Assigned Novell's Present Claims to Caldera**

Even if the Court were to determine that the language of the assignment does not

unambiguously encompass the claims asserted in counts I and VI, extrinsic evidence shows that

Novell and Caldera intended it to do so.  Under governing Utah law (*see* Asset Purchase

Agreement § 10.1, attached as Ex. 1 to Holley Aff.), when the language of a contract is

ambiguous, the court may "consider extrinsic evidence of the parties' intent." *Café Rio*, 207

P.3d at 1240.  Here, such evidence demonstrates conclusively that the assignment was intended

to encompass all claims arising out of Microsoft's allegedly anticompetitive conduct in the PC

operating system market.

Evidence confirms that Novell viewed allegations of harm to WordPerfect and

Quattro Pro arising out of Microsoft's conduct in the PC operating system market to be

"associated" with DR DOS.  For example, on April 26, 1993, Novell filed a complaint against

Microsoft with the European Commission ("E.C.") alleging that Microsoft's allegedly

anticompetitive conduct was injuring Novell's PC operating system, DR DOS, as well as

WordPerfect, Quattro Pro and other office productivity applications.  (*See* Novell's Complaint to

the E.C., April 26, 1993 ¶¶ 9, 154-65, attached as Ex. 50 to Holley Aff.)  Specifically, Novell

argued that "Applications" were a relevant market (*id.* ¶¶ 71-75) and asserted that Microsoft "has

increasingly leveraged its dominance" in PC operating systems to increase its share of Windows-

based "general business applications." (*Id.* ¶ 87.)  The two principal methods that Microsoft

allegedly used to achieve this leveraging were (i) withholding technical information that

third-party applications developers needed to make their products compatible with Microsoft's

PC operating systems, which Novell called the "Technical Information Issue" (*Id.* ¶¶ 89(v), 112-18) and (ii) entering into license agreements with PC manufacturers that prevented them from installing non-Microsoft applications on their new machines, which Novell called the "Exclusionary Arrangements Issue." (*Id.* ¶¶ 89(vi), 119-22.) These are, of course, close analogues to counts I and VI of Novell's complaint in this action. Moreover, Novell alleged that Microsoft's failure to provide adequate information about its PC operating systems to third-party applications developers restricted the ability of other operating system vendors to compete in the marketplace. (*Id.* ¶ 118.) Novell also alleged that the effect of Microsoft's license agreements with PC manufacturers was "to consolidate its dominant position in the DOS Market, Windows Market and Microsoft Windows-compatible Applications Market" and thereby "deny access for competing suppliers to the marketplace." (*Id.* ¶ 122.) In other words, Novell's 1993 E.C. complaint claimed that Microsoft was leveraging its PC operating system monopoly into markets for office productivity applications, thereby causing harm not only to DR DOS but to WordPerfect, Quattro Pro and other applications as well.

Novell's internal deliberations about pursuing an antitrust lawsuit against Microsoft further confirm that Novell viewed the present claims as "associated" with DR DOS. In November 1994, Novell General Counsel David Bradford raised the idea of bringing a single "major antitrust action" against Microsoft for harm to DR DOS, WordPerfect and Quattro Pro. (Ex. 7 to Holley Aff. at 1.) Like the E.C. complaint, this action would allege that Microsoft "lock[ed] out Novell and DRI from the desktop operating system market" and in turn "unlawfully leveraged its operating monopoly to achieve an unfair competitive advantage in the applications market." (*Id.* at 2.) Mr. Bradford opined that the close linkage between the two sets of claims could prove a tactical advantage, speculating that "[w]ere a jury to find against

Microsoft in the desktop operating system monopoly they are very likely to piggyback their

decision for the applications market as well." (*Id.* at 3.) Novell's outside counsel, Stephen Hill

of Snow Christensen, drafted a complaint for Novell that included these claims against

Microsoft. (*See* Novell Draft Compl., attached as Ex. 10 to Holley Aff.) Seeking to "limit

Microsoft's ability to leverage its desktop PC monopoly position in a manner that gives it an

unfair advantage in the network operating system and desktop PC applications markets"

(Bradford April 12 Memo at 1, attached as Ex. 9 to Holley Aff.), the draft complaint requested

that Microsoft be required "to disclose to all software developers the APIs for any operating

system it produces, as well as any modifications, enhancements, updates, or new versions of such

operating systems at the time that such products are released for beta testing." (Novell Draft

Compl. at 33, attached as Ex. 10 to Holley Aff.) Making explicit the link between DR DOS and

harm to Novell's applications business, Mr. Bradford explained that "the destruction of DR DOS

provides . . . the best platform from which to insist on injunctive relief that can protect Novell's

interests in the future." (Bradford April 12 Memo at 2, attached as Ex. 9 to Holley Aff.) Such

relief would have addressed precisely the conduct at issue in count I of this action: Microsoft's

alleged manipulation of its operating system APIs to the detriment of WordPerfect and Quattro

Pro.

In June 1995, Novell attempted to obtain equivalent relief from Microsoft without

filing a lawsuit. In a letter to Microsoft CEO Bill Gates, Novell CEO Robert Frankenberg

threatened to bring a lawsuit against Microsoft for monopolizing the PC operating system market

and "leverag[ing] its dominant OS [operating system] position in the applications market,"

demanding that Novell's applications developers receive "equal access" to Microsoft's operating

system APIs. (Ex. 14 to Holley Aff. at 2-3; *see also* Ex. 16 to Holley Aff.) As an example of

how Microsoft leveraged its PC operating system monopoly—allegedly maintained through

conduct harmful to DR DOS—into the applications markets, Mr. Frankenberg cited "Microsoft's

refusal to fix certain bugs in Windows '95," which "cause[d] Novell applications to be

incompatible with Windows '95." (Ex. 14 to Holley Aff. at 2.)  That same conduct is at the heart

of count I in this action.  If anything, counts I and VI are *more* closely associated with DR DOS

than the monopoly leveraging claim outlined in Mr. Frankenberg's letter, as they allege harm to

competition in the PC operating system market, the very market in which DR DOS competed.

Novell ultimately decided to pursue the threatened lawsuit against Microsoft

through its proxy, Caldera.  Indeed, Mr. Hill, who drafted the Novell complaint and represented

Caldera in the ensuing litigation, has stated under oath that claims brought by Caldera were the

"same claims" contained in the Novell draft complaint.  (Hill Decl. ¶ 5, attached as Ex. 8 to

Holley Aff.)  Through that lawsuit, Caldera requested the same injunctive relief that Novell had

previously considered seeking.  (*Compare* Caldera Amended Compl. at 31-32, attached as Ex. 30

to Holley Aff., *with* Novell Draft Compl. at 33, attached as Ex. 10 to Holley Aff.)  Novell made

clear that although it no longer owned DR DOS and the associated antitrust claims, those

claims—and the requested relief—were inextricably linked with the alleged harm that Microsoft

had done to WordPerfect and Quattro Pro.  At a hearing on Novell's motion to intervene in the

*Caldera* action, the lawyer who spoke on behalf of Novell claimed that Novell had "an interest in

the injunctive relief because it affects their business as a competitor of Microsoft, and I mean *in*

*the software applications business*." (July 16, 1998 Tr. at 21 (emphasis added), attached as Ex.

40 to Holley Aff.)  If granted, the requested relief would have required Microsoft to disclose its

operating system APIs, including the namespace extension APIs that Novell alleges Microsoft

withheld information about in order to harm WordPerfect and Quattro Pro.  This confirms that in

1996 Novell understood that claims for harm to its office productivity applications were encompassed by the *Caldera* action attacking Microsoft's alleged monopolization of the PC operating system market.

Indeed, Novell believed—as shown by contemporaneous documents—that it had a single cause of action against Microsoft for anticompetitive conduct in the PC operating system market. In an April 1995 memorandum to the company's board of directors, David Bradford explained that Novell's draft complaint reflected "a proposed legal strategy to limit Microsoft's power (both current and future) and to obtain damages from Microsoft for their anti-competitive conduct as it relates to its monopolization of the desktop operating system market." (Bradford April 12 Memo at 1, attached as Ex. 9 to Holley Aff.) This is what count I of Novell's current complaint seeks as well. Similarly, in an April 1996 memorandum, Mr. Bradford referred to a contemplated lawsuit for "Microsoft anticompetitive conduct in the DOS marketplace." (Memorandum from David R. Bradford to file, April 1, 1996, attached as Ex. 51 to Holley Aff.) A May 1996 memorandum from Mr. Hill to Bradford regarding the sale of DR DOS and Novell's antitrust claims contains handwritten notes, apparently written by Mr. Bradford in preparation for a presentation to the board (*see* p. 8, *supra*), stating, "Most of you are familiar w/ Novell's case against M/S for monop of the P.C. O.S. market." (Ex. 21 to Holley Aff. at 1.) In an August 1996 letter to one of the lawyers who helped prepare Novell's draft complaint, Bradford described the *Caldera* action as "a lawsuit against Microsoft for Microsoft's conduct to monopolize the Desktop Operating System market," and noted that as part of the sale of claims to Caldera, "Novell has promised to provide Caldera with our documents and files related in any way to any cause of action Novell may have had against Microsoft *in this market*." (Ex. 28 to Holley Aff. (emphasis added).)

- 32 -

Mr. Bradford's characterization of the transferred claims was echoed by Mr. Frankenberg at his deposition in this action.  Despite Novell's assertion that Mr. Frankenberg "denied that he intended to assign anything other than the DR-DOS Claim" (Novell Mem. at 21)—which Novell defines narrowly as "the injuries [Microsoft] caused to the DR-DOS business" (*id.* at 4)—Mr. Frankenberg in fact testified that Novell assigned to Caldera the right to bring an antitrust lawsuit for Microsoft's "activities" in "the operating system marketplace."  (Frankenberg Dep. at 46-47, attached as Ex. 25 to Holley Aff.)  Novell's former CEO thus agrees that the assigned claims went beyond claims for harm to the DR DOS business itself; they also encompassed claims arising out of conduct in the PC operating system market that had a less "direct" connection to DR DOS.

Also telling is the context in which the Asset Purchase Agreement was negotiated.  According to Ryan Richards, an internal Novell lawyer, Novell was preparing to bring its present claims for "damage caused to Novell's business applications" back in May 1996—two months before it assigned its antitrust claims to Caldera.  (Affidavit of Ryan L. Richards, sworn to on April 23, 2009, ¶¶ 1, 4, 6, attached as Ex. 52 to Holley Aff.)  Yet although Novell was aware of these claims at the time the Asset Purchase Agreement was negotiated, there is no indication in the contemporaneous documents, or indeed in the Asset Purchase Agreement itself, that the parties intended to carve out the present claims from the assignment.  This, too, demonstrates that Novell did not assign to Caldera only the part of its claim for anticompetitive conduct in the PC operating system market involving harm to DR DOS, while retaining the other part of the same cause of action for anticompetitive conduct in the same market that caused harm to Novell's office productivity applications.  Consistent with the legal prohibition on such claim

splitting, Novell sold the entire cause of action. *See Pueschel* v. *United States*, 369 F.3d 345,

355 (4th Cir. 2004) (claim splitting "frustrate[s] the goals of *res judicata*").

Against the clear language of the Asset Purchase Agreement and the

contemporaneous evidence, Novell argues that Caldera's failure in its lawsuit to assert claims for

harm to WordPerfect and Quattro Pro dispositively establishes that such claims were excluded

from the scope of the assignment. (*See* Novell Mem. at 18, 20.) This is wrong.[7] There is

nothing in the contemporaneous documents to indicate that Novell was retaining any antitrust

claims against Microsoft, and both Novell's documents and the testimony given by Novell

employees consistently refer to the antitrust lawsuit against Microsoft in the singular. (*See, e.g.*,

Ex. 7 to Holley Aff. at 1 ("a major antitrust action"); Bradford April 12 Memo at 3 ("Antitrust

claim against Microsoft"), attached as Ex. 9 to Holley Aff.; Ex. 16 to Holley Aff. ("antitrust

claim against Microsoft"); Ex. 19 to Holley Aff. at 1 ("cause of action against Microsoft"); Ex.

21 to Holley Aff. at 1 ("Novell's case against M/S for monop of the P.C. O.S. market");

Frankenberg Dep. at 48 ("a private antitrust suit against Microsoft"), attached as Ex. 25 to Holley

Aff.; Deposition of Novell Vice President of Corporate Development Robert Hicks, *Canopy

Group*, July 13, 2001 at 5 (Novell's "potential cause of action against Microsoft"), attached as

Ex. 53 to Holley Aff.)  Moreover, Novell was keen to hide its role in the case, and having

Caldera allege harm to Novell's applications would make it clear that Novell was behind

Caldera's lawsuit against Microsoft. (*See* pp. 8-10, *supra*.)  Yet Caldera *did* seek injunctive

---

[7]     Caldera may have thought that a claim for anticompetitive conduct in one market that
purportedly caused injury to products in an entirely different market was illogical or meritless, or
that—as shown in Microsoft's current motion for summary judgment, filed October 7, 2009—
such a claim was factually unsupportable.  Likewise, Novell may have decided to focus on its
strongest claims and eliminate claims of questionable validity, but any such tactical decision
cannot alter the true meaning of the contract.

relief that was designed to benefit Novell's applications—relief that Novell itself intended to pursue prior to the assignment. (*See* pp. 30-31, *supra*.)

Finally, Novell mischaracterizes the language of the Caldera Settlement Agreement. Although Novell correctly points out that the contract releases and discharges Microsoft from any claims "that have been asserted in the [*Caldera*] Action or that are based on, arise from or otherwise relate directly or indirectly to the facts alleged in the [*Caldera*] Action," it neglects to mention that this provision is preceded by the phrase "without limitation" and followed by the phrase "including without limitation the Novell Claims." (*See* Novell Mem. at 21; Caldera Settlement Agreement ¶ 6, attached as Ex. 2 to Holley Aff.) Similarly, Novell implies that the settled "Novell Claims" are limited to "all such claims formerly held by Digital Research, Inc.," again ignoring the words "without limitation." (*See* Novell Mem. at 21; Caldera Settlement Agreement at 1, attached as Ex. 2 to Holley Aff.) In fact, the "Novell Claims" are defined to be coextensive with the claims assigned by Novell to Caldera in the Asset Purchase Agreement. (*See* Caldera Settlement Agreement at 1 (defining "Novell Claims" as "any and all claims or causes of action . . . associated directly or indirectly" with DR DOS), attached as Ex. 2 to Holley Aff.) Thus, the language of the Caldera Settlement Agreement does not limit the scope of the assigned claims in the way Novell asserts.

As demonstrated above (*see* pp. 23-28, *supra*), the Asset Purchase Agreement unambiguously assigned to Caldera the claims now asserted by Novell in counts I and VI. Even if the language of the assignment were ambiguous, however, extrinsic evidence establishes that Novell sold its present claims to Caldera in 1996. *See Wash. Metro. Area Transit Auth.*, 476 F.3d at 235 ("[S]ummary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence.").

**C.      This Court Is Not Barred from Considering Microsoft's Interpretation of the Asset Purchase Agreement**

Realizing the weakness of its position, Novell attempts to prevent Microsoft from even offering an interpretation of the Asset Purchase Agreement.  To do so, Novell invokes a supposed "black letter rule" that, as a stranger to the Asset Purchase Agreement, Microsoft cannot offer its own interpretation of that agreement absent evidence of a disagreement between Novell and Caldera as to its meaning.  (Novell Mem. at 15.)  Novell is wrong for several reasons.

*First*, Novell's support for this proposition of law rests entirely on two unpublished decisions from district courts in Washington and Oregon and a Restatement provision—Restatement (Second) of Contracts § 201(1)—that has never been adopted in Utah.  (Novell Mem. at 15.)  Tellingly, Novell does not cite a single Utah case applying its supposed "black letter rule."  That is because Restatement (Second) of Contracts § 201(1) proposes that contracts should be interpreted according to a subjective standard based on the "mutual understanding" of the contracting parties, RESTATEMENT (SECOND) OF CONTRACTS § 201 cmt. c (1981), whereas the "vast majority of courts" apply an objective standard that "assign[s] a meaning to words according to external criteria."  11 Richard A. Lord, WILLISTON ON CONTRACTS § 31:1 (4th ed. 2009).  Utah follows the majority rule.  *See, e.g., Sears* v. *Riemersma*, 655 P.2d 1105, 1107-08 (Utah 1982) (interpreting a contract requires "giving an *objective and reasonable* construction to the contract as a whole" (emphasis added)).

*Second*, even if Novell's proposed rule were the law, it would be inapplicable here.  In order to bar a third party's interpretation of an agreement under the Restatement rule, it must be shown that "the parties have attached the same meaning to a promise or agreement or a term thereof."  RESTATEMENT (SECOND) OF CONTRACTS § 201(1).  Although Novell tries to shift the burden to Microsoft to show "evidence of a relevant disagreement between Novell and

Caldera" (Novell Mem. at 15), it is Novell's burden to show that the parties agreed that the present claims were not covered by the assignment, as it is Novell's burden to demonstrate that it still owns the claims. *See OSRecovery*, 380 F. Supp. 2d at 246. The very cases cited by Novell are in accord. *See Joplin Enters.* v. *Allen*, 1992 U.S. Dist. LEXIS 20762 (W.D. Wash. Dec. 15, 1992), at *2 (third-party interpretation barred in light of evidence presented by a party to the contract, including an averment by all contracting parties as to its meaning); *KKSN, Inc.* v. *Rogers*, 1993 U.S. Dist. LEXIS 7059 (D. Or. May 26, 1993) (third-party interpretation barred where all contracting parties were parties to the action and averred as to meaning of contract). Novell's self-serving assertion that the parties did not intend to assign the present claims falls far short of meeting this burden, particularly in light of the substantial contemporaneous evidence to the contrary.

## III.    Alternatively, Novell's Present Claims Are Barred by *Res Judicata*

The doctrine of *res judicata* (*i.e.*, claim preclusion) independently bars Novell from asserting its present claims. Having orchestrated, participated in and substantially benefited from the *Caldera* litigation, Novell cannot now bring another lawsuit against Microsoft arising out of the same core of operative facts. The present suit is an improper attempt by Novell to obtain a "second bite at the apple" by splitting its single cause of action arising out of Microsoft's alleged anticompetitive conduct in the PC operating system market.[8]  *See Pueschel*,

---

[8]     Novell claims that it is "black letter law" that "claim preclusion does not bar an action brought by an assignor on a 'partial assignment' even where the claims rest on the same facts." (Novell Mem. at 27 n.80.)  Restatement (Second) of Judgments § 55, upon which Novell relies, does not, however, address the present situation, in which the assignor retains an interest in the assigned claims. Having split its cause of action and retained an interest in both the assigned and purportedly retained claims, Novell is attempting to litigate the same cause of action twice—a result foreclosed by the established rule against claim splitting. *See Pueschel*, 369 F.3d at 355.
    Moreover, Novell does not cite a single case (let alone one in the Fourth Circuit) applying this supposed rule of "black letter law."  Novell instead misreads *Indian Coffee Corp.* v. *Procter*
                                                                                            *(footnote continued)*

369 F.3d at 355 (noting that the goals of *res judicata* would be frustrated if parties are allowed to

engage in artful pleading and claim splitting); *Waldman* v. *Village of Kiryas Joel*, 207 F.3d 105,

110 (2d Cir. 2000) (it is a "well-established rule that a plaintiff cannot avoid the effects of res

judicata by 'splitting' his claim into various suits"). Absent Microsoft's consent (which is

lacking here), such claim splitting is wholly impermissible. *See Keith* v. *Aldridge*, 900 F.2d 736,

740 (4th Cir. 1990).

For *res judicata* to preclude Novell's present claims, "three elements must be

present: (1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or

their privies, and (3) a subsequent suit based on the same cause of action." *Ohio Valley*

*Environmental Coalition* v. *Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009) (citation

omitted). Novell does not dispute that the stipulated judgment entered by the *Caldera* court upon

the settlement between Caldera and Microsoft (*see* Order of Dismissal, *Caldera*, January 10,

2000, attached as Ex. 54 to Holley Aff.; Stipulation, *Caldera*, January 10, 2000, attached as Ex.

55 to Holley Aff.) constitutes a "judgment on the merits" for the purposes of *res judicata*. *See*

*Arizona* v. *California*, 530 U.S. 392, 414 (2000) ("consent judgments ordinarily support claim

preclusion"). The other two elements of *res judicata* are also met in this case: (i) Novell and

Caldera were in privity by virtue of both Novell's assignment to Caldera of its antitrust claims

and Caldera's role as Novell's proxy in the *Caldera* litigation; and (ii) Novell's present claims

---

(*footnote continued*)
& *Gamble Co.*, 752 F.2d 891 (3d Cir. 1985), to "endorse" its preferred result. The Third Circuit
made no such endorsement. *Indian Coffee* merely supports the unremarkable proposition that
harm suffered by one party (*e.g.*, a parent corporation) gives rise to a separate claim from harm
suffered by a different party (its subsidiary). *See* 752 F.2d at 893-94. This principle is in no way
applicable to the present situation, in which both sets of claims arise from harm allegedly
suffered by Novell.

arise out of the same cause of action that was asserted in the *Caldera* litigation. As such, Novell is barred from asserting those claims here.

A.    **Novell and Caldera Were in Privity with Respect to the *Caldera* Litigation**

In *Taylor* v. *Sturgell*, 128 S. Ct. 2161 (2008), the Supreme Court held that claim preclusion against a nonparty is appropriate when, *inter alia*, (i) there was a pre-existing "substantive legal relationship" between the nonparty and a party to the prior action, such as the assignor and assignee of a claim; or (ii) the nonparty was "adequately represented by someone with the same interests" who was a party to the earlier action. *Id.* at 2172. The relationship between Novell and Caldera with respect to the *Caldera* litigation fits squarely within both of these categories.

1.    **The Substantive Legal Relationship Between Novell and Caldera Establishes Privity**

Even if Novell did not transfer to Caldera the claims asserted in counts I and VI, the parties would still be in privity by virtue of the substantive legal relationship that arose from the contract assigning the claims that *were* transferred. *See Taylor*, 128 S. Ct. at 2172. Under the terms of the deal (not all of which were reflected in the Asset Purchase Agreement), Caldera was obligated to sue Microsoft and share the proceeds of that lawsuit with Novell. *See Canopy Group*, 92 P.3d at 770. Such an agreement is enough to establish privity between Novell and Caldera because a substantive legal relationship that gives rise to privity "is one in which the parties to the first suit are somehow accountable to nonparties who file a subsequent suit raising identical issues." *Pelt* v. *Utah*, 539 F.3d 1271, 1290 (10th Cir. 2008). As the *Canopy Group* court found, Caldera was indeed contractually accountable to Novell for Novell's share of the proceeds from the *Caldera* litigation. The contractual relationship between Novell and Caldera meets the test articulated in *Taylor*. *See Pelt*, 539 F.3d at 1290 (noting that contractual

relationships qualify to establish privity); *see also Nationwide Mut. Fire Ins. Co.* v. *George V. Hamilton, Inc.*, 571 F.3d 299, 310-11 (3d Cir. 2009) (same).

## 2. Novell Was Adequately Represented in the *Caldera* Litigation

Novell is also bound by the *Caldera* litigation because it was "adequately represented" by Caldera, which had the "same interests" as Novell throughout the litigation. *Taylor*, 128 S. Ct. at 2172. Courts find privity based on a nonparty's adequate representation in a prior lawsuit where (i) "the interests of the nonparty and [its] representative are aligned"; and (ii) the party to the earlier suit "understood itself to be acting in a representative capacity." *Id.* at 2176. The undisputed facts establish both elements of this test.

*First*, by retaining a substantial stake in the claims it assigned to Caldera, Novell's interests in the *Caldera* litigation were indistinguishable from Caldera's. Indeed, when Novell moved to intervene in that action, it asserted an interest in both the monetary *and* injunctive relief sought by Caldera from Microsoft. (July 16, 1998 Tr. at 21, attached as Ex. 40 to Holley Aff.) This alignment of interests is clear. *See, e.g., Hunt* v. *Enzo Biochem, Inc.*, 2009 WL 1683990, at *7 (S.D.N.Y. June 15, 2009) (finding privity where plaintiffs' "share in any potential recovery in the [prior lawsuit] gave them a vested interest in that lawsuit").

*Second*, Caldera plainly understood that it was acting as Novell's representative in the *Caldera* litigation. Novell disingenuously claims that "[t]he only relationship between Caldera and Novell is recorded in the [Asset Purchase Agreement]" (Novell Mem. at 26), knowing full well that the *Canopy Group* court found that "[t]he main purposes of this sale were to obligate Canopy [Caldera's successor] to bring suit against Microsoft, to allow Novell to share in the recovery, and at the same time to obfuscate Novell's role in the action against Microsoft." *Canopy Group*, 92 P.3d at 770. The evidence that Caldera was acting on Novell's behalf is overwhelming: Caldera (i) asserted antitrust claims against Microsoft that had been formulated

- 40 -

by Novell, and sought the injunctive relief Novell wanted (*see* Bradford April 12 Memo at 1, attached as Ex. 9 to Holley Aff.); (ii) based its complaint against Microsoft on the draft complaint prepared by Novell (Hill Decl. ¶ 5, attached as Ex. 8 to Holley Aff.); (iii) was represented by a legal team that Novell assembled—including Novell's regular outside counsel, Snow Christensen (*id.* ¶ 4; Love Dep. at 35, attached as Ex. 26 to Holley Aff.); (iv) conferred with Novell's lawyers about litigation strategy (*see, e.g.*, Ex. 34 to Holley Aff.); and (v) kept Novell apprised of its settlement negotiations with Microsoft.  (*See* Ex. 42 to Holley Aff.)

As Novell concedes, Caldera believed it had the authority to settle all of the claims asserted in the *Caldera* litigation (Novell Mem. at 26)—authority that included the power to settle Novell's economic interests in those claims as well as Novell's interests in any potential injunctive relief.  Tellingly, in its settlement agreement with Microsoft, Caldera purported to settle all claims that "arise from or otherwise relate directly or indirectly to the facts alleged in the Action, including without limitation the Novell Claims" (Caldera Settlement Agreement ¶ 6, attached as Ex. 2 to Holley Aff.), and represented that it had "the right to settle and to release the claims hereunder without the consent or approval of Novell."  (*Id.* ¶ 14(a)(ii).)  Caldera thus understood it was settling Novell's residual interests in the *Caldera* litigation along with its own. Novell was adequately represented by Caldera in the *Caldera* litigation, and is now bound by the outcome of that litigation, pursuant to which Novell was paid more than $53 million.

### 3. Judicial Estoppel Does Not Bar Microsoft from Establishing Novell's Role in the *Caldera* Litigation

In desperation, Novell seeks to invoke the doctrine of judicial estoppel to prevent Microsoft from demonstrating the true nature of Novell's involvement in the *Caldera* litigation. (*See* Novell Mem. at 24.)  To do so, Novell points to the position that Microsoft adopted in 1998 in opposing Novell's effort to intervene in the *Caldera* litigation.  Unaware of Novell's deep

involvement at that time—due to Novell's deliberate "obfuscation" of the facts (as the Utah court later put it in the *Canopy Group* decision)—Microsoft took the position that Novell did not have a sufficient interest in the *Caldera* litigation to permit it to intervene.  This merely demonstrates that Novell's obfuscation had been effective.

Remarkably, while Novell seeks to bind Microsoft to statements made a decade ago in the *Caldera* litigation when Microsoft was ignorant of the true facts about Novell's participation in that case, Novell now takes a position that is diametrically opposed to the one it took in 1998 when seeking to intervene in the *Caldera* litigation.  During oral argument on Novell's motion to intervene, Novell's counsel argued strenuously that Novell had "a very real interest" in the *Caldera* litigation and that Novell was "deeply involved in the current lawsuit." (July 16, 1998 Tr. at 42, attached as Ex. 40 to Holley Aff.)

Judicial estoppel is only appropriate where a party has "intentionally misled the [previous] court to gain unfair advantage." *Zinkand* v. *Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (citation omitted).  "Without bad faith, there can be no judicial estoppel." *Id.*  Novell has presented no evidence that Microsoft acted in bad faith when it argued back in 1998—based on facts then available to it, before Novell's obfuscation was revealed—that Novell had only a remote interest in the *Caldera* litigation.  Applying judicial estoppel against Microsoft in these circumstances would be contrary to the doctrine's equitable nature.  *Cf. New Hampshire* v. *Maine*, 532 U.S. 742, 750 (2001) (holding that judicial estoppel is an equitable doctrine that should be "invoked by a court at its discretion").  The Court should not allow Novell to benefit from its own misleading course of conduct.  Having successfully "clouded" the fact that it was the moving force behind the *Caldera* litigation (as the court in Utah found), it is Novell that should be bound by the position it took in that case.

**B.**     **Novell's Present Claims Arise out of the Same Cause of Action Asserted in the *Caldera* Litigation**

Having been in privity with Caldera with respect to its lawsuit against Microsoft,

Novell is precluded from asserting any claims based on the same cause of action. *See Ohio*

*Valley Environmental Coalition*, 556 F.3d at 210.  That is, Novell cannot now bring claims that

"arise out of the same transaction or series of transactions or the same core of operative facts" as

the claims asserted in the *Caldera* litigation. *Pueschel*, 369 F.3d at 355.  Novell's present claims

arise out of Microsoft's allegedly anticompetitive conduct in the PC operating system market—

the same cause of action asserted in the *Caldera* litigation—and are therefore barred.

The Fourth Circuit has held that the factors to be considered when determining

whether two sets of claims arise out of the same cause of action include "their relatedness in

time, space, origin, or motivation, and whether, taken together, they form a convenient unit for

trial purposes." *Pittston Co.* v. *United States*, 199 F.3d 694, 704 (4th Cir. 1999) (citation

omitted).  By this measure, a comparison between Novell's claims and those asserted in the

*Caldera* litigation reveals a striking degree of similarity.  Both suits allege that Microsoft

engaged in anticompetitive conduct in the same market during the same time period, and both

suits arise out of conduct that allegedly harmed DR DOS. (*See* pp. 17-19, 23-28, *supra*.)

Moreover, the relief sought in the *Caldera* litigation was designed to protect *both* DR DOS *and*

the Novell office productivity applications for which Novell now claims damages (WordPerfect

and Quattro Pro).  Caldera sought injunctive relief requiring Microsoft to disclose its operating

system APIs, such as the namespace extension APIs at issue in count I of this action. (Caldera

Amended Compl. at 31-32, attached as Ex. 30 to Holley Aff.)  The lawyer who represented

Caldera and Novell at the hearing on Novell's motion to intervene in the *Caldera* litigation

acknowledged that such relief would benefit Novell's "software applications business." (July 16,

- 43 -

1998 Tr. at 21, attached as Ex. 40 to Holley Aff.)  Novell cannot bring a claim in the *Caldera*

litigation based on Microsoft's allegedly anticompetitive conduct in the PC operating system

market and seek injunctive relief that would benefit Novell's applications products, and then sue

again—a decade later—asserting a strikingly similar claim that seeks damages for purported

harm to those same products. *See Int'l Tel. & Tel. Corp.* v. *Gen. Tel. & Elecs. Corp.*, 369 F.

Supp. 316, 321-22 (M.D.N.C. 1973) (in seeking relief for antitrust claims, "a complainant may

pull both triggers together [seeking both injunctive and monetary relief], or he may pull either

one or the other.  However, he may not pull one trigger, wait until he sees if he has hit the target,

and then, even if successful, make the same target stand in the same position for another round of

target practice.").

      Although Novell argues that its remaining claims in this case differ from those

asserted in the *Caldera* action because "Caldera sought damages only for injuries to DR-DOS"

(Novell Mem. at 28), Novell cannot avoid *res judicata* by splitting its cause of action and

alleging harm to different products in successive lawsuits.  As the Fourth Circuit made clear in

*Harnett* v. *Billman*, "[c]laims may arise out of the same transaction or series of transactions even

if they involve different harms or different theories or measures of relief." 800 F.2d 1308, 1314

(4th Cir. 1986); *see also Anyanwutaku* v. *Fleet Mortgage Group, Inc.*, 85 F. Supp. 2d 566, 571

(D. Md. 2000).  Were the law otherwise, parties could "frustrate the goals of *res judicata* through

artful pleading and claim splitting given that [a] single cause of action can manifest itself into an

outpouring of different claims." *Pueschel*, 369 F.3d at 355 (internal quotes omitted).

      Moreover, Novell's argument fails to recognize that the essence of an antitrust

claim is not the product or products purportedly harmed, but rather the market in which

competition was allegedly injured.  The law is clear that in analyzing antitrust claims it is

necessary to consider the relevant market and "the defendant's ability to lessen or destroy competition" in that market. *Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 456 (1993). During the June 7, 2005 oral argument on Microsoft's motion to dismiss, Novell implicitly recognized this point, repeatedly emphasizing that count I of the complaint in this action was the "operating system count." (June 7, 2005 Tr. at 33-34, attached as Ex. 4 to Holley Aff.)  Novell's counsel also acknowledged that count I is based on allegations "that Microsoft used unlawful means to maintain the operating system monopoly" (*id.* at 34-35), and even asserted that (i) count I is "complaining about harm that was done to the PC operating system market" (*id.* at 48) and (ii) count VI relates to the PC operating system market, stating that the essence of the claim was that "Microsoft . . . leveraged its operating system monopoly by charging OEMs that did not cooperate." (*Id.* at 35.)

Novell also asserts now that its claims allege harm to a different market than that involved in *Caldera*.  According to Novell, its present claims relate to Microsoft's purported "Windows" monopoly, whereas the claims asserted in *Caldera* concerned Microsoft's purported "DOS" monopoly. (Novell Mem. at 29.)  In fact, both sets of claims relate to the same market— the market for Intel x86-compatible PC operating systems.  Although DOS was a character-based operating system and Windows was a graphical operating system—one that functioned first as a complement to DOS and then as a replacement for it—both products competed in that market, as Novell admits in its complaint. (*See* Novell Compl. ¶ 144 (Microsoft "increas[ed] Novell's reliance on Windows" by "suppress[ing] . . . competing and potentially competing operating systems (such as Novell's own DR-DOS . . .)"), attached as Ex. 31 to Holley Aff.; *id.* ¶ 31 ("Windows displaced MS-DOS and achieved monopoly power in the PC operating systems market").)  The complaint in the DOJ's 1994 action against Microsoft, which Novell argues

formed the basis of the *Caldera* litigation (Novell Mem. at 28), defines the relevant market as

"personal computer operating systems for the x86 class of microprocessors (hereinafter the 'PC

operating system market')." (Complaint, *United States* v. *Microsoft Corp.* (D.D.C. July 15,

1994) ¶ 13, attached as Ex. 33 to Holley Aff.) That is indistinguishable from the market alleged

in this action, which Novell defines as "operating systems . . . designed to control PCs that

feature microprocessors designed and manufactured by Intel Corporation ('Intel') or other

companies whose processors are compatible with Intel's." (Novell Compl. ¶ 25, attached as Ex.

31 to Holley Aff.; *cf.* Caldera Amended Compl. ¶ 1 (defining "DOS Market" as "MS-DOS

operating system software and functionally-equivalent software . . . designed to run on personal

computers using Intel x86 or Intel x86-compatible microprocessors"), attached as Ex. 30 to

Holley Aff.)

   Indeed, this Court has noted that "DOS was a competitor" in the Intel-compatible

PC operating system market (Order of August 26, 2008, attached as Ex. 32 to Holley Aff.), and

Robert Frankenberg, Novell's former CEO, testified that DR DOS, MS-DOS and Windows 95

all competed in the same market.  (Frankenberg Dep. at 50-51, attached as Ex. 25 to Holley Aff.)

In sum, Novell's attempt to distinguish the relevant market in this action from that at issue in

*Caldera* fails.

   Novell also ar gues that its present claims differ from those asserted in the *Caldera*

litigation because the "majority of the alleged technical conduct [alleged by Caldera] concerned

the relationship between Windows 3.1 and DR-DOS," while counts I and VI purportedly "arise

from the DOJ's later attempt, in 1998, to curb Microsoft's anticompetitive conduct with respect

to Windows 95 and Windows 98." (Novell Mem. at 28.)  Novell fails to mention that the

*Caldera* litigation drew on the same "applications barrier to entry" theory on which the

government premised its 1998 suit against Microsoft and on which Novell rests its instant

claims. (*Compare* Caldera Amended Compl. ¶¶ 68-69, attached as Ex. 30 to Holley Aff., *with*

*United States* v. *Microsoft*, 253 F.3d 34, 55 (D.C. Cir. 2001), *and Novell*, 505 F.3d at 306.)

Moreover, Windows 95 was at the center of the *Caldera* litigation (as it is here), in which

Caldera alleged that Microsoft's development and marketing of Windows 95 as a replacement

for both MS-DOS and Windows 3.1 destroyed customer demand for DR DOS as a standalone

product. (*See* pp. 12-13, *supra*.) Not only do the two lawsuits concern the same markets and

focus on the same Microsoft product, but the anticompetitive conduct allegedly engaged in by

Microsoft and the legal basis for challenging such conduct are essentially identical. Finally,

Novell sold its applications in 1996, and Windows 98 has nothing to do with this case.

Moreover, as shown above (*see* pp. 23-28, *supra*), Novell's office productivity

applications were so closely aligned with DR DOS during the relevant period that it is very

difficult to disassociate claims for harm to one from claims for harm to the other. Novell's

antitrust economics expert admits that Novell viewed WordPerfect and Quattro Pro as closely

linked to the success of DR DOS. (Noll Reply Report at 59, attached as Ex. 6 to Holley Aff.)

According to Novell, the potential of its PerfectOffice suite of office productivity applications to

become a middleware threat to Microsoft's PC operating system monopoly hinged on Novell's

ownership of DR DOS. (Deposition of Roger G. Noll, September 10, 2009 at 136 (PerfectOffice

"comes closer" to threatening Microsoft, "particularly before Novell discontinued DR DOS"),

attached as Ex. 56 to Holley Aff.) Indeed, the threat to Microsoft's position in PC operating

systems stemmed from Novell's "array of software products that included an operating system,

middleware and productivity applications," rather than from any single product. (Noll Report at

7-8, attached as Ex. 5 to Holley Aff.) Novell cannot show that the alleged harm to WordPerfect

and Quattro Pro—which purportedly strengthened the applications barrier to entry—did not

harm DR DOS.  Likewise, Novell cannot show that conduct purportedly eliminating DR DOS as

a competitor in the PC operating system market did not also reduce demand for Novell's office

productivity applications.  The alleged harm to Novell's products cannot be disaggregated

because DR DOS and Novell's applications were closely complementary products.

Finally, Novell itself thought that its claims for harm to DR DOS and its office

productivity applications would "form a convenient unit for trial purposes." *Pittston*, 199 F.3d at

704; *see also Anyanwutaku*, 85 F. Supp. 2d at 571 (courts consider "'whether . . . treatment [of

claims] as a unit conforms to the parties' expectations or business understanding or usage'")

(quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1982)).  In fact, Novell General

Counsel David Bradford thought that trying both sets of claims together would provide Novell

with a tactical advantage at trial.  (Ex. 7 to Holley Aff. at 3 ("Were a jury to find against

Microsoft in the desktop operating system monopoly they are very likely to piggyback their

decision for the applications market as well."); *see* p. 4, *supra*.)  This is a further indication that

the two sets of claims arise out of the same cause of action.

In short, Novell's present claims arise out of the same core of operative facts as

the claims asserted in the *Caldera* litigation:  Microsoft's alleged "single continuous campaign"

to destroy Novell in order "to maintain its monopoly in the PC operating systems market."

(Novell Compl. ¶ 22, attached as Ex. 31 to Holley Aff.)  Having taken the position that its claims

were all of a piece, Novell cannot now pretend that they are separate.  *Cf. Crystal Import Corp.*

v. *AVID Identification Sys., Inc.*, 582 F. Supp. 2d 1166, 1171 (D. Minn. 2008) (holding that two

antitrust claims were part of the same cause of action where plaintiff's "claim is just one segment

of a 'series of connected transactions' stemming from [defendant's] alleged campaign to

maintain monopoly power in the [relevant] market"). For purposes of *res judicata*, Novell's

claims are the "same claims" that were litigated in the *Caldera* action.

## CONCLUSION

Novell's motion for summary judgment should be denied, and Microsoft's

cross-motion for summary judgment should be granted.

Respectfully submitted,

By: _____
     G. Stewart Webb, Jr.
     (Fed. Bar. No. 00828)

Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052
Phone: (425) 706-8080
Facsimile: (425) 936-7329
rwallis@microsoft.com
steveaes@microsoft.com

VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, Maryland 21202
Phone: (410) 244-7565
Facsimile: (410) 244-7742
gswebb@venable.com

Mark M. Bettilyon
RAY QUINNEY & NEBEKER
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145
Phone: (801) 532-1500
Facsimile: (801) 532-7543
mbettilyon@rqn.com

David B. Tulchin
Steven L. Holley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Facsimile: (212) 558-3588
tulchind@sullcrom.com
holleys@sullcrom.com

*Attorneys for Microsoft Corporation*

November 13, 2009