# UNITED STATES DISTRICT COURT

# CONFIDENTIAL

------------------------------------------------------

NOVELL, INCORPORATED                    MDL Docket No. 1332

Plaintiffs,
v.

MICROSOFT CORPORATION,

Defendant.

------------------------------------------------------

# EXPERT REPORT OF
## Kevin M. Murphy, Ph.D

June 24, 2009

# Table of Contents

I.   **Introduction** ................................................................................................. 1
     A.  Assignment ........................................................................................... 1
     B.  Qualifications ........................................................................................ 2
     C.  Summary of Opinions ........................................................................... 4

II.  **Market Definition and Market Power** ............................................. 9
     A.  Operating Systems ................................................................................ 9
     B.  Web Browsers ...................................................................................... 12
     C.  Office Productivity Applications ........................................................ 13

III. **Framework for Analysis** ................................................................... 13

IV.  **PC Operating System Competition Would Not Have Been Greater If Novell's
     OPAs Had Been More Successful on the Windows Platform** .................. 14
     A.  The Government Economic Theory in Microsoft III ........................... 15
     B.  Professor Noll's Claim that Novell's OPAs Could Have Increased Operating
         Systems Competition Because They Were Cross Platform is Flawed ........................ 18
         i.   The Economic Theory of the Government Case in Microsoft III Was Based on
              the Implicit Assumption that Applications Could Not Reduce the Applications
              Barrier to Entry .................................................................................. 18
         ii.  Market Evidence Provides No Indication that Novell's OPAs Had a
              Significant Influence on PC Operating Systems Competition ............................. 19
         iii. Professor Noll's Argument is Internally Inconsistent ........................................ 21
     C.  Professor Noll's Claim that Novell's OPAs Contained Middleware that Would
         Reduce the Applications Barrier to Entry and Increase Operating System
         Competition Is without Merit .................................................................... 23
         i.   Market Evidence .................................................................................. 25
         ii.  The Technologies Bundled with Novell's APIs Did Not Attract ISV Support
              for Economic and Technical Reasons ...................................................... 27
              a.  Middleware Has Little Value when PC Operating System Markets Are
                  Concentrated .............................................................................. 27
              b.  OPAs Are Not a Natural Distribution Method for Middleware ....................... 28
              c.  Technical Limitations of Middleware and Novell's Technologies ................ 28
         iii. Professor Noll's Claims are Inconsistent With The Court's Finding in
              Microsoft III ......................................................................................... 31

V.   **The Challenged Conduct Did Not Cause Anticompetitive Harm to Novell's
     OPAs or Harm PC Operating System Competition, and It Benefited
     Consumers** ..................................................................................................... 31
     A.  Exclusionary Agreements ......................................................................... 32
         i.   The Alleged Conduct Did Not Harm Novell's OPAs .................................... 32
         ii.  The Alleged Conduct Did Not Prevent Novell's OPAs from Affecting PC
              Operating System Competition ............................................................. 34
              a.  The OEM Channel Has Never Been an Important Channel for OPA
                  Sales .......................................................................................... 35

i

      b.  Professor Noll Provides No Evidence that Windows Prices Were Higher for OEMs that Installed Competing OPAs ....................................................36

      c.  Prepaid Balances Did Not Exclude Competitors.............................................36

    iii. The Challenged Conduct Benefited Consumers...................................................38

      a.  MDAs Were Procompetitive .........................................................................38

      b.  Microsoft's Contracts Featuring Minimum Commitments Were Procompetitive..............................................................................................40

B.  Tying.............................................................................................................................41

    i.  None of the Alleged Ties Involved OPA Products ...............................................42

    ii.  The Challenged Conduct Had Procompetitive Effects..........................................43

      a.  Integration of Additional Software Functionality into Products Is Common in Markets Where There Are No Anticompetitive Concerns ..........43

      b.  Windows 95 Integration Was Procompetitive...............................................44

      c.  Integration of Web Browsing Functionality .................................................46

C.  Technical Allegations .................................................................................................47

    i.  Much of the Conduct Was Unrelated to OPAs during the Period Novell Owned WordPerfect .............................................................................................47

    ii.  Microsoft's Decision Not to Document Formally the Namespace Extension APIs Did Not Cause Anticompetitive Harm to Novell's OPAs.............................49

    iii. Deciding Not to Formally Document APIs and Limiting Access to Source Code is Procompetitive ........................................................................................52

D.  Inaccurate and Misleading Product Information .........................................................53

    i.  The Alleged Conduct Did Not Harm Novell.......................................................54

    ii.  The Conduct Did Not Prevent Novell's OPAs from Increasing PC Operating System Competition and Was Procompetitive .....................................................55

      a.  The OS/2 "headfake".....................................................................................55

      b.  Applications FUD...........................................................................................59

      c.  Windows 95 Logo Program...........................................................................61

E.  Conduct Directed at GroupWise ................................................................................62

    i.  The Conduct Directed at MAPI Did Not Harm Novell or Harm PC Operating System Competition ............................................................................................62

    ii.  MAPI Was Procompetitive ..................................................................................65

**VI.  There Is No Evidence that the Lack of Success of Novell's OPAs on Windows Was Due To Microsoft's Alleged Anticompetitive Conduct. .....................................66**

A.  Microsoft's Development and Pricing of Suites Contributed to the Success of Microsoft's OPAs Relative to Novell's OPAs .........................................................68

B.  The Success of Microsoft's OPAs Relative to Novell's Is Due to Higher Quality Applications and Not Access to Source Code and Undocumented APIs....................70

    i.  Undocumented APIs and access to source code do not explain the success of Microsoft's OPAs relative to Novell's OPAs ......................................................70

      a.  Professor Noll's Claims Regarding the Quality of Microsoft's Products Are Unfounded ...........................................................................................74

C.  WPC and Then Novell Made Strategic Errors that Led to the Demise of Their OPAs...........................................................................................................................76

    i.  WPC's Strategy Prior to Its Acquisition by Novell Led to the Demise of WordPerfect Because of the Emergence of GUI Platforms and Suites................76

ii

ii.  Novell's Strategy for WordPerfect Was Flawed .................................................... 80

CONTAINS CONFIDENTIAL INFORMATION

## I.    Introduction

1.      My name is Kevin M. Murphy.  I am the George J. Stigler Professor of Economics in the Booth School of Business and the Department of Economics at the University of Chicago, where I have taught since 1983.  I have been retained by counsel for Microsoft Corporation ("Microsoft") as an expert in economics.

### A. Assignment

2.      Counsel for Microsoft asked me to determine whether Novell suffered any anticompetitive harm related to its sales of certain office productivity applications ("OPAs"), Word Perfect and Quattro Pro,[1] as a result of allegedly anticompetitive conduct by Microsoft during the time Novell Inc. ("Novell") owned WordPerfect and Quattro Pro from 1994-96; and, if so, whether that conduct reduced PC operating systems competition.

3.      Counsel for Microsoft also asked me to evaluate the analyses and opinions set forth in the declaration of Novell's expert Roger Noll.  In addition, insofar as they pertain to liability issues in this action, I have been asked to evaluate certain analyses and opinions set forth by Dr. Frederick Warren-Boulton and Mr. Ronald Alepin.

4.      This report sets forth my opinions on these matters, describes the data and analyses that underlie my opinions, and describes my ongoing analyses.  I reserve the right to present demonstrative exhibits containing my analyses at trial and to supplement my opinions as I continue to refine my analysis as new evidence becomes available.

---

[1] I understand from counsel that Microsoft contends that these products and the suites that contain these two products are the only products at issue in this case.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

## B. Qualifications

5.      I received my bachelor's degree in economics from the University of California, Los Angeles, in 1981, and I received my doctorate in economics from the University of Chicago in 1986.

6.      At the University of Chicago, I am a member of the faculties of both the Booth School of Business and the Department of Economics.  I teach graduate level courses in microeconomics, price theory, empirical labor economics, and the economics of public policy issues.  In these courses, I cover a wide range of topics, including the incentives that motivate firms and individuals, the operation of markets, and the impacts of regulation and the legal system.  Most of my teaching focuses on two things: how to use the tools of economics to understand the behavior of individuals, firms and markets; and how to apply economic analysis to data.  My focus in both research and teaching is on integrating economic principles with empirical analysis.

7.      I have authored or co-authored more than 65 articles in a variety of areas in economics.  Those articles have been published in leading scholarly and professional journals, including the *American Economic Review*, *Journal of Law and Economics*, and *Journal of Political Economy*.  Many of my articles consider economic issues related to industrial organization and antitrust.[2]

---

[2] See "Vertical Restraints as Contract Enforcement" (with Benjamin Klein), *Journal of Law and Economics*, Vol. 31, October 1988, pp. 265-297; "Vertical Integration as a Self-Enforcing Contractual Arrangement" (with Benjamin Klein), *American Economic Review*, Vol. 87, May 1997, pp. 415-420; "A Competitive Perspective on Internet Explorer" (with Steven J. Davis), *American Economic Review*, Vol. 90, May 2000, pp. 184-187; "Economic Perspectives on Software Design: PC Operating Systems and Platforms" (with Steven J. Davis and Jack MacCrisken), in David S. Evans, editor, *Microsoft, Antitrust and the New Economy: Selected Essays* (Norwell, MA: Kluwer Academic Press of Massachusetts, 2002); "The Economics of Copyright 'Fair Use' In a Networked World" (with Benjamin Klein and Andres Lerner), in *American Economic Review*, Vol. 92, May 2002, pp. 205-208;  "Entry, Pricing and Product Design in an Initially Monopolized Market" (with Steven J. Davis and Robert H. Topel), *Journal of Political Economy*, Vol. 112, Feb. 2004, pp. S188–S225; "The Antitrust Economics of Interchange Fees" (with Benjamin Klein, Kevin Green, and Lacey Place), *Antitrust Law Journal* Vol 73 no. 3, pp. 571-626; and "Exclusive Dealing

(…continued)

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

8.      I am a Fellow of the Econometric Society and a member of the American Academy of Arts and Sciences.  In 1997, I was awarded the John Bates Clark Medal, which is awarded once every two years by the American Economic Association to an outstanding American economist under the age of forty.   In 2005, I was named a MacArthur Fellow, an award that provides a five-year fellowship to individuals who show exceptional merit and promise for continued and enhanced creative work.

9.      In addition to my position at the University of Chicago, I am also a Principal at Chicago Partners, a subsidiary of Navigant Consulting.  Chicago Partners is a consulting firm that specializes in the application of economics to law and regulatory matters.  I have consulted on a variety of antitrust, intellectual property, and other matters involving economic and legal issues such as class certification, damages, labor practices, exclusionary access, tying, mergers, price fixing, price discrimination, and joint ventures.   My curriculum vitae is attached to this report as Appendix A.[3]  Chicago Partners is paid $890/hour for my time spent on this matter, and I receive compensation from Chicago Partners based on its billings in this case.

10.      My analyses and opinions in this case are consistent with and in varying degrees build upon earlier work I have done in antitrust matters involving Microsoft. In April 2002, I testified on behalf of Microsoft before the U.S. District Court in the District of Columbia responsible for determining what remedies to impose on Microsoft in connection with its liability for monopoly maintenance under the Sherman Act.[4]  In July 2002, I submitted a declaration on behalf of Microsoft responding to a motion for a preliminary injunction in a private antitrust lawsuit brought by Sun Microsystems,

---

(…continued)

Intensifies Competition for Distribution" (with Benjamin Klein), *Antitrust Law Journal*, Vol. 75, Nov. 2008, pp. 433-466.

[3] Appendix B lists additional materials I reviewed and/or relied upon in preparing this report.

[4] Direct Testimony of Kevin M. Murphy, State of New York, et al. vs. Microsoft Corporation, Civil Action No. 98-1233 (CKK), April 12, 2002.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

Incorporated, against Microsoft.[5]  I also testified in that case.[6]  I submitted reports in private class-action litigation in California (October 2002), District of Maryland (Multi-district Litigation) (October 2002), Arizona (July 2003), Minnesota (July 2003), Iowa (August 2006) and Mississippi (May 2009).[7]

### C.  Summary of Opinions

11.    Based on my work to date, I have reached opinions in three broad areas.  I list them here, together with a brief description of the basis for each one.

**Opinion 1: PC operating system competition would not have been enhanced if Novell's OPAs had been more successful on the Windows platform.**

12.    Professor Noll claims that Novell's OPAs represented threats to Microsoft's PC operating system position because they were cross-platform applications.[8]  This claim is without merit for many reasons.  First, the theory that a few cross-platform applications could influence PC operating system competition is counter to the government's economic theory in *State of New York, et al. vs. Microsoft Corporation* ("Microsoft III") that was accepted by both the District and Circuit Court.  The

---

[5] Declaration of Kevin M. Murphy In Support of Microsoft's Opposition to Sun Microsystems, Inc.'s Motion for Preliminary Injunction, Sun Microsystems, Inc. v. Microsoft Corporation, Case No. C02-01150 RMW (PVT), July 3, 2002.

[6] Deposition of Kevin M. Murphy, July 23, 2002, in Sun MicroSystems Inc. v. Microsoft Corporation, United States District Court (D. Md.), In Re: Microsoft Antitrust Litigation, MDL No. 1332.  Testimony of Kevin M. Murphy, December 4-5, 2002, Sun Preliminary Injunction Hearing, United States District Court (D. Md.), In Re: Microsoft Antitrust Litigation, MDL No. 1332.

[7] Expert Report of Kevin M. Murphy, Case No. J.C.C.P. NO. 4106, Superior Court of the State of California for the City and County of San Francisco, October 4, 2002.  Expert Report of Kevin M. Murphy, United States District Court for the District of Maryland, in re: Microsoft Antitrust Litigation, MDL No. 1332, October 4, 2002. Expert Report of Kevin M. Murphy, Ph.D, Case No. 2000-000722, in Jake Lucero v. Microsoft Corporation, July 14, 2003.  Expert Report of Kevin M. Murphy, Ph.D, Case No. MC 00-005994, Fourth Judicial District of the District Court for the State of Minnesota and County of Hennepin, July 14, 2003.  Expert Report of Kevin M. Murphy, Ph.D., Case No. CL82311, Iowa District Court for Polk County, Joe Combs et. al. v. Microsoft Corporation, August 4, 2006. Expert Report of Kevin M. Murphy, Ph.D., Civil Action No. G2004-1542, Chancery Court of Hinds County, Jim Hood, Attorney General ex rel State of Mississippi v. Microsoft Corporation, May, 11, 2009.

[8] Declaration of Roger G. Noll, May, 1, 2009, pp. 8-9.

4

government's economic theory was that an alternative PC operating system would need to have nearly the same number of applications as Windows, which the court said numbered 70,000, to be competitive.  The court found that the availability of thousands of applications on a competing PC operating system would have no impact on PC operating system competition, so it is virtually inconceivable that a single OPA or even two OPAs would have a material impact on competition.  Second, even if one accepts that claim (which I do not) that OPAs could impact PC operating system competition, the evidence indicates that Novell's OPAs were never sufficiently important to impact PC operating system competition. When WordPerfect was the leading word processor program, WPC tried unsuccessfully to influence PC operating system competition by not writing a version of WordPerfect for Windows. Third, Professor Noll's theory is internally inconsistent because, if Novell's OPAs were sufficiently important to impact PC operating system competition, Microsoft would have had no incentive to reduce the quality of Novell's OPAs on Windows.

13.      Professor Noll also claims that Novell's OPAs were threats to PC operating system competition because they "contained middleware as well as applications" and, by exposing APIs to which independent software vendors ("ISVs") could write cross-platform applications, they were a threat to become an alternative platform for application programs.[9]  This claim is inconsistent with the market evidence that no full-featured applications have been written to the APIs exposed by Novell's OPAs, the APIs exposed by other OPA products, or even middleware technologies that attracted greater developer interest such as Sun's Java.  My analysis indicates that Novell's OPAs failed to attract developer support because there was little incentive to write cross-platform applications, because OPAs were not natural distribution mechanisms for middleware, and because the technologies were more technically limited than middleware platforms such as Java.

---

[9] Declaration of Roger G. Noll, May 1, 2009, p. 9.

CONTAINS CONFIDENTIAL INFORMATION

**Opinion 2: The conduct that Professor Noll alleges is anticompetitive did not cause anticompetitive harm to Novell's OPAs, did not prevent Novell's OPAs from becoming a threat to PC operating system competition, and benefited consumers.**

14.     Professor Noll argues that Microsoft undertook a broad range of anticompetitive conduct "to undermine competing applications and middleware products."[10]  However, much of the conduct he discusses was not directed at Novell's OPAs and had no impact on Novell's OPA business.  Some conduct occurred before or after Novell owned OPA products, and Professor Noll offers no coherent theory as to how this conduct could have impacted Novell's OPA business.  Other conduct was directed at applications never owned by Novell.

15.     I have found no evidence (and Professor Noll provides none) that the conduct allegedly directed at OPAs during the time Novell owned WordPerfect caused anticompetitive harm to Novell's OPAs or prevented Novell's OPAs from impacting PC operating system competition.  Moreover, much of this conduct had obvious procompetitive effects because it led to lower prices and higher quality products, and Professor Noll completely ignores these effects.

**Opinion 3: Professor Noll's analysis is wholly inadequate to support his claims because he fails to consider factors other than the challenged conduct that explain the decline of Novell's OPAs.**

16.     Around 1990, WordPerfect was the leading word processing program.[11] By the time Novell agreed to purchase WordPerfect in March of 1994, its share of word processor sales had fallen substantially and that trend continued through the time Novell sold WordPerfect to Corel in March of 1996.  By 1994, Microsoft Word had become the leading word processing program.  In addition, beginning in 1992 Microsoft

---

[10] Declaration of Roger G. Noll, May 1, 2009, p. 10.
[11] Deposition of Dean Clive Winn II, December 10, 2008, pp. 64, 76.

CONTAINS CONFIDENTIAL INFORMATION

Office became the leading office suite program, while Novell's PerfectOffice failed to gain a significant share of suite sales.[12]

17.     Professor Noll attributes the decline of WordPerfect and the failure of PerfectOffice to the alleged anticompetitive conduct.  He gives little to no consideration to other factors including procompetitive conduct by Microsoft and strategic errors by the owners of WordPerfect that explain the decline of Novell's OPA.  My analysis indicates that the decline of Novell's OPA was due to Microsoft's successful strategy of producing high quality, low price OPAs and integrating those products into suites, and to strategic errors by WordPerfect Corporation ("WPC") and Novell that were unrelated to any conduct by Microsoft.

18.     Prior to its purchase by Novell, WPC had a strategy of writing WordPerfect to a variety of different platforms.  However, prior to 1990, it strategically chose not to write a version for Windows because it did not want to see Windows become the leading PC operating system.[13]  In addition, WPC did not attempt to develop any additional OPAs that might complement its then-leading word processor.

19.     This strategy led to the demise of WordPerfect for two reasons.  First, after the release of Windows 3.0 in 1990, Windows quickly became the leading applications platform,[14] yet WPC did not produce a version of WordPerfect for Windows until 18 months after the release of Windows 3.0.[15]  That version was rushed into development and was regarded by reviewers and WPC itself as a poor quality product.[16]  Second,

---

[12] WordPerfect Corp., PC Suite Marketing Team "1994 Business Plan," NOV 00022294; Deposition of Robert Frankenberg, March 25, 2009, pp. 32-34.

[13] Deposition of Charles Middleton, December 13, 2008, pp. 44; Deposition of Willard Peterson, October 1, 2008, pp. 77-80.

[14] Deposition of Willard Peterson, October 1, 2008, pp. 108, 111; Deposition of Robert Frankenberg, March 25, 2009, pp. 24-26.

[15] Deposition of Willard Peterson, October 1, 2008, pp. 20, 67, 70-71, 111-112.

[16] Deposition of Willard Peterson, October 1, 2008, pp. 72-73, 95-96, 111-12; Deposition of Craig Bushman, November 18, 2008, pp. 27-28; "Windows Word Processors," *PC World*, April 1992, pp. 147-66; Deposition

(…continued)

CONTAINS CONFIDENTIAL INFORMATION

after Microsoft released Microsoft Office for Windows 3.0 in 1992, suites became the primary way in which users purchased OPAs.[17]  Because WPC did not have complementary OPA products to bundle with WordPerfect, it partnered with Borland to sell WordPerfect together with Borland's spreadsheet Quattro Pro in a product called Borland Office.[18]  However, Borland Office was not a successful product because Quattro Pro was widely regarded as an inferior spreadsheet and there was effectively no integration between the two products.[19]

20.     After it purchased WordPerfect, Novell did not address the cause of WordPerfect's decline by bundling WordPerfect with another quality suite product and focusing its development efforts on the upcoming version of Windows.  Instead, Novell attempted to bundle WordPerfect and Netware, and it devoted nearly all of its programming efforts to the wrong version of Windows.  The bundling strategy was a failure.  Novell never made any progress toward integrating WordPerfect and Netware because neither its customers nor its own developers saw the benefits of the integration, and it quickly abandoned that strategy.  In addition, Novell continued to bundle WordPerfect with Quattro Pro in PerfectOffice even though there was little demand for Quattro Pro.[20] The development strategy was also an error. After Novell purchased WordPerfect, Novell devoted nearly all of its programming resources to producing a new version of WordPerfect for Windows 3.1 because it did not anticipate a significant

---

(…continued)

of David Acheson, November 19, 2008, pp. 39, 56, 61;  Deposition of Craig Bushman, November 18, 2008, pp. 28-29.

[17] Deposition of Nolan Larsen, November 17, 2008, pp.  33-36.

[18] Deposition of Craig Bushman, November 18, 2008, p. 98; Deposition of David Acheson, November 19, 2008, p. 107.

[19] WordPerfect Corp., PC Suite Marketing Team "1994 Business Plan," NOV 00022294; Novell "Perfect Office 3.0 Introduction: Pricing Study," NOV 00039774-77 at 75; June 27, 1994 *InfoWorld* Reviews/Product Comparison, NOV 00528056-69; Deposition of Dean Clive Winn II, December 10, 2008, pp. 115-117; Deposition of Scott Kliger, February 25, 2009, pp. 44, 45; Deposition of Gary Lawrence Gibb, March 17, 2009, pp. 67-68; Deposition of David Acheson, November 19, 2008, pp. 107-108.

[20] Deposition of Robert Frankenberg, March 25, 2009, pp. 33-34.

CONTAINS CONFIDENTIAL INFORMATION

decline of Windows 3.1 applications sales after the release of Windows 95.[21]  This decision proved disastrous when Windows 95 became so popular that sales of applications for Windows 3.1 stagnated.[22]

## II.    Market Definition and Market Power

21.    Professor Noll argues that there are separate antitrust markets for PC operating systems, graphical user interfaces ("GUIs"), web browsers, word processors, spreadsheets, presentation software, relational databases, groupware, and office suites.[23]  He also claims that Microsoft had market power in each one of these markets.

22.    I have several comments on the markets defined by Professor Noll and his claims that Microsoft had market power.  Although the majority of my analysis is not sensitive to the precise choice of market definitions, I find that some of the market definitions proffered by Professor Noll do not provide a useful basis for analysis or are irrelevant to this case.  I comment here only on those that I find most troubling and accept the market definitions that do not pose significant obstacles to a reasonable analysis.

### A.  Operating Systems

23.    In Microsoft III, the Court of Appeals determined that PC operating systems for Intel-compatible personal computers constituted a relevant antitrust market, and that certain types of middleware might pose a competitive threat to Microsoft's position in that market.[24]  Professor Noll contends that products outside this

---

[21] Novell's August 3, 1994 "Unification Plan," NOV-25-006568-78 at 70, 73.
[22] October 20, 1995 Novell "Board of Directors Review," NOV 00317786-99 at 86.
[23] Declaration of Roger G. Noll, May 1, 2009, pp. 26-36.
[24] *United States* v. *Microsoft Corp.*, 253 F.3d 34, pp. 52-54 (D.C. Cir. 2001) (Hereinafter "Court of Appeals").

CONTAINS CONFIDENTIAL INFORMATION

market—such as OPAs—posed competitive threats to Microsoft's position in the Intel-compatible PC operating system market.[25]

24.    I reject Professor Noll's separation of the PC operating system market into two separate markets, one for character-mode PC operating systems and one for graphical users interfaces (GUIs),[26] for several reasons:

a)  Since 1995, no commercially significant PC operating system has been distributed without a GUI.  Apple MacOS X, Sun Solaris, IBM OS/2, and Windows PC operating systems have all been distributed with a GUI.  The other major consumer and business-related PC operating system, for Apple PCs, included an integrated GUI long before Windows did, and the functionalities of the two PC operating systems have developed roughly in parallel.  Competition in the marketplace is largely among PC operating systems with integrated GUIs, which is clear evidence that consumers value this feature.  The relevant questions, therefore, pertain to the substitutability and competition among these products.

b)  Versions of Windows introduced prior to the release of Windows 95 in August 1995 could be and often were purchased separately from MS-DOS, a character-based OS.[27]  However, since the spread of powerful GUIs for PCs, the distribution and sale of GUIs separate from character-based OSs has been the exception, not the rule.  The provision of Windows separate from MS-DOS is best regarded as a transitory phenomenon that allowed the industry (and users) to make the transition from character–based to GUI-based PC operating system

---

[25] Declaration of Roger G. Noll, May 1, 2009, pp. 8-9.
[26] Declaration of Roger G. Noll, May 1, 2009, pp. 26-29.
[27] I note that as Windows evolved, it included many advanced PC operating system functions (such as memory management) in addition to a GUI. (See e.g. http://www.microsoft.com/windows/ winhistorydesktop.mspx.) Especially with Windows 3.x, it is most appropriate to think of MS-DOS+Windows as an alternative PC operating system, rather than as MS-DOS with a GUI.

CONTAINS CONFIDENTIAL INFORMATION

products while maintaining a high degree of backward compatibility. This also allowed the transition to be spread out over time.

c) At various times, character-based PC operating systems (e.g., MS-DOS), GUI-equipped PC operating systems (e.g., Windows 95, various Linux distributions, and OS/2) and GUI/OS combinations (e.g., MS-DOS + Windows 3.x) have all competed against each other in the market for Intel-compatible PC operating systems. Competition was between PC operating system products or combinations of products, some of which had GUIs and some of which did not.[28] The evolution of PC operating systems, driven by technological advances and consumer demand, clearly favored GUI-equipped PC operating systems.

d) Even when sold separately, GUIs have almost always been intended to work with a specific PC operating system.[29] The notion that GUIs can be freely mixed and matched with several character-based PC operating systems has little historical precedent.

e) In his technical discussion of PC operating systems, Novell's expert Ronald Alepin states that PC operating systems consist of several components, one of which is a user interface.[30] There is no reason to believe that this user interface must be character-based, like in MS-DOS or other early-generation PC operating systems, and Mr. Alepin does not make this claim. User interfaces are necessary

---

[28] Professor Noll seems to confuse this competition with putting GUIs and non-GUI OS products in the same market. Rather than saying that MS-DOS competed with Windows, it is better to say that MS-DOS competes against the combination of MS-DOS and Windows 3.1 as an applications platform.

[29] For example, Windows 1.x through Windows 3.x were designed to work with MS-DOS (and IBM's branded version, PC-DOS). Versions of these GUIs were never offered for non-DOS PC operating systems. Similarly, Presentation Manager, which was briefly distributed to previous purchasers of OS/2 1.0, worked only with OS/2. In the Unix world, the same GUI is often available for multiple "flavors" of Unix (often based on some version of the X-Windows system). Even there, however, GUIs are distributed with PC operating system products for the most part.

[30] Expert report Ronald S. Alepin, May 1, 2009, pp. 23-24.

**Contains Confidential Information**

parts of PC operating systems, and technological innovation and market forces have led them to evolve from character-based interfaces to GUIs.

25.     From these observations, I conclude that competition among PC operating systems evolved from character-based systems to a mix of character-based and GUI platforms, to GUI-only platforms.

### B. Web Browsers

26.     Professor Noll asserts that there is a separate antitrust market for web browsers—such as *Internet Explorer, Netscape Navigator*, *Firefox, Chrome*, *Safari* and *Opera*— and that Microsoft had substantial market power in the alleged market.[31] There are three issues associated with his claim.  First, whether such a relevant market exists is irrelevant to the liability issues in this case.  Second, in Microsoft III, the Court of Appeals found that neither plaintiffs in that case nor the District Court had shown that a web browser market existed or that it was protected by entry barriers that would enable a firm to monopolize it.[32]  Likewise, Professor Noll performs no analysis that would indicate that browsing software constitutes a separate market for antitrust purposes.  Third, Professor Noll's claim that Microsoft's alleged market power in web browsers harmed Novell is contradicted by the fact that Microsoft did not even introduce its first web browser until August 1995, just seven months before Novell reached a deal to sell WordPerfect.  Microsoft's share of web browser usage at the time of the sale of WordPerfect was only roughly 9 percent.[33]

---

[31] Declaration of Roger G. Noll, May 1, 2009, p. 7.

[32] Court of Appeals at 81-84.

[33] University of Illinois at Urbana-Champaign College of Engineering. The College of Engineering collects data of all web browsers visiting its web pages. A summary of all page accesses has been published since 1996. In April 1996, Internet Explorer's access share was 8.9%.  See http://www.ews.uiuc.edu/bstats/ months/9604-month.html.

CONTAINS CONFIDENTIAL INFORMATION

### C. Office Productivity Applications

27.     Professor Noll defines separate antitrust markets for suites and for the separate components of suites: word processors, spreadsheets, presentation graphics, relational databases and groupware.[34]  After 1995, however, the proportion of word processors and spreadsheets sold as standalone products fell to less than 20 percent. (See Exhibit 1).  This suggests that there was little competition among the individual components of suites after 1995.  It is also important to keep in mind that office suites and their components could not have been relevant antitrust markets for this case after Novell sold WordPerfect to Corel in March 1996.

## III.     Framework for Analysis

28.     Novell is seeking damages for the harm suffered in its OPA business that Professor Noll alleges resulted from Microsoft's efforts to maintain its PC operating system monopoly.[35]

29.     Professor Noll's claim that Microsoft should be found liable in this case for anticompetitive conduct can only be valid if at least three conditions are satisfied:

a)  Novell's OPAs had the potential to impact competition in the PC operating system market;

b)  The challenged conduct directly harmed Novell's OPAs at the time they were owned by Novell, and did not have offsetting procompetitive effects;

c)  The harm to Novell's OPAs identified in (b), if it occurred, must have been sufficient to cause a reduction in PC operating system competition.

30.     As an example of how I apply these conditions, suppose that Novell's OPAs had the potential to facilitate PC operating system competition, but the conduct

---

[34] Declaration of Roger G. Noll, May, 1, 2009, p. 70.
[35] Expert Report of Frederick R. Warren-Boulton, Ph. D., May 1. 2009, p. 2.

CONTAINS CONFIDENTIAL INFORMATION

did not harm Novell's OPAs because it was directed at Lotus or it occurred after Novell sold its OPAs to Corel. If so, then I would conclude there is no basis for antitrust liability because condition (b) would fail. Condition (b) would also fail if the conduct harmed Novell by reducing client PC operating system competition directly, or if the conduct harmed Novell by reducing competition in some other market such as network PC operating systems. Similarly, suppose that the conduct harmed Novell's OPAs and led to a significant reduction in its share of OPA sales, but Novell's OPAs did not have the potential to increase PC operating system competition. In this case, I would conclude that there is no antitrust liability because condition (a) would not be satisfied. Finally, suppose that conditions (a) and (b) are satisfied and that the challenged conduct directly harmed Novell's OPAs, but that harm was not significant enough to actually impact PC operating system competition. If so, I would conclude that there would be no antitrust liability because condition (c) would not be satisfied.

31.     My analysis indicates that none of the conduct that Professor Noll challenges satisfies any of these three conditions, let alone all of them. Therefore, there is no basis for Professor Noll's liability claims.

## IV.   PC Operating System Competition Would Not Have Been Greater If Novell's OPAs Had Been More Successful on the Windows Platform

32.     Professor Noll alleges that anticompetitive acts by Microsoft against Novell's OPAs were motivated by a desire to preserve the applications barrier to entry in the PC operating system market,[36] analogous to the government's claim in Microsoft III.[37] He argues that Novell's OPAs "posed two related threats to Microsoft's market

---

[36] Declaration of Roger G. Noll, May 1, 2009, pp. 8-9.
[37] Appellees' Brief, United States and State of New York et al. v. Microsoft Corporation, United States Court of Appeals for the District of Columbia Circuit, February 9, 2001, at 9-10.

CONTAINS CONFIDENTIAL INFORMATION

power in PC operating systems and GUIs."[38]  First, Professor Noll argues that Novell's OPAs were cross platform, and "strong cross-platform competitors in these products reduce the applications barrier to entry that protects the dominant position of Microsoft's PC operating system and GUI."[39]  Second, he claims that Novell's OPAs contained middleware that "was a threat to become an alternative platform for applications programs."[40]

33.     Professor Noll's theory of how Novell's OPAs represented PC operating system threats is highly flawed.  It is contradicted by the court's finding in Microsoft III, it is internally inconsistent, it is inconsistent with the facts, and it is contradicted by market evidence.  Before discussing these flaws in detail, it is worth reviewing the government's theory in Microsoft III.

## A.  The Government Economic Theory in Microsoft III

34.     In its case against Microsoft, the government's economic theory was based on the argument that network effects create a barrier to entry in the market for PC operating systems.[41]  PC operating system markets feature network effects in that the value of a particular PC operating system to both consumers and ISVs is an increasing function of the number of consumers using that PC operating system.

35.     PC operating systems exhibit both direct and indirect network effects. Direct network effects exist when the value to an individual user of a product rises as the number of other people using the product increases.  The network effects that are most important in PC operating systems are referred to as indirect network effects. Indirect network effects occur when an increase in the number of users causes other

---

[38] Declaration of Roger G. Noll, May 1, 2009, p. 9.
[39] Declaration of Roger G. Noll, May 1, 2009, p. 9.
[40] Declaration of Roger G. Noll, May 1, 2009, p. 9.
[41] Appellees' Brief, United States and State of New York et al. v. Microsoft Corporation, United States Court of Appeals for the District of Columbia Circuit, February 9, 2001, at 9.

CONTAINS CONFIDENTIAL INFORMATION

firms to make investments that increase the value of the product.  In PC operating system markets, indirect network effects exist because ISVs (and hardware manufacturers) are more likely to make their software or hardware compatible with a PC operating system as the number of users of the PC operating system rises.  Network effects are sometimes called network *externalities* because, for example, an individual's decision to use Windows does not take into account the effect of that decision on the value of Windows to others.

36.     Network effects shape the structure of PC operating systems markets.  Because consumers and ISVs prefer PC operating systems with more users, an PC operating system that attracts a large share of users generates a "positive feedback loop" making it even more attractive to other users.  Thus, in any PC operating system market, we expect to see a small number of PC operating system competitors.

37.     In addition, network effects shape PC operating systems markets' competitive dynamics.  Indirect network effects create what the District and Circuit Courts in Microsoft III referred to as the applications barrier to entry.  The courts' reasoning was that a potential entrant would need to attract ISVs to write applications for the new PC operating system before consumers would be willing to switch to that PC operating system.[42]  However, if porting an application to a new PC operating system is costly, ISVs would only do so for PC operating systems that ISVs expect to attract a large number of users.  This affects competitive dynamics by providing a PC operating system with a large installed base a significant advantage.  Consumers and ISVs would generally be unwilling to switch to a competing (and incompatible) PC operating system that offered only a small increase in functionality relative to the incumbent, because in doing so they would sacrifice the network-related benefits of the

---

[42] Court of Appeals, at 55.

CONTAINS CONFIDENTIAL INFORMATION

PC operating system with the large installed base. Consumers, for example, would give up the variety of applications written to the PC operating system.

38.     The government's case revolved around the premise that the diffusion of Netscape's Navigator and Sun's Java could potentially reduce the applications barrier to entry, and thereby presented a competitive threat to Microsoft in the PC operating systems market. The government's theory was that the Navigator and Java were middleware that exposed applications programming interfaces ("APIs") and had the potential to develop into platforms for development of general purpose applications. If Navigator and/or Java became ubiquitous, application developers would have an incentive to write to the middleware's APIs rather than the Windows APIs, and once they did so, consumers would be indifferent to which PC operating system they used, as long as the PC operating system supported Navigator and/or Java. The PC operating system would therefore be "commoditized" and the market for PC operating systems would become more competitive. The government alleged that Microsoft engaged in various anticompetitive acts that prevented this chain of events from happening. In particular, the government argued that Microsoft attempted to prevent Navigator and Java from achieving the ubiquity required to pose a PC operating system threat.

39.     While the post-trial market evidence described below indicates that neither Navigator nor Java had the ability to serve as a platform for general purpose applications, the government's economic theory rested in part on the premise that Navigator and Java offered a unique opportunity at the time for firms to overcome the applications barrier to entry. This software was both ubiquitous and contained APIs that were perceived to have the potential to support applications software at least as well as Windows. Under the government's theory, developers could potentially reach a large market with high quality applications by writing to Navigator's and/or Java's APIs.

CONTAINS CONFIDENTIAL INFORMATION

40.     The government did not claim and the courts in Microsoft III did not find that application software generally possessed the combination of factors that made Netscape and Java nascent threats to Windows.  While some software products existed that exposed APIs, none of them were ubiquitous enough to attract large-scale software development.  And while there were many popular cross-platform applications written by firms other than Microsoft, these generally did not contain APIs that would allow software developers to write a wide range of full-fledged applications that bypassed Windows.

41.     The idea that Netscape and Java, and not application software more generally, or even cross-platform software more generally, had the potential to trigger a strong competitive threat to Windows was a crucial step in the government's argument. If the government instead had asserted that a broader set of applications created opportunities for firms to overcome the application barriers to entry, then it could not have claimed that acts alleged to disadvantage Netscape and Java had the potential to generate significant harm to competition in PC operating systems

### B.  Professor Noll's Claim that Novell's OPAs Could Have Increased Operating Systems Competition Because They Were Cross Platform is Flawed

#### i.  *The Economic Theory of the Government Case in Microsoft III Was Based on the Implicit Assumption that Applications Could Not Reduce the Applications Barrier to Entry*

42.     Professor Noll alleges that Novell's OPAs offered a competitive threat analogous to Netscape and Java, and that anticompetitive acts by Microsoft against Novell were motivated by a desire to preserve the applications barrier to entry in the PC operating system market.  This competitive threat arises, according to Noll, because Novell's OPAs are "cross-platform" applications.  However, Professor Noll's argument is insufficient: what he must show is not simply that Novell's OPAs are cross-platform applications, but rather that Novell's OPAs are sufficiently important to PC operating systems' success to have affected competition in the PC operating systems market.

CONTAINS CONFIDENTIAL INFORMATION

Many "cross-platform applications" have little effect on competition in PC operating systems; to reiterate, the government's argument with respect to Netscape and Java was *not* just that they were cross-platform applications, but that they had the potential to affect PC operating systems competition in a way that other applications do not. Professor Noll provides no explanation for why Novell's OPAs could influence competition in PC operating systems, beyond his general claim that they are "cross-platform" applications.

43.     Professor Noll's theory—that a single application or even a suite of applications had the potential to overcome the applications barrier to entry—is also at odds with the District Court findings regarding the number of applications an operating system needed to be a competitor to Windows.  The government's case was founded on the premise that a successful operating system competitor to Windows would need to support a similar number of applications.  The District Court found that even if a contending operating system (such as Apple's) attracted several thousand compatible applications it could still not compete with Windows, which supported over 70,000 applications.[43]

### ii.  *Market Evidence Provides No Indication that Novell's OPAs Had a Significant Influence on PC Operating Systems Competition*

44.     The success of Windows relative to OS/2 provides direct evidence that contradicts Professor Noll's proposition that Novell's OPAs had a significant influence on PC operating systems competition.  Both WPC and Lotus initially chose not to write Windows applications in an attempt to prevent Windows from gaining popularity. According to WPC executive Willard Peterson, WPC and Lotus were reluctant to support Windows based on their belief that they would do better if OS/2 succeeded because WPC believed IBM was much less competent an application developer than

---

[43] United States v. Microsoft Corp., 84 F. Supp. 2d 9 (1999) [hereinafter FOF], ¶40.

CONTAINS CONFIDENTIAL INFORMATION

Microsoft and, therefore, was less likely than Microsoft to compete effectively with WPC and other ISVs.[44]  According to Lotus's executive David Reed, Lotus had decided by 1985 (the year Windows 1.0 was released) that they did not want to see Windows become the standard desktop applications platform.[45]  Lotus worked with IBM to discourage other ISVs from developing applications for Windows.[46]

45.    The efforts of Lotus and WPC to tilt the operating system outcomes away from Windows and toward OS/2 were ultimately unsuccessful.  Instead, Windows became the leading PC operating system.  If the measures taken by WPC and Lotus aimed at moving the market away from Windows were unsuccessful in influencing PC operating system outcomes in the late 1980s and early 1990s, at a time when WordPerfect was the leading word processor and Lotus 1-2-3 was the leading spreadsheet, there is little reason to believe that a more successful version of PerfectOffice would have influenced PC operating system outcomes after Novell had acquired WordPerfect in 1994.  By the time of Novell's purchase of WordPerfect, WordPerfect's share had fallen below 30 percent, down from a high of 47 percent in 1990.  (See Exhibit 2).  As shown in Exhibit 3, PerfectOffice's share of suite sales was less than 5 percent by the time Novell sold WordPerfect and Quattro Pro in 1996.  Based on this evidence, there is no reason to believe that Novell's OPAs had, or could have had, a substantial influence on outcomes in PC operating systems.

46.    The fact that WordPerfect was unsuccessful at influencing PC operating system competition is not surprising in that a large share of PC owners did not even have a word processor installed in the late 1980s and early 1990s.  Exhibit 4 shows the yearly share of the installed base of all word processors available on Microsoft PC

---

[44] W. E. "Pete" Peterson, Almost Perfect (1998), Chapter 10, available at http://www.wordplace.com/ap/almostperfect.pdf (downloaded September 11, 2002). Peterson confirmed these views in his deposition. (Deposition of Willard E. Peterson, March 19, 2002, pp. 169-172).
[45] Deposition of David Reed, December 10, 2001, p. 667.
[46] See, for example, Letter from Jim Manzi to Jim Cannavino, September 28, 1989 (Reed 60) (Bates Numbers IBM 7510070919); Deposition of David Reed, December 11, 2001, pp. 880-884.

CONTAINS CONFIDENTIAL INFORMATION

operating systems relative to the installed base of Microsoft PC operating systems. Prior to 1991, more than half of all computers with Microsoft operating systems did not have a word processor installed. Therefore, the majority of Microsoft PC operating system users could not have based their PC operating system choice on the availability of a particular word processor. The same holds true for suites because the installed base of word processors is necessarily larger than the installed base of suites.

47.     The experience of Apple is also inconsistent with Professor Noll's theory that a popular OPA could induce consumers to choose an alternative operating system and, therefore, was integral to the success of competing operating systems. When WordPerfect was the most popular word processing program, it was available on both the Macintosh and MS-DOS. During this time period, Apple was never able to induce a large share of users to switch from MS-DOS to Macintosh, in spite of the fact that Macintosh had a large base of other applications. In addition, Apple has never been able to induce a large share of users to switch from Windows to the Macintosh even though Microsoft Office has been the most popular suite on both platforms since it was first introduced.

### iii. Professor Noll's Argument is Internally Inconsistent

48.     Professor Noll alleges that Microsoft's actions disadvantaged Novell's OPAs, thereby inhibiting competition in PC operating systems, and he envisions a but-for world in which Microsoft did not engage in these actions. However, in articulating his argument, he ignores the direct effect PC operating system providers have to promote applications development because of the direct effect application software has on a PC operating systems' success. If WordPerfect had the potential to have a significant impact on PC operating systems' demand (though I have seen no evidence that this is indeed true during the time period of the case), this would have been true for Windows as well as competing PC operating systems. This would have provided Microsoft a strong incentive to enhance, not degrade, WordPerfect's performance on Windows. Professor Noll's theory is that Microsoft instead had an incentive to degrade

CONTAINS CONFIDENTIAL INFORMATION

WordPerfect's performance in hopes of preserving or enhancing its position in PC operating systems.  It is unclear why it would have been in Microsoft's interest to do so, particularly during a time when OS/2 was an alternative, if WordPerfect had the potential to influence PC operating systems.

49.     Professor Noll's argument is thus internally inconsistent.  He argues that WordPerfect was an important enough application to influence outcomes in PC operating systems that Microsoft would want to hamper its development—an indirect effect  on competition. Yet if WordPerfect indeed was important to the success of PC operating systems, then Microsoft would have had a strong incentive to enhance WordPerfect's performance because the direct effect of doing so would be important for the success of Windows.  It is not clear how Professor Noll can implicitly claim that Microsoft's incentive to enhance WordPerfect's performance on Windows, which follows from a direct effect of application quality on the demand for Windows, is small and at the same time implicitly claim that the effect he emphasizes—an indirect effect— is large.

50.     Market evidence demonstrates that Microsoft did not have a strong incentive to degrade the performance of applications on its platforms.  Over time, Microsoft has produced only a modest share of the applications software for the Windows platform (roughly 20 percent measured by revenues).[47]  Withholding PC operating system information or designing its PC operating system software in ways that disadvantage non-Microsoft developers would reduce the quality and increase costs for 80 percent of the applications (which in turn would reduce the attractiveness of Windows to consumers) in exchange for a somewhat larger share for the 20 percent of applications software that Microsoft sells.  Thus, the economics of disadvantaging non-Microsoft developers makes it unlikely that Microsoft would engage in such behavior.

---

[47] IDC, Worldwide Software Market Forecast Summary, 2001-2005, Report #25569, September 2001, Tables 5, 8, 16, 17.

CONTAINS CONFIDENTIAL INFORMATION

51.      The evidence also points strongly in the other direction.  Microsoft had documented nearly 10,000 application programming interfaces ("APIs") for Windows as of Windows 98[48] and is widely acknowledged to have some of the best support for developers of any OS platform.[49]  This evidence, ignored by Professor Noll,[50] is consistent with the incentives I have described here and not with those described by Professor Noll.

**C.  Professor Noll's Claim that Novell's OPAs Contained Middleware that Would Reduce the Applications Barrier to Entry and Increase Operating System Competition Is without Merit**

52.      Professor Noll's claims regarding the middleware potential of Novell's OPAs are vague.  Again, according to the government's economic theory in Microsoft III, middleware could increase PC operating system competition if the middleware functionality was to be cross-platform; it could induce ISVs to write applications to its own APIs rather than the APIs of any particular PC operating system; and the availability of cross-platform applications would increase users' willingness to switch from the leading platform. Professor Noll claims that PerfectOffice and GroupWise

---

[48] FOF, ¶ 77.

[49] Giga Research rated Microsoft "One of the Leaders" in development tools, stating that "Microsoft will continue to leverage developer loyalties and low-cost ease-of-use strategies to expand the footprint of companies for which it can effectively serve as the main strategic platform solutions …."  (Heffner, Randy and Mike Gilpin, "The Players in the Application Platform Battle:  Part 1," Giga Research, March 19, 2002.)  Gartner has given Microsoft a "Strong Positive," its highest rating, for developer support.  (Smith, David Mitchell, "Vendor Rating:  Microsoft Still 'Positive' as Pressure Mounts," Gartner Research, October 13, 2003.) Sun Microsystems Sr. Product Manager Sherman Dickman, in describing Microsoft's competitive strengths, stated "Microsoft currently boasts unparalleled developer mind share, thanks to the success of its developer program (MSDN - Microsoft Developer's Network) and its tools (Visual Basic)." ("Marketing Plan: Java 2 Platform, Standard Edition version 1.4," January 22, 2002, SUN2-27-000829)

[50] Professor Noll also ignores the evidence that Microsoft supported WordPerfect's efforts to write for Windows. See, for example, Deposition of Norman Thomas Creighton, December 11, 2008, pp. 108, 112; Deposition of Scott Kliger, February 25, 2009 pp. 48-49, 51-53.

CONTAINS CONFIDENTIAL INFORMATION

contained middleware and exposed APIs,[51] yet he never asserts that the middleware was cross-platform in the sense that it could serve as a basis for cross-platform applications.  In addition, he asserts that PerfectOffice contained a feature that allowed users to launch other applications from within the PerfectOffice shell.[52]  However, he never claims that these other applications would employ PerfectOffice APIs.  Finally, he claims that because PerfectOffice was "installed with and made use of" Netscape Navigator the combination of PerfectOffice and Netscape had the potential to "reduce the need for end users to upgrade their PC operating system in order to obtain new applications features,"[53] but he does not claim that this combination could induce users to switch away from Windows.

53.    Despite the lack of clarity of Professor Noll's claims, market evidence indicates that Novell's OPAs clearly did not have the potential to increase PC operating system competition.  There have been no full featured, widely-adopted applications written to the APIs of the technologies bundled with Novell's OPAs.  There have also been no applications of this type written to the APIs exposed by any OPAs or, in fact, any middleware layer.

54.    The failure of Novell's OPAs or any middleware layer to serve as a platform for general application development is due to several factors.  First, because of Microsoft's position in the PC operating system market, there was little incentive for ISVs to write cross-platform applications to a middleware layer.  Second, OPAs were not a natural distribution mechanism for middleware functionality.  Third, the functionality contained in the technologies bundled with Novell's OPAs was much more technically limited than other potential middleware platforms such as Java (which has also failed to support successful cross-platform productivity applications).

---

[51] Declaration of Roger G. Noll, May 1, 2009, p. 9.
[52] Declaration of Roger G. Noll, May 1, 2009, p. 9.
[53] Declaration of Roger G. Noll, May 1, 2009, p. 9.

CONTAINS CONFIDENTIAL INFORMATION

### i.   Market Evidence

55.    If the claims of Professor Noll and Mr. Alepin are valid, then we would expect at least some evidence that ISVs wrote robust, cross-platform applications to the APIs of OPAs in general and Novell's OPAs in particular.  However, the evidence is clear that Novell failed to induce any, let alone a sufficient number, of ISVs to do so.  I could find no evidence, and Professor Noll offers none, of any robust, cross-platform third-party applications that were developed using PerfectFit or any of the other technologies Novell bundled with PerfectOffice or GroupWise.  Likewise, I could find no evidence, and Professor Noll offers none, that Novell's major product offerings were built with AppWare or that full-featured, widely-used applications were built with the AppWare framework.

56.    The experience of Microsoft Office also suggests that ISVs would not find OPAs a platform for general purpose applications development.  Microsoft Office exposes APIs.  It is available on the two most popular PC operating systems: Windows and Macintosh.  It is far and away the most popular OPA suite on either platform.  However, its developer base consists primarily of either in-house or value-added corporate developers who primarily customize Office for their own needs,[54] and ISVs have not developed any full-featured cross-platform applications written to Office that would make users more willing to switch to the Macintosh platform.[55]

---

[54] "The Office developer base can be divided into two broad segments: corporate developers and solution providers (or value-added resellers). Corporate developers are typically IT or MIS staff within companies that have already committed to the Office productivity applications. These companies ... customize the applications and tool for the specific needs of their business. ... Solution providers offer services to the same type of customers, but place more emphasis on their own productivity and on the marketability of their skill set."  Microsoft Office XP Developer Product Guide, February 2001.

[55] In a Microsoft Developer's Network (MSDN) article about Microsoft Office XP, for example, developers are told, "Applications you create with Microsoft Office XP are likely to fall into one of the following broad categories: data-management applications, document templates, add-ins, and Web applications — either with or without a data-management component."  (http://msdn.microsoft.com/en-us/library/aa189705(office.10).aspx).

CONTAINS CONFIDENTIAL INFORMATION

57.     Finally, the experience of Java is most telling with regard to the platform potential of Novell's technologies.  Java has been widely recognized as having the greatest potential to serve as a cross-platform middleware layer.  Java has attracted much greater interest from software developers than Novell's technologies and received much wider distribution than Novell's technologies, yet it did not succeed as a platform for client applications.  In the late 1990s, Netscape[56], IBM[57], Corel[58] and other ISVs sympathetic to Java attempted but failed to write cross-platform applications.  Even today, Java has ubiquitous distribution;[59] it is less fragmented[60] and more sophisticated; and its GUI libraries are more mature than when some ISVs were attempting to write full-featured Java client applications in the 1990s.[61]  However, there are still no robust,

---

[56] Michael A. Cusumano and David B. Yoffie, Competing on Internet Time: Lessons from Netscape and Its Battle with Microsoft (New York: The Free Press, 1998), pp. 179-180.

[57] Howard Solomon, "Lotus Pulls Plug on Life Support for Desktop App," *Computing Canada*, September 24, 1999.

[58] "Productivity Apps," *PC Magazine*, May 15, 1998, p. 84.

[59] http://www.sun.com/aboutsun/media/presskits/javaone2004/Schwartz_JavaOne_062804.pdf (downloaded April 29, 2009).
http://www.sun.com/aboutsun/media/presskits/javaone2007/index.jsp#stats (downloaded April 29, 2009).

[60] Sun acknowledged internally that issues with Java as a development platform included "It is not backward-compatible across minor releases. … This is a serious problem now …" and "… the developer's perception of Java as an unstable platform is widespread."  (Sun Microsystems internal memo titled, "Difficulties Associated with the Solaris Java Runtime Environment" by Julian S. Taylor and cosigned by 22 others, March 21, 2002, SUN2-574-00000564)  Moreover, Sun's customers had expressed "it's not uncommon to take two third-party products and be unable to find a common certified VM between them."  (SUN2-574-00000577).  Sun introduced Java Update in August 2003 in part to address these "Product Weaknesses" (Sun Microsystems, "Java 2 Platform, Standard Edition version 1.4 Marketing Plan," January 22, 2002, SUN2-27-000835, http://today.java.net/pub/n/Sun_142_01_JDK_JRE and http://java.sun.com/developer/community/chat/JavaLive/2005/jl0301.html, downloaded May 5, 2009).

[61] "Unfortunately, AWT didn't offer the required desktop features. Swing addressed this problem, but it was full of bugs. Today, Java has the features you need for building large desktop applications and the bugs were fixed." (Andrei Cioroianu, author of "Java XML Programmer's Reference" and "Professional Java XML," February 18, 2004, http://www.onjava.com/pub/a/onjava/2004/02/18/desktop.html, downloaded May 5, 2009.)  "It's now 2006 and the world is a very different place. … Swing is totally there now: mature, fixed, better, and 100% ready to step up to the [user interface] challenge." (Joe Winchester, Editor-in-Chief of the Java Developer's Journal, June 20, 2006, http://java.sys-con.com/node/232079, downloaded May 5, 2009.)

CONTAINS CONFIDENTIAL INFORMATION

widespread "write once run everywhere" client-only applications.  Even Sun's flagship OpenOffice is only partially written in Java.[62]

### ii. The Technologies Bundled with Novell's APIs Did Not Attract ISV Support for Economic and Technical Reasons

#### a. Middleware Has Little Value when PC Operating System Markets Are Concentrated

58.    All potential middleware threats have suffered from what I will refer to as the "topology" of PC operating system markets.  Cross-platform middleware is attractive when the markets for PC operating systems are fragmented; that is, when there are many competing PC operating systems that each have relatively small shares of all users.  In this case, the incentives for ISVs to "write once — run anywhere" are relatively high.  Writing one application that can run on 10 individual platforms may be worthwhile when the alternative is to write a specialized application limited to only 10-20 percent of all users — on, say, the largest of the many small platforms — or writing 10 specialized native applications in order to get the same potential user base.  Under such conditions, the performance/portability trade-off that would be acceptable to an ISV could be substantial.  This is also why Java has been relatively successful on servers, where the operating system topology is much more fragmented, and on cell phones and other non-PC clients, where special-purpose operating systems abound.[63]

59.    As Professor Noll emphasizes in this case, however, the topology of the market for PC operating systems has been far from fragmented.  According to Professor Noll, Microsoft's share of new PC operating systems was never below 80 percent in any

---

[62] http://download.openoffice.org/common/java.html.

[63] See Phillip Allen Johnson, "Three Faces of Java Will See Different Fates," Lantimes.com, March, 1998: "Windows NT has to share the server territory with various Unix versions, Novell, Inc. Netware, the range of IBM OSs, and others.  If a programmer has to write a single server application that can run on all the different servers in the company, Java may be the only way to get it done.", http://web.archive.org/ web/19991110021525/http://www.lantimes.com/98/98mar/803c037b.html.

CONTAINS CONFIDENTIAL INFORMATION

year between 1993 and 2001.[64]  With this topology of user shares, the payoff to writing applications to a cross-platform middleware layer is small.  An ISV switching to middleware for its application would sacrifice functionality for a large base of users (Windows) in order to appeal to a much smaller set of users (the users of the remaining PC operating systems).  In this market environment, there is not much demand for cross-platform middleware capabilities.

60.    In addition, prior to the introduction of Windows 95, any application written to Windows or MS-DOS would also run on the other main x86 PC operating system at the time, OS/2, because IBM had access to all Windows 3x and MS-DOS APIs. This would further reduce the incentive of an ISV to write applications to a middleware platform.

### b.    *OPAs Are Not a Natural Distribution Method for Middleware*

61.    As described above, the government's theory in Microsoft III was that ISVs would only write applications to middleware if it was ubiquitous.  In other words, the middleware layer had to be something that nearly all users already had installed on their computers or at least could easily install on their computers.  OPAs would be a poor choice for distributing middleware for general purpose applications because, as discussed above, the share of computers with any business word processor or suite was never more than 60 percent before Novell sold WordPerfect.  (See Exhibit 4).  Novell never attempted to achieve ubiquity for its OPAs by either heavily discounting or giving away for free its OPAs or groupware as both Netscape and Java did.

### c.    *Technical Limitations of Middleware and Novell's Technologies*

62.    Professor Noll alleges that WordPerfect and PerfectOffice represented middleware threats through various technologies bundled with PerfectOffice, including the Desktop Application Director (DAD), the PerfectOffice desktop shell, and

---

[64] Declaration of Roger G. Noll, May 1, 2009, Table 3.

CONTAINS CONFIDENTIAL INFORMATION

PerfectFit.[65]  Professor Noll also describes AppWare, Corsair and GroupWise as middleware threats.[66]

63.    Even if Novell's OPAs did contain middleware, ISVs considering writing to that middleware layer faced the same inherent limitations faced by any effort to write applications that ran without modification on different hardware-PC operating system platforms.[67]  Portability involved sacrifices on other performance dimensions.[68] Developers could increase speed and add features by taking advantage of platform-specific techniques.  For example, early efforts to write Java applications were substantially slower and less full-featured than alternatives written to take advantage of specific platforms even though Java offered far more support for applications than OPAs.[69]

64.    I understand that Professor Bennett explains in his expert report in this case that all of the technologies that were bundled with PerfectOffice added additional functionality to PerfectOffice but did not serve as a platform for applications development.   While these capabilities would give users the ability to perform simple actions within PerfectOffice applications and create simple GUI elements such as dialog boxes, they do not represent the kind of development tools, either individually or in combination, necessary to create general purpose applications.

[65] Declaration of Roger G. Noll, pp. 89, 109.
[66] Declaration of Roger G. Noll, p. 89.
[67] The idea of using high-level languages to create code that would work on different platforms dates back to at least the 1950s, when languages such as FORTRAN and COBOL were seen as providing the ability to write source code that could simply be recompiled to run on any platform.  Java the language is no different in concept.  Where Java differs from most earlier efforts is that it is a run-time environment in which the JVM creates machine-specific code at the time the application is run.  Even there, however, it is not without precedent.  Many versions of BASIC (including the one that gave Microsoft its start in the mid 1970s) used run-time interpreters.  Of the three PC operating systems offered for the original IBM PC, one (UCSD-Pascal) was in fact an interpreted version of the Pascal language.  It lost out to MS DOS in large part because of its slow performance.
[68] *See* "Does Java Really Matter?" *PC Magazine*, April 7, 1998.
[69] *See* Wylie Wong, "Andreessen: Netscape's Javagator Is Dead," *CRN*, July 1, 1998, http://content.techweb.com/printableArticle?doc_id=TWB19980701S0001 (downloaded September 30, 2002).

CONTAINS CONFIDENTIAL INFORMATION

65.    GroupWise, AppWare and Corsair also failed to develop into platforms for applications development because of technical limitations.  GroupWise suffered from poor developer support and was criticized for its lack of an integrated development environment, and its strong ties to NetWare were considered a disadvantage due to NetWare's perception as a file and print services environment rather than as an applications development platform.[70]  Similarly, while Novell evangelized AppWare, it did not live up to the hype and failed to attract developer interest.  It was perceived as lacking the features expected by seasoned programmers,[71] overly simple, and unsuitable for creating a "real enterprise application."[72]  Professor Noll describes Corsair as "an alternative to the Windows GUI" which comprised cross-platform middleware that made Novell a target for Microsoft.[73]  As early as April 1994, it was characterized in an internal strategy document by Novell as "doomed to failure as currently directed."[74]  It was originally scheduled for release in 1995[75] however, despite development continuing through 1995,[76] Corsair was never marketed to the

---

[70] "GroupWare Special Report," PC User, November 13, 1996.

[71] "Novell's … AppWare development tool offers fledgling programmers an attractive graphical environment, but lacks the robust feature set seasoned developers have come to expect from market leaders such as Microsoft's Visual Basic."  DelRossi, Robert A., "AppWare's limits outweigh its innovations." *InfoWorld* Vol. 17 No. 16, April 17, 1995, pp. 85-88.

[72] "AppWare, for its part, attempted to oversimplify a very complex task. Point-and-click application development appeals to almost no one. If you felt you must point and click, you probably didn't have the sophistication to create a real enterprise application. Those who were up to the task preferred other tools."Wittman, Art, "Oracle and Novell: separated at birth?" *Network Computing*, Vol. 8 No. 7, April 15, 1997, pp. 123-124.

[73] Declaration of Roger G. Noll, p. 89.

[74] Novell internal strategy document by Joe Firmage, Vice President of Strategy for Novell's Network Systems Group, NOV 00032659;  Firmage, Joe, "Perspective: An open-source letter," October 1, 2003, available at  (http://news.cnet.com/2010-7344-5083904.html).

[75] "Questions & Answers: Networking and Novell, An Interview with Robert Frankenberg," *Network Computing* 14(514), November 15, 1994.

[76] "Novell readies middleware for Net; Lotus cuts client prices," *Computer Reseller News* 662, December 11, 1995, p. 225.

CONTAINS CONFIDENTIAL INFORMATION

public and was eventually abandoned, and thus could not have posed a credible threat to Microsoft.[77]

### iii. Professor Noll's Claims are Inconsistent With The Court's Finding in Microsoft III

66.    Finally, as argued previously with respect to Professor Noll's claims regarding cross-platform applications, his claims regarding the middleware potential of OPAs are also inconsistent with the government theory in Microsoft III.  If OPAs had exposed a broad enough range of APIs to attract developers of general purpose applications and had the sort of ubiquitous distribution that would be necessary to make them an attractive platform for developing applications, then the government could not have claimed that acts alleged to disadvantage Netscape and Java had the potential to generate significant harm to competition in PC operating systems. However, the government did not claim and the District and Circuit courts did not find that OPAs had either of the characteristics that the courts in Microsoft III saw as unique to Navigator and Java in making them potential threats to Windows.

## V.    The Challenged Conduct Did Not Cause Anticompetitive Harm to Novell's OPAs or Harm PC Operating System Competition, and It Benefited Consumers

67.    Even if Novell's OPAs had the potential to impact PC operating system competition, Professor Noll's liability claims could only be valid if the alleged anticompetitive conduct harmed Novell's OPAs and prevented them from increasing PC operating system competition.  Professor Noll's analysis of Microsoft's alleged anticompetitive conduct fails to support his claims.  Much of the alleged conduct was unrelated to OPAs or occurred before Novell owned those OPAs or after Novell sold its OPAs to Corel, and Professor Noll offers no coherent theory as to how this conduct

---

[77] Deposition of Robert Frankenberg, March 25, 2009, p. 28.

CONTAINS CONFIDENTIAL INFORMATION

caused anticompetitive harm to Novell's OPAs. For the small set of challenged acts that are related to Novell's OPAs, Professor Noll provides zero evidence that the conduct caused anticompetitive harm to Novell's OPAs or prevented them from increasing PC operating system competition.  In addition, Professor Noll completely ignores the obvious procompetitive impact of much of the challenged conduct.

68.    The lack of focus on determining the actual impact of Microsoft's challenged conduct on PC operating system competition is reflected in the taxonomy of alleged anticompetitive acts put forth by Professor Noll.  Professor Noll organizes his analysis of the conduct around the types of acts rather than around how the acts harm competition.  There is no reason to believe that the effect of one practice on Netscape or Java in 1997 would have any relationship to the effect of the same type of action on Novell in 1994.  A proper analysis must focus on the competitive significance of the acts, not on their qualitative similarity.

## A. Exclusionary Agreements

69.    Professor Noll argues that Microsoft entered into many exclusionary agreements that had the effect of excluding competitors from the market.  My analysis suggests that the conduct was either unrelated to OPAs or not directed at Novell, or it occurred before or after Novell owned OPAs competing with Microsoft's products. Professor Noll provides no sensible explanation for how this conduct could have harmed Novell's OPAs.  Even if the conduct had harmed Novell's OPAs, Professor Noll provides no evidence that suggests that the challenged conduct prevented Novell's OPAs from impacting PC operating system competition.  Moreover, many of these agreements have clear procompetitive effects.

### i.  *The Alleged Conduct Did Not Harm Novell's OPAs*

70.    The agreements that Professor Noll alleges are anticompetitive were either unrelated to OPAs during the time Novell was in the OPA business or were not directed at Novell.

CONTAINS CONFIDENTIAL INFORMATION

a) Professor Noll alleges that Microsoft tried to reach agreements not to compete with IBM and Netscape.[78]  These alleged agreements covered web browsers and PC operating systems, not OPAs.  Even if those agreements had been related to OPAs, they still would have had no impact on Novell because Microsoft never entered into those agreements with Netscape or IBM.

b) Professor Noll also argues that some of the agreements at issue in Microsoft III reduced competition by excluding Netscape and/or Java.[79]  Whatever impact those agreements might have had on Netscape and/or Java, they had no impact on Novell's OPAs.  In addition, even if this conduct could somehow have impacted OPAs, it occurred after Novell sold WordPerfect and Quattro Pro, so it could not have harmed Novell's OPAs.

c) Professor Noll claims that Microsoft's Market Development Agreements ("MDAs") were anticompetitive because they gave discounts to Original Equipment Manufacturers ("OEMs") "based on the degree to which the OEM committed to sell mostly Microsoft products."[80]  As I discuss in more detail below, his characterization of the details of the agreements themselves is highly inaccurate.  Even if his characterization were accurate, MDAs could not have impacted OPA sales.  In the MDA program, OEMs earned discounts only on Windows and not application products.  OEMs earned the discounts for achieving milestones for activities related to PC operating system products and not applications, and Professor Noll has identified no MDA provision that could have adversely affected sales of Novell's OPAs.

d) Professor Noll also argues that Microsoft's Enterprise Agreements ("EAs") were anticompetitive because they gave discounts to enterprises that committed to

---

[78] Declaration of Roger G. Noll, May 1, 2009, pp. 108-113.
[79] Declaration of Roger G. Noll, May 1, 2009, pp. 92-96.
[80] Declaration of Roger G. Noll, May 1, 2009, pp. 102.

CONTAINS CONFIDENTIAL INFORMATION

Windows, Office, and BackOffice for 100 percent of their desktops.[81]  Professor Noll fails to mention that Microsoft's EA program did not begin until 1997, well after Novell had sold WordPerfect.  Whatever potential impact these agreements may have had on OPA sales after 1997, they had no impact on Novell's OPAs.

e) Finally, Professor Noll claims that Microsoft punished or threatened to punish OEMs with higher Windows prices if they preinstalled competitors' OPAs.[82]  He also asserts that Microsoft forced OEMs to set unrealistically high minimum commitments and then used the resulting prepaid balances to induce OEMs to renew their contracts with Microsoft at the expense of competing applications.[83]  However, he admits that this conduct was not directed at Novell; rather, the alleged anticompetitive threats to raise Windows prices were directed at OEMs that considered installing Lotus SmartSuite.[84]  In fact, the single example he cites regarding prepaid balances relates to Acer's decision to install Microsoft Works rather than SmartSuite.[85]

### ii. The Alleged Conduct Did Not Prevent Novell's OPAs from Affecting PC Operating System Competition

71.    The only agreements that could potentially have affected OPA sales, even though they did not harm Novell, were Microsoft's agreements with OEMs.  As noted above, Professor Noll alleges that Microsoft conditioned Windows pricing on excluding Microsoft's OPA competitors.[86]  He also argues that Microsoft forced OEMs to sign contracts with unrealistic minimum purchase commitments.[87]  As a result, OEMs had

---

[81] Declaration of Roger G. Noll, May 1, 2009, p. 106.
[82] Declaration of Roger G. Noll, May 1, 2009, pp. 96-100.
[83] Declaration of Roger G. Noll, May 1, 2009, pp. 100-102.
[84] Declaration of Roger G. Noll, May 1, 2009, p. 100.
[85] Declaration of Roger G. Noll, May 1, 2009, p. 101.
[86] Declaration of Roger G. Noll, May 1, 2009, pp. 92-96.
[87] Declaration of Roger G. Noll, May 1, 2009, pp. 100-102.

CONTAINS CONFIDENTIAL INFORMATION

large prepaid balances at the end of the contracts that allegedly tied them to Microsoft for the next contract at the exclusion of competing OPAs.[88]

72.    Professor Noll's claims that Microsoft's conduct reduced PC operating system competition are only valid if the conduct prevented Novell's OPAs from being sufficiently attractive that they would lead users to choose other PC operating systems over Windows.   Several factors demonstrate that these OEM agreements did not prevent Novell's OPAs from increasing PC operating system competition.

*a. The OEM Channel Has Never Been an Important Channel for OPA Sales*

73.    A small share of OPA sales occurred through the OEM channel.  Most businesses have preferred to install applications themselves.[89]  Moreover, few home users wanted full office productivity suites during the time Novell owned WordPerfect and instead preferred packages such as Works Suite because they included applications such as Encarta and games that were oriented to home users.[90]  Professor Noll admits that WPC did not place much emphasis on selling through the OEM channel and that as of April 1995, less than 1 percent of WordPerfect sales occurred through OEMs.[91]  In fact, WPC "deliberately avoided the OEM bundling marketplace because of the low margins."[92]  Exhibit 5 shows the share of Microsoft OPAs sold through the OEM channel.  During the period Novell owned WordPerfect, the share of Microsoft's OPAs sold through the OEM channel was never more than 10 percent in any year.  According to IDC, less than 7 percent of all suite sales occurred through the OEM channel in 1996.[93]  Thus, even if it were true that Microsoft's agreements prevented Novell from

---

[88] Declaration of Roger G. Noll, May 1, 2009, pp. 100-102.
[89] Deposition of John Throckmorton, November 2, 2001, pp. 308-309.
[90] Compaq considered offering Corel Office preinstalled, but when it surveyed PC owners it learned that they strongly preferred Works Suite. COMPAQ 012919 -  012959. See Compaq Computer Corporation, "Bundled Productivity Applications Proposal", January 18, 2001. Compaq 012960-012979.
[91] Declaration of Roger G. Noll, May 1, 2009, p. 98.
[92] NWP00035565-69 at 65; Deposition of Willard E. Peterson, October 1,2008,  pp. 85-86, 89; Deposition of Dean Clive Winn II, December 10, 2008, pp. 20, 26, 31.
[93] IDC #13421, PC Office Suite Market Review and Forecast, 1996-2001, pp. 9-10.

CONTAINS CONFIDENTIAL INFORMATION

making sales in the OEM channel, Novell was still free to compete for a large share of OPA sales. These contracts could not have prevented Novell's OPAs from capturing a large enough share of the OPA market to be a competitive threat to PC operating systems.

### b. *Professor Noll Provides No Evidence that Windows Prices Were Higher for OEMs that Installed Competing OPAs*

74.    To support his claim that Microsoft excluded competing OPAs from the OEM channel, Professor Noll cites Judge Jackson's Findings of Fact regarding Microsoft's alleged threats to IBM concerning the bundling of SmartSuite with IBM PCs,[94] but fails to note that IBM rejected Microsoft's alleged offer.[95] He also cites affidavits from IBM/Lotus executives asserting that OEMs had told them that they would not buy SmartSuite for fear of antagonizing Microsoft.[96] He does not cite testimony from a representative of a large OEM (Compaq) that contradicts this.[97] Moreover, Professor Noll does not provide any empirical evidence to suggest that OEMs that installed competing OPAs paid higher prices for Windows than OEMs that did not.

### c. *Prepaid Balances Did Not Exclude Competitors*

75.    There are several serious flaws with Professor Noll's claim regarding prepaid balances. Some of Microsoft's contracts for applications contained "minimum commitments" that stipulated that the OEM would pay Microsoft some minimum amount, irrespective of how many units the OEM sold that were covered by the contract.[98] My analysis of these minimums is that they have no anticompetitive consequences. They are met once the OEM has sold a given number of PCs, irrespective

---

[94] Declaration of Roger G. Noll, May 1, 2009, p. 100.
[95] FOF, at ¶¶ 124-29.
[96] Expert Report of Professor Roger G. Noll, June 2, 2006, pp. 137, footnotes 265, 266.
[97] Deposition of Michael Rubin, November 28, 2001, pp. 78-81. Rubin was formerly at Compaq, where he was a Manager of Product Line Planning in Compaq's consumer products division.
[98] Declaration of Roger G. Noll, May 1, 2009, p. 101.

CONTAINS CONFIDENTIAL INFORMATION

of whether the PCs have Microsoft's or competitors' applications installed.  They thus have no impact on an OEMs' decision with respect to whether to install Microsoft's or a competitors' OPAs on the covered units.

76.     My understanding is that prepaid balances become relevant when an OEM's sales fall short of its minimum commitment.  Microsoft sometimes allowed OEMs to apply this shortage to their subsequent contract.  This effectively decreased their minimum commitment in the previous year and increased their minimum commitment in the subsequent year if the OEM renewed its contract.  It is unclear why this conduct, which is not unlike "rollover minutes" used by mobile phone companies, could have excluded Novell.  All Novell would have had to do was provide a discount large enough to offset the OEM's lost discount for failing to renew with Microsoft.

77.     Professor Noll cites only one example to support his claim that Microsoft used prepaid balances to exclude a competitor's OPAs.  In 1996 Microsoft agreed to roll over Acer's $3 million prepaid balances.  At the same time, Acer decided to switch from pre-installing SmartSuite to pre-installing Microsoft Works on some models, so the solitary example has nothing to do with Novell's OPAs.  Professor Noll dismisses the claim by Acer's executive Michael Culver that the decision to switch to Works had nothing to do with Microsoft's offer to roll over its prepaid balances.[99]  Even this example cannot be a source of harm to Novell since it involved Lotus's SmartSuite rather than Novell's OPAs.  It also involved Microsoft's consumer product Works that targeted a segment different than the one targeted by Novell's OPAs.

---

[99] Noll claims this would imply that "software costs are irrelevant to purchase decisions." Declaration of Roger G. Noll, May 1, 2009, fn. 126. However, the same executive testified that bundling Works was more profitable for the first time buyers Acer was targeting because they did not need the additional functionality included in SmartSuite and that bundling with SmartSuite would yield higher support costs. Deposition of Michael Culver, April 18, 2002, pp. 26-30. He also testified that he would have chosen Works over SmartSuite even without the rolled over prepaid balanced because there was no other comparable bundle of productivity applications. Deposition of Michael Culver, April 18, 2002, pp. 79-80.

CONTAINS CONFIDENTIAL INFORMATION

### iii. The Challenged Conduct Benefited Consumers

78.    While none of the alleged exclusionary agreements had any impact on Novell's OPA business or reduced PC operating system competition, many of these agreements had clear procompetitive effects.

#### a. MDAs Were Procompetitive

79.    Consumers choose among computing platforms (i.e., combinations of hardware and software) based on their prices and functionality.   Success in the marketplace depends on whether a platform offers consumers an attractive combination of hardware, PC operating system software, and applications.   The technical and economic interrelationships of platform components create substantial incentives to coordinate platform development in order to "drive the platform forward."   A common response to this need for coordination has been the vertically integrated platform approach in which a single supplier produces and markets both the hardware and the PC operating system, and sometimes even the applications software.   Examples of vertically integrated platforms include the Apple/Mac OS and Sun's model of selling its own proprietary version of Unix PC operating system (Solaris) on its own hardware.

80.    While a vertically integrated structure successfully "internalizes" the interactions among platform components, it sacrifices much of the ingenuity and many of the incentives available in vertically disintegrated approaches.   The Windows/Intel platform represents a hybrid model in which individual firms (Microsoft and Intel) have large shares of sales in some segments of the platform (PC operating systems and microprocessors, respectively), while the other components of the platform (other hardware and applications) are effectively decentralized, being provided by a wide range of suppliers.

81.    This decentralization creates a need for platform coordinating activities like the MDA program.   Such a program guides the product design and marketing decisions of independent suppliers in a way that provides for more uniform platform

CONTAINS CONFIDENTIAL INFORMATION

development and promotion.  This benefits consumers by providing for, among other things, better-coordinated improvements to the platform.

82.     One of the most important ways in which Microsoft supports the development of the platform has been through its MDA program.  Since 1994 Microsoft has been providing discounts to OEMs for achieving certain milestones.  In 2001, Microsoft made some minor revisions to the program and changed the name to the Market Development Program (MDP).  Exhibit 6 summarizes my review of Microsoft's MDAs with some of the largest OEMs from 1994 to 2003.  From this review, I have concluded that Professor Noll's analysis of MDAs is flawed on many dimensions.  MDAs were procompetitive because they induced OEMs to make investments that increased the value to consumers of the Windows platform—investments that OEMs would not otherwise have made.

83.     The first column of Exhibit 6 categorizes the milestones that OEMs needed to achieve to earn discounts.  This column refutes Professor Noll's implicit claim that the MDA program gave OEMs discounts for selling a required share of their PCs with Windows or penalized OEMs for installing rival middleware.  In addition, these milestones demonstrate that the MDA program was fundamentally different from licensing practices prohibited by the 1994 consent decree.  Prior to the 1994 consent decree, OEMs received discounts simply for choosing per-processor or per-system licenses over per-copy licenses.  Under the MDA program, OEMs receive discounts for undertaking activities that enhanced the value of the Windows platform.

84.     The next three columns highlight that each one of these activities provided benefits to Microsoft, consumers and other participants in the Windows platform.  Since the full value of providing these benefits would not be captured by an individual OEM, each OEM would not have the economically appropriate incentive to undertake these activities without the incentives provided by the MDA program.  The next column in the table highlights how the same procompetitive benefits could be achieved by a vertically integrated platform vendor, such as Apple.  For example, an integrated

CONTAINS CONFIDENTIAL INFORMATION

platform vendor would preserve a standard user interface—a benefit to consumers—by installing the same interface on all the machines it sells.  Microsoft reduces OEMs' incentives to "Balkanize" the interface by providing financial incentives in arms-length transactions with downstream OEMs.

### b. *Microsoft's Contracts Featuring Minimum Commitments Were Procompetitive*

85.     Microsoft has historically priced its applications software to OEMs in two ways.  "Per copy" licenses stipulate a price that the OEM pays Microsoft for each copy of a Microsoft application that the OEM installs.  "Per-system" licenses stipulate that the OEM pays Microsoft an amount per unit that it ships of a predefined class of PCs (a "system").  In exchange, the OEM has the right to install a Microsoft application on any or all units in this class.[100]

86.     An important element of Microsoft's per-system licenses is that, unlike Microsoft's "per copy" licenses, the OEM pays a zero incremental price for installing a Microsoft application on a unit covered by a per-system license.  These contracts are efficient because they encourage the OEM to install a Microsoft application as long as the OEM's value of doing so exceeds zero, so they equate the marginal cost of the OEM to the marginal cost of Microsoft.  Per-copy licenses, on the other hand, encourage OEMs to install less than the efficient amount of Microsoft's software on their machines because the price OEMs pay for incremental copies exceeds Microsoft's cost of supplying these copies.  Microsoft, OEMs, and end-users benefit from per-system licenses because all units for which customers' willingness to pay exceed the marginal cost of production are sold.

---

[100] Prior to the 1995 consent decree, Microsoft also used "per-processor" licenses that stipulated an amount that the OEM paid Microsoft for each PC the OEM shipped that used a particular processor. These were used primarily for PC operating system licenses and not for application licenses.  See Final Judgment, United Sates v. Microsoft Corporation, Civil Action No. 94-1564, August 21,1995, p. 2.

CONTAINS CONFIDENTIAL INFORMATION

87.     A firm that prices its goods such that customers pay nothing per unit must, of course, be compensated through other means, so that the firm can cover its fixed costs.  The efficient fixed payment would vary across OEMs based on the number of units they expect to sell, with larger OEMs having larger fixed payments.  However, buyers do not have an incentive to accurately reveal how many units they expect to sell, so sellers need some mechanism for inducing buyers to reveal their expectations.  A contract with minimum commitments plus a fixed payment per unit past that minimum level provides that incentive.  These kinds of contracts are used frequently by mobile phone operators who charge lower prices per minute for customers who commit to more minutes and a fixed marginal price per minute for customers that go over their minimum.

88.     Thus, the existence of prepaid balances is a natural consequence of contracts with minimum commitments.  Contracts with minimum commitments, in turn, flow naturally from the fact that Microsoft's marginal costs of having an OEM install an additional copy of a Microsoft software is effectively zero.  Microsoft and OEMs would have an incentive to adopt contracts of this form absent any possibility of excluding OPA competitors because marginal cost pricing and reducing transaction costs are in Microsoft's and OEMs' mutual interest.

## B. Tying

89.     Professor Noll claims that Microsoft tied a variety of different products to its PC operating system products in order to preserve its market power in PC operating systems.[101]  As with Professor Noll's allegations regarding exclusive agreements, none of this conduct harmed Novell's OPA business, none of the conduct reduced the ability

---

[101] Declaration of Roger G. Noll, May 1, 2009, pp. 113-114.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

of Novell's OPAs to affect PC operating system competition, and much of the conduct had a clear procompetitive impact.[102]

### i. *None of the Alleged Ties Involved OPA Products*

90.    Professor Noll alleges that Microsoft's inclusion of PC operating system functionality into Windows and allegedly tying Windows and MS-DOS in Windows 95 and subsequent Windows 9x products were anticompetitive ties.[103]  Since GUIs are not OPAs and Novell did not produce a GUI, there is no logic as to the claim that the conduce caused harm to Novell's OPAs, or have affected PC operating system competition through such harm to Novell.  Professor Noll's claims regarding the tying of Internet Explorer to Windows[104] are similarly flawed.  Internet Explorer is not an OPA and Novell did not produce a web browser.  Professor Noll's analysis provides no sensible justification for how this conduct harmed Novell's OPAs or harmed PC operating system competition through the harm to Novell's OPAs.

91.    Professor Noll also claims that Microsoft's decision to prevent OEMs from launching alternative shells on the initial boot sequence of Windows was anticompetitive.[105]  It is unclear exactly why this conduct represents tying because, as Professor Noll admits, users still had the opportunity to use alternative shells.[106]

92.    Finally, Professor Noll argues that it was anticompetitive to tie a network client with Windows for Workgroups.[107]  Since Windows users could obtain Windows without the network client and were free to install other network clients, it was clearly not a tie.  Moreover, while Microsoft's decision to offer Windows users a network client

---

[102] He also alleges that Microsoft tied its messaging application to Windows 95 even though he admits that not all versions of Windows 95 required installation of the messaging application. This issue is discussed in more detail below. Declaration of Roger G. Noll, May 1, 2009, p. 123-124
[103] Declaration of Roger G. Noll, May 1, 2009, pp. 114-116.
[104] Declaration of Roger G. Noll, May 1, 2009, pp. 119-123.
[105] Declaration of Roger G. Noll, May 1, 2009, pp. 117.
[106] Declaration of Roger G. Noll, May 1, 2009, pp. 118.
[107] Declaration of Roger G. Noll, May 1, 2009, pp. 118-119.

CONTAINS CONFIDENTIAL INFORMATION

to compete with Novell's network client clearly affected Novell by providing competition to its network client competition, such competition is procompetitive. It is also not clear why Microsoft's decision to offer Windows users a networking client would affect Novell's OPA business. Professor Noll offers no explanation for why this conduct is relevant to this case.

93.    In conclusion, since none of the products allegedly tied to Windows were OPA products, this conduct could not have reduced the sales of Novell's OPAs significantly so as to prevent them from increasing PC operating system competition.

### ii. The Challenged Conduct Had Procompetitive Effects

94.    As Professor Noll notes, bundling of products is common and in most cases is procompetitive.[108]   However, Professor Noll completely ignores the procompetitive effects of software integration.

### a. Integration of Additional Software Functionality into Products Is Common in Markets Where There Are No Anticompetitive Concerns

95.    One standard test of the hypothesis that a particular act is anticompetitive is to see whether other firms for which anticompetitive effects are unlikely (e.g., firms with smaller market shares) engage in similar business practices. To the extent that such firms engage in the same or similar behavior, one can infer that the practice has a procompetitive rationale. This is particularly true for product design practices which (absent anticompetitive concerns) are generally regarded as procompetitive. It is clear that the integration of additional functionality into existing software products is part of the dynamic nature of competition in software markets,[109] and Novell has added functionality into its products that were once sold separately.[110]  Thus, Microsoft's

---

[108] Declaration of Roger G. Noll, May 1, 2009, pp. 113.

[109] Declaration of Roger G. Noll, May 1, 2009, pp. 21.

[110] "… it's important to understand the basic design goals of PerfectOffice. These can be divided into the following areas: Ease of learning and use; Integrated working environment; Integration with network services," Bill Bruck et al. "Using Novell PerfectOffice 3" (Indianapolis: Que Corporation, 1995), p. 9.

CONTAINS CONFIDENTIAL INFORMATION

behavior is standard business practice in the industry, and this practice presumably has a procompetitive justification.

96.    Professor Noll's failure to consider that Novell and other software firms regularly add additional functionality to their products is particularly troublesome in this case because he fails to provide any means by which we can judge the alleged anticompetitive effects of the conduct.  As such, his analysis ignores evidence supporting a procompetitive interpretation of the integration, and at the same time provides no analysis that would allow us to weigh the procompetitive and anticompetitive effects.  Even if there are circumstances where firms with market power may sometimes be held to different standards and may not be allowed to engage in some behavior that would be legal for firms without market power, Professor Noll does not provide a coherent application of this limited proposition.

   b.   *Windows 95 Integration Was Procompetitive*

97.    Windows 95 eliminated the need for a copy of MS-DOS; the low-level functions that MS-DOS provided for the Windows 3.x platform were incorporated into an integrated product, Windows 95.  This integration offered important advantages to Microsoft in developing the platform and to consumers using it.  Some of these advantages came simply from coordinating the development of both elements, so that new features (such as long file names or plug and play) that required simultaneous changes in the real mode (a function provided earlier by MS-DOS) and protected mode (a function provided earlier by Windows 3.x) components of Windows 95 could be made far more easily.[111]  Prior to Windows 95, Windows required additional code and incurred limitations to ensure that it would work with various existing versions of

---

[111] Microsoft Corporation's Answer to Caldera, Inc.'s Second Set of Interrogatories, October 22, 1998, response to Interrogatory #4.

CONTAINS CONFIDENTIAL INFORMATION

MS-DOS.[112]  Integration also reduced the combinations that had to be tested by Microsoft.[113]  In addition to the features and greater reliability made possible by integration, end users enjoyed the benefits of simpler installation.  Instead of installing DOS and Windows separately, they performed a single installation of Windows 95.[114]

98.    Market evidence also indicates that integration of GUIs with the rest of the PC operating system was efficient and procompetitive.  During the late 1980s and early 1990s, most vendors of commercially significant PC operating systems offered integrated products.  Apple's Macintosh OS had always been integrated.  Once the GUI portion of OS/2 was released in 1988, IBM's OS/2 was sold as an integrated product.[115]  Similarly, Microsoft's advanced PC operating system, Windows NT, was designed and sold starting in 1993 as an integrated product.  New entrants, such as NeXT and Be, also followed the integrated path.[116]  IBM's unsuccessful joint venture with Apple, Taligent, also took an integrated approach.[117]  At the time that Windows 95 was being designed and implemented, it is especially noteworthy that OS/2 was identified by many as the

---

[112] These versions differed not only by version number (e.g., MS-DOS 4.01 v. MS-DOS 3.3), but also across various OEMs that had slight differences in their versions of MS-DOS.

[113] Supplemental Report of John K. Bennett, *Caldera, Inc. v. Microsoft Corporation*, Case No. 2:96 CV 0645B, December 28, 1999, pp. 67.

[114] For comments on Windows 95's ease of installation see Wes Rataushk, "Windows 95: where are we today?" *Computer Shopper*, December 1995, p. 598; Laura Cox and Ben Z. Gotteseman, "Compatibility Compared," *PC Magazine*, September 26, 1995, p. 172; Bryan Chua, Julia Carreon, and Anita Epler, "Reaching an OS impasse: 32-bit desktop PC operating systems," *InfoWorld*, November 13, 1995, p. 90. Microsoft's internal strategy documents also indicate that end users preferred the integrated product. "The users we spoke with hope that DOS goes away over time. …Everyone hoped that future, improved versions of Windows would replace DOS entirely." MS-PCA 1111962.  Recent Apple advertisements also highlight the benefits of integration. http://movies.apple.com/movies/us/apple/getamac_ads2/box_480x376.mov and http://movies.apple.com/movies/us/apple/getamac_ads1/ilife_480x376.mov (downloaded June 8, 2009).

[115] My understanding is that OS/2's GUI, "Presentation Manager," has never been offered for sale as a separate product.

[116] *See* Ross M. Greenberg, "Faces of Unix; graphical user interfaces for Unix systems," *PC Magazine*, September 12, 1989, pp. 143; Scot Hacker, Henry Bortman, and Chris Herborth, "The History of Be, Inc," *The BeOS Bible* (Berkeley, CA: Peachpit, 1999), pp. 30-35.

[117] *See* Allan Friedman, "Taligent," *Computer Desktop Encyclopedia* (Amacom, 1996).

CONTAINS CONFIDENTIAL INFORMATION

most important competitive threat to Microsoft's position on the x86 desktop, while Apple offered a platform alternative. Both OS/2 and Apple offered integrated GUIs that, from a user's perspective, functioned in the same way as Windows 95. As an economist I cannot fathom how it is anticompetitive for a seller to "meet" the product-design characteristics of competitors, especially when that product design has proven *ex-post* to meet the market test.

99.    Professor Noll's claim that Microsoft's integration in Windows 95 was an anticompetitive tie ignores the benefits of integration and the consistency of Microsoft's integration with decisions made by numerous other firms without substantial market power, as discussed above. Microsoft continued to make MS-DOS and Windows 3.x available for licensing for the shrinking number of customers who were interested.[118]

### c. *Integration of Web Browsing Functionality*

100.    Microsoft's inclusion of web browsing functionality with Windows provided benefits to consumers and ISVs. Microsoft's provision of web browsing software with its PC operating system product was consistent with the behavior of all major competitors, including IBM (OS/2), Apple (MacOS), Sun (Solaris), and the commercial distributions of Linux (such as RedHat). Providing complementary software functionality (web browsing capabilities) with the PC operating system "increase[es] the value of third-party software (and Windows) to consumers."[119] The Court of Appeals recognized these benefits, though it found that Microsoft's restrictions on removing end-user access and commingling of the IE code with Windows code were

---

[118] IDC data show that about 44 million copies of MS-DOS or MS-DOS plus Windows 3.x shipped in 1994, compared with 16 million in 1996 (IDC, *Operating Environments, Review and Forecast 1996-2001*, Report #14024, August 1997, Table 2; IDC, *Client Operating Environment: 1998 Worldwide Markets and Trends*, Report #16086, May 1998, Table 2).
[119] Court of Appeals, at 95.

CONTAINS CONFIDENTIAL INFORMATION

anticompetitive, and the consent decree allowed Microsoft to continue integrating the web browsing functionality as long as it allowed removal of end user access.[120]

## C. Technical Allegations

101.    Professor Noll cites a variety of instances in which he alleges that Microsoft used "technical attacks" based on its control of platform elements to disadvantage competing suppliers of applications and middleware.[121] Many of these allegations are irrelevant to the case because they were unrelated to OPAs or did not occur during the period Novell sold OPAs, and Professor Noll offers no sensible theory of how this conduct harmed Novell's OPAs. Professor Noll also distorts the facts with respect to the namespace extension APIs in Windows 95 (referred to in Professor Noll's report as the "IShell API"), and provides no evidence that Microsoft's conduct had any impact on competition. Finally, Professor Noll does not recognize the obvious procompetitive effect of Microsoft's decision not to formally document certain APIs.

### i. *Much of the Conduct Was Unrelated to OPAs during the Period Novell Owned WordPerfect*

102.    As noted above, most of the conduct referenced by Professor Noll either pre- or post-dated Novell's ownership of WordPerfect or was unrelated to OPAs.

*a)* Professor Noll alleges that Microsoft withheld documentation regarding how Microsoft's applications overcame memory limitations and used computer based training in Windows.[122] However, the method for overcoming the memory limitations was no longer a feature of Windows by the time Windows 3.0 was

---

[120] See, for example, Court of Appeals at pp. 65-66. Memorandum Opinion, United States District Court for the District of Columbia, State of New York, et. al. v. Microsoft Corporation, Civil Action No. 98-1233, November 1, 2002, pp. 126-139.
[121] Declaration of Roger G. Noll, May 1,2009, p. 125.
[122] Declaration of Roger G. Noll, pp. 132-133.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

released in 1990,[123] and the CBT documentation was no longer relevant as of the April 1992 release of the Windows 3.1 Software Development Kit (SDK).[124]  The alleged conduct occurred more than two years before Novell acquired WordPerfect.

b)  Professor Noll makes several allegations of technical attacks related to web browsers such as the RNA API, the Scripting Tool, APIs used by Internet Explorer, and the use of Internet Explorer to display Microsoft Windows Help.[125] Since web browsers are not OPAs and Novell was not in the web browser business, it is unclear how this alleged conduct harmed Novell's OPAs.[126]

c)  Professor Noll alleges that Microsoft's "incomplete disclosure" of client-to-server communications protocols have prevented thin clients from supplanting Microsoft desktop PC operating systems.[127]  While this conduct might be relevant in a case involving Novell's server PC operating systems business, I fail to see how this harmed Novell's OPAs.

d)  Professor Noll also alleges that Microsoft purposefully withheld information regarding an "OLE Control" (OCX) container mechanism in Microsoft Access in early 1994 and that "Lotus and Borland complained that this gave Microsoft's productivity applications an unfair advantage."[128] Professor Noll provides no coherent explanation for how conduct that Borland and Lotus complained about regarding database software before Novell owned WordPerfect could have harmed Novell's OPAs.

---

[123] Declaration of Roger G. Noll, pp. 133.
[124] Declaration of Roger G. Noll, pp. 133.
[125] Professor Noll also ignores the fact that the Circuit Court ruled that this conduct was procompetitive. (See Court of Appeals, at 67.)
[126] Declaration of Roger G. Noll, pp. 133-134.
[127] Declaration of Roger G. Noll, pp. 139-140.
[128] Declaration of Roger G. Noll, p. 136.

CONTAINS CONFIDENTIAL INFORMATION

## ii. Microsoft's Decision Not to Document Formally the Namespace Extension APIs Did Not Cause Anticompetitive Harm to Novell's OPAs.

103.    The only conduct discussed by Professor Noll that had a plausible causal impact on Novell's OPAs was Microsoft's decision to discourage ISVs from using certain namespace extension APIs in Windows 95 and not to document formally those APIs.  However, my analysis of the factual record and the economic evidence indicates that the decision did not cause anticompetitive harm because the conduct did not prevent Novell's OPAs from increasing PC operating system competition.

104.    I understand that Professor Bennett explains that the namespace extension APIs would have permitted an ISV to create a custom folder in the hierarchical "tree view" of Windows Explorer.  Professor Noll asserts that Novell intended to use the namespace extension APIs to "implement a greater integration of its products, including integration between the desktop and the network."[129]  He also claims that Bill Gates ordered documentation regarding the namespace extension APIs not be provided to ISVs because he "learned that WordPerfect developers were more innovative than his own applications group in using this feature."[130]  Professor Noll further claims that "retracting these APIs cost WordPerfect between 7 and 11.5 developer-years of efforts."[131]  Mr. Alepin alleges that this caused the release of PerfectOffice to be delayed by 10 months.[132]

105.    While Professor Noll relies in part on deposition testimony of WordPerfect developers to support his claims, contemporaneous documents and the actions of Novell and other OPA vendors indicate that the functionality made possible by the namespace extension APIs would not have made Novell's OPAs more successful

---

[129] Declaration of Roger G. Noll, p. 134.
[130] Declaration of Roger G. Noll, p. 135.
[131] Declaration of Roger G. Noll, p. 135.
[132] "The decision delayed introduction of products optimized for Chicago to June 1996, well beyond the release of Windows 95 in August 1995 ." Expert Report of Ronald S. Alepin, p. 100.

CONTAINS CONFIDENTIAL INFORMATION

and that Novell's delayed release of OPAs for Windows 95 was due to factors other than Microsoft's decision not to document formally the namespace extension APIs.

a) The fact that Microsoft decided not to document formally the namespace extension APIs did not mean that Novell could not use the APIs. At the time Microsoft made its decision, documentation of the namespace extension APIs had already been included in an earlier beta version of Windows 95,[133] and Mr. Alepin admits in his report that "Microsoft did not withdraw the extensions."[134] If Novell had believed that using the namespace extension APIs would significantly increase the functionality of PerfectOffice and the only factor causing the delay was developing a work around, then it is not clear why Novell would not have released a version that used the API while continuing to develop a work-around. The fact that Novell chose to delay the release suggests that factors other than the work-around contributed to the delay.

b) This is consistent with testimony that the workaround was not the only factor causing the delay. Novell's decision to independently implement system dialogs to match its legacy dialogs rather than use the Windows 95 system dialogs required a significant commitment independent of whether Novell used the namespace extension APIs. Indeed, the lead developer at Novell in charge of the effort to replicate namespace extensions stated that his estimate of 7 to 11.5 developer-years of effort (as cited by Mr. Noll) included 4.5 developer-years to integrate the file dialogs into five of Novell's applications as well as the time and effort required to implement system dialogs to match their legacy dialogs, both

---

[133] Deposition of Satoshi Nakajima, February 24, 2009, Exhibit 6.
[134] Expert Report of Ronald Alepin, May 1, 2009, p. 92.

CONTAINS CONFIDENTIAL INFORMATION

which would have been necessary even if they had used the namespace extension APIs.[135]

c) Contemporaneous documents do not support the claims of WordPerfect developers that Novell viewed the namespace extension APIs as crucial to providing additional functionality. For example, on February 21, 1995, Novell revised a "Concept Design Specification" for "Win95 Shell Integration" for WordPerfect for Windows 95, stating: "We will not take advantage of this feature [utilizing the namespace extension APIs] since Microsoft has discontinued support of the required API since this document was originally written."[136] Notably, the discontinuation of support impacted only one of the 22 functional requirements described in the document, and was the last one on the list.[137] After notifying Novell and other ISVs about Microsoft's decision not to document formally the namespace extension APIs, Microsoft's manager of Chicago developer relations, Brad Struss, reported in an October 12, 1994 e-mail that "[s]o far, Stac, Lotus, WP, Oracle, SCC appear to be OK with this."[138]

d) No other OPAs used the namespace extensions.[139] If the functionality was genuinely valuable, one would have expected other OPAs to exploit those APIs. Moreover, according to Professor Noll, WordPerfect developers used a

---

[135] "A. We felt that if we were to drop the -- the file management capabilities that we had, and also ignore all the new spaces that were inside of Windows 95, that we would have -- we would not be received as a Windows 95 application. Or if we were to just go with what they had, we would not be received as being WordPerfect. … Q. So did Wordperfect end up writing its own dialog boxes? A. We ended -- we ended up writing for the file dialog boxes." Deposition of Adam Harral, December 12, 2001, p. 86. "We would have had a cost in trying to move to Windows 95 in the file system anyways, the -- but the addition of having to work out our own -- not having our own -- not having the system dialogs for anything, but having to build all of those from scratch as well...our team of seven worked on that for a year." Deposition of Adam Harral, December 12, 2001, pp. 88-89.
[136] NOV-B00941834-63 at 44.
[137] NOV-B00941834-63 at 44. NOV-B00941714-23
[138] MX 6055840-44 at 40.
[139] Deposition of Paul Maritz, May 22, 2009, exhibit 23 and Deposition of Joseph Belfiore, January 13, 2009, pp. 200-211.

CONTAINS CONFIDENTIAL INFORMATION

workaround for the PerfectOffice release in May 1996 and were using fully implemented namespace extensions in the June 1997 release.[140]  Thus, PerfectOffice for Windows 95 had the functionality that other office suites did not have.

### iii. Deciding Not to Formally Document APIs and Limiting Access to Source Code is Procompetitive

106.    Despite Professor Noll's assertion that "[t]he only plausible reason [for retracting the documentation] was to prevent applications products from entering the market,"[141] there are a variety of reasons that a software vendor might want to withdraw documentation for a planned feature in general, and that Microsoft did not want to formally document the namespace extensions APIs in particular.  I understand that Professor Bennett asserts that Microsoft was concerned that its support of these APIs would be incompatible with future PC operating systems.[142]  Microsoft also worried that applications that used the namespace extension APIs could cause the entire shell to crash, since these APIs were running in the same process as the PC operating system user interface.[143]

107.    PC operating system providers have valid technical reasons for not formally documenting APIs, and I understand that Professor Bennett claims it is common for PC operating systems to have some undocumented interfaces.  Even

---

[140] Declaration of Roger G. Noll, May, 1, 2009, pp. 136.

[141] Declaration of Roger G. Noll, May 1, 2009, p. 135.

[142] On the day that Bill Gates decided to withdraw the documentation, Bob Muglia, the Director of the Windows NT Program Management Group, regarded it as a positive development for Windows NT. "This is very good news," he stated in an e-mail, "Since Bill has decided these interfaces won't be published, NT development does not have to expend precious energy on implementing these for NT." MS 045558-59.  Deposition of Bob Muglia, February 6, 2009, exhibit 10.  Deposition of Steven Madigan, January 15,2009, pp. 111-113;  Deposition of Satoshi Nakajima, February 24, 2009, p. 59.

[143] Deposition of Satoshi Nakajima, February 24, 2009, pp.54-55. See also, October 12, 1994 e-mail from Scott Henson to Microsoft's Developer Relations Group, which was responsible for communicating Microsoft's decision regarding the namespace extension APIs to ISVs.  The e-mail lists the reasons for the decisions, including the fact that "[b]adly written name space extension[s] could cause the reliability of Windows 95 to be less than what it should."  MX 6055840 at 43.

CONTAINS CONFIDENTIAL INFORMATION

Novell's Netware has undocumented APIs. [144] Doing so can help prevent the fragmentation of the platform. Reducing dependence on interfaces that may not be supported in the future is important for managing the growth and development of the PC operating system and platform. [145]

108.    PC operating system providers also have valid reasons for limiting access to source code. Source code is intellectual property. As a matter of basic economics, the value of that intellectual property to its owner depends on the owner's ability to protect it from expropriation by others, particularly rivals. Such protection is widely acknowledged to be procompetitive, because of its effect in spurring innovation. It is my understanding that Microsoft, or any other developer of such intellectual property, is under no blanket legal obligation to provide it to rivals.

109.    Access to source code was rarely offered to third-party developers, nor do developers generally express a great desire for such access. For instance, Kent Erickson, Novell's current Senior Vice President, has testified that Novell takes many steps to protect its confidential information when developing a proprietary product. [146] William Lowe, president of IBM's Entry Level Division from 1985-88, stated that IBM did "absolutely not" provide source code access to outside developers. [147] As with software integration, if we observe software firms in markets where there are no competitive concerns engaging in particular conduct, then we should presume that the conduct is procompetitive.

### D. Inaccurate and Misleading Product Information

110.    Professor Noll also alleges the Microsoft used inaccurate or misleading product information to harm Novell's OPAs. According to Professor Noll, Microsoft

---

[144] Deposition of Adam Harral, December 13, 2001, pp. 253-254.
[145] Deposition of Satoshi Nakajima, February 24,2009, pp. 59-60.
[146] Deposition of Kent Erickson, February 5, 2009, p. 78-79.
[147] Deposition of William Lowe, March 21, 2002, pp. 155-156.

CONTAINS CONFIDENTIAL INFORMATION

allegedly misled ISVs about its PC operating system plans in the late 1980s and early 1990s, provided false information (which he refers to as "FUD"[148]) about its competitors product, failed to provide a designed for Windows logo for Corel's PerfectOffice, and did not make available a printing process that Novell wanted to use. His analysis suffers from the same shortcomings described above. He does not provide any evidence that the conduct harmed Novell's OPAs or that it reduced PC operating system competition, and he ignores the obvious procompetitive effects of the alleged conduct.

### i. *The Alleged Conduct Did Not Harm Novell*

111.    Professor Noll claims that Microsoft misled major ISVs in the late 1980's by publicly expressing support for OS/2 while secretly improving Windows and developing its own applications. Allegedly as a result of this "headfake," the leaders in word processing and spreadsheets, WordPerfect and Lotus, respectively, delayed writing versions for Windows and lost important opportunities to establish their products on that platform.[149] Professor Noll asserts that "Microsoft finally redirected ISVs to write to Windows in the summer of 1990."[150] Since this was approximately 4 years before Novell purchased WordPerfect, any potential adverse effect it had on WordPerfect would have been known to Novell and would have been reflected in the market value of WordPerfect. Thus, this conduct cannot have harmed Novell's OPAs.

112.    Professor Noll also alleges that Microsoft's failure to grant a "Designed for Microsoft Windows 95" logo to PerfectOffice when it was released in May 1996 and Microsoft's failure to have the printing API that Novell wanted to use ready for

---

[148] FUD is an acronym for "fear, uncertainty, and doubt". Professor Noll contends that FUD is necessarily false information. However, FUD is often truthful information that casts a competitor's product in an unfavorable light.

[149] Declaration of Roger G. Noll, May 1, 2009, pp. 145 – 151.

[150] Declaration of Roger G. Noll, May 1,2009, pp. 149.

Windows 95 were anticompetitive.[151]  However, Novell had already sold PerfectOffice to Corel when the Windows 95 version was released, so even if the failure to grant the logo or the inability to exploit a superior printing process reduced PerfectOffice's sales, this could not have harmed Novell.

113.    Finally, I could find nothing in Professor Noll's discussion of applications FUD to even suggest that Microsoft provided false information to the public about Novell's OPAs that harmed Novell.

### ii. *The Conduct Did Not Prevent Novell's OPAs from Increasing PC Operating System Competition and Was Procompetitive*

#### a. *The OS/2 "headfake"*

114.    In many ways the OS/2 "headfake" is an odd claim: a requirement that firms communicate their competitive plans to rivals will tend to reduce incentives to engage in procompetitive actions and strategies.[152]  The ability to catch one's rivals by surprise is one of the means by which firms are able to profit from product improvements, price cuts, new marketing schemes, and other competitive innovations. However, although I do not think that requiring firms to disclose their business plans to rivals would be a good idea in general, or in this case in particular, it is not necessary to reach that issue in this case.  The facts do not support the assertion that Lotus and WordPerfect were misled, or that Microsoft pursued a policy of misleading ISVs about the future of Windows.

115.    At the outset, I note that Professor Noll's theory regarding the "headfake" is at odds with Microsoft's incentives under his basic theory.  Professor Noll alleges that Microsoft's monopoly in PC operating systems is protected by an applications barrier to

---

[151] Declaration of Roger G. Noll, May 1, 2009, pp. 151-156.

[152] At the time of this alleged act, Microsoft was not a leading supplier of the challenged applications, nor was Windows a leading OS platform to support applications -- in fact its future was highly uncertain.  In light of these facts, the anticompetitive foundations of plaintiffs' claim are not apparent.

CONTAINS CONFIDENTIAL INFORMATION

entry.[153]  According to the applications barrier to entry theory, the value of a PC operating system depends primarily on the number and quality of applications available to run on it.  By this logic, the hypothesized "headfake" would be detrimental for a company trying to promote a new platform, such as Windows in the 1985-90 period.  By inducing ISVs to write to OS/2, a purposeful "headfake" would have the effect of reducing the number of applications written for Windows, while increasing the number of applications written for the main rival to Windows at the time, OS/2.  As a matter of economics, it is hard to see how this would be in Microsoft's business interest, much less with Professor Noll's view of the overarching importance of the applications barrier to entry.[154]

116.    Below I summarize the flaws in Professor Noll's claims that the OS/2 "headfake" was anticompetitive.

a)    The evidence indicates that Microsoft in fact did try to get ISVs, including Lotus and WPC in particular, to write applications for Windows, starting no later than 1986.[155]  Microsoft's efforts continued over the next several years without success, despite the growing sales of Windows and the disappointing sales of OS/2.  The testimony of witnesses in this case demonstrates that, in fact, WPC deliberately "didn't put any resources to writing on Windows at first," not because it was misled about which platform to develop for, but because WPC's

---

[153] Declaration of Roger G. Noll, May 1, 2009, pp. 8.

[154] I note that this claim is also inconsistent with the finding of the District Court that OS/2 failed for lack of applications (Findings of Fact, United States v. Microsoft Corporation, Civil Action Nos. 98-1232, 98-1233, November 5, 1999, available at http://www.usdoj.gov/atr/cases/f3800/msjudge.pdf (downloaded September 6, 2002), ¶ 46).

[155] Bill Gates testified that "we went down to WordPerfect and asked them to write for the – write for Windows.  You know, we wanted them to do that."  Deposition of Bill Gates, May 19, 2009, pp. 342; Jeff Raikes, former President of Microsoft's Business Division, testified that "we've consistently encouraged companies like WordPerfect, like Lotus, to do those types of [Windows] applications.  That was true in the '80s.  And so, yeah, that was our approach."  Deposition of Jeff Raikes, January 27, 2009, pp. 224. David Reed, "Microsoft Visit," September 2, 1986 (Reed 44) (Bates Numbers IBM 7510239480-3); W. E. "Pete" Peterson, Almost Perfect (1998), Chapter 7, available at http://www.wordplace.com/ap/almostperfect.pdf (downloaded September 16, 2002).

CONTAINS CONFIDENTIAL INFORMATION

leaders viewed Microsoft as their "toughest competition," and "we were pulling for anyone but Microsoft to win."[156]

b) Microsoft's publicly announced application strategy was to hedge its bets, developing for three GUI platforms (Macintosh, Windows, and OS/2). Bill Gates publicly encouraged ISVs to do likewise.[157] In keeping with that policy, Microsoft released Word for the Macintosh in 1985, for Windows in 1989, and for OS/2 by February 1991.[158] It released Excel for the Macintosh in 1985, for Windows in 1987, and for OS/2 in 1989.[159] Microsoft also made the upcoming improvements in Windows 3.0 widely known, including its ability to address larger amounts of memory.[160] Thus, claims that Lotus or WPC had reason to be surprised by the capabilities of Windows 3.0 when it was released in May 1990 are unsustainable.[161]

---

[156] Deposition of Willard Peterson, October 1, 2008, pp. 77-80. W. E. "Pete" Peterson, Almost Perfect (1998), p.55, available at http://www.wordplace.com/ap/almostperfect.pdf (downloaded September 16, 2002).

[157] In early 1989, Gates was quoted in the trade press: "Our direction is, within the next 18 months, to have a whole family of applications [under Macintosh, OS/2 and Windows]," said Microsoft Chairman William Gates. "Anybody who's not doing what we're doing is crazy." [Brackets in original] (Jane Morrissey and Gina Smith, "Microsoft Details Broad Applications, OS Strategy; Will Exploit Wide Range of Platforms," PC Week, February 27, 1989, pp. 4 (Reed 51)). See also, Evan Schwartz, "Lotus Explains Its 1-2-3 Delay," Computer System News, October 17, 1988 (Reed 52); Deposition of Willard Peterson, October 1, 2008, pp. 128-129 (testifying that Bill Gates approached Mr. Peterson at a convention in 1989 and said "[y]ou know, you need to develop for Windows").

[158] "Writing on Computers", The San Francisco Chronicle, February 13,1985; "Microsoft Word for Windows now available in thousands of stores nationwide", Business Wire, January 8,1990; "Microsoft Ships Word for OS/2", Computer Reseller News, February 4, 1991.

[159] Microsoft Develops Program for Apple", The New York Times, May 3, 1985; "PERSONAL COMPUTERS; New Products Fuel Boom in Exhibits at Show", The New York Times, November 10, 1987; "PERSONAL COMPUTERS; Software for OS/2", The New York Times, October 10, 1989.

[160] Gina Smith and Lisa Picarille, "Windows 3.0 Will Exploit '386 to Relieve Memory Constraints," *PC Week*, February 13, 1989, pp. 1, 6 (Reed 48).

[161] Of course, both WordPerfect and Lotus eventually did write to Windows. IDC data indicate that in 1992 WordPerfect shipped 1.8 million copies of WordPerfect for Windows, compared to 2.6 million for Microsoft Word. IDC, 1992 Word Processing Market: DOS Windows, OS/2, and Macintosh, May 1993, Report #7691, Table 3.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

c) Several smaller companies created successful applications for Microsoft Windows early on, including Samna, which developed the Ami Pro word processor that Lotus acquired in 1991;[162] Aldus, which developed a version of its PageMaker desktop publishing program;[163] and Micrografx, which developed In*a*vision, a drawing program.[164] The fact that ISVs other than WPC and Lotus chose to focus on the Windows platform is consistent with the view that, at the time, not every ISV was misled into focusing on OS/2.

d) Success on Windows in 1990-1991 was by no means a guarantee of success in future years. As late as 1993, the number of MS-DOS users still outnumbered the number of Windows users, and Lotus 1-2-3 had the largest installed base of spreadsheet users until 1994.[165] The number of PC users was also expanding rapidly: the total number of MS-DOS and Windows users in 1991 was roughly 97 million (of whom only 10 million used Windows), compared to 160 million users in 1996 and 249 million users in 2000 (of whom only 3 million used DOS alone).[166] These data indicate that at the time of the alleged "headfake," the vast majority of the Windows business would come from new users and those

---

[162] Lotus, "1994 Report to Shareholders," March 20, 1995 (Reed 40) (Bates Numbers 7510297440-53); "Lotus Acquires Samna Corp.," LOTUS, December 1990, pp. 14.

[163] Deposition of Paul Brainerd, March 7, 2002, pp. 14-23.

[164] Deposition of George Grayson, July 17, 2002, pp. 8-10, 70-72.

[165] IDC, The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, Report #10238, September 1995, Table 13; IDC, PC Operating Systems Market Review and Forecast, 1994-1999, Report #10048, July 1995, Table 14.

[166] IDC, Desktop Operating System Review and Forecast: The Second Phase of the Industry Begins, Report #7445, May 1993, Table 4; IDC, Operating Environments, Review and Forecast, 1996-2001, Report #14024, August 1997, Table 3; IDC, Worldwide Client and Server Operating Environments, Market Forecast and Analysis Summary 2001-2005, Report #25118, August 2001, Table 5. Installed base for DOS in 2000 is interpolated using predicted shares from IDC, Client Operating Environments Market Forecast and Analysis, 2002-2004, Report #22346, June 2000, Table 7.

CONTAINS CONFIDENTIAL INFORMATION

making a transition from DOS. The record for other application segments also shows that many early leaders in the Windows business did not survive.[167]

e) Microsoft's decision to continue with Windows development served to *increase* PC operating system competition and was procompetitive. The evidence is overwhelming that it provided consumers with what turned out to be a preferred PC operating system at lower prices.[168]

### b. Applications FUD

117.    Disseminating negative information about a competitor's product is not uncommon, nor is any reasonable consumer surprised when vendors make comparisons that emphasize product dimensions on which their products appear to be better than their competitors'. In the 1980s, for example, Apple contrasted the Macintosh's ease of use with IBM PCs; it did not highlight the fact that the Macintosh's GUI used up much of the computing capacity of its hardware, leaving little left for the users' tasks.[169] Apple later placed ads that highlighted the benefits of buying an integrated hardware-software system from one vendor with the complications of getting products from multiple vendors to work on Intel-compatible systems running

---

[167] For example, Ami Pro, which eventually was purchased by Lotus, was the early leader among Windows word processors but lost out to Word (Stan J. Liebowitz and Stephen E. Margolis, Winners, Losers, & Microsoft (Oakland, CA: The Independent Institute, 1999), pp. 181). PageMaker, which was eventually purchased by Adobe, was the early leader in high-end desktop publishing but lost out to Quark QuarkXPress (pp. 209).

[168] A 1993 internal Microsoft strategy document describes competition between Chicago (then in development) and OS/2. "IBM is after the desktop. …..We must respond with a powerful 32-bit system, which is smaller and much faster than OS/2 so it runs on average machines. It must be completely compatible with DOS and Windows apps and device drivers. By meeting these goals, Chicago will put OS/2 into its grave." Chicago Strategy Document, November 24, 1993, MS-PCA 1180276.

[169] John Sculley states "…the market for what we did was still very small because the functionality of aMacintosh—remember, the microprocessors weren't very powerful. There were no hard drives in those days. Memory was small. Memory was expensive. So we didn't have applications that really satisfied the requirements of the mainstream business market." Deposition of John Sculley, June 27, 2002, pp. 76-77. In the Fall of 1984 Apple published a 16-page (with fold-out) advertising insert in Newsweek magazine that compared the IBM to the Macintosh and did not mention any of these limitations. "1984 Apple Newsweek Advertising Insert," http://toastbucket.com/apple1984ad/ (downloaded March 2, 2009).

CONTAINS CONFIDENTIAL INFORMATION

Windows;[170] it did not focus on the restricted choices and higher prices faced by Macintosh users as a result of Apple's vertical integration.  Lotus planned to tell OEMs that it would not write 1-2-3 for Windows until Microsoft met a list of technical requirements; it did not tell OEMs that it chose that list in part because it knew that Microsoft could not meet them and still release Windows 3.0 on schedule.[171]  IBM used "FUD" in this sense to promote OS/2 over Windows.[172]  My view is not that such actions are justified in all cases, only that such actions are commonplace in the marketplace, and Professor Noll does not offer any means by which to differentiate

---

[170] Apple ran television commercials in 1995 that specifically targeted Windows and the complications involved with getting products from multiple vendors. One add was entitled "Dinosaurs" and another was entitled "Crowd Control," available at http://www.uriahcarpenter.info/ (downloaded March 2, 2009).

"Dinosaurs" text of audio:

**Father:** Hey! Wanna see some dinosaurs?
**Son:** Yeah! Dinosaurs!
**Father:** That's a good man here. [sigh][time passes] Loading CD-ROM into Windows. [time passes]
**Son:** Where are the dinosaurs dad?
**Father:** I'm not sure. [time passes]
**Son:** DOS Command dot... [time passes]
**Son:** Can we see them now?
**Father:** Not Yet. [time passes] CONFIG.SYS... [time passes] Configure jumpers and DIP switches?
**Son:** Dad, what's a DIP?
**Father:** I don't know. [time passes] Where you going kiddo?
**Son:** To the Crandles'.
**Father:** What's at the Crandles'?
**Son:** They have a Mac.

"Crowd Control" text of Audio:

**Presenter:** I...I...I'm really sorry folks. The presentation should be running. I just installed my new operation system [nervous laughter] - Windows 95. [nervous laughter]
**Man in audience:** Try typing SYSEDIT.EXE
**Presenter:** [nervously] Thank You.
**Man #2 in audience:** Check your AUTOEXEC.BAT
**Woman in audience:** No! Look in your CONFIG.SYS
**Presenter:** [nervously] Thank You
**Voice-over:** If you're looking for a computer that's easy to use, there's still only one way to go.
**Man #3 in audience:** Get a Macintosh!"

[171] Deposition of David Reed, December 10, 2001, pp. 823-827, 831-836; Memo from David Reed to Frank King, Carl Young, Frank Ingari, "Windows and OEMs," July 13, 1989 (Reed 57) (Bates Numbers IBM 7510239639-47). For other examples of Lotus anti-Windows "FUD," see "OS/2 Windows Kit," (Reed 2) (Bates Numbers IBM 7510239899-923); and Memo from Semmes Walsh to Frank King et al, "Windows vs. OS/2 Comparison," October 18, 1989 (Reed 5) (Bates Numbers IBM 7510238758-65).

[172] See my section on the OS/2 claims advanced by plaintiffs' experts.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

what he broadly labels "FUD" from the procompetitive provision of information. Absent any way to differentiate, one could just as easily assert that Apple's popular "I'm a Mac and I'm a PC" commercials are anticompetitive FUD.

118.    The FTC and various state agencies have the authority to pursue false advertising claims, but apparently did not for any of the Microsoft acts cited by Professor Noll. Moreover, Professor Noll has not shown that the information provided was false, and disseminating truthful information about the inadequacies of a competitor's products clearly benefits consumers.

####        c.    *Windows 95 Logo Program*

119.    Professor Noll also alleges that Microsoft's failure to grant Novell an exemption from certain requirements for participation in the "Designed for Microsoft Windows 95" logo program was anticompetitive. Specifically, Professor Noll claims that it was anticompetitive for Microsoft to require that Novell's applications be compatible with both Windows 95 and Windows NT to receive the "designed for Windows 95" logo.

120.    While the absence of the "designed for Windows 95" logo could not have impacted Novell, since it had already sold its OPAs to Corel by the time those applications were released for Windows 95, the logo program had a clear procompetitive justification analogous to Microsoft's MDA program for Windows. Consumers familiar with the features of one application will find it easier to use another application if they share common features. The value of the Windows platform increases, therefore, if Windows applications share common features. Individual ISVs would not take this effect into consideration absent some incentives from Microsoft. The Windows logo program increases the incentives for ISVs to do so and enhances the value of the Windows platform which benefits Microsoft, ISVs, OEM and peripheral manufacturers. Moreover, because Windows NT was, in 1995, a relatively new PC

CONTAINS CONFIDENTIAL INFORMATION

operating system with a small installed base,[173] ISVs would have little incentive to make sure their applications worked on both versions of Windows absent the requirement for participation in the Windows logo program.  The requirement that an application work on both Windows 95 and Windows NT provided ISVs incentives to write their applications to work on both, and this raised the value of the Windows platform.

### E.  Conduct Directed at GroupWise

121.    Professor Noll alleges that by withholding and extending its Messaging API (MAPI) and bundling MAPI with Windows, Microsoft harmed GroupWise[174] and groupware competition.[175]  Specifically, he alleges that Microsoft failed to provide a timely version of MAPI, and in so doing, prevented groupware competitors from providing the same level of messaging functionality as was provided by Microsoft.[176]  He also alleges that Microsoft extended MAPI to provide more functionality, but refused to make these extensions part of its open middleware.[177]  Finally, he alleges that Microsoft required an icon be installed and its icon placed on the desktop before a competing messaging application can be installed.[178]  Professor Noll provides no evidence that the conduct harmed Novell and no evidence that the conduct harmed PC operating system competition.  Moreover, he ignores the procompetitive impact of the conduct.

### i.  *The Conduct Directed at MAPI Did Not Harm Novell or Harm PC Operating System Competition*

122.    In asserting that Microsoft prevented competitors' products from providing the same level of functionality as Microsoft's products, Professor Noll

---

[173] IDC, PC Operating Systems Market Review and Forecast, 1995-2000, Report #11568, Table 2; http://www.microsoft.com/windows/WinHistoryDesktop.mspx.
[174] Again, I understand that Microsoft contends that GroupWise is not a part of this litigation.
[175] Declaration of Roger G. Noll, May 1, 2009, pp. 10.
[176] Declaration of Roger G. Noll, May 1, 2009, pp. 123-124.
[177] Declaration of Roger G. Noll, May 1, 2009, pp. 123, 137-138.
[178] Declaration of Roger G. Noll, May 1, 2009, pp. 124.

CONTAINS CONFIDENTIAL INFORMATION

misinterprets the role of an API.  I understand that Professor Bennett explains that the API for MAPI allowed any vendor to implement their own interface functionality.[179] For example, if a user today wants to use a Microsoft Outlook client with a Lotus Notes server for messaging, they would direct their Outlook client to use the interface supplied by Lotus Notes rather than the default Outlook interface.[180]

123.     Professor Noll also ignores the market dynamics at the time of the alleged bad acts.  At the time that Microsoft proposed MAPI as a messaging standard, an industry consortium composed of Novell, Apple, Borland, IBM, MCI, Oracle WordPerfect, and the industry leader, Lotus, had proposed a competing standard known as VIM (Vendor Independent Messaging).[181]  If Novell was concerned with Microsoft's leadership, it could have continued to use and promote its messaging standard.

124.     By delaying the release of its Messaging API, Microsoft did not harm competitors in the groupware market because it did not provide advantages to Microsoft's groupware product.  Until MAPI was available, groupware providers could simply continue to use heterogeneous, proprietary sets of interfaces so that groupware clients could communicate with groupware servers.

125.     Professor Noll alleges that, in addition to delaying the release of MAPI, Microsoft harmed competition by creating extensions to MAPI.  I understand that Professor Bennett asserts that MAPI was designed to be extensible,[182] and the ability to

---

[179] "XAPIA X400 Group AIMS For Electronic Mail Peace." Computergram International Apt. Data Services Ltd., July 27, 1992.

[180] See, e.g., http://support.microsoft.com/kb/190146.

[181] Everett, Patricia, "Microsoft Surprises VIM by asking For XAPIA Intervention in API War." Open OSI Product & Equipment News Data Trends Publications, Inc., July 2, 1992, Vol. 5, No. 13.

[182] "'There is nothing that is undocumented in MAPI,' said Dan Fay, technical evangelist for messaging at Microsoft.  '…. We are using MAPI the way it is designed to be used.'  Microsoft says MAPI was designed as an extensible API and that it and other vendors are free to create their own extensions to the specification.'  Barney, Doug, "Lotus, Novell say Microsoft is hiding MAPI extensions."  InfoWorld, March 13, 1995, p. 8.

CONTAINS CONFIDENTIAL INFORMATION

add features is integral to the process of innovation and competition in the software industry as competitors strive to differentiate their products.  Indeed, Mr. Alepin concedes that Novell planned to use the proprietary extension mechanisms in MAPI to create its own extensions, as did Lotus.[183]  Not only were competitors free to innovate by introducing their own extensions, but the full functionality of the MAPI specification was still available to any user who wanted to use an alternative vendor's groupware client with Microsoft Exchange Server.[184]

126.    Professor Noll also alleges that Microsoft bundled MAPI with Microsoft Office 97. He claims that this was anticompetitive because there was an incompatibility between GroupWise and Office 97.[185]  By implying, but providing no evidence of, anticompetitive motivations and failing to provide appropriate context, this allegation distorts the facts.

127.    Professor Noll, while asserting that Microsoft "took advantage" of its bundling of MAPI with Office 97, notably does not assert that there was any intent on the part of Microsoft to cause an incompatibility.  Moreover, while he states that in the month it took to fix the problem, "Novell customers could not use GroupWise,"[186] he fails to acknowledge that groupware is a product intended for use in an enterprise setting,[187] where deployment engineers who identify a compatibility issue would be able to postpone the deployment until the incompatibility was resolved.

---

[183] Expert Report of Ronald Alepin, pp. 131; IBM 7510138374-77 at 77 (internal Lotus e-mail detailing plans for proprietary extensions to MAPI).

[184] According to Barry Briggs, senior architect in the Lotus Communications group, Microsoft's extensions were a "superset of the standard API."  Barney, Doug, "Lotus, Novell say Microsoft is hiding MAPI extensions."  InfoWorld, March 13, 1995, p. 8.

[185] Declaration of Roger G. Noll, May 1, 2009, pp. 138.

[186] Declaration of Roger G. Noll, May 1, 2009, pp. 138.

[187] GroupWise's target market, for example, was described as having expanded in 1994 from "small and medium companies with up to 20,000 users to large companies with up to 88,000 users."  Electronic Messaging News, "Novell E-mail Package Upgrade Delayed to Accommodate Second Name Change," August 3, 1994.

CONTAINS CONFIDENTIAL INFORMATION

128.    Professor Noll also alleges that it was anticompetitive for Microsoft to make it difficult to remove the "Inbox" icon from Windows 95 analogous to the claim in Microsoft III regarding removal of the IE icon.[188]  However, Professor Noll's claim is inconsistent with the economics of the government's claim.  By preventing removal of the IE icon, the government claimed that Microsoft discouraged OEMs from installing a second web browser.  The government's reasoning was that inexperienced users would be confused by the presence of two web browser icons and would call the OEM's technical support.  Because these support costs reduce OEM profitability, the government argued that OEMs would be reluctant to install a second web browser. Groupware, however, is used almost exclusively in an enterprise setting, where the software is installed by IT departments.  IT personnel could easily remove the "Inbox" icon, so an enterprise's decision regarding the use of GroupWise could not have been affected by the conduct.

### ii.  MAPI Was Procompetitive

129.    In alleging that Microsoft prevented competitors from providing the same level of functionality as was provided by Microsoft, Professor Noll ignores both the role of APIs and the nature of the market.  According to Microsoft's January 1993 MAPI proposal, MAPI was intended to solve problems including "vastly different interfaces" and "systems and development tools … largely incompatible with each other," thereby making messaging applications "plentiful, easy to use, and compatible with each other and with a multitude of messaging systems."[189]  In promoting an interface that increases the adoption and usage of messaging on Windows, Microsoft would provide platform leadership as well as cultivate a developer community surrounding its messaging products and ultimately improve the value of the Windows platform to users.

---

[188] Declaration of Roger G. Noll, May 1, 2009, pp. 124.
[189] "Microsoft Messaging Application Program Interface (MAPI) Overview," January 1993.  MS7058541.

CONTAINS CONFIDENTIAL INFORMATION

130.    Professor Noll and Mr. Alepin also ignore the procompetitive effects of proprietary protocols for communications between its own client and server operating systems.  Mr. Alepin concedes that such proprietary protocols "allowed Microsoft to achieve better functionality among its own products."[190]  This is procompetitive, and competing groupware providers were free to, and did, do likewise.  As Rich Hume, a developer who worked on Novell's GroupWise product admitted, Novell itself used a proprietary protocol to communicate between its GroupWise e-mail client and its GroupWise e-mail server.[191]  Lotus Notes and Lotus Domino also communicate in proprietary ways.[192]

## VI. There Is No Evidence that the Lack of Success of Novell's OPAs on Windows Was Due To Microsoft's Alleged Anticompetitive Conduct.

131.    Professor Noll alleges that the conduct described above reduced competition in the market for PC operating systems by harming Novell's OPAs.  In other words, Professor Noll is arguing that in a "but-for" world without the challenged conduct, competition in the market for PC operating systems would have been enhanced.  As I showed above, Professor Noll has failed to show how the challenged acts harmed Novell's OPAs and also how any potential effect on Novell's OPAs would have translated into a change in PC operating system competition.  On top of that, Professor Noll does not provide a clear description of the structure of the but-for world.  He simply asserts that Microsoft's challenged conduct allegedly directed at Novell

---

[190] Expert Report of Ronald Alepin, pp. 115.
[191] Deposition of Rich Hume, March 24, 2009, pp. 25-26.
[192] "Notes technology runs on both the client and the server. The two communicate using a proprietary protocol." Pope, William. "A Planning Model for Lotus Notes Applications," 1998. Proceedings of the Computer Measurement Group's 1998 International Conference. "Lotus Notes currently provides a robust and powerful set of distributed business objects….Their only drawback is that they are distributed on top of the Notes proprietary RPC, requiring that Lotus provide both server and client components." IBM white paper: Lotus Notes and Distributed Objects, January 1997.

CONTAINS CONFIDENTIAL INFORMATION

reduced competition in the market for PC operating systems. This undermines his analysis in two ways. First, absent a coherent description of the market structure in the but-for world, there is no way to assess whether the alleged anticompetitive conduct would even potentially explain the difference between market structure in the actual and but-for worlds. Second, because his analysis provides no sensible benchmark against which to compare Microsoft's prices, volume or product quality, there is no way to assess whether competition in the market for PC operating systems would be enhanced in his but-for world.

132.    At a minimum, plaintiff's experts must be alleging that Novell's OPAs would have been more successful relative to Microsoft's in Professor Noll's but-for world than they were in the actual world. How much more successful Novell's OPAs would have been absent the conduct depends on the importance of the alleged anticompetitive conduct relative to other factors including the procompetitive conduct of Microsoft that explain the success of Microsoft's OPAs relative to Novell's. Professor Noll makes no effort to determine the importance of the procompetitive conduct relative to the alleged anticompetitive conduct. Indeed, Dr. Warren-Boulton attributes all of the decline in the value of Novell's OPAs to the alleged anticompetitive conduct.[193]

133.    My analysis indicates that the difference in the relative success of Microsoft's and Novell's OPAs was due to the strategic decisions made by both companies. Microsoft's success was due to a strategy of producing high quality and low priced applications and integrating them into a suite, which are procompetitive acts. This strategy was very successful and provided large benefits to consumers. On the other hand, WPC's and then Novell's strategies were important contributors to the demise of their OPAs. As discussed below, market and record evidence do not support

---

[193] Expert Report of Frederick R. Warren-Boulton, May 1, 2009, p. 3.

CONTAINS CONFIDENTIAL INFORMATION

Professor Noll's assertion that the lack of success of Novell's OPAs on Windows was due to the alleged anticompetitive acts.

**A.    Microsoft's Development and Pricing of Suites Contributed to the Success of Microsoft's OPAs Relative to Novell's OPAs**

134.    Microsoft's success in OPA software reflects in part its introduction of "office suites."  The office suite is a concept that has proved so popular that few copies of the applications included in such suites were or are sold on a stand-alone basis.  As shown in Exhibit 1, the share of word processors sold in suites rose from less than 20 percent in 1992 when Microsoft Office 3.0 was released to 86 percent in 1996.[194]

135.    Professor Noll claims that Microsoft's pricing of office suites has led to the dominance of suites over individual applications and has harmed consumers because "it discourages users from assembling their own 'best of breed' bundle" and it "creates a barrier to entry in each applications category."[195]  This claim makes no sense.  Microsoft has always offered Word and Excel as separate products, so there was nothing that prevented users from choosing individual applications.  The dramatic success of "suites," even as their key components remained available on a standalone basis, shows that consumers have chosen them in overwhelming numbers over the separate applications that Professor Noll endorses and that continue to be available, at least from Microsoft.

136.    Microsoft's creation of the "suite" concept met demand from consumers for greater integration among applications.  Prior to Microsoft Office, Lotus and others had tried to address such demand with "integrated," multifunction applications like Symphony (and Jazz on the Macintosh), but they were not popular because their

---

[194] http://channel9.msdn.com/shows/History/The-History-of-Microsoft-1992/(downloaded June 24, 2009).
[195] Declaration of Roger G. Noll, May 1, 2009, p. 65.

CONTAINS CONFIDENTIAL INFORMATION

capabilities with respect to individual functions were limited relative to standalone applications.[196]  Suites addressed that issue by including "full" versions of each application.

137.    In his deposition, Willard Peterson stated that WordPerfect used such pricing strategies in its bundling of MS-DOS products prior to the release of Microsoft Office, and that WordStar had used such a strategy as early as 1983-84.[197]  He believed that consumers "felt it offered a benefit to them."[198]  He acknowledged that Microsoft had "a great spreadsheet with a good word processor," and that Excel "was probably as much to blame for what happened to us as Windows," since WordPerfect did not offer a spreadsheet program that could compete with Excel.[199]

138.    As the individual applications in suites were integrated, there were also benefits to consumers and efficiencies for producers from the ability to use shared code for common functions.[200]  Borland's former CEO, Phillipe Kahn, acknowledged in his deposition that Borland's office suite, which combined products from Borland and WordPerfect, lacked this form of integration, which consumers wanted.[201]  Kahn also stated his belief that the "market…wanted suites."[202]

139.    The trade press also recognized the consumer benefits from better integration in suites.  A 1994 review in *PC Computing*, for example, noted that in addition to giving users "more bang for the buck," suites also gave users "quick installation, a great price, and a collection of power business applications that work together smoothly…"[203]  That same year, *PC Magazine* commented favorably on the

---

[196] Deposition of Stephen Crummey, October 9, 2001, pp. 200-201, 219-221.
[197] Deposition of Willard E. Peterson, March 19, 2002, pp. 80-81.
[198] Deposition of Willard E. Peterson, March 19, 2002, p. 82.
[199] Deposition of Willard E. Peterson, October 1, 2008, pp. 26, 31-33, 64.
[200] On both types of benefits, see Deposition of David Reed, December 11, 2001, pp. 962-963.
[201] Deposition of Philippe Kahn, April 16, 2002, pp. 184, 194.
[202] Deposition of Philippe Kahn, April 16, 2002, p. 189.
[203] Ed Bott, "Suite Sensations," PC Computing, February 1994, pp. 158.

CONTAINS CONFIDENTIAL INFORMATION

increasing integration of the applications included in the various suites, citing benefits from "Interface consistency…[,]Effortless data sharing….[,]Shared resources…[,and] Quick access to any application from any other."[204]

140.     In addition to greater integration, consumers benefited greatly from Microsoft's pricing of suites.  Part of Microsoft's suite strategy was to sell Office for less than the price of two of the individual components.  Microsoft's strategy led to a significant reduction in OPA prices as Microsoft's share of OPA sales rose.  Exhibits 7-A and 7-B graph share data and price trends for the leading word processors (Microsoft Word and WordPerfect) and the leading spreadsheets (Excel and Lotus 1-2-3) based on data from IDC.  As is clear from the figures, the data show falling prices for the Microsoft applications products and the products that compete with them at the same time that Microsoft's share of revenues in those products increased.

**B.   The Success of Microsoft's OPAs Relative to Novell's Is Due to Higher Quality Applications and Not Access to Source Code and Undocumented APIs**

***i.   Undocumented APIs and access to source code do not explain the success of Microsoft's OPAs relative to Novell's OPAs***

141.     One way to test whether Microsoft's OPAs' success on Windows was due to the anticompetitive acts alleged by Professor Noll or to Microsoft's successful market strategy is to compare how well its OPAs fared on Windows with how well it did in environments where it did not have the alleged advantages.  The success of Microsoft's OPAs on the Macintosh well before their success on Windows contradicts assertions that Microsoft's OPAs succeeded only when Microsoft controlled the platform on which they ran.  Word and Excel, released for the Macintosh in 1985, were both rapid

---

[204] Michael J. Miller, "Suite Deals," PC Magazine, February 8, 1994, pp. 140.

CONTAINS CONFIDENTIAL INFORMATION

successes and, as shown in Exhibits 8 and 9, remained the most successful OPAs on the Macintosh for the next 10 years.[205]

142.    Despite the fact that it competed with Apple's own MacWrite program, Word accounted for half of all word processors sold for the Macintosh in 1987, a higher share than WordPerfect had for word processors running on DOS in that year.[206]  In that same year, Excel accounted for 75 percent of spreadsheets sold to run on the Macintosh.  (Microsoft's Multiplan accounted for an additional 14 percent.[207]) The popularity of these programs has increased since then.  (See Exhibits 8 and 9). Moreover, Microsoft achieved this success without special access to Macintosh code.[208]

143.    In contrast, Lotus and WordPerfect were not successful on the Macintosh. Lotus Jazz—which provided spreadsheet, word processing, and database functions—was introduced in 1985 and withdrawn in 1988 after poor sales.[209]  Lotus did not release 1-2-3 for the Macintosh until December 1991,[210] and it sold poorly, despite an endorsement from Apple's CEO.[211]  WordPerfect announced in 1986 that it would offer its word processor for the Macintosh, but did not release it until 1988.[212]  It was not a major success, despite some corporate interest to facilitate the exchange of files with

---

[205] "Microsoft Develops Program for Apple," The New York Times, May 3, 1985; Brand, Stewart, "Writing on Computers," Sun Francisco Chronicle, February 13, 1985.
[206] IDC, Macintosh Markets: Software Review and Forecast, Report #3542, July 1988, Figure 13; IDC, Word Processing Software, Report #3633, November 1988, Table 1.
[207] IDC, Macintosh Markets: Software Review and Forecast, Report #3542, July 1988, Figure 7.
[208] Deposition of John Sculley, June 27, 2002, pp. 39-40; Deposition of Kurt Piersol, July 16, 2002, p. 93; Deposition of Ben Waldman, August 22, 2001, pp. 489-491.
[209] William M. Bulkeley, "Lotus Cancels Its Modern Jazz Package, Ending Bid to Fix '85 Software Package," The Wall Street Journal, June 15, 1988 (Reed 38).
[210] Markoff, John, "Company News; An Apple PC Version of Lotus 1-2-3," The New York Times, June 4, 1991.
[211] Marc Ferranti, "1-2-3 for Macintosh Due Out in 2 Weeks," PC Week, December 9, 1991, p. 4; Lotus, "1994 Report to Shareholders," March 20, 1995 (Reed 40) (Bates Numbers 7510297440-53); Kelly R. Conatser, "1-2-3 and the Mac Finally Click," LOTUS, October 1991, pp. 33-36.  In 1992 Lotus shipped 36,000 copies of 1-2-3 for Macintosh.  In the same year, Microsoft shipped 480,000 copies of Excel for Macintosh (IDC, The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, Report #8306, March 1994, Table 8).
[212] Deposition of Willard E. Peterson, March 19, 2002, pp. 101-102, 105.

CONTAINS CONFIDENTIAL INFORMATION

other departments using WordPerfect for DOS.[213]  Throughout this period, reviewers in the trade press overwhelmingly chose Word and Excel as the outstanding products for the Macintosh in their categories.[214]

144.    The success of Word and Excel on the Macintosh demonstrates that Microsoft's GUI applications were popular first on a platform to which Microsoft did not have preferential access to platform information.  Microsoft's Macintosh applications also provided the company and its developers with experience in writing GUI applications, which required different interfaces and programming methods than applications for character-based PC operating systems.[215]

145.    Indeed, the leaders in DOS applications, WordPerfect and Lotus, may have been handicapped by their success on DOS when they first wrote GUI versions. WordPerfect tried to "port" its character-based code, rather than starting from the ground up to take advantage of the GUI platform, as Microsoft and smaller companies, such as Samna and Micrografx, did.[216]  WordPerfect developers had no prior experience writing GUI applications.[217]  WPC and Lotus sought to capitalize on the large installed

---

[213] Deposition of Willard E. Peterson, March 19, 2002, pp. 104-109; W. E. "Pete" Peterson, Almost Perfect (1998), Chapter 9, available at http://www.wordplace.com/ap/almostperfect.pdf (downloaded September 26, 2002.)

[214] Thom Holmes, "Make My Page!," Byte, May 1987, pp. 159; Charles Spezzano, "Software for the Serious Writer: Professional Word Processing Packages," InfoWorld, April 13, 1987; Charles Rubin, "Macintosh Word Processors," InfoWorld, September 28, 1987; Barbara Assadi, "Mac Word Processors: A Blend of Features" InfoWorld, August 21, 1989; Galen Gruman, "Making a Splash," InfoWorld, August 13, 1990; Don Crabb, "Excel is Spreadsheet of Choice for Macintosh Users Who Need Power," InfoWorld, November 10, 1986, p. 59; Rochelle Garner, "Spreadsheet Products," InfoWorld, November 10, 1986, p. 51; Doug and Denise Green, "Macintosh Spreadsheets: From the Simple to the Sublime," InfoWorld, June 22, 1987; Jim Hays and Greg Smith, "Spreadsheet Applications for the Mac Offer Fresh Look," InfoWorld, December 12, 1988, p. S1; Pat Bensky, "Macintosh Spreadsheets: Getting a Handle on 3 of the Best," InfoWorld, July 17, 1989.

[215] Deposition of John Sculley, June 27, 2002, pp. 67-72; Deposition of George Grayson, July 17, 2002, pp. 78-79.

[216] Deposition of Norman Thomas Creighton, March 22, 2002, pp. 47-48; Deposition of Willard E. Peterson, March 19, 2002, pp. 265;  "Interview: Said Mohammadioun Stakes Company on New Program," LOTUS, March 1989, pp. 14-15.

[217] Deposition of Karl Ford, February 16, 2009, pp. 27-29.

CONTAINS CONFIDENTIAL INFORMATION

bases of users familiar with their interfaces, but those interfaces were poorly adapted to a GUI environment.[218]  As shown in Exhibit 10, WordPerfect was unable to achieve anywhere near the share on GUI-based Windows or Macintosh that it did on character-based MS-DOS.

146.   Testimony from executives from competing OPAs supports the market evidence that undocumented APIs and access to source code do not explain the success of Microsoft's OPAs relative to Novell's.  Said Mohammadioun, founder of Samna and developer of the Ami Pro word processor, whose company was bought by Lotus, testified that it was "normal" for application developers to write excellent products without needing source code for the PC operating system because "we never have access to the source code or the environment."[219]  In response to questions from plaintiffs' attorneys, he stated that access to source code could help in "certain very specific cases," but went on to say, "I don't think that's a very big thing."[220]

147.   George Grayson, whose company (Micrografx) had an agreement with IBM to extend its Mirrors product to port applications from Windows to OS/2,[221] testified that he never used Windows source code for the purpose of developing applications—at least one of which was highly praised—nor did he consider that a handicap.[222]

---

[218] Deposition of David Reed, December 10, 2001, pp. 811-812; Deposition of Willard E. Peterson, March 19, 2002, pp. 265-266; Henry Fersko-Weiss, "A First Look at 1-2-3/G, Lotus's Spreadsheet for OS/2 Presentation Manager," LOTUS, January 1990, pp. 6-9; "Lotus and WordPerfect Unite under OS/2 PM," LOTUS, January 1990, pp. 26.

[219] Deposition of Said Mohammadioun, December 14, 2001, pp. 318-319.

[220] Deposition of Said Mohammadioun, December 14, 2001, pp. 472-474.

[221] Deposition of George Grayson, July 17, 2002, pp. 25-26, 49-51.

[222] Deposition of George Grayson, July 17, 2002, p. 85. Micrografx Designer was given one of PC Magazine's Awards for Technical Excellence (See Bill Machrone, "Annual Awards for Technical Excellence," PC Magazine, January 17, 1989, pp. 105).

CONTAINS CONFIDENTIAL INFORMATION

     *a.   Professor Noll's Claims Regarding the Quality of Microsoft's Products Are Unfounded*

148.    To support his claim that WordPerfect and Novell's OPAs would have been more successful absent Microsoft's alleged anticompetitive conduct, Professor Noll claims that the success of Microsoft's applications cannot be explained by superior quality.[223]  Professor Noll provides no basis for his claims.  I asked researchers working under my direction to compile reviews of word processors, spreadsheets, and office suites from the late 1980s to the late 1990s – the period over which Microsoft's OPAs gained widespread success.  They used various search tools to identify reviews and product awards in major computing magazines.  They compiled two types of articles: head-to-head reviews in which competing products were ranked or scored and product awards of various types.  (See Appendix C for summary tables and a description of how the reviews were identified and selected).

149.    This research shows that, in the opinions of reviewers in the trade press, the relevant Microsoft applications generally have been superior to the offerings of competitors since the early 1990s, particularly in the "suites" category.

150.    In spreadsheets, Lotus 1-2-3, although the market leader in spreadsheets until roughly 1993,[224] consistently ranked behind Excel.  Quattro Pro achieved substantially fewer wins than Excel.  Out of 24 head-to-head reviews, Excel won 15 and tied with Quattro Pro in 5.  Quattro Pro won two (in early 1990 and in late 1993), and Lotus 1-2-3 won none (although it did tie with Excel for first in one review).  There was

---

[223] Expert Report of Professor Roger G. Noll, June 2, 2006, pp. 81.

[224] IDC, Spreadsheet Software, Report #3834, December 1988, Table 7; IDC, PC Spreadsheet Software: Market Review and Forecast, 1988, Report #4389, November 1989, Table 5; IDC, PC Spreadsheet Software, Report #5256, March 1991, Tables 1, 2; IDC, PC Spreadsheet Software 1991 Spreadsheet Report, Report #5962, February 1992, Table 1; IDC, The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, Report #8306; IDC, The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, Report #10238, September 1995.

CONTAINS CONFIDENTIAL INFORMATION

one three-way draw.  Excel also won the most product awards given out in this product category.

151.    In word processing, the DOS version of WordPerfect generally prevailed over the DOS version of Word, but in the 20 head-to-head reviews of Windows versions, Word won 10 outright and tied for first in 8 (usually with Ami Pro, not WordPerfect for Windows).[225]  In only two cases did it rank behind a competitor's product (Ami Pro in 1993 and WordPerfect in 1995).  In the awards identified, Word prevailed more often than its competitors.

152.    The verdict of reviewers in favor of Microsoft was strongest for suites. Out of a dozen head-to-head reviews, Microsoft won 10 and tied for first in 2 (both with WordPerfect in 1996).  Microsoft won 13 of the 16 awards found for suites and tied once.  Corel's suite won the remaining 2 awards.

153.    This systematic review indicates that although the trade press was not unanimous in its judgments of relative quality, Microsoft's products were usually ranked highest, with the strongest lead in the suites category that became an increasingly important vehicle for distributing word processing and spreadsheet applications during the period Novell owned WordPerfect.  My analysis is consistent with the testimony of WPC and Novell executives. For example, Willard Peterson testified that reviews of WordPerfect for Windows were "less than glowing".[226]

154.    As discussed below, Professor Noll also neglects to account for the role of missteps taken by WPC and later by Novell in the decline of WordPerfect.

_____

[225] In the one review in which DOS and Windows word processors were ranked on a numerical scale, Word for Windows scored slightly higher than WordPerfect for DOS. (See John Lombardi, "Treasures Abound: The High-End Word Processors Get More Graphical and Sport Even More Features," InfoWorld, January 29, 1990).

[226] Deposition of Willard Peterson, October 1, 2008, pp. 73, 106-107, 134; W. E. "Pete" Peterson, Almost Perfect (1998), Chapter 9, p. 70, available at http://www.wordplace.com/ap/almostperfect.pdf (downloaded June 22, 2009).

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

## C. WPC and Then Novell Made Strategic Errors that Led to the Demise of Their OPAs

### i. WPC's Strategy Prior to Its Acquisition by Novell Led to the Demise of WordPerfect Because of the Emergence of GUI Platforms and Suites

155.    In 1990, WordPerfect was the leading word processor for character-based PC operating systems, such as MS-DOS.  Initially, at least, the appeal of the GUI platform was not appreciated by top management at WPC who felt that MS-DOS would continue to be the platform of choice.[227]  WPC also felt that MS-DOS was their cash cow and did not want to see the GUI-based PC operating system succeed.[228]  As a result, the most able software developers were assigned to DOS applications rather than GUI applications.[229]  WPC chose not to port WordPerfect to the Windows platform in hopes of forestalling the success of the Windows platform.[230]  This strategy proved costly to WPC because of the increasing popularity of GUI based PC operating systems.[231]  Exhibits 11 and 12 show that while GUI platforms prevailed in the marketplace, WordPerfect's performance on GUI platforms never approached the success it achieved on the MS-DOS platform and in fact declined after 1992.[232],[233]

---

[227] Initially, at least, the virtues of GUI were not appreciated by top management at WPC.  Deposition of Nolan Larsen, November 17, 2008, vol. 1, pp. 15-16, 114-15, 143; Deposition of Charles Middleton, December 13, 2008, p. 39; Deposition of Willard E. Peterson, October 1, 2008, pp. 139-40; Deposition of Charles Middleton, December 13, 2008, pp. 33-41.

[228] Deposition of David Acheson, November 19, 2008, pp. 54-55; Deposition of Charles Middleton, December 13, 2008, p. 58.

[229] Deposition of Willard E. Peterson, October 1, 2008, pp. 79-81, 106-07, 139-40.

[230] Deposition of Norman Thomas Creighton, December 11, 2008, vol. 1, pp. 39-40; Creighton Deposition Exhibit 20; Deposition of Willard E. Peterson, October 1, 2008, pp. 77-80, 106, 139-40; Deposition of Craig Bushman, November 18, 2008, p. 40; Deposition of David Acheson, November 19, 2008, p. 56; NOV 00479868; NOV 00615900.

[231] Deposition of Deposition of Willard E. Peterson, October 1, 2008, pp. 108-110; Deposition of Robert Frankenberg, March 25, 2009, pp. 24-25.

[232] See also Deposition of Willard Peterson, October 1, 2008, pp. 21-22, 145-46.

[233] Data for OS/2 are not shown separately because Word for DOS and Word for Windows could also run on OS/2 and data for their use on the OS/2 platform are not available.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

156.    Moreover, WPC's strategy beginning in the late 1980's to run on as many platforms as possible in order to achieve "ubiquity"[234] was costly to WPC. This strategy further impeded WPC's efforts to develop for GUI platforms because it required that WPC reduce the functionality of its applications to "the lowest common denominator" across all the platforms.[235]   At the same time, there was relatively little return to WPC's multi-platform strategy because most of the platforms generated relatively few sales. In 1988, for example, WPC developed for the MS-DOS, Vax, Amiga, Data General, Apple, Mac, Atari, Unix, 370, and OS/2 platforms.[236]  After MS-DOS, the other nine platforms accounted for less than 10 percent of WPC's sales.[237]  WPC continued supporting multiple platforms until it was acquired by Novell. Shortly after the acquisition, however, Mr. Frankenberg approved recommendations to eliminate or reduce resources supporting WordPerfect on non-Windows platforms.[238]

157.    WPC eventually turned its focus to the Windows platform but it would be 18 months after the release of Windows 3 before WPC released its Windows product (WP 5.1).[239]  This delay occurred in part because WordPerfect coded a MS-DOS version

---

[234] Deposition of Willard E. Peterson, March 19, 2002, p. 128; MS-PCA 2205351.
[235] Deposition of Nolan Larsen, November 17, 2008, pp. 178; Deposition of Willard E. Peterson, March 19, 2002, pp. 94-95, 128-133.  In writing cross-platform software, developers face a trade-off between using components provided by the underlying PC operating systems to provide a feature and duplicative efforts implementing the feature on multiple platforms.  (Examples of functionality provided by the underlying PC operating systems include GUI components, interprocess communication (IPC), and filesystem access.)  When using components provided by the underlying PC operating systems, if a certain feature is desired across multiple platforms, the feature would necessarily be restricted to functionality that is provided by all of the platforms.
[236] Deposition of Willard E. Peterson, March 19, 2002, pp. 129-133 and Exhibit 10.
[237] Deposition of Willard E. Peterson, March 19, 2002, pp. 129-133 and Exhibit 10.
[238] Deposition of Robert Frankenberg, March 25, 2009, Exhibit 6.
[239] Deposition of Norman Thomas Creighton, December 11, 2008, vol. 1, pp. 58; Deposition of Willard E. Peterson, October 1, 2008, pp. 20-21, 71.

CONTAINS CONFIDENTIAL INFORMATION

in assembly language but had to transition to higher level languages when GUIs emerged.[240]

158.    The delay was costly to WPC in two ways.  First, WPC lost sales to consumers that instead purchased Word or another Windows compatible word processor during this 18 month period.[241]  Second, the quality of the WPC releases suffered because the rush to get the products released as soon as possible limited the time and effort WPC could put into developing them, adversely affecting future sales.[242] Indeed, most contemporaneous product reviews rated Microsoft Word as substantially better than WordPerfect, which further contributed to the poor performance of WordPerfect's Windows product.[243]

159.    Another major misstep by WPC that further contributed to the decline of WordPerfect's sales was its late and incomplete entry into OPA suites.[244]  Prior to the introduction of the OPA suite by Microsoft, Word Perfect was the leading word processor application and Lotus 1-2-3 was the leading spreadsheet application.[245] Given the dominance of its standalone WordPerfect product, WPC initially did not

---

[240] Deposition of Willard E. Peterson, October 1, 2008, p. 146; Deposition of Norman Thomas Creighton, December 11, 2008, p. 58; Deposition of Nolan Larsen, November 17, 2008, pp. 89-90; Deposition of Charles Middleton, December 13, 2008, pp. 70-76.

[241] Deposition of David Acheson, November 19, 2008, p. 39; Deposition of Dean Clive Winn II, December 10, 2008, p. 78.

[242] Deposition of Dean Clive Winn II, December 10, 2008, vol. 1, pg. 111; Deposition of Gary Lawrence Gibb, March 17, 2009, vol.1, pp. 32-34; NOV-B00366497-513 at 499; Deposition of Willard E. Peterson, October 1, 2008, pp. 12, 24, 72, 73; MS-PCA1314286-306.

[243] Deposition of Willard E. Peterson, October 1, 2008, pp. 95-96 and Exhibits 7 and 11.  Consumers primarily relied on product reviews when making software purchasing decisions, and poor reviews of WordPerfect's Windows product contributed to the disparity between WordPerfect's lackluster Windows product and the previous success of its DOS product.  Deposition of Dean Clive Winn II, December 10, 2008, p. 161; Deposition of Willard E. Peterson, October 1, 2008, pp. 92-93.

[244] Deposition of Dean Clive Winn II, December 10, 2008, pp. 111. Deposition of Craig Bushman, November 18, 2008, pp. 38-39, 77; Deposition of Nolan Larsen, November 17, 2008, pp. 35-36, 50; Deposition of David Acheson, November 19, 2008, pp. 125-126.

[245] Deposition of Dean Clive Winn II, December 10, 2008, p. 64; IDC, Spreadsheet Software, #3834; IDC, PC Spreadsheet Software: Market Review and Forecast, 1988, #4389; IDC, PC Spreadsheet Software, #5256; IDC, PC Spreadsheet Software 1991 Spreadsheet Report, #5962.

CONTAINS CONFIDENTIAL INFORMATION

think it likely that a Microsoft suite could significantly chip away at its leading "best in class" word processing application.[246]

160.    It turned out, however, that as a result of the market success of Excel, the successful integration of Word and Excel functionality, and the pricing of the suite at less than the sum of the standalone prices of the suite components, Microsoft's Office suite quickly was able to overcome the previous advantages of Word Perfect.[247] Microsoft Office was released at a time when WordPerfect did not have a suite of its own.[248]  Lotus was quick to follow with its Lotus SmartSuite offering, and as discussed above, suites rapidly became the primary way in which consumers purchased OPAs.

161.    By 1993 WPC recognized the need to develop a suite that would be competitive with the suite offerings of Microsoft and Lotus.[249]  WPC needed to obtain a spreadsheet application since its market research showed that a word processor and spreadsheet were what consumers wanted most in a suite.[250]  WPC's market research also showed that Lotus 1-2-3 would provide the strongest partner to Word Perfect.[251] WPC attempted to partner with Lotus 1-2-3 but its negotiations with Lotus failed.[252] Although WPC understood that few consumers preferred Quattro Pro, WPC partnered with Borland's Quattro Pro to create the Borland Office suite.[253]   WPC's strategy was to

---

[246] Deposition of Nolan Larsen, November 17, 2008, pp. 33, 36; Microsoft  had "a great spreadsheet with a good word processor" and as a result customers started "standardizing on Microsoft products," Deposition of Willard E. Peterson, October 1, 2008, p. 26; NOV 00288786-801 at 790.

[247] Deposition of Willard E. Peterson, October 1, 2008, p. 26.

[248] Deposition of Willard E. Peterson, October 1, 2008, p. 33, pp. 117-118; Deposition of David Acheson, November 19, 2008, pp. 103-104, 110-111; Deposition of Dean Clive Winn II, December 10, 2008, pp. 124-125.

[249] NOV 00056546 (Mar. 9, 1993 Letter from Jean-Loup).

[250] NOV 00056782-84 at 83 ("Word processing and spreadsheets are the most important components in a suite; no other applications are close in importance…").

[251] Deposition of Nolan Larsen, November 17, 2008, vol. 1, p. 43; NOV 00531024-025 at 25;  NOV 00056782-84  at 84 ("A suite combination of WordPerfect and either Lotus 1-2-3 or Microsoft Excel is rated significantly higher than a WordPerfect and Quattro Pro combination…").

[252] Deposition of Nolan Larsen, November 17, 2008, vol. 1, pp. 42, 160.

[253] NOV 00056782-84, (July 25, 1993 Suites Issues Study); NOV00181724-45; Deposition of Robert Frankenberg, March 25, 2009, pp. 33, 35.

CONTAINS CONFIDENTIAL INFORMATION

promote the suite as containing other, "best in class," applications rather than Quattro Pro, acknowledging that "the jury is still out on …Quattro Pro."[254]

162.    WPC intended initially to only provide a "simple level of integration based on joint efforts between WPC and Borland."[255]  However, it soon became clear that consumers valued suites not just for the quality of the individual applications themselves but also based on the ability to use the applications in a suite in an integrated and consistent way.  Integration efforts for Borland Office suffered from the fact that the suite components were supplied by two separate companies and because of WPC's rush to release its suite offering.[256]  As product reviews concluded, the WPC suite was more of a bundle of independent products and lacked the level of integration desired by consumers.[257]  WPC's suite marketing teams agreed and concluded that "[a]s an incomplete suite, the Borland Office has not been met with great enthusiasm" because "it did not take into account some of the factors which persuade people to buy suites – integration and consistency."[258]  In 1994-1995, most customers were choosing to buy applications in suites, and as Mr. Frankenberg testified, Microsoft's Office suite was "by far the most popular."[259]

### ii.    *Novell's Strategy for WordPerfect Was Flawed*

163.    Because of the growing importance of Windows and the increasing importance of suites, WPC's fortunes had declined significantly prior to its acquisition by Novell.  Former WPC co-owner Willard (Pete) Peterson testified that Novell

---

[254] NWP0007882.

[255] NWP0007882.

[256] Deposition of Scott Kliger, February 25, 2009, vol. 1, pp. 42-45; Kliger Deposition Exhibit 4 (NOV0528057); NOV 00181719-23 at 21,(1993 Suite Marketing Proposal); NOV 00022294-307 at 296.

[257] NOV 00049497; NOV 00532019;  Deposition of Dean Clive Winn II, December 10, 2008, Exhibit 22 (NOV00532017); Deposition of Norman Thomas Creighton, December 11, 2008, pp. 102; NOV 00478238-45 at 38-39; NOV 00528056

[258] NWP0007880; Deposition of Norman Thomas Creighton, December 11, 2008, vol. 1, pp. 102-103; NOV 00392836-39 at 37; NOV 00478371; NOV 00478238-45 at 38-39; NOV 00022294-307 at 296

[259] Deposition of Robert Frankenberg, March 25, 2009, p. 33.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

purchased a "sinking ship."[260] Further, many of the problems described above continued to affect WordPerfect sales under Novell's ownership.

164.    As discussed below, Novell further contributed to WordPerfect's decline by not addressing the causes of its decline -- not bundling WordPerfect with another quality suite product, and not focusing on the next version of Windows.  Instead, Novell chose a strategy of attempting to bundle WordPerfect and Netware, and devoted nearly all of its programming efforts to the wrong version of Windows.[261]

165.    Novell's stated motivation for the acquisition of WordPerfect and Quattro Pro was to link applications to its network PC operating system in order to compete with Microsoft.[262]  In so doing, it hoped that selling Netware and OPAs together would raise the profile of its Netware software and that it could leverage its server market to get Word Perfect greater access to potential sales.[263]  Market evidence suggests that Novell overestimated the potential returns from this strategy and as a result paid too much for WPC.[264]  Novell's share price declined 15 percent on the day the transaction was announced.[265]  Indeed, it turned out that differences between Novell's systems software and its OPA software, and the lack of applications developers at Novell, made combining functionality difficult.[266]

---

[260] Deposition of Willard E. Peterson, October 1, 2008, vol. 1, pp. 35, 222.  See also Deposition of Charles Middleton, December 13, 2008, pp. 122-23.
[261] NOV00317786
[262] NOV 00072005-008; NOV 00491634; NOV 00615747; NOV-B01929968;  Defendant's Exhibit 3148 Clark, Don, "Novell Nouveau: Software Firm Fights To Remake Business After Ill-Fated Merger," The Wall Street Journal, January 12, 1996, p. 1-5; Deposition of Craig Bushman, November 18, 2008, pp. 94.
[263] NOV 00049950.
[264] Deposition of Willard Peterson, October 1, 2008, pp. 221-222.
[265] NOV 00650243; James Kim, "Novell Expansion Adds Skepticism," USA Today, March 23, 1994, p. 3B; Bloomberg, "Novell to Acquire WordPerfect Corporation and Purchase Borland's Quattro Pro spreadsheet Business," Business Wire, March 21, 1994; "Novell, WordPerfect Finalize Merger," Daily Herald, June 27, 1994.
[266] NOV-B18875562-68 at 65; NOV00201836-37 at 37; NOV 0071990-97 at 91; Deposition of Norman Thomas Creighton, December 11, 2008, pp. 135-36, 144; Deposition of Craig Bushman, November 18, 2008, pp. 76; Deposition of David Acheson, November 19, 2008, pp. 24-26, 35-36, 94-96, 144-145, 149.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

166.    Further, the acquisition of WordPerfect and Quattro Pro was Novell CEO Ray Noorda's idea, but Mr. Noorda resigned shortly after the acquisition.  Novell's leadership that succeeded him did not support the acquisition.[267]  In addition, record evidence shows that some of Novell's own developers questioned the feasibility of achieving synergies from integrating the WordPerfect and Netware softwares.  One WordPerfect developer in fact concluded that the attempt to do so was generally artificial and "made no sense."[268]  Novell ultimately concluded that consumers did not place higher value on applications that were network enabled.[269]  The fact that Novell decided to sell WordPerfect and Quattro Pro only 18 months after the purchase indicates that Novell itself quickly realized the flaws in this strategy.

167.    During the brief time in which Novell owned the WordPerfect group, Novell made some decisions that further adversely affected WordPerfect.  A major example is Novell's decision to wait until it completed its offering for the 16-bit Windows 3.1 platform before focusing on developing its products for the 32-bit Windows 95 platform.[270]  Novell had not been overly concerned about being late to Windows 95 because it did not anticipate a significant decline of 16-bit Windows applications sales after the release of Windows 95.[271]  As it turned out, the release of Windows 95 nearly froze 16-bit applications product sales.[272]

168.    Novell sold the WordPerfect group before it could release its 32-bit product, PerfectOffice 7.0, and the decision to sell the group further delayed the release

---

[267] Deposition of Craig Bushman, November 18, 2008, pp. 51, 61-62, 71, 75; Deposition of Karl Ford, February 16, 2009, pp. 95.
[268] Deposition of Thomas Creighton, December 11, 2008, pp. 154-155; NOV00201836-37.
[269] NOV 00663930-31; Deposition of Gary Lawrence Gibb, March 17, 2009, pp. 104-05; Deposition of David Acheson, November 19, 2008, pp. 144-45.
[270] Deposition of Adam Harral, December 12, 2001, Exhibit 15; NOV-25-006570; NOV 00617897; Deposition of Robert Frankenberg, March 25, 2009, pp. 94-96, Exhibit 6; Deposition of David Hallmeyer, February 17, 2009, p. 56; Deposition of Thomas Freeman, March 31, 2009, pp. 18, 21-23.
[271] NOV-B18875562; NOV-25-006568-78 at 70, 73.
[272] NOV00317786; NOV-B18875562.

CONTAINS CONFIDENTIAL INFORMATION

*Expert Report of Kevin Murphy (Novell)*

of this product.[273]  PerfectOffice 7.0 was ultimately released by the buyer, Corel, in 1996. Novell owned the WordPerfect group for less than two years, and Novell's poor business strategy and management decisions were recognized as the reasons why the benefits of the merger failed to materialize.[274]

169.    In sum, Professor Noll provides no evidence that WordPerfect's market decline was caused by anticompetitive actions taken by Microsoft.  In addition, Professor Noll ignores evidence that the success of Microsoft's OPAs relative to Novell's OPAs is better explained by procompetitive strategies undertaken by Microsoft and the failure of first WPC and then Novell to pursue successful market strategies.

Signed, June 24, 2009, at Chicago, Illinois.

Kevin M. Murphy

---

[273] Jones, Chris, "Corel aims to dispel doubts with 32-bit upgrade of PerfectOffice." Infoworld, February 12, 1996, p. 25; NOV 00617897; NOV00109154.
[274] Foremski, Tom, "Flawed Vision." Computer Business Review, December 1, 1995; Deposition of David Hallmeyer, February 17, 2009, p. 54; Deposition of Nolan Larsen, November 17, 2008, p. 57.

CONTAINS CONFIDENTIAL INFORMATION

# Appendix A

## *Curriculum Vitae*

# Kevin M. Murphy

June 2009

*Business Address:*

University of Chicago
Booth School of Business
5807 South Woodlawn Avenue
Chicago, Illinois 60637
email: murphy@chicagogsb.edu

*Home Address:*

1810 Pennington Court
New Lenox, Illinois 60451
Phone: (815)463-4756
Fax: (815)463-4758

**Education**

University of California, Los Angeles, A.B., Economics, 1981
University of Chicago, Ph.D., 1986
Thesis Topic: *Specialization and Human Capital*

**Honors and Awards** 2008: John von Neumann Lecture Award, Rajk College, Corvinus University, Budapest
2007: Kenneth J. Arrow Award (with Robert H. Topel)
October 2005: Garfield Research Prize (with Robert H. Topel)
September 2005: MacArthur Foundation Fellow
1998: Elected to the American Academy of Arts & Sciences
1997: John Bates Clark Medalist
1993: Fellow of The Econometric Society
1989 – 1991: Sloan Foundation Fellowship, University of Chicago
1983 – 1984: Earhart Foundation Fellowship, University of Chicago
1981 – 1983: Fellowship, Friedman Fund, University of Chicago
1980 – 1981: Phi Beta Kappa, University of California, Los Angeles
1980 – 1981: Earhart Foundation Fellowship, University of California, Los Angeles
1979 – 1981: Department Scholar, Department of Economics, University of California, Los Angeles

**Other Affiliations** Faculty Research Associate, National Bureau of Economic Research

**Research and Academic Positions**

July 2005: Present: George J. Stigler Distinguished Service Professor of Economics, Department of Economics and Graduate School of Business, University of Chicago
2002: George J. Stigler Professor of Economics, Department of Economics and Booth School of Business, University of Chicago
1993 – 2002: George Pratt Shultz Professor of Business Economics and Industrial Relations, University of Chicago
1989 – 1993: Professor of Business Economics and Industrial Relations, University of Chicago
1988 – 1989: Associate Professor of Business Economics and Industrial Relations, University of Chicago
1986 – 1988: Assistant Professor of Business Economics and Industrial Relations, University of Chicago
1983 – 1986: Lecturer, Booth School of Business, University of Chicago
1982 – 1983: Teaching Associate, Department of Economics, University of Chicago
1979 – 1981: Research Assistant, Unicon Research Corporation, Santa Monica, California

**Selected Publications**

**Books**

Social Economics: Market Behavior in a Social Environment with Gary S. Becker, Cambridge, MA: Harvard University Press (2000).

Measuring the Gains from Medical Research: An Economic Approach edited volume with Robert H. Topel, Chicago: University of Chicago Press (2003).

**Articles**

"Government Regulation of Cigarette Health Information," with Benjamin Klein and Lynne Schneider, 24 *Journal of Law and Economics* 575 (1981).

"Estimation and Inference in Two-Step Econometric Models," with Robert H. Topel, 3 *Journal of Business and Economic Statistics* 370 (1985).

"Unemployment, Risk, and Earnings: Testing for Equalizing Wage Differences in the Labor Market," with Robert H. Topel, in Unemployment and the Structure of Labor Markets, pp. 103-139, ed. Kevin Lang and Jonathan S. Leonard. London: Basil Blackwell (1987).

"The Evolution of Unemployment in the United States: 1968-1985," with Robert H. Topel, in NBER Macroeconomics Annual, pp. 11-58, ed. Stanley Fischer. Cambridge, MA: MIT Press (1987).

"Cohort Size and Earnings in the United States," with Mark Plant and Finis Welch, in Economics of Changing Age Distributions in Developed Countries, pp. 39-58, ed. Ronald D. Lee, W. Brian Arthur, and Gerry Rodgers. Oxford: Clarendon Press, (1988).

"The Family and the State," with Gary S. Becker, 31 *Journal of Law and Economics* 1 (1988).

"A Theory of Rational Addiction," with Gary S. Becker, 96 *Journal of Political Economy* 675 (1988).

"Vertical Restraints and Contract Enforcement," with Benjamin Klein, 31 *Journal of Law and Economics* 265 (1988).

"Income Distribution, Market Size, and Industrialization," with Andrei Shleifer and Robert W. Vishny, 104 *Quarterly Journal of Economics* 537 (1989).

"Wage Premiums for College Graduates: Recent Growth and Possible Explanations," with Finis Welch, 18 *Educational Researcher* 17 (1989).

"Industrialization and the Big Push," with Andrei Shleifer and Robert W. Vishny, 97 *Journal of Political Economy* 1003 (1989).

"Building Blocks of Market Clearing Business Cycle Models," with Andrei Shleifer and Robert W. Vishny, in <u>NBER Macroeconomic Annual,</u> pp. 247-87, ed. Olivier Jean Blanchard and Stanley Fischer. Cambridge, MA: MIT Press (1989).

"Efficiency Wages Reconsidered: Theory and Evidence," with Robert H. Topel, in <u>Advances in the Theory and Measurement of Unemployment,</u> pp. 204-240. ed. Yoram Weiss and Gideon Fishelson. London: Macmillan, (1990).

"Empirical Age-Earnings Profiles," with Finis Welch, 8 *Journal of Labor Economics* 202 (1990).

"Human Capital, Fertility, and Economic Growth," with Gary S. Becker and Robert F. Tamura, 98 *Journal of Political Economy*, S12 (1990).

"Accounting for the Slowdown in Black-White Wage Convergence," with Chinhui Juhn and Brooks Pierce, in <u>Workers and Their Wages: Changing Patterns in the United States,</u> pp. 107-143, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"The Role of International Trade in Wage Differentials," with Finis Welch, in <u>Workers and Their Wages: Changing Patterns in the United States,</u> pp. 39- 69, ed. Marvin Kosters. Washington, D.C.: American Enterprise Institute (1991).

"Why Has the Natural Rate of Unemployment Increased over Time?" with Robert H. Topel and Chinhui Juhn, 2 *Brookings Papers on Economic Activity* 75 (1991).

"The Allocation of Talent: Implications for Growth," with Andrei Shleifer and Robert W. Vishny, 106 *Quarterly Journal of Economics* 503 (1991).

"Rational Addiction and the Effect of Price on Consumption," with Gary S. Becker and Michael Grossman, 81 *American Economic Review* 237 (1991).

"Wages of College Graduates," in <u>The Economics of American Higher Education,</u> pp. 121-40, ed. William E. Becker and Darrell R. Lewis. Boston: Kluwer Academic Publishers (1992).

"Changes in Relative Wages, 1963-1987: Supply and Demand Factors," with Lawrence F. Katz, 107 *Quarterly Journal of Economics* 35 (1992).
"The Structure of Wages," with Finis Welch. 107 *Quarterly Journal of Economics* 285 (1992).

"The Transition to a Market Economy: Pitfalls of Partial Planning Reform," with Andrei Shleifer and Robert W. Vishny, 107 *Quarterly Journal of Economics* 889 (1992).

"The Division of Labor, Coordination Costs, and Knowledge," with Gary S. Becker, 107 *Quarterly Journal of Economics* 1137 (1992).

"Industrial Change and the Rising Importance of Skill" with Finis Welch, in <u>Uneven Tides: Rising Inequality in America</u>, pp. 101-132, ed. Peter Gottschalk and Sheldon Danziger. New York: Russell Sage Foundation Publications (1993).

"Wage Inequality and the Rise in Returns to Skill," with Chinhui Juhn and Brooks Pierce, 101 *Journal of Political Economy* 410 (1993).

"Occupational Change and the Demand for Skill, 1940-1990," with Finis Welch, 83 *American Economic Review* 122 (1993).

"Inequality and Relative Wages," with Finis Welch, 83 *American Economic Review* 104 (1993).

"Why Is Rent-Seeking So Costly to Growth?" with Andrei Shleifer and Robert W. Vishny, 83 *American Economic Review* 409 (1993).

"A Simple Theory of Advertising as a Good or Bad," with Gary S. Becker, 108 *Quarterly Journal of Economics* 941 (1993).

"Relative Wages and Skill Demand, 1940-1990," with Chinhui Juhn, in <u>Labor Markets, Employment Policy, and Job Creation,</u> pp. 343-60, ed. Lewis C. Solmon and Alec R. Levenson. The Milken Institute Series in Economics and Education. Boulder, CO: Westview Press, (1994).

"Cattle Cycles," with Sherwin Rosen and Jose A. Scheinkman, 102 *Journal of Political Economy* 468 (1994).

"An Empirical Analysis of Cigarette Addiction," with Gary S. Becker and Michael Grossman, 84 *American Economic Review* 396 (1994).

"Inequality in Labor Market Outcomes: Contrasting the 1980s and Earlier Decades," with Chinhui Juhn, 1 *Economic Policy Review* 26 (1995).

"Employment and the 1990-91 Minimum Wage Hike," with Donald R. Deere and Finis Welch, 85 *American Economic Review* 232 (1995).

"Examining the Evidence on Minimum Wages and Employment," with Donald R. Deere and Finis Welch, in <u>The Effects of the Minimum Wage on Employment</u>, pp. 26-54, ed. Marvin H.

Kosters. Washington, D.C.: The AEI Press, (1996).

"Social Status, Education, and Growth," with Chaim Fershtman and Yoram Weissm, 104 *Journal of Political Economy* 108 (1996).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Quality and Trade," with Andrei Shleifer, 53 *Journal of Development Economics* 1 (1997).

"Wage Inequality and Family Labor Supply," with Chinhui Juhn, 15 *Journal of Labor Economics* 72 (1997).

"Vertical Integration as a Self-Enforcing Contractual Arrangement," with Benjamin Klein, 87 *American Economic Review* 415 (1997).

"Unemployment and Nonemployment," with Robert H. Topel, 87 *American Economic Review* 295 (1997).

"Wages, Skills, and Technology in the United States and Canada," with W. Craig Riddell and Paul M. Romen, in General Purpose Technologies and Economic Growth, pp. 283-309, ed. Elhanan Helpman.  Cambridge, MA: M.I.T. Press, (1998).

"Perspectives on the Social Security Crisis and Proposed Solutions," with Finis Welch, 88 *American Economic Review* 142 (1998).

 "Population and Economic Growth," with Gary S. Becker and Edward Glaeser, 89 *American Economic Review* 145 (1999).

 "A Competitive Perspective on Internet Explorer," with Steven J. Davis, 90 *American Economic Review* 184 (2000).

"Industrial Change and the Demand for Skill" with Finis Welch, in The Causes and Consequences of Increasing Inequality, pp. 263-84, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Wage Differentials in the 1990s: Is the Glass Half Full or Half Empty?" with Finis Welch, in *The Causes and Consequences of Increasing Inequality*, pp. 341-64, ed. Finis Welch.  Volume II in the Bush School Series in the Economics of Public Policy.  Chicago: University of Chicago Press, (2001).

"Economic Perspectives on Software Design: PC Operating Systems and Platforms," with Steven J. Davis and Jack MacCrisken, in Microsoft, Antitrust, and the New Economy: Selected Essays, pp. 361-420, ed. Davis S. Evans. Boston, MA: Kluwer, (2001).

"Current Unemployment, Historically Contemplated," with Robert H. Topel and Chinhui Juhn, 1 *Brookings Papers on Economic Activity* 79 (2002).

"The Economics of Copyright 'Fair Use' in A Networked World," with Andres Lerner and Benjamin Klein, 92 *American Economic Review* 205 (2002).

"The Economic Value of Medical Research" with Robert H. Topel, in <u>Measuring the Gains from Medical Research: An Economic Approach,</u> pp. 41-73, ed. Robert H. Topel and Kevin M. Murphy. Chicago: University of Chicago Press, (2003).

"School Performance and the Youth Labor Market," with Sam Peltzman, 22 *Journal of Labor Economics* 299 (2003).

"Entrepreneurial ability and market selection in an infant industry: evidence from the Japanese cotton spinning industry," with Atsushi Ohyama and Serguey Braguinsky, 7 *Review of Economic Dynamics* 354 (2004).

"Entry, Pricing, and Product Design in an Initially Monopolized Market," with Steven J. Davis and Robert H. Topel, 112 *Journal of Political Economy*: S188 (2004).

"Diminishing Returns: The Costs and benefits of Increased Longevity," with Robert H. Topel, 46 *Perspectives in Biology and Medicine* S108 (2004).

"Persuasion in Politics," with Andrei Shleifer, 94 *American Economic Review* 435 (May 2004).

"Black-White Differences in the Economic Value of Improving Health," with Robert H. Topel, 48 *Perspectives in Biology and Medicine* S176 (2005).

"The Equilibrium Distribution of Income and the Market for Status," with Gary S. Becker and Iván Werning, 113 *Journal of Political Economy* 282 (2005).

"The Market for Illegal Goods: The Case of Drugs," with Gary S. Becker and Michael Grossman, 114 *Journal of Political Economy* 38 (2006).

"Competition in Two Sided Markets: The Antitrust Economics of Payment Card Interchange Fees," with Benjamin Klein, Kevin Green, and Lacey Place, 73 *Antitrust Law Journal* 571 (2006).

"The Value of Health and Longevity," with Robert H. Topel, 114 *Journal of Political Economy* 871 (2006).

"Social Value and the Speed of Innovation," with Robert H. Topel, 97 *American Economic Review* 433 (2007).

"Education and Consumption: The Effects of Education in the Household Compared to the Marketplace," with Gary S. Becker, 1 *The Journal of Human Capital* 9 (Winter 2007).

"Why Does Human Capital Need a Journal?" with Isaac Ehrlich, 1 *The Journal of Human Capital* 1 (Winter 2007).

"Critical Loss Analysis in the *Whole Foods* Case" with Robert H. Topel, 3 (2) *GCP Magazine* (March 2008)

"Exclusive Dealing Intensifies Competition for Distribution," with Benjamin Klein, Antitrust Law Journal, Vol. 75 (October 2008).

"Fertility Decline, the Baby Boom and Economic Growth," with Gary Becker, Curtis Simon, Robert Tamura (forthcoming, Journal of Human Capital 2009).

**Selected Working Papers**

"Gauging the Economic Impact of September 11th", with Gary S. Becker, Unpublished Working Paper (October 2001).

"War In Iraq Versus Containment: Weighing the Costs," with Steven J. Davis and Robert H. Topel, *NBER Working Paper No.12092* (March 2006).

"Estimating the Effect of the Crack Epidemic," with Steve Levitt and Roland Fryer, Unpublished Working Paper (September 2006).

"The Interaction of Growth in Population and Income," with Gary S. Becker, Unpublished Working Paper (2006).

"Persuasion and Indoctrination," with Gary Becker (2007).

"The Value of Life Near Its End and Terminal Care," with Gary Becker and Tomas Philipson (2007).

**Selected Comments**

Comment on "Causes of Changing Earnings Equality," by Robert Z. Lawrence. Federal Reserve Bank of Kansas City (1998).

"Comment: Asking the Right Questions in the Medicare Reform Debate," Medicare Reform: Issues and Answers, pp. 175-81, ed. Andrew J. Rettenmaier and Thomas R. Saving. Chicago: University of Chicago Press (2000).

Comment on "Social Security and Demographic Uncertainty," by Henning Bohn in Risk Aspects of Investment-Based Social Security Reform, ed. John Y. Campbell and Martin Feldstein. Chicago: University of Chicago Press (2001.)

Comment on "High Technology Industries and Market Structure," by Hal R. Varian. Federal Reserve Bank of Kansas City (2001).

**Popular Press Articles**

"The Education Gap Rap," *The American Enterprise,* (March-April 1990), pp. 62.

"Rethinking Antitrust," with Gary S. Becker, *Wall Street Journal*, (February 26, 2001) pp. pA22.

"Prosperity Will Rise Out of the Ashes," with Gary S. Becker, *Wall Street Journal*, (October 29, 2001) pp. pA22.

"The Economics of NFL Team Ownership" with Robert H. Topel, report prepared at the request of the National Football League Players' Association. (January 2009)

**About Murphy**

"Higher Learning Clearly Means Higher Earning," by Carol Kleiman. *Chicago Tribune*, March 12, 1989, Jobs Section pp. 1. Long article about "The Structure of Wages" with picture of Murphy.

"Why the Middle Class Is Anxious," by Louis S. Richman. *Fortune*, May 21, 1990, pp. 106. Extensive reference to Murphy's work on returns to education.

"Unequal Pay Widespread in U.S.," by Louis Uchitelle., *New York Times,* August 14, 1990, Business Day section pp. 1. Long piece on income inequality.

"One Study's Rags to Riches Is Another's Rut of Poverty," by Sylvia Nasar, *New York Times*, June 17, 1992, Business Section pp. 1. Long piece on the income inequality research.

"Nobels Pile Up for Chicago, but Is the Glory Gone?" by Sylvia Nasar, *New York Times* November 4, 1993, Business Section pp. 1. Long piece on Chicago School of economics. Featured a photo of five of the "brightest stars on the economics faculty" (including Murphy) and a paragraph about Murphy's research.

"This Sin Tax is Win-Win," by Christopher Farrell. *Business Week*, April 11, 1994, pp. 30. Commentary section refers to Murphy, Becker, and Grossman's work on rational addiction.

"Growing inequality and the economics of fragmentation," by David Warsh, *Boston Sunday Globe*, August 21, 1994, pp. A1. Two-page article with picture and biographical details about Murphy and his research; part of a series about "how the new generation replaced the old in economics."

"A Pay Raise's Impact," by Louis Uchitelle. *New York Times*, January 12, 1995, Business Section pp. 1. Article about consequences of proposed increase in the minimum wage. Articles featuring Murphy's comments on the minimum wage appeared in numerous other publications, including the *Chicago Tribune*; in addition, Murphy was interviewed on CNN (January 26, 1995).

"The Undereducated American," *Wall Street Journal*, August 19, 1996, pp. A12. Changes in the rate of returns to education.

"In Honor of Kevin M. Murphy: Winner of the John Bates Clark Medal," by Finis Welch, 14 *Journal of Economic Perspectives* 193 (2000)

**Testimony, Reports, and Depositions (Last 4 Years)**

Testimony of Kevin M. Murphy, January 29, 2005, in Wade et al v. The Kroger Co. et al, United States District Court for the Western District of Kentucky, Louisville Division. Case No. 3:01 CV-699-R.

Expert Report of Kevin M. Murphy, May 24, 2005, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03-1329.

Declaration of Kevin M. Murphy, July 1, 2005, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Expert Report of Kevin M. Murphy, August 1, 2005, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Expert Report of Kevin M. Murphy, August 1, 2005, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Initial Submission of Kevin M. Murphy, October 15, 2005, in the 2003 MSA Adjustment Proceeding.

Deposition of Kevin M. Murphy, October 18, 2005, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Deposition of Kevin M. Murphy, November 8, 2005, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03- 1329.

Deposition of Kevin M. Murphy, December 8, 2005, in the 2003 MSA Adjustment Proceeding.

Final Submission of Kevin M. Murphy, January 30, 2006, in the 2003 MSA Adjustment Proceeding.

Expert Rebuttal Report of Kevin M. Murphy, April 7, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Deposition of Kevin M. Murphy, April 21, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Trial Testimony of Kevin M. Murphy, May 16-17, 2006, in High Pressure Laminates Antitrust Litigation, United States District Court for the Southern District of New York. Case No. 00-MD-1368 (CLB).

Expert Report of Kevin M. Murphy, May 26, 2006, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., Eastern District of New York. Case No. CV-0401945.

Initial Submission of Kevin M. Murphy, August 7, 2006, in the 2004 MSA Adjustment Proceeding.

Trial Testimony of Kevin M. Murphy, August 16-17, 2006, in Applied Medical v. Ethicon, Inc., et al., United States District Court for the Central District of California. Case No. SACV 03-1329.

Expert Report of Kevin M. Murphy, August 28, 2006, in Barbara Schwab, et al. v. Philip Morris USA Inc., et al., United States District Court for the Eastern District of New York. Case No. CV-0401945.

Final Submission of Kevin M. Murphy, December 8, 2006, in the 2004 MSA Adjustment Proceeding.

Expert Report of Kevin M. Murphy, December 11, 2006, Tucker et al. v. Walgreens, United States District Court for the Southern District of Illinois. Case No. 05-CV-440-GPM.

Supplemental Expert Report of Kevin M. Murphy, February 16, 2007, in Conmed Corp. v. Ethicon, Inc., et al., United States District Court for the Southern District of New York. Case No. 03-CV-8800.

Expert Report of Kevin M. Murphy, June 4, 2007, in Eolas Technologies Inc. and The Regents of the University of California v. Microsoft Corporation, United States District Court for the Northern District of Illinois Eastern Division. Case No. 99-C-0626.

Expert Report of Kevin M. Murphy, July 2, 2007, in Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GMBH v. Johnson & Johnson and Cordis Corporation, The United States District Court for the Northern District of California San Francisco Division. Case No. C 02-790 SI.

Expert Report of Kevin M. Murphy, July 9, 2007, in FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc., United States District Court for the District of Columbia. Case No. 1:07-CV-01021-PLF.

Rebuttal Expert Report of Kevin M. Murphy, July 13, 2007, in FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc. United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Deposition of Kevin M. Murphy, July 17, 2007,  in the Matter of FTC v. Whole Foods Market, Inc. and Wild Oats Markets, Inc., United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Affidavit of Kevin M. Murphy, July 25, 2007,  in Ashley Pelman v. McDonald's, United States District Court for the Southern District of New York. Case No. 02 CIV 7821 (RWS).

Testimony of Kevin M. Murphy, July 31, 2007, in the Matter of FTC v. Whole Foods Market,

Inc., et al., United States District Court for the District of Columbia. Case No. 1:07-CV-01021.

Initial Submission of Kevin M. Murphy, August 1, 2007, in the 2005 MSA Adjustment Proceeding.

Deposition of Kevin M. Murphy, August 22, 2007, in Boston Scientific Corporation, Boston Scientific Scimed, Inc., Scimed Life Systems, Inc., and Schneider (Europe) GMBH v. Johnson & Johnson and Cordis Corporation, The United States District Court for the Northern District of California San Francisco Division. Case No. C 02-790 SI.

Expert Report of Kevin M. Murphy, October 26, 2007, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation on behalf of Mercedes U.S.A. LLC., The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, October 26, 2007, in the Matter of New Motor Canadian Export Antitrust Litigation on behalf of Chrysler LLC, Chrysler Motors LLC, and Chrysler Canada Inc., The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, October 31, 2007, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation, The United States District Court for the District of Maine.

Deposition of Kevin M. Murphy, January 15-16, 2008, in the Matter of New Motor Vehicles Canadian Export Antitrust Litigation, The United States District Court for the District of Maine.

Expert Report of Kevin M. Murphy, February 1, 2008, in the Matter of Allied Orthopedic Appliances, Inc., v. Tyco Healthcare Group L.P., The United States District Court for the Central District of California Western District.

Declaration of Kevin M. Murphy, February 22, 2008, in the Matter of Novelis Corporation v. Anheuser-Busch, Inc., The United States District Court for the Northern District of Ohio Eastern Division.

Deposition of Kevin M. Murphy, February 28, 2008, in the Matter of Allied Orthopedic Appliances, Inc., v. Tyco Healthcare Group L.P., The United States District Court for the Central District of California Western District.

Expert Report of Kevin M. Murphy, March 7, 2008, in the Matter of Sun Microsystems, Inc., et al. v. Hynix Semiconductor, Inc., et al. (Consolidated), Unisys Corporation v. Hynix Semiconductor, Inc., et al., Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al., All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al., DRAM Claims Liquidation Trust, by its Trustee Wells Fargo Bank, NA Hynix Semiconductor, et al., The United States District Court for the Northern District of California San Francisco Division.

Deposition of Kevin M. Murphy, April 24, 2008, in the Matter of Sun Microsystems, Inc., et al.

v. Hynix Semiconductor, Inc., et al. (Consolidated), Unisys Corporation v. Hynix Semiconductor, Inc., et al., Jaco Electronics, Inc. v. Hynix Semiconductor, Inc., et al., Edge Electronics, Inc. v. Hynix Semiconductor, Inc., et al., All American Semiconductor, Inc. v. Hynix Semiconductor, Inc., et al., DRAM Claims Liquidation Trust, by its Trustee Wells Fargo Bank, NA Hynix Semiconductor, et al., The United States District Court for the Northern District of California San Francisco Division.

Expert Report of Kevin M. Murphy, June 6, 2008, in the Matter of Kelci Stringer v. National Football League, NFL Properties, Riddell Inc., The United States District Court for the Southern District of Ohio Eastern Division.

Initial Submission of Kevin M. Murphy, October 6, 2008, in the 2006 MSA Adjustment Proceeding.

Expert Report of Kevin M. Murphy, October 29, 2008, in the Matter of Fair Issac Corporation; and myFICO Consumer Services, Inc. vs. Equifax, Inc.; Equifax Information Services LLC; Experian Information Solutions Inc.; TransUnion, LLC; VantageScore Solutions LLC; and Does I through X.

Expert Report of Kevin M. Murphy, November 21, 2008, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc.

Expert Report of Kevin M. Murphy, November 21, 2008, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC.

Deposition of Kevin M. Murphy, December 12, 2008, in the Matter of Fair Issac Corporation; and myFICO Consumer Services, Inc. vs. Equifax, Inc.; Equifax Information Services LLC; Experian Information Solutions Inc.; TransUnion, LLC; VantageScore Solutions LLC; and Does I through X.

Deposition of Kevin M. Murphy, December 15, 2008, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc.

Rebuttal Expert Report of Kevin M. Murphy, December 26, 2008, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC.

Final Submission of Kevin M. Murphy, January 16, 2009, in the 2006 MSA Adjustment Proceeding.

Expert Report of Kevin M. Murphy, January 23, 2009, in the Matter of City of New York v. Amerada Hess Corp., et al., The United States District Court for the Southern District of New York. Report submitted on behalf of Citgo Petroleum Corporation.

Declaration of Kevin M. Murphy, January 29, 2009, in the Matter of Insignia Systems, Inc. v. News America Marketing In-Store, Inc.

Deposition of Kevin M. Murphy, February 10, 2009, in the Matter of Valassis Communications, Inc. v. News America Incorporated, a/k/a News America Marketing Group, News America FSI, Inc. a/k/a News America Marketing FSI, LLC and News America Marketing In-Store Services, Inc. a/a/a News American Marketing In-Store Services, LLC.

Expert Report of Kevin M. Murphy, February 13, 2009, in the Matter of City of New York v. Amerada Hess Corp., et al., The United States District Court for the Southern District of New York. Report submitted on behalf of Citgo Petroleum Corporation regarding Citgo's share of total RFG supply at the New York Harbor.

Expert Report of Kevin M. Murphy, March 3, 2009, in the Matter of St. Francis Medical Center, on behalf of itself and all others similarly situated vs. C.R. Bard, Inc.

Deposition of Kevin M. Murphy, March 6, 2009, in the Matter of St. Francis Medical Center, on behalf of itself and all others similarly situated vs. C.R. Bard, Inc.

Expert Report of Kevin M. Murphy, March 17, 2009, in the Matter of ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation.

Deposition of Kevin M. Murphy, April 6, 2009, in the Matter of ZF Meritor LLC and Meritor Transmission Corporation v. Eaton Corporation.

Declaration of Kevin M. Murphy, April 16, 2009, in the Matter of Sun Microsystems, Inc., a California corporation v. Hynix Semiconductor Inc., et al.

Declaration of Kevin M. Murphy, April 23, 2009, in the Matter of Sun Microsystems, Inc., a California corporation v. Hynix Semiconductor Inc., a Korean corporation,  Hynix Semiconductor America Inc., a California corporation, et al.

Expert Report of Kevin M. Murphy, May 11, 2009, in the Matter of Jim Hood, Attorney General ex rel State of Mississippi v. Microsoft Corporation.

Expert Report of Professor Kevin M. Murphy, June 12, 2009, in the Matter of CITGO Petroleum Corporation v. Ranger Enterprises, Inc., United States District Court for the Western District of Wisconsin.

# Appendix B

## Novell, Incorporated v. Microsoft Corporation
## Report of Kevin M. Murphy
## Summary of Materials Reviewed and/or Relied Upon

### *Bates-Numbered Documents*

| | |
|---|---|
| COMPAQ012919 through COMPAQ012959 | NOV 00479868 through NOV 00479876 |
| COMPAQ012960 through COMPAQ012979 | NOV 00491634 through NOV 00491634 |
| IBM 7510070919 through IBM 7510070919 | NOV 00528056 through NOV 00528069 |
| IBM 7510138374 through IBM 7510138377 | NOV 00531024 through NOV 00531025 |
| IBM 7510238758 through IBM 7510238765 | NOV 00532017 through NOV 00532018 |
| IBM 7510239480 through IBM 7510239483 | NOV 00532019 through NOV 00532020 |
| IBM 7510239639 through IBM 7510239647 | NOV 00615747 through NOV 00615748 |
| IBM 7510239899 through IBM 7510239923 | NOV 00615900 through NOV 00615902 |
| IBM 7510251964 through IBM 7510251970 | NOV 00617897 through NOV 00617903 |
| IBM 7510297440 through IBM 7510297453 | NOV 00650243 through NOV 00650243 |
| MS 045558 through MS 045559 | NOV 00663930 through NOV 00663931 |
| MS7058541 through MS7058561 | NOV 0071990 through NOV 0071997 |
| MS-PCA 1111961 through MS-PCA 1111962 | NOV00109154 through NOV00109155 |
| MS-PCA 1180275 through MS-PCA 1180285 | NOV00110568 through NOV00110604 |
| MS-PCA 2205351 through MS-PCA 2205357 | NOV00181724 through NOV00181745 |
| MS-PCA1314286 through MS-PCA1314306 | NOV00201836 through NOV00201837 |
| MX 6055840 through MX 6055844 | NOV00317786 through NOV00317799 |
| MX 6109491 through MX 6109498 | NOV00418617 through NOV00418619 |
| NOV 00019459 through NOV 00019474 | NOV00652122 through NOV00652124 |
| NOV 00022294 through NOV 00022307 | NOV-25-006568 through NOV-25-006578 |
| NOV 00032657 through NOV 00032662 | NOV-B00029922 through NOV-B00029922 |
| NOV 00039774 through NOV 00039777 | NOV-B00366497 through NOV-B00366513 |
| NOV 00049460 through NOV 00049531 | NOV-B00656734 through NOV-B00656748 |
| NOV 00049950 through NOV 00049950 | NOV-B00941714 through NOV-B00941723 |
| NOV 00056546 through NOV 00056546 | NOV-B00941834 through NOV-B00941863 |
| NOV 00056782 through NOV 00056784 | NOV-B01152591 through NOV-B01152600 |
| NOV 00072005 through NOV 00072008 | NOV-B01644605 through NOV-B01644617 |
| NOV 00181719 through NOV 00181723 | NOV-B01929968 through NOV-B01929975 |
| NOV 00288786 through NOV 00288801 | NOV-B18875562 through NOV-B18875568 |
| NOV 00317786 through NOV 00317799 | NWP00035565 through NWP00035569 |
| NOV 00392836 through NOV 00392839 | NWP00040816 through NWP00040833 |
| NOV 00478184 through NOV 00478191 | NWP0007878 through NWP0007891 |
| NOV 00478238 through NOV 00478245 | SUN2-27-000818 through SUN2-27-000879 |
| NOV 00478371 through NOV 00478372 | SUN2-574-00000559 through SUN2-574-00000577 |

# Appendix B

## Novell, Incorporated v. Microsoft Corporation
## Report of Kevin M. Murphy
## Summary of Materials Reviewed and/or Relied Upon

*Publicly Available Documents*

**Literature**

"GroupWare Special Report," PC User, November 13, 1996

"Corel Aims to Dispel Doubts with 32-bit Upgrade of PerfectOffice," 1996 InfoWorld Media Group, February 12, 1996

"Novell Takes a Stab at Middleware: Early Users say Appware can cut programming costs. But can it cut the enterprise mustard?" Data Communications, Vol. 22, No. 12, December 21, 1993

"Novell to Acquire WordPerfect Corporation and Purchase Borland's Quattro Pro Spreadsheet Business," Business Wire, March 21, 1994

"XAPIA X400 Group AIMS For Electronic Mail Peace." Computergram International Apt. Data Services Ltd., July 27, 1992

"Does Java Really Matter?" PC Magazine, April 7, 1998

"Interview: Said Mohammadioun Stakes Company on New Program," LOTUS, March 1989

"Lotus Acquires Samna Corp.," LOTUS, December 1990

"Lotus and WordPerfect Unite under OS/2 PM," LOTUS, January 1990

"Microsoft Messaging Application Program Interface (MAPI) Overview," January 1993

"Novell readies middleware for Net; Lotus cuts client prices," *Computer Reseller News* 662, December 11, 1995

"Productivity Apps," PC Magazine, May 15, 1998

"Questions & Answers: Networking and Novell, An Interview with Robert Frankenberg," *Network Computing* 14(514), November 15, 1994

Assadi, Barbara "Mac Word Processors: A Blend of Featuresm" InfoWorld, August 21, 1989

Barney, Doug, "Lotus, Novell say Microsoft is hiding MAPI extensions." InfoWorld, March 13, 1995

Bensky, Pat "Macintosh Spreadsheets: Getting a Handle on 3 of the Best," InfoWorld, July 17, 1989

Bortman, Henry, Scot Hacker,  and Chris Herborth, "The History of Be, Inc," The BeOS Bible (Berkeley, CA: Peachpit, 1999)

Bott, Ed, "Suite Sensations," PC Computing, February 1994

Bruck, Bill  et al. Using Novell PerfectOffice 3.  (Indianapolis:  Que Corporation, 1995)

Bulkeley, William M.  "Lotus Cancels Its Modern Jazz Package, Ending Bid to Fix '85 Software Package," The Wall Street Journal, June 15, 1988

Campbell, George, "Windows word processors," PC World, Vol. 10 No. 4, April 1992

Carreon, Julia, Bryan Chua, and Anita Epler, "Reaching an OS impasse: 32-bit desktop operating systems," InfoWorld, November 13, 1995

Charf, Sarah, et. al. "Microsoft Word for Windows Now Available in Thousands of Stores Nationwide." Business Wire, January 8, 1990

Christian, Pat, "Novell, WordPerfect Finalize Merger," Daily Herald, June 27, 1994

Cioroianu, Andrei, "Java XML Programmer's Reference," February 18, 2004

2

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

Cioroianu, Andrei, "Professional Java XML," February 18, 2004,
http://www.onjava.com/pub/a/onjava/2004/02/18/desktop.html, accessed on May 5, 2009

Computergram, "Battle For Dominance In The Electronic Mail Market Rages", Computer Business Review, December 9, 1996

Conatser, Kelly R. "1-2-3 and the Mac Finally Click," LOTUS, October 1991

Cox, Laura and Ben Z. Gotteseman, "Compatibility Compared," PC Magazine, September 26, 1995

Crabb, Don "Excel is Spreadsheet of Choice for Macintosh Users Who Need Power," InfoWorld, November 10, 1986

Cusumano, Michael A. and David B. Yoffie, Competing on Internet Time: Lessons from Netscape and Its Battle with Microsoft (New York: The Free Press, 1998)

Davis, Steven J. and Kevin Murphy, "A Competitive Perspective on Internet Explorer," American Economic Review, Vol. 90, May 2000, pp. 184-187

Davis, Steven J., Jack MacCrisken, and Kevin Murphy, "Economic Perspectives on Software Design: PC Operating Systems and Platforms," in David S. Evans, editor, Microsoft, Antitrust and the New Economy: Selected Essays

Davis, Steven J., Kevin Murphy, and Robert H. Topel, "Entry, Pricing and Product Design in an Initially Monopolized Market," Journal of Political Economy, Vol. 112, Feb. 2004, pp S188 – S225

DelRossi, Robert A., "AppWare's limits outweigh its innovations." InfoWorld Vol. 17 No. 16, April 17, 1995, pp. 85-88

Electronic Messaging News, "Novell E-mail Package Upgrade Delayed to Accommodate Second Name Change," August 3, 1994

Everett, Patricia, "Microsoft Surprises VIM by asking For XAPIA Intervention in API War." Open OSI Product & Equipment News Data Trends Publications, Inc., Vol. 5 No. 13, July 2, 1992

Ferranti, Marc "1-2-3 for Macintosh Due Out in 2 Weeks," PC Week, December 9, 1991

Fersko-Weiss, Henry, "A First Look at 1-2-3/G, Lotus's Spreadsheet for OS/2 Presentation Manager," LOTUS, January 1990

Friedman, Allan "Taligent," Computer Desktop Encyclopedia (Amacom, 1996)

Garner, Rochelle "Spreadsheet Products," InfoWorld, November 10, 1986

Green, Denise and Doug Green "Macintosh Spreadsheets: From the Simple to the Sublime," InfoWorld, June 22, 1987

Green, Kevin, Benjamin Klein, Kevin Murphy, and Lacey Place, "The Antitrust Economics of Interchange Fees," Antitrust Law Journal Vol 73 no. 3, pp 571-626

Greenberg, Ross M. "Faces of Unix; graphical user interfaces for Unix systems," PC Magazine, September 12, 1989

Gruman, Galen ,"Making a Splash," InfoWorld, August 13, 1990

Hays, Jim and Greg Smith, "Spreadsheet Applications for the Mac Offer Fresh Look," InfoWorld, December 12, 1988

Heffner, Randy and Mike Gilpin, "The Players in the Application Platform Battle: Part 1," Giga Research, March 19, 2002

Holmes, Thom "Make My Page!," Byte, May 1987

Hudgins-Bonafield, Christine, "Racing Against the Clock," Network Computing Issue 96, May 1, 1995

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

IDC, 1992 Word Processing Market: DOS, Windows, OS/2, and Macintosh, Report #7691, May 1993

IDC, Client Operating Environment: 1998 Worldwide Markets and Trends, Report #16086, May 1998

IDC, Client Operating Environments Market Forecast and Analysis, 2002-2004, Report #22346, June 2000

IDC, Desktop Operating System Review and Forecast: The Second Phase of the Industry Begins, Report #7445, May 1993

IDC, Macintosh Markets: Software Review and Forecast, Report #3542, July 1988

IDC, Operating Environments, Review and Forecast 1996-2001, Report #14024, August 1997

IDC, PC Operating Systems Market Review and Forecast, 1994-1999, Report #10048, July 1995

IDC, PC Operating Systems Market Review and Forecast, 1995-2000, Report #11568

IDC, PC Spreadsheet Software 1991 Spreadsheet Report, Report #5962, February 1992

IDC, PC Spreadsheet Software, Report #5256, March 1991

IDC, PC Spreadsheet Software: Market Review and Forecast, 1988, Report #4389, November 1989

IDC, Spreadsheet Software, Report #3834, December 1988

IDC, The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, Report #10238, September 1995

IDC, The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, Report #8306, March 1994

IDC, Word Processing Software, Report #3633, November 1988

IDC, Worldwide Client and Server Operating Environments, Market Forecast and Analysis Summary 2001-2005, Report #25118

IDC, Worldwide Software Market Forecast Summary, 2001-2005, Report #25569, September 2001

Kim, James Novell Expansion Adds Skepticism, USA Today, Mar. 23, 1994

Klein, Benjamin and Kevin Murphy, "Exclusive Dealing Intensifies Competition for Distribution," Antitrust Law Journal, Vol. 75, Nov. 2008, pp 433-466

Klein, Benjamin and Kevin Murphy, "Vertical Integration as a Self-Enforcing Contractual Arrangement," American Economic Review, Vol. 87, May 1997, pp. 415-420

Klein, Benjamin and Kevin Murphy, "Vertical Restraints as Contract Enforcement," Journal of Law and Economics, Vol. 31, October 1988, pp. 265-297

Klein, Benjamin, Kevin Murphy, and Andres Lerner, "The Economics of Copyright 'Fair Use' In a Networked World," American Economic Review, Vol. 92, May 2002, pp. 205-208

Lewis, Peter H., "Peripherals: World About Processors." The New York Times, June 18, 1985

Liebowitz, Stan J. and Stephen E. Margolis, Winners, Losers, & Microsoft (Oakland, CA: The Independent Institute, 1999)

Lombardi, John, "Reviews/Product Comparison Windows Word Processors," InfoWorld, February 10, 1992

Lombardi, John, "Treasures Abound: The High-End Word Processors Get More Graphical and Sport Even More Features," InfoWorld, January 29, 1990

Lotus, "Then Do Whatever You Want," LOTUS, July 1990

Machrone, Bill, "5th Annual Awards for Technical Excellence," PC Magazine, January 17, 1989

# Appendix B

## Novell, Incorporated v. Microsoft Corporation
## Report of Kevin M. Murphy
## Summary of Materials Reviewed and/or Relied Upon

Mendelson, Edward, "7 Windows Word Processors:  What You'll See Is What You'll Want," PC Magazine, Vol. 11 No. 4, Feb. 25, 1992

Microsoft Office XP Developer Product Guide, February 2001

Microsoft Rivals May Miss the Boat, The San Fransisco Chronicle, September 26, 1995

Miller,  Michael J. "Suite Deals," PC Magazine, February 8, 1994

Morrissey, Jane  and Gina Smith, "Microsoft Details Broad Applications, OS Strategy; Will Exploit Wide Range of Platforms," PC Week, February 27, 1989

Novell Nouveau: Software Firm Fights to Remake Business After Ill-Fated Merger, The Wall Street Journal, January 12, 1996

Peterson, W. E. "Pete", Almost Perfect (1998), available at http://www.wordplace.com/ap/almostperfect.pdf, accessed on September 11, 2002

Phillip Allen Johnson, "Three Faces of Java Will See Different Fates," Lantimes.com, March, 1998

Picarille, Lisa and Gina Smith, "Windows 3.0 Will Exploit '386 to Relieve Memory Constraints," *PC Week*, February 13, 1989

Rataushk, Wes "Windows 95: where are we today?" Computer Shopper, December 1995

Reinhardt, Andrew and Stan Miastkowski "Short Takes A Pair of New Words from Microsoft." Byte, Vol. 16 No. 1, January 1, 1991

Rubin, Charles "Macintosh Word Processors," InfoWorld, September 28, 1987

Schwartz, Evan, "Lotus Explains Its 1-2-3 Delay," Computer System News, October 17, 1988

Smith, David Mitchell, "Vendor Rating:  Microsoft Still 'Positive' as Pressure Mounts," Gartner Research, October 13, 2003

Solomon, Howard, "Lotus Pulls Plug on Life Support for Desktop App," Computing Canada, September 24, 1999

Spezzano,  Charles "Software for the Serious Writer: Professional Word Processing Packages," InfoWorld, April 13, 1987

Tavis, Mike, "White paper: Lotus Notes and Distributed Objects," IBM,  January 27, 1997

Weidl, Eric, AppWare Programming Primer: A Guide to Constructing Applications.  Addison-Wesley, June 1995

Wittman, Art, "Oracle and Novell: separated at birth?"  Network Computing, Vol. 8 No. 7, April 15, 1997

Wylie Wong, "Andreessen: Netscape's Javagator Is Dead," *CRN*, July 1, 1998, http://content.techweb.com/printableArticle?doc_id=TWB19980701S0001, accessed on January 24, 2002

Markoff, John, "Company News; An Apple PC Version of Lotus 1-2-3," The New York Times, June 4, 1991.

Microsoft Develops Program for Apple," The New York Times, May 3, 1985

Brand, Stewart, "Writing on Computers," Sun Francisco Chronicle, February 13, 1985.

Microsoft Develops Program for Apple", The New York Times, May 3, 1985

New Products Fuel Boom in Exhibits at Show", The New York Times, November 10, 1987

"PERSONAL COMPUTERS; Software for OS/2", The New York Times, October 10, 1989

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

**Websites**

"1984 Apple Newsweek Advertising Insert," http://toastbucket.com/apple1984ad/, accessed on March 2, 2009

http://channel9.msdn.com/shows/History/The-History-of-Microsoft-1992/, accessed on June 24, 2009

http://download.openoffice.org/common/java.html, accessed on June 24, 2009

http://java.sun.com/developer/community/chat/JavaLive/2005/jl0301.html, accessed on May 5, 2009

http://java.sys-con.com/node/232079, accessed on May 5, 2009

http://movies.apple.com/movies/us/apple/getamac_ads1/ilife_480x376.mov, accessed on July 31, 2006

http://movies.apple.com/movies/us/apple/getamac_ads2/box_480x376.mov, accessed on July 31, 2006

http://msdn.microsoft.com/en-us/library/aa189705(office.10).aspx, accessed on June 17, 2009

http://msdn.microsoft.com/en-us/library/bb773177(VS.85).aspx, accessed on June 17, 2009

http://msdn.microsoft.com/en-us/library/cc815464.aspx, accessed on June 16, 2009

http://msdn.microsoft.com/en-us/magazine/cc188741(printer).aspx, accessed on June 17, 2009

http://news.cnet.com/2010-7344-5083904.html, accessed on June 23, 2009

http://support.microsoft.com/kb/190146, accessed on June 16, 2009

http://today.java.net/pub/n/Sun_142_01_JDK_JRE, accessed on May 5, 2009

http://web.archive.org/web/19991110021525/http://www.lantimes.com/98/98mar/803c037b.html, accessed on June 17, 2009

http://wiki.services.openoffice.org/wiki/Java_and_OpenOffice.org, accessed on April 30, 2009

http://www.answers.com/topic/dialog-box, accessed on June 17, 2009

http://www.cbronline.com/news/battle_for_dominance_in_the_electronic_mail_market_rages, accessed on June 6, 2009

http://www.ews.uiuc.edu/bstats/, accessed on June 17, 2009

http://www.microsoft.com/windows/winhistorydesktop.mspx, accessed on June 17, 2009

http://www.onjava.com/pub/a/onjava/2004/02/18/desktop.html, accessed on May 5, 2009

http://www.sun.com/aboutsun/media/presskits/javaone2004/Schwartz_JavaOne_062804.pdf, accessed on April 29, 2009

http://www.sun.com/aboutsun/media/presskits/javaone2007/index.jsp#stats, accessed on April 29, 2009

http://www.webopedia.com/TERM/d/dialog_box.html, accessed on June 17, 2009

http://www.webopedia.com/TERM/D/DLL.html, accessed on June 16, 2009

Televison Commercial Titled "Crowd Control," available at http://www.uriahcarpenter.info/, accessed on June 16, 2009

Televison Commercial Titled "Dinosaurs," available at http://www.uriahcarpenter.info/, accessed on June 16, 2009

http://www.microsoft.com/windows/WinHistoryDesktop.mspx

# Appendix B

## Novell, Incorporated v. Microsoft Corporation
## Report of Kevin M. Murphy
## Summary of Materials Reviewed and/or Relied Upon

**Financial Statements**

Novell 1993 10-K (http://sec.gov/Archives/edgar/data/758004/0000891618-94-000027.txt, accessed on June 17, 2009)

*Court Documents*

**Court Proceedings**

Final Judgment, United Sates v. Microsoft Corporation, Civil Action No. 94-1564, August 21,1995

Appellees' Brief, United States and State of New York et al. v. Microsoft Corporation, United States Court of Appeals for the District of Columbia Circuit, February 9, 2001

Findings of Fact, United States v. Microsoft Corporation, Civil Action Nos. 98-1232, 98-1233, November 5, 1999, available at http://www.usdoj.gov/atr/cases/f3800/msjudge.pdf, accessed on September 6, 2002

Genex Corp. v. G.D. Searle & Co., 666 F. Supp. 755, 761-62 (D. Md. 1987) (Motz, J.)

Harnett v. Billman, 800 F.2d 1308, 1314 (4th Cir. 1986)

Judge Motz's August 26, 2008 Order, Novell, Inc. v. Microsoft Corp., Civil No. JFM-05-1087

Memorandum Opinion, United States District Court for the District of Columbia, State of New York, et. al. v. Microsoft Corporation, Civil Action No. 98-1233, November 1, 2002

Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1044 (4th Cir. 1987)

Microsoft Corporation's Answer to Caldera, Inc.'s Second Set of Interrogatories, October 22, 1998

Novell v. Microsoft, Plaintiffs Memorandum In Opposition to Defendant's Motion to Dismiss, February 22, 2005

Novell, Inc. v. Microsoft Corp., 505 F.3d 302, 307 (4th Cir. 2007)

Opinion, United States Court of Appeals, United States v. Microsoft Corporation, Nos. 00-5212, 00-5213, June 28, 2001, available at http://www.microsoft.com/presspass/legal/06-28opinion.mspx, accessed on September 6, 2002

Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P., 57 F.3d 1317, 1326 (4th Cir. 1995)

United States v. Microsoft Corp., 253 F.3d 34, (D.C. Cir. 2001)

United States v. Microsoft Corp., 84 F.Supp.2d 9, 20 (D.D.C. 1999)

**Transcripts**

Testimony of Kevin M. Murphy, December 4-5, 2002, Sun Preliminary Injunction Hearing, United States District Court (D. Md.), In Re: Microsoft Antitrust Litigation, MDL No. 1332

Testimony of Kevin M. Murphy, State of New York, et al. vs. Microsoft Corporation, Civil Action No. 98-1233 (CKK), April 12, 2002

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

**Depositions and Deposition Exhibits**

Deposition and Exhibits to the Deposition of Gary Lawrence Gibb, March 17, 2009

Deposition and Exhibits to the Deposition of Adam Harral (Volume 1), December 12, 2001

Deposition and Exhibits to the Deposition of Adam Harral (Volume 2), December 13, 2001

Deposition and Exhibits to the Deposition of Ben Waldman, August 22, 2001

Deposition and Exhibits to the Deposition of Bob Muglia, February 6, 2009

Deposition and Exhibits to the Deposition of Bradford Struss, January 14, 2009

Deposition and Exhibits to the Deposition of Cameron Myhrhold, February 12, 2009

Deposition and Exhibits to the Deposition of Charles Middleton, December 13, 2008

Deposition and Exhibits to the Deposition of Craig Bushman, November 18, 2008

Deposition and Exhibits to the Deposition of David Acheson (Volume 1), November 19, 2008

Deposition and Exhibits to the Deposition of David Acheson (Volume 2), December 9, 2008

Deposition and Exhibits to the Deposition of David Hallmeyer, February 17, 2009

Deposition and Exhibits to the Deposition of David LeFevre, January 7, 2009

Deposition and Exhibits to the Deposition of David Reed (Volume 3), December 10, 2001

Deposition and Exhibits to the Deposition of David Reed (Volume 4), December 11, 2001

Deposition and Exhibits to the Deposition of Dean Clive Winn II, December 10, 2008

Deposition and Exhibits to the Deposition of George Grayson, July 17, 2002

Deposition and Exhibits to the Deposition of Jeff Raikes, January 27, 2009

Deposition and Exhibits to the Deposition of Joe Belfiore, January 13, 2009

Deposition and Exhibits to the Deposition of John Sculley, June 27, 2002

Deposition and Exhibits to the Deposition of John Throckmorton, November 2, 2001

Deposition and Exhibits to the Deposition of Karl Ford, February 16, 2009

Deposition and Exhibits to the Deposition of Kent Erickson, February 5, 2009

Deposition and Exhibits to the Deposition of Kevin M. Murphy, July 23, 2002, in Sun MicroSystems Inc. v. Microsoft Corporation, United States District Court (D. Md.), In Re: Microsoft Antitrust Litigation, MDL No. 1332

Deposition and Exhibits to the Deposition of Kurt Piersol, July 16, 2002

Deposition and Exhibits to the Deposition of Michael Culver, April 18, 2002

Deposition and Exhibits to the Deposition of Michael Rubin, November 28, 2001

Deposition and Exhibits to the Deposition of Nolan Larsen, November 17, 2008

Deposition and Exhibits to the Deposition of Norman Thomas Creighton, December 11, 2008

Deposition and Exhibits to the Deposition of Norman Thomas Creighton, March 22, 2002

Deposition and Exhibits to the Deposition of Paul Brainerd, March 7, 2002

Deposition and Exhibits to the Deposition of Paul Maritz, January 9, 2009

Deposition and Exhibits to the Deposition of Philippe Kahn, April 16, 2002

Deposition and Exhibits to the Deposition of Ralph Yarro, September 26, 2001

# Appendix B

**Novell, Incorporated v. Microsoft Corporation
Report of Kevin M. Murphy
Summary of Materials Reviewed and/or Relied Upon**

Deposition and Exhibits to the Deposition of Ransom H. Love, August 1, 2001

Deposition and Exhibits to the Deposition of Richard Hume, March 24, 2009

Deposition and Exhibits to the Deposition of Robert Frankenberg, March 25, 2009

Deposition and Exhibits to the Deposition of Russell Siegelman, March 5, 2009

Deposition and Exhibits to the Deposition of Said Mohammadioun, December 14, 2001

Deposition and Exhibits to the Deposition of Satoshi Nakajima, February 24, 2009

Deposition and Exhibits to the Deposition of Scott Henson, December 17, 2008

Deposition and Exhibits to the Deposition of Scott Kliger, February 25, 2009

Deposition and Exhibits to the Deposition of Stephen Crummey, October 9, 2001

Deposition and Exhibits to the Deposition of Stephen Madigan, January 15, 2009

Deposition and Exhibits to the Deposition of Thomas Freeman, March 31, 2009

Deposition and Exhibits to the Deposition of Willard E. Peterson, March 19, 2002

Deposition and Exhibits to the Deposition of Willard E. Peterson, October 1, 2008

Deposition and Exhibits to the Deposition of William H. Gates III (Volume 1), March 4, 2009

Deposition and Exhibits to the Deposition of William H. Gates III (Volume 2), May 19, 2009

Deposition and Exhibits to the Deposition of William Lowe, March 21, 2002

**Declarations**

Declaration of Kevin M. Murphy In Support of Microsoft's Opposition to Sun Microsystems, Inc.'s Motion for Preliminary Injunction, Sun Microsystems, Inc. v. Microsoft Corporation, Case No. C02-01150 RMW (PVT), July 3, 2002

Declaration of Roger G. Noll, May 1, 2009

**Expert Reports**

Expert Report of Frederick R. Warren-Boulton, May 1, 2009

Expert Report of Kevin M. Murphy, Case No. 2000-000722, in Jake Lucero v. Microsoft Corporation, July 14, 2003

Expert Report of Kevin M. Murphy, Case No. CL82311, Iowa District Court for Polk County, Joe Combs et. al. v. Microsoft Corporation, August 4, 2006

Expert Report of Kevin M. Murphy, Case No. J.C.C.P. NO. 4106, Superior Court of the State of California for the City and County of San Francisco, October 4, 2002

Expert Report of Kevin M. Murphy, Case No. MC 00-005994, Fourth Judicial District of the District Court for the State of Minnesota and County of Hennepin, July 14, 2003

Expert Report of Kevin M. Murphy, Civil Action No. G2004-1542, Chancery Court of Hinds Count, Jim Hood, Attorney General ex rel State of v. Microsoft Corporation, May, 11, 2009

Expert Report of Kevin M. Murphy, United States District Court for the District of Maryland, in re: Microsoft Antitrust Litigation, MDL No. 1332, October 4, 2002

Expert Report of Roger G. Noll, June 2, 2006

# Appendix B

## Novell, Incorporated v. Microsoft Corporation
## Report of Kevin M. Murphy
## Summary of Materials Reviewed and/or Relied Upon

Expert Report of Ronald S. Alepin, May 1, 2009

Supplemental Report of John K. Bennett, Caldera, Inc. v. Microsoft Corporation, Case No. 2:96 CV 0645B, December 28, 1999

**Complaints**

Caldera v. Microsoft, First Amended Complaint , February 12, 1998

Novell v. Microsoft, Complaint, November 12, 2004

**Miscellaneous Court Documents**

DOJ case exhibit GX 2195

Novell's Objections and Responses to Microsoft's Second Set of Requests for Production, dated March 2, 2009

**All Documents Relied upon in the Following Reports**

Declaration of Kevin M. Murphy In Support of Microsoft's Opposition to Sun Microsystems, Inc.'s Motion for Preliminary Injunction, Sun Microsystems, Inc. v. Microsoft Corporation, Case No. C02-01150 RMW (PVT), July 3, 2002

Expert Report of Kevin M. Murphy, Case No. 2000-000722, in Jake Lucero v. Microsoft Corporation, July 14, 2003

Expert Report of Kevin M. Murphy, Case No. CL82311, Iowa District Court for Polk County, Joe Combs et. al. v. Microsoft Corporation, August 4, 2006

Expert Report of Kevin M. Murphy, Case No. J.C.C.P. NO. 4106, Superior Court of the State of California for the City and County of San Francisco, October 4, 2002

Expert Report of Kevin M. Murphy, Case No. MC 00-005994, Fourth Judicial District of the District Court for the State of Minnesota and Count of Hennepin, July 14, 2003

Expert Report of Kevin M. Murphy, Civil Action No. G2004-1542, Chancery Court of Hinds County, Jim Hood, Attorney General ex rel State of Mississippi v. Microsoft Corporation, May, 11, 2009

Expert Report of Kevin M. Murphy, United States District Court for the District of Maryland, in re: Microsoft Antitrust Litigation, MDL No. 1332, October 4, 2002

*Data Sources for Exhibits*

IDC , The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, #10238, September 1995, MSR 0000451 - MSR0000482

IDC, 1994 Preliminary Office Suites Market Year in Review, #9622, January 1995, MS-PCA 2204696 - MS-PCA 2204701

# Appendix B

### Novell, Incorporated v. Microsoft Corporation
### Report of Kevin M. Murphy
### Summary of Materials Reviewed and/or Relied Upon

IDC, 1996 Preliminary Office Suites, Word Processor, and Spreadsheet Market Year in Review, #12676, January 1997, MS CA 0003323 - MS CA 0003336

IDC, Client Operating Environments:  1998 Worldwide Markets and Trends, #16086, May 1998, MS-PCA 2462899 - MS-PCA 2462969

IDC, Graphical User Interfaces, #4743, October 1990

IDC, IBM Announces OS/2 2.0:  Hitting the Ball Back into Microsoft's Court, #6512, April 1992, MS-PCA 2226342 - MS-PCA 2226346

IDC, Microsoft Windows Five-Year Forecast, #5952, June 1992

IDC, Office Suite Forecast and Analysis, 1999 - 2004, #22658, July 2000, MSR 0000626 - MSR 0000638

IDC, Office Suite Market Review and Forecast, 1998-2003, #19936, August 1999

IDC, Office Suites Market Review and Forecast: Revised 1994 Market Sizing, #10752, November 1995, MS-PCA 2204742 - MS-PCA 2204746

IDC, Operating Environments, Review and Forecast, 1996-2001, #14024, August 1997

IDC, PC Office Suite Market Review and Forecast, 1996-2001, #13421, May 1997, MS-PCA 2461805 - MS-PCA 2461846

IDC, PC Office Suite Market Review and Forecast, 1997-2002, #15834, May 1998, MS-PCA 2466120-201

IDC, PC Office Suite, Word Processor, and Spreadsheet Markets Review and Forecast, 1995-2000, #12279, 1996, LIEB 001471 - LIEB 001535

IDC, PC Software, The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, #8306, March 1994, MSR 0000405 - MSR 0000450

IDC, PC Spreadsheet Market Review and Forecast, 1996-2001, #13574, June 1997

IDC, PC Spreadsheet Market Review and Forecast, 1997-2002, #15836, April 1998, MSR 0000498 - MSR 0000515

IDC, PC Spreadsheet Market Review and Forecast, 1998-2003, #18999, May 1999

IDC, PC Spreadsheet Software 1991 Spreadsheet Report, Report #5962, February 1992

IDC, PC Spreadsheet Software, Report #5256, March 1991

IDC, PC Spreadsheet Software: Market Review and Forecast, 1988, Report #4389, November 1989

IDC, PC Word Processor Market Review and Forecast, 1996-2001, #13573, May 1997

IDC, PC Word Processor Market Review and Forecast, 1997-2002, #15835, April 1998, MSR 0000292 - MSR 0000306

IDC, Spreadsheet Software, Report #3834, December 1988

IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, #10158, September 1995, NWP00044099 - NWP00044137

IDC, Word Processing Market Review and Forecast, 1990, #5698, August 1991, MS-PCA 2213293 - MS-PCA 2213333

IDC, Word Processing Market Review and Forecast, 1991, #6615, July 1992, MS-PCA 2226885- MS-PCA 2226944

IDC, Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, #8430, May 1994, NWP00042825- NWP00042875

IDC, Word Processing Software, 1989, #5019, December 1990, MS-PCA 2460371 - MS-PCA 2460407

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

IDC, Word Processing Software, October 1988, #3633, LIEB 000103 - LIEB 000135

MS Sales Data, MSM-MS_037: MS-PCAMS 5500049

MS Sales Data, MSM-MS_038: MS-PCAMS 5500050

MS Sales Data, MSM-MS_039: MS-PCAMS 5500051

MS Sales Data, MSM-MS_040: MS-PCAMS 5500052

MS01 129343 through MS01 129348

MS98 0008857 through MS98 0008861

MS98 0009080 through MS98 0009085

MS98 0009187 through MS98 0009193

MSC 5050337 through MSC 5050342

MSC 5061033 through MSC 5061038

MS-CC-MDL 303928 through MS-CC-MDL 303935

MS-CC-MDL 5035222 through MS-CC-MDL 5035231

MS-CC-MDL 5041461 through MS-CC-MDL 5041466

MS-CC-MDL 5041467 through MS-CC-MDL 5041472

MS-CC-MDL 5041473 through MS-CC-MDL 5041478

MS-CC-MDL 5043298 through MS-CC-MDL 5043303

MS-CC-MDL 5043304 through MS-CC-MDL 5043305

MS-CC-MDL 5043434 through MS-CC-MDL 5043439

MS-CC-MDL 5043497 through MS-CC-MDL 5043498

MS-CC-MDL 5049431 through MS-CC-MDL 5049440

MS-CC-MDL 5058239 through MS-CC-MDL 5058243

MS-PCA 10200054 through MS-PCA 120059

MS-PCA 1197407 through MS-PCA 1197411

MS-PCA 1197425 through MS-PCA 1197429

MS-PCA 1198569 through MS-PCA 119573

MS-PCA 1198574 through MS-PCA 119578

MS-PCA 1198608 through MS-PCA 1198612

MS-PCA 1198630 through MS-PCA 1198634

MS-PCA 1198681 through MS-PCA 1198685

MS-PCA 1200019 through MS-PCA 1200025

MS-PCA 1203086 through MS-PCA 1203090

MS-PCA 1203628 through MS-PCA 1203633

MS-PCA 1203640 through MS-PCA 1203644

MS-PCA 1203674 through MS-PCA 1203678

MS-PCA 1203688 through MS-PCA 1203692

# Appendix B

**Novell, Incorporated v. Microsoft Corporation**
**Report of Kevin M. Murphy**
**Summary of Materials Reviewed and/or Relied Upon**

MS-PCA 1203908 through MS-PCA 1203914

MS-PCA 1203975 through MS-PCA 1203980

MS-PCA 1205501 through MS-PCA 1205505

MS-PCA 1206043 through MS-PCA 1206047

MS-PCA 1337986 through MS-PCA 1337991

MS-PCA 1680921 through MS-PCA 1680925

MS-PCA 1680926 through MS-PCA 1680931

MS-PCA 1681487 through MS-PCA 1681497

MS-PCA 1681640 through MS-PCA 1681644

MS-PCA 1682616 through MS-PCA 1682621

MS-PCA 1715367 through MS-PCA 1715373

MS-PCA 1715374 through MS-PCA 1715380

MS-PCA 1715808 through MS-PCA 1715816

MS-PCA 1715808 through MS-PCA 1715816

MS-PCA 201071 through MS-PCA 1201076

MS-PCA1205490 through MS-PCA 1205495

MS-PCA1205496 through MS-PCA 1205500

MSS 5180916 through MSS 5180922

MSS 5180958 through MSS 5180963

MSS 5180970 through MSS 5180975

MSS 5180976 through MSS 5180981

MSS 5181204 through MSS 5181209

MSS 5181215 through MSS 5181219

MSS 5181620 through MSS 5181625

MSS 5181626 through MSS 5181632

# Exhibit 1
## Share of Windows Office Productivity Applications Sold as Part of an Office Suite
**(1992-1996, in percentages)**

| Product | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| Word Processors | 16.0 | 34.4 | 55.5 | 71.2 | 86.3 |
| Spreadsheets | 22.4 | 40.0 | 59.7 | 75.8 | 94.3 |

Note:

Shares based on number of units shipped.

Source:

IDC Consumer and Productivity Applications: Consumer Software, IDC #12676, January 1997; MS-PCA 2461793

# Exhibit 2
## Shares of Word Processing Software[1]
### (1986-1996, in percentages)

| Product | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WordPerfect[2] | 17.5 | 26.2 | 34.4 | 42.1 | 47.1 | 45.0 | 44.6 | 39.6 | 28.0 | 16.8 | 6.3 |
| Word | 7.0 | 9.2 | 13.7 | 17.1 | 28.1 | 39.8 | 44.7 | 49.8 | 64.6 | 78.6 | 88.3 |
| IBM DisplayWrite | 7.0 | 13.4 | 15.8 | 14.3 | 9.1 | 3.6 | 0.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| MicroPro/WordStar | 12.6 | 12.6 | 10.3 | 7.6 | 4.6 | 3.0 | 1.7 | 1.1 | 0.2 | 0.0 | 0.0 |
| Lotus[3] | 0.0 | 1.2 | 1.0 | 0.7 | 1.4 | 3.4 | 7.7 | 8.7 | 6.7 | 4.1 | 5.1 |
| Ashton Tate | 13.7 | 18.4 | 9.1 | 5.4 | 3.1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other | 42.1 | 19.0 | 15.6 | 12.8 | 6.6 | 4.2 | 0.7 | 0.8 | 0.5 | 0.5 | 0.2 |

Notes:

(1) Shares calculated based on revenue for all IBM-compatible word processing software products sold through office suites and standalone.

(2) WordPerfect includes LetterPerfect.

(3) Lotus includes Amipro, Lotus Write, and Manuscript.

Sources:

IDC, Word Processing Software, October 1988, #3633, LIEB 000103 - LIEB 000135

IDC, Word Processing Software, 1989, December 1990, # 5019, MS-PCA 2460371 - MS-PCA 2460407

IDC, Word Processing Market Review and Forecast, 1990, August 1991, # 5698, MS-PCA 2213293 - MS-PCA 2213333

IDC, Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825- NWP00042875

IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- NWP00044137

IDC, PC Office Suite, Word Processor, and Spreadsheet Markets Review and Forecast, 1995-2000, 1996, #12279, LIEB 001471 - LIEB 001535

IDC, PC Word Processor Market Review and Forecast, 1996-2001, May 1997, #1357.

IDC, PC Word Processor Market Review and Forecast, 1997-2002,April 1998, #15835, MSR 0000292 - MSR 0000306

# Exhibit 3
# Shares of Office Suite Software
**(1993-1997, in percentages)**

| Product | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Microsoft Office | 80.6 | 83.1 | 89.0 | 89.2 | 94.5 |
| Perfect Office/Borland Office | 2.2 | 2.6 | 3.6 | 4.8 | 2.1 |
| Lotus Office | 17.1 | 14.3 | 7.4 | 5.9 | 3.4 |
| Total Shipments (in Thousands) | 3,200 | 7,900 | 14,689 | 29,207 | 41,388 |

Note:

Shares calculated based on revenue for Windows-based suites sold through traditional channels and those bundled on hardware as part of OEM agreements.

Sources:

IDC, Office Suites Market Review and Forecast: Revised 1994 Market Sizing, November 1995, #10752, MS-PCA 2204742 - MS-PCA 2204746

IDC, 1994 Preliminary Office Suites Market Year in Review, January 1995, #9622, MS-PCA 2204696 - MS-PCA 2204701

IDC, PC Office Suite Market Review and Forecast, 1996-2001, 1997, #13421, MS-PCA 2461805 - MS-PCA 2461846

IDC, Office Suite Market Review and Forecast, 1998-2003, August 1999, #19936

IDC, Office Suite Forecast and Analysis, 1999 - 2004, July 2000, #22658, MSR 0000626 - MSR 0000638

**Exhibit 4**

**Share of Microsoft PC Operating System Installed Base with a Word Processor**

**(1988-1996)**

| | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|---|---|
| Microsoft PC Operating Systems (in millions) | 29.6 | 39.8 | 36.5 | 37.0 | 46.3 | 59.2 | 100.6 | 170.3 | 231.3 |
| Word Processors Installed on Microsoft PC Operating Systems (in millions) | 10.4 | 13.3 | 14.1 | 18.8 | 24.8 | 33.1 | 40.9 | 50.6 | 59.8 |
| *Share of Microsoft PC Operating System Installed Base with a Word Processor* | *35.0%* | *33.4%* | *38.6%* | *50.8%* | *53.6%* | *55.9%* | *40.7%* | *29.7%* | *25.9%* |

Note:

Word processing software installed based includes all IBM-compatible word processing software products sold through office suites and standalone.

Sources:

IDC, Word Processing Software, October 1988, #3633, LIEB 000103 - LIEB 000135

IDC, Word Processing Software, 1989, December 1990, # 5019, MS-PCA 2460371 - MS-PCA 2460407

IDC, Word Processing Market Review and Forecast, 1990, August 1991, # 5698, MS-PCA 2213293 - MS-PCA 2213333

IDC, Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825- NWP00042875

IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- N

IDC, PC Office Suite, Word Processor, and Spreadsheet Markets Review and Forecast, 1995-2000, 1996, #12279, LIEB 001471 - LIEB 001535

IDC, PC Word Processor Market Review and Forecast, 1996-2001, May 1997, #1357.

IDC, PC Word Processor Market Review and Forecast, 1997-2002, April 1998, #15835, MSR 0000292 - MSR 0000306

IDC, Operating Environments Review and Forecast, 1996-2001, August 1997, #14024.

IDC, Client Operating Environments:  1998 Worldwide Markets and Trends, May 1998, #16086.

IDC, Microsoft Windows Five-year Forecast, June 1992, #5952.

IDC, IBM Announces OS/2 2.0: Hitting the Ball Back into Microsoft's Court, April 1992, #6512.

IDC, Graphical User Interfaces, October 1990, #4743.

# Exhibit 5

## Share of Microsoft Office Productivity Application Sales by Distribution Channel

**(1994-1998, in percentages)**

| Fiscal Year | OEM Channel | FPP Channel | Volume Licensing |
|:-----------:|:-----------:|:-----------:|:----------------:|
| 1994 | 4.0 | 74.2 | 21.9 |
| 1995 | 5.4 | 53.2 | 41.4 |
| 1996 | 10.2 | 44.5 | 45.3 |
| 1997 | 15.0 | 32.6 | 52.4 |
| 1998 | 17.3 | 17.9 | 64.8 |

Note:

Microsoft Office Productivity Applications include Office, Office Professional, Word, and Excel.

Shares calculated based on revenue.

Source:

MS Sales Data, MSM-MS_037: MS-PCAMS 5500049

MS Sales Data, MSM-MS_038: MS-PCAMS 5500050

MS Sales Data, MSM-MS_039: MS-PCAMS 5500051

MS Sales Data, MSM-MS_040: MS-PCAMS 5500052

**Exhibit 6**

**Summary of MDA Activities, Benefits and Discounts Offered**

**(1994-2003)**

| Milestone Activity Type | External Benefits to MS | Consumer benefits | Other Beneficiaries | How would a vertically integrated firm internalize the external effect? | Years Offered | Average Discount |
|---|---|---|---|---|---|---|
| Anti-Piracy | Increases OS sales | MS's incentive to invest in R&D increases leading to higher quality products | ISVs, peripheral manufacturers, other OEMs | Install OS on all its computers | 1996, 1997, 1998, 1999, 2002-2003 | $1.80 |
| Windows Logo display and promotion on boxes, on PCs or in advertising | Promotes Windows brand | Provides information on whether PC will work with Windows | | Promote hardware as well as software | 1994-1995, 1996, 1997, 1999, 2000, 2002-2003 | $2.07 |
| Customer Support | Increases the value of OS and provides information on user problems | Consumers get better support and faster bug fixes | ISVs, peripheral manufacturers | Make sure it had a sufficient number of trained customer support personnel and a method for documenting problems | 1996, 1997, 1998, 1999, 2000 | $1.45 |
| Localized version | Increases value of platform and helps cover fixed development costs | Local value of using computers increase and MS has increased incentive to develop localized versions | ISVs, peripheral manufacturers, other OEMs | Provide incentives to customers to purchase localized version | 1996, 1997, 1998, 1999 | $0.90 |
| Ship PCs with latest OS | Reduces support costs and increases returns to investment in innovation | More applications on higher quality OS | ISVs | Provide price incentives to customers to purchase most recent version | 1994-1995, 1996, 1997, 1998, 1999 | $1.73 |
| Hardware Requirements | Increases the value of OS because PCs can exploit features of OS | More valuable platform because hardware can take advantage of software features | ISVs, peripheral manufacturers | Design hardware to take advantage of features of OS | 1996, 1997, 2002-2003 | $3.29 |
| Peripheral support | Increases the value of the OS by increasing peripheral options and reducing peripheral costs | More valuable platform because of higher quality and lower cost peripherals | Peripheral manufacturers | Design hardware to be compatible with its own peripherals | 1994-1995, 1996, 1997, 1998, 2002-2003 | $1.33 |
| Testing and sales training | Improve quality of OS and increase OS sales | Higher quality OS and more informed choices | ISVs, peripheral manufacturers, other OEMs | Train its sales force regarding OS features and test whether hardware is compatible with software | 1994-1995, 1996, 1998, 1999 | $1.63 |
| Preserving standard Windows interface | Increases the value of OS | Users get consistent and familiar interface | ISV's | Design interface to promote its hardware and software | 1996 | $1.33 |

Sources:

MSS 5181626 - 5181632, MSS 5181620 - 5181625, MSS 5181215 - 5181219, MSS 5181204 - 5181209, MSS 5180976 - 5180981, MSS 5180970 - 5180975, MSS 5180958 - 5180963, MSS 5180916 - 5180922, MS-PCA1205496 - 1205500, MS-PCA1205490 - 1205495, MS-PCA 201071 - 1201076, MS-PCA 1715808 - 1715816, MS-PCA 1715808 - 1715816, MS-PCA 1715367 - 1715380, MS-PCA 1715367 - 1715373, MS-PCA 1682616 - 1682621, MS-PCA 1681640 - 1681644, MS-PCA 1681487 - 1681497, MS-PCA 1680926 - 1680931, MS-PCA 1680921 - 1680925, MS-PCA 1337986 - 1337991, MS-PCA 1206043 - 1206047, MS-PCA 1205501 - 1205505, MS-PCA 1203975 - 1203980, MS-PCA 1203908 - 1203914, MS-PCA 1203688 - 1203692, MS-PCA 1203674 - 1203678, MS-PCA 1203640 - 1203644, MS-PCA 1203628 - 1203633, MS-PCA 1203086 - 1203090, MS-PCA 1200019 - 1200025, MS-PCA 1198681 - 1198685, MS-PCA 1198630 - 1198634, MS-PCA 1198612, MS-PCA 1198574 - 1198578, MS-PCA 1198569 - 119573, MS-CC-MDL 5043434- 5043439, MS-PCA 1197425 - 1197429, MS-PCA 1197407 - 1197411, MS-PCA 1023808 - 1023815, MS-PCA 10200054 - 120059, MS-CC-MDL 5058239 - 5058243, MS-CC-MDL 5049431 - 5049440, MS-CC-MDL 5043497- 5043498, MS-CC-MDL 5043304 - 5043305, MS-CC-MDL 5043298 - 5043303, MS-CC-MDL 5041473 - 5041478, MS-CC-MDL 5041467 - 5041472, MS-CC-MDL 5041461 - 5041466, MS-CC-MDL 5035222 - 5035231, MS-CC-MDL 303928 - 303935, MSC 5061033 - 5061038, MSC 5050337 - 5050342, MS98 0009187 - 0009193, MS98 0009080 - 0009085, MS98 0008857 - 0008861, MS01 129343 - 129348.

**Exhibit 7-A**

## MS Word and WordPerfect Revenue per License, and MS Word Share of Word Processing Software Sales



Notes:   Revenue per license is calculated by dividing revenue by number of units sold.
Source:  IDC, Word Processing Software, October 1988, #3633 and December 1990 #5019.  IDC, Word Processing Market Review and Forecast, 1990, August 1991 #5698.   IDC, Word
        Processing Software Market Review and Forecast-DOS, Windows, OS/2, and Macintosh, May 1994 #8430.  IDC, The Word Processing Software Market Review and Forecast,
        1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995 #10158.  IDC PC World Processor Market Review and Forecast, 1996-2001, 1997 #12573 and 1997-2002, 1998 #15835.

**Exhibit 7-B**

# Excel and Lotus 1-2-3 Revenue per License
# and Excel Share of Spreadsheet Software Sales



Note:   Revenue per license is calculated by dividing revenue by number of units sold.
Source:  IDC, Spreadsheet Software, 1988 #3834.  IDC, Spreadsheet Software: Market Review and Forecast, 1989 #4389.  IDC, PC Spreadsheet Software, 1991 #5256.  IDC, PC Spreadsheet Software 1991 Spreadsheet Report, #5962. The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, #8306.  IDC, The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, #10238.  PC Spreadsheet Market Review and Forecast, 1996-2001 #13574; 1997-2002 #15836; 1998-2003 #18999.

# Exhibit 8
## Share of Word Processing Software
## on Macintosh PC Operating Systems
**(1991-1996, in percentages)**

| Product | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| Word | 65.4 | 73.7 | 77.2 | 79.3 | 87.0 | 85.1 |
| WordPerfect | 14.0 | 11.9 | 9.8 | 14.4 | n.a. | n.a. |
| Other | 20.5 | 14.4 | 13.1 | 6.3 | 13.0 | 14.9 |

Note:

Shares calculated based on revenue for all Macintosh word processing software products sold through office suites and standalone.

n.a. = not available

Sources:

IDC Word Processing Market Review and Forecast, 1991,July 1992, #6615, MS-PCA 2226885- MS-PCA 2226944

IDC Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825- NWP00042875

IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- NWP00044137

IDC, Consumer and Productivity Applications: Consumer Software, January 1997, IDC #12676, MS CA 0003323 - MS CA 0003336

IDC, PC Word Processor Market Review and Forecast, 1997-2002, 1998, #15835, MSR0000292 - MSR0000306

# Exhibit 9
# Share of Spreadsheet Software
# on Macintosh PC Operating Systems
**(1992-1996, in percentages)**

| Product | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| Excel | 91.0 | 91.7 | 97.8 | 98.7 | 98.8 |
| Lotus 1-2-3 | 5.5 | 6.4 | 2.0 | n.a. | n.a. |
| Other | 3.5 | 1.8 | 0.2 | 1.3 | 1.2 |

Note:

Shares calculated based on revenue for all Macintosh spreadsheet software products sold through office suites and standalone.

n.a. =  not available

Sources:

IDC, PC Software, The Spreadsheet Software Markets Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1992-1997, March 1994, #8306, MSR 0000405 - MSR 0000450

IDC , The Spreadsheet Software Market Review and Forecast: DOS, Windows, OS/2, and Macintosh, 1994-1999, September 1995, #10238, MSR 0000451 - MSR0000482

IDC, PC Spreadsheet Market Review and Forecast, 1996-2001, June 1997, #13574

**Exhibit 10**
## WordPerfect Share of Word Processing Software Sales
## on MS DOS and GUI PC Operating Systems
**(1990-1996, in percentages)**

| PC Operating Systems | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| MS DOS | 54.7 | 64.0 | 73.4 | 82.4 | 81.5 | 80.0 | 93.3 |
| Windows/Macintosh/OS/2 | n.a. | 14.7 | 28.5 | 26.0 | 23.1 | 14.8 | 5.7 |
| All PC OS | 43.5 | 41.7 | 41.5 | 37.6 | 27.0 | 15.9 | 6.2 |

Note:

Shares calculated based on revenue for all PC word processing software products sold through office suites and standalone.

n.a. = not available

Sources:

IDC Word Processing Market Review and Forecast, 1991, July 1992, #6615, MS-PCA 2226885- MS-PCA 2226944

IDC Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825-NWP00042875

IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- NWP00044137

IDC, Consumer and Productivity Applications: Consumer Software, January 1997, IDC #12676, MS CA 0003323 - MS CA 0003336

IDC, PC Word Processor Market Review and Forecast, 1997-2002, April 1998, #15835, MSR0000292 - MSR0000306

**Exhibit 11**

## GUI Share of Word Processing Software Sales and
## WordPerfect's Share of GUI Word Processing Software Sales



Note:
Shares calculated based on revenue for all PC word processing software products sold through office suites and standalone.
Sources:
IDC Word Processing Market Review and Forecast, 1991,July 1992, #6615, MS-PCA 2226885- MS-PCA 2226944; IDC Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825- NWP00042875; IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- NWP00044137; IDC, Consumer and Productivity Applications: Consumer Software, January 1997, IDC #12676, MS CA 0003323 - MS CA 0003336; IDC, PC Word Processor Market Review and Forecast, 1997-2002, 1998, #15835, MSR0000292 - MSR0000306

**Exhibit 12**

## DOS Share of Word Processing Software Sales
## and WordPerfect's Share of DOS Word Processing Software Sales



Note:
Shares calculated based on revenue for all PC word processing software products sold through office suites and standalone.
Sources:
IDC Word Processing Market Review and Forecast, 1991,July 1992, #6615, MS-PCA 2226885- MS-PCA 2226944; IDC Word Processing Software Markets Review and Forecast--DOS, Windows, OS/2, and Macintosh, May 1994, #8430, NWP00042825- NWP00042875; IDC, The Word Processing Software Market Review and Forecast, 1994-1999: DOS, Windows, OS/2, and Macintosh, September 1995, # 10158, NWP00044099- NWP00044137; IDC, Consumer and Productivity Applications: Consumer Software, January 1997, IDC #12676, MS CA 0003323 - MS CA 0003336; IDC, PC Word Processor Market Review and Forecast, 1997-2002, 1998, #15835, MSR0000292 - MSR0000306

# Appendix C. Reviews of Applications

This appendix summarizes reviews of applications (word processors, spreadsheets, and suites) in computer magazines.

## A. Identification of Reviews

The goal of the search was to find comparison reviews (i.e., reviews that covered more than one product and ranked them by quality). The search for reviews was limited to the following 10 magazines: *Byte*, *Computer Shopper*, *Home Office Computing*, *InfoWorld*, *PC Computing*, *PC Magazine*, *PC World*, *Windows Sources*, *PC Week*, *Windows Magazine*. These include all of the major computer magazines likely to have reviewed the relevant applications.

Computer Select CDs were used to gather reviews from 1991 to 2001. The search was limited to the following article types: cover story, buyers guide, software review, evaluation, or column. Articles were then searched for the keywords "spreadsheet" or "word processor." Lexis-Nexis was used to find articles earlier than 1991 and to find copies of full articles if Computer Select had only an abstract. Lexis was searched individually by magazine for "spreadsheet" or "word process*"

From the articles identified, we eliminated articles that reviewed only a single product. We also eliminated awards that were based on polls of readers, as they are unlikely to provide useful information beyond what is already available in more reliable form from sales data. We found eight multi-product reviews in *PC Week* that included the products of interest, five for word processors and three for spreadsheets, but did not include them because they did not rank the products or declare a winner.

## B. Word Processing

We focused on three word processing products: Word, WordPerfect, and Ami Pro (later Word Pro). Word came in DOS and Windows versions, all from Microsoft. WordPerfect came in DOS versions (all from what came to be called the WordPerfect Corporation) and Windows versions (first from WordPerfect, then Novell, later Corel). Ami Pro came only in Windows versions (first from Samna, then from Lotus, later Lotus/IBM). Although some reviews included other products (especially in 1980s and especially for DOS products), the rankings reported do not include those other products.

Prior to 1990, none of the reviews included word processors that ran on Windows. From 1990 to 1993, most head-to-head reviews dealt separately with DOS and Windows version. (The exception was one *InfoWorld* review.) We did not find any head-to-head reviews of DOS word processors after 1993.

### 1. DOS Word Processors

Table 1 summarizes reviews of word processors written to run on DOS. For the awards, we show only which one won, unless the award explicitly named a runner-up or declared a tie.

1

**Table 1. Summary of Reviews of DOS Word Processors**

| | | Rankings | | |
|---|---|---|---|---|
| **Date** | **Magazine** | **Word** | **WP** | **Ami Pro** |
| **Head-to-Head Reviews** | | | | |
| January-86 | PC Magazine | 1.5 | 1.5 | #N/A |
| April-87 | InfoWorld | 2 | 1 | #N/A |
| February-88 | PC Magazine | 1.5 | 1.5 | #N/A |
| March-88 | InfoWorld | 2 | 1 | #N/A |
| September-88 | InfoWorld | 2 | 1 | #N/A |
| January-89 | InfoWorld | 2 | 1 | #N/A |
| November-89 | PC Magazine | 1.5 | 1.5 | #N/A |
| January-90 | InfoWorld | 2 | 1 | #N/A |
| December-90 | PC Magazine | 1.5 | 1.5 | #N/A |
| May-92 | PC Magazine | 2 | 1 | #N/A |
| October-93 | Computer Shopper | 2 | 1 | #N/A |
| **Awards** | | | | |
| December-87 | InfoWorld | 2 | 1 | #N/A |
| January-88 | PC Magazine | 1 | | #N/A |
| January-89 | PC Magazine | | 1 | #N/A |
| January-94 | Home Office Computing | | 1 | #N/A |

## 2. Windows Word Processors

Table 2 summarizes reviews of word processors written to run on Windows.

2

**Table 2. Summary of Reviews of Windows Word Processors**

| | | Rankings | | |
|---|---|---|---|---|
| Date | Magazine | Word | WP | Ami Pro |
| | | **Head-to-Head Reviews** | | |
| January-90 | InfoWorld | 1 | #N/A | 2 |
| July-90 | PC Magazine | 1.5 | #N/A | 1.5 |
| August-90 | InfoWorld | 1 | #N/A | 2 |
| December-90 | PC Magazine | 1.5 | #N/A | 1.5 |
| February-92 | InfoWorld | 1 | 3 | 2 |
| February-92 | PC Magazine | 1.5 | 3 | 1.5 |
| April-92 | PC World | 1 | 3 | 2 |
| June-92 | Byte | 1.5 | 3 | 1.5 |
| August-93 | PC Computing | 2 | 3 | 1 |
| November-93 | PC Magazine | 2 | 2 | 2 |
| February-94 | Windows Sources | 1 | 2 | 3 |
| February-94 | InfoWorld | 1 | 3 | 2 |
| March-94 | PC World | 1 | 2 | 3 |
| March-94 | Windows Magazine | 2 | 2 | 2 |
| June-94 | Home Office Computing | 1 | 2.5 | 2.5 |
| October-94 | PC Magazine | 1 | 2.5 | 2.5 |
| March-95 | Windows Magazine | 2 | 1 | 3 |
| November-95 | PC Magazine | 1.5 | 1.5 | 3 |
| March-96 | Home Office Computing | 1.5 | 3 | 1.5 |
| February-97 | PC Magazine | 1 | 2.5 | 2.5 |
| | | **Awards** | | |
| January-91 | PC Magazine | 1.5 | | 1.5 |
| December-91 | PC Computing | | 1 | |
| December-91 | PC Magazine | | | 1 |
| December-92 | PC Computing | 2 | | 1 |
| January-93 | PC Magazine | 2 | | 1 |
| December-93 | PC Computing | 2 | 1 | |
| December-93 | PC Magazine | | 1 | |
| January-94 | Home Office Computing | | 1 | |
| February-94 | Windows Magazine | 1.5 | 1.5 | |
| December-94 | PC Magazine | 1 | | |
| January-95 | Home Office Computing | 1 | | |
| January-95 | PC Magazine | 1 | | |
| December-95 | PC Computing | 2.5 | 2.5 | 1 |
| December-95 | PC Magazine | 1.5 | | 1.5 |
| February-96 | Windows Magazine | | 1.5 | 1.5 |
| May-96 | Windows Magazine | 1.5 | 1.5 | |
| January-97 | PC Computing | 1 | | 2 |
| February-97 | Windows Magazine | 1 | | |
| December-97 | Windows Magazine | 1.5 | 1.5 | |
| September-97 | PC Computing | 1 | 2 | |
| June-98 | PC Computing | 1.5 | 1.5 | |
| February-01 | Windows Magazine | | 1 | |

3

## C. Spreadsheets

We focused on three spreadsheets: Excel, Lotus 1-2-3, and Quattro. Excel always was written for Windows, although in the early years it was often run on DOS systems using its included Windows runtime environment. Lotus did not have a Windows version until 1991, Quattro until 1992. Quattro changed hands, starting with Borland, then sold to Novell in 1994, then to Corel in 1996. Unlike the word processing reviews, none of the spreadsheet reviews examined treated Windows and DOS versions separately for purposes of evaluation. Table 3 summarizes the reviews.

**Table 3. Summary of Reviews of Spreadsheets**

| Date | Magazine | Excel | 1-2-3 | Quattro |
|------|----------|-------|-------|---------|
| | | **Rankings** | | |
| | **Head-to-Head Reviews** | | | |
| February-88 | InfoWorld | 1 | 3 | 2 |
| January-89 | InfoWorld | 1 | 2.5 | 2.5 |
| July-89 | InfoWorld | 1.5 | 1.5 | 3 |
| January-90 | InfoWorld | 2 | 3 | 1 |
| April-90 | PC Magazine | 1.5 | 3 | 1.5 |
| December-90 | PC Magazine | 1.5 | 3 | 1.5 |
| January-91 | InfoWorld | 1 | 3 | 2 |
| December-91 | PC Magazine | 1 | 2.5 | 2.5 |
| October-92 | InfoWorld | 1 | 3 | 2 |
| November-92 | PC Magazine | 1.5 | 3 | 1.5 |
| January-93 | PC World | 1.5 | 3 | 1.5 |
| March-93 | Windows Sources | 1 | 3 | 2 |
| November-93 | PC Computing | 2 | 3 | 1 |
| January-94 | Windows Sources | 1 | 3 | 2 |
| February-94 | PC World | 1.5 | 3 | 1.5 |
| February-94 | InfoWorld | 1 | 2 | 3 |
| April-94 | Windows Magazine | 2 | 2 | 2 |
| May-94 | Computer Shopper | 1 | 3 | 2 |
| May-94 | Home Office Computing | 1 | 2.5 | 2.5 |
| October-94 | PC Magazine | 1 | 2.5 | 2.5 |
| February-95 | Windows Magazine | 1 | 2.5 | 2.5 |
| April-96 | Home Office Computing | 1 | 3 | 2 |
| February-97 | PC Magazine | 1 | 2.5 | 2.5 |
| February-98 | PC World | 1 | 2.5 | 2.5 |
| | **Awards** | | | |
| December-87 | InfoWorld | 1 | | |
| January-88 | PC Magazine | 1 | | |
| January-89 | Byte | 1 | | |
| January-90 | Byte | | | 1 |
| January-90 | PC Computing | | | 1 |
| January-90 | PC Magazine | | 2 | 1 |
| December-91 | PC Computing | 1 | | |
| December-91 | PC Magazine | 1 | | |
| December-92 | PC Computing | 1 | | 2 |
| December-92 | PC Magazine | 2 | | 1 |
| January-93 | PC Magazine | 1.5 | | 1.5 |
| December-93 | PC Computing | 1 | 2.5 | 2.5 |
| December-93 | PC Magazine | | | 1 |
| February-94 | Windows Magazine | | 1.5 | 1.5 |
| January-95 | Home Office Computing | | | 1 |
| January-95 | PC Magazine | 1 | | |
| December-95 | PC Computing | 1 | 2.5 | 2.5 |
| May-96 | Windows Magazine | 1 | | |
| January-97 | PC Computing | 1 | 2.5 | 2.5 |
| February-97 | Windows Magazine | 1 | | |
| June-97 | Windows Magazine | 1 | | |
| September-97 | PC Computing | 1 | | 2 |
| June-00 | Windows Magazine | 1 | | |
| February-01 | Windows Magazine | 1 | | |

Note:    The DOS version of Lotus 1-2-3 was reviewed until 12/91. Starting with the December 1991 review, 1-2-3 for Windows was reviewed. The 12/91 and 11/92 PC Magazine reviews include both Windows and DOS versions of 1-2-3. In May 1994, Home Office Computing included both a Windows and DOS version of 1-2-3 in its review but the Windows version ranked higher than the DOS version. Quattro did not release a Windows version until 1992. Starting with the 10/92 InfoWorld review, the Windows version of Quattro was always reviewed with the exception of the 11/92 PC Magazine review which looked at both the DOS and Windows version but picked the Windows version as an Editors' Choice.

## D. Suites

According to IDC, sales of suites were not significant prior to 1993. The earliest reviews of suites that we found were from 1994, as summarized in Table 4.

**Table 4. Summary of Reviews of Suites**

| Date | Magazine | Microsoft | Lotus/IBM | WordPerfect |
|------|----------|-----------|-----------|-------------|
| | **Head-to-Head Reviews** | | | |
| April-94 | Computer Shopper | 1 | 2.5 | 2.5 |
| May-94 | PC World | 1 | 2 | 3 |
| May-94 | Windows Sources | 1 | 2.5 | 2.5 |
| June-94 | InfoWorld | 1 | 2 | 3 |
| February-95 | Computer Shopper | 1 | 2.5 | 2.5 |
| March-95 | Home Office Computing | 1 | 2.5 | 2.5 |
| June-96 | Home Office Computing | 1.5 | 3 | 1.5 |
| September-96 | PC World | 1.5 | 3 | 1.5 |
| February-97 | PC Magazine | 1 | 2.5 | 2.5 |
| July-97 | Home Office Computing | 1 | 2 | 3 |
| August-97 | PC Computing | 1 | 3 | 2 |
| January-99 | Home Office Computing | 1 | 3 | 2 |
| | **Awards** | | | |
| December-94 | PC Magazine | 1 | | |
| January-95 | Home Office Computing | 1 | | |
| September-95 | Computer Shopper | 1 | | 2 |
| February-96 | Windows Magazine | 1 | | |
| May-96 | Windows Magazine | 1 | | |
| January-97 | PC Computing | 1 | 2.5 | 2.5 |
| February-97 | Windows Magazine | 1 | | |
| June-97 | Windows Magazine | | | 1 |
| September-97 | PC Computing | 1 | | 2 |
| December-97 | Home Office Computing | 1 | 2.5 | 2.5 |
| January-98 | PC Computing | 1 | 2.5 | 2.5 |
| June-98 | PC Computing | 1 | | 2 |
| January-99 | PC Computing | 1 | 2.5 | 2.5 |
| February-99 | PC Computing | 1 | | |
| June-00 | Windows Magazine | | | 1 |
| February-01 | Windows Magazine | 1.5 | | 1.5 |

6