## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP.<br>ANTITRUST LITIGATION<br><br>This Document Relates to:<br>*Novell, Inc. v. Microsoft Corporation*,<br>Civil Action No. JFM-05-1087 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

MDL Docket No. 1332
Hon. J. Frederick Motz

## NOVELL'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO MICROSOFT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Jeffrey M. Johnson (Bar No. 09328)
David L. Engelhardt
James R. Martin
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC  20006-5403
Telephone:  (202) 420-2200
Facsimile:  (202) 420-2201

R. Bruce Holcomb
ADAMS HOLCOMB LLP
1875 Eye Street NW, Suite 810
Washington, DC  20006
Telephone:  (202) 580-8820
Facsimile:  (202) 580-8821

*Attorneys for Novell, Inc.*

December 14, 2009

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.    MICROSOFT CANNOT MEET ITS BURDEN OF SHOWING THAT NOVELL
ASSIGNED THE APPLICATIONS CLAIMS ................................................................ 2

    A.    The APA Unambiguously Did Not Transfer The Applications Claims ................. 3

    B.    Extrinsic Evidence Confirms That The Contracting Parties Did Not Intend
To Transfer The Applications Claims .................................................................... 4

    C.    Microsoft Is Barred From Disputing The Meaning The Parties Have Attached
To The Contract ...................................................................................................... 11

    D.    Microsoft's Interpretation, If Considered At All, Is Unreasonable ....................... 13

    E.    Microsoft's Evidence, If Considered At All, Does Not Support
Its Interpretation .................................................................................................... 14

II.    MICROSOFT'S PRECLUSION DEFENSES FAIL ....................................................... 17

    A.    Microsoft Has Abandoned Collateral Estoppel ..................................................... 19

    B.    Res Judicata Does Not Bar Novell's Present Claims ............................................. 19

        1.    Microsoft Cannot Establish an Exception to the Rule Against
Nonparty Preclusion ................................................................................. 19

            a.    Caldera did not adequately represent Novell ...................................... 19

            b.    Novell and Caldera were not in privity with respect to the
applications claims ............................................................................... 23

        2.    Microsoft Has Not Met Its Burden of Establishing That Novell Is
Raising the "Same Claim" That Caldera Raised ....................................... 23

            a.    The "operative" facts in *Caldera* are not operative here .................... 25

            b.    The "operative" facts here were not operative in *Caldera* ................. 27

            c.    The alleged harms are different ........................................................... 29

            d.    The evidence at trial will be different .................................................. 29

            e.    Microsoft cannot show that the claims are the same ........................... 31

CONCLUSION ...................................................................................................................... 36

# TABLE OF AUTHORITIES

Page

Cases

*Am. Cas. Co. v. Baker*,
  22 F.3d 880 (9th Cir. 1994) ................................................................................11

*Anyanwutaku v. Fleet Mortgage Group, Inc.*,
  85 F. Supp. 2d 566 (D. Md. 2000) .......................................................................31

*Baladevon, Inc. v. Abbott Labs., Inc.*,
  871 F. Supp. 89 (D. Mass. 1994) ....................................................................11, 12

*Caldera, Inc. v. Microsoft Corp.*,
  72 F. Supp. 2d 1295 (D. Utah 1999).............................................................. *passim*

*Crystal Import Corp. v. AVID Identification Systems, Inc.*,
  582 F. Supp. 2d 1166 (D. Minn. 2008) ...............................................................32

*Esquire Trade & Finance, Inc. v. CBQ, Inc.*,
  562 F.3d 516 (2d Cir. 2009)................................................................................23

*Flying J Inc. v. Comdata Network, Inc.*,
  405 F.3d 821 (10th Cir. 2005) ............................................................................12

*General Auto Service Station LLC v. City of Chicago, Illinois*,
  319 F.3d 902 (7th Cir. 2003) .........................................................................20, 21

*Giusti v. Sterling Wentworth Corp.*,
  201 P.3d 966 (Utah 2009).....................................................................................3

*Harnett v. Billman*,
  800 F.2d 1308 (4th Cir. 1986) .......................................................................24, 31

*Hunt v. Enzo Biochem, Inc.*,
  Nos. 06 Civ. 170(SAS) et al., 2009 WL 1683990 (S.D.N.Y. June 15, 2009) ........................22

*In re Fine Paper Litig.*,
  632 F.2d 1081 (3d Cir. 1980)..............................................................................18

*Ins. Corp. of Am. v. Dillon, Hardamon & Cohen*,
  725 F. Supp. 1461 (N.D. Ind. 1988) .............................................................. 11, 12-13

*James v. Zurich-American Ins. Co.*,
  203 F.3d 250 (3d Cir. 2000)................................................................................11

*Joplin Enters. v. Allen*,
  No. C91-1035C, 1992 U.S. Dist. LEXIS 2076 (W.D. Wash. Dec. 15, 1992)..................11, 12

Page

*King Airway Co. v. Pub. Tr. of Routt County, Colo.*,
  No. 95-1315, 1997 WL 186256 (10th Cir. Apr. 17, 1997) ........................................2

*KKSN, Inc. v. Rogers*,
  No. 92-1611-FR, 1993 U.S. Dist. LEXIS 7059 (D. Or. May 25, 1993) ..........................11, 12

*Lexington Ins. Co. v. W. Roofing Co.*,
  No. 03-2036-JWL, 2003 WL 22205614 (D. Kan. Sept. 23, 2003) .........................................2, 3

*Lowery v. Stovall*,
  92 F.3d 219 (4th Cir. 1996) ...........................................................................21

*Nationwide Mutual Fire Insurance Co. v. George V. Hamilton, Inc.*,
  571 F.3d 299 (3d Cir. 2009) ...........................................................................23

*Novak v. Active Window Prods., Inc.*,
  No. 01-CV-3566(DLI)(WDW), 2007 WL 749810 (E.D.N.Y. Mar. 7, 2007) ......................2, 3

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009), *petition for cert. filed*, 78 U.S.L.W. 3099
  (U.S. Aug. 26, 2009) (No. 09-247) ..................................................................19

*OSRecovery, Inc. v. One Groupe International, Inc.*,
  380 F. Supp. 2d 243 (S.D.N.Y. 2005) ...............................................................2

*Pelt v. Utah*,
  539 F.3d 1271 (10th Cir. 2008) .....................................................................23

*Pittston Co. v. United States*,
  199 F.3d 694 (4th Cir. 1999) ..............................................................7, 24, 25, 34

*Pueschel v. United States*,
  369 F.3d 345 (4th Cir. 2004) ....................................................................24, 31

*Sunbury Textile Mills, Inc. v. Comm'r*,
  585 F.2d 1190 (3d Cir. 1978) ......................................................................11

*Syndia Corp. v. Gillette Co.*,
  No. 01 C 2485, 2002 WL 548843 (N.D. Ill. Apr. 11, 2002) ....................................11

*Taylor v. Sturgell*,
  128 S. Ct. 2161 (2008) .......................................................................19, 20, 23

*United States v. Dunn*,
  557 F.3d 1165 (10th Cir. 2009) ...................................................................3, 4

*Young v. Wardley Corp.*,
  182 P.3d 412 (Utah Ct. App. 2008) ..................................................................3

Page

Other Authorities

Jody S. Kraus & Robert E. Scott, *Contract Design and the Structure of Contractual Intent*,
   84 N.Y.U. L. Rev. 1023 (2009) ............................................................................4

11 Richard A. Lord, *Williston on Contracts* § 31:1 (4th ed. 1999) ..............................................12

Restatement (First) of Contracts § 227 (1932) ............................................................12

Restatement (Second) of Contracts § 201 (1981) .................................................11, 12

Restatement (Second) of Contracts § 326 (1981) ........................................................18

Restatement (Second) of Judgments § 24 (1982) .................................................24, 31

Restatement (Second) of Judgments § 41 (1982) ........................................................23

Restatement (Second) of Judgments § 55 (1982) .................................................18, 23

6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1554 (2d ed. 1990) ................2

20 Charles Alan Wright & Mary Kay Kane, *Federal Practice and Procedure Deskbook*
   § 75 (2002) .........................................................................................................2

## **INTRODUCTION**

Microsoft once told this Court that if allowed discovery on the issues presented by these cross-motions, Microsoft would show that Novell intentionally sold the present claims to Caldera. Microsoft claimed it would prove that when Novell agreed to assign its claims "associated directly or indirectly with any of the DOS Products or Related Technology,"[1] Novell had some "obfuscated" intent to include the separate claims associated with its applications business.

Discovery is now over. All of the witnesses involved in the transaction between Novell and Caldera unequivocally reject Microsoft's proffer. Paul Graf, the attorney who represented Caldera in its acquisition of Novell's DOS business and claims, states that Caldera never even considered acquiring Novell's applications claims, and Novell certainly did not include those claims in the assignment. In *Caldera, Inc. v. Microsoft Corp.*, and again in this action, Robert Frankenberg, Novell's CEO at the time of the transaction, flatly rejected Microsoft's assertion of a broad transfer of claims or any intent to transfer anything other than claims for harm to DR-DOS. David Bradford, who was Novell's Senior Vice President and General Counsel, joins Mr. Frankenberg in testifying that Novell did not intend to assign the applications claims to Caldera. And Stephen Hill, an attorney who counseled Novell in preparing and assigning the DOS claims, and then represented Caldera in litigating the acquired claims, confirms that neither of his former clients intended to transfer the applications claims.

As a matter of law, Microsoft cannot pry from Novell, and force upon Caldera, a claim that neither of them intended to transfer. All of the defenses at issue rely on the false premise. Because Novell did not assign the applications claims, it is the real party in interest, and because its

---

[1] Asset Purchase Agreement between Novell and Caldera (July 23, 1996) [NOV00728312-54] ("APA") § 3.1 (see Exhibit 13 to the Affidavit of Alex Hassid attached to Novell's opening brief (Oct. 7, 2009)). Previously attached exhibits will be cited as "(Opening Ex. __)."

relationship with Caldera was limited to the assigned claims, Caldera's settlement with Microsoft does not bar Novell's prosecution of the unassigned applications claims.  For these and other reasons shown below, the Court should strike Microsoft's fourth (estoppel), fifth (waiver), twelfth (accord and satisfaction), thirteenth (res judicata), and fourteenth (collateral estoppel) affirmative defenses.

## ARGUMENT

## I.   MICROSOFT CANNOT MEET ITS BURDEN OF SHOWING THAT NOVELL ASSIGNED THE APPLICATIONS CLAIMS

Where the plaintiff makes a prima facie showing that it is the real party in interest, the defendant bears the burden of proving that the plaintiff's right to recover was extinguished.[2] *See, e.g.*, *Lexington Ins. Co. v. W. Roofing Co.*, No. 03-2036-JWL, 2003 WL 22205614, at *1 (D. Kan. Sept. 23, 2003) (citing *King Airway Co. v. Pub. Tr. of Routt County, Colo.*, No. 95-1315, 1997 WL 186256, at *5 (10th Cir. Apr. 17, 1997)); *Novak v. Active Window Prods., Inc.*, No. 01-CV-3566(DLI)(WDW), 2007 WL 749810, at *3 (E.D.N.Y. Mar. 7, 2007).  By virtue of its prior ownership of the applications, and its retention of the claims when it divested the applications, Novell has made its prima facie showing.[3]  The law does not require Novell to go further and prove the negative of non-assignment.[4]  The burden has shifted; if Microsoft cannot prove that Novell's admitted right was later extinguished, its defense should be stricken.  *See Novak*, 2007 WL 749810,

---

[2] *See* 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1554, at 406 (2d ed. 1990) (objection to plaintiff's status as real party in interest generally treated as "something in the nature of an affirmative defense").

[3] *See* 20 Charles Alan Wright & Mary Kay Kane, *Federal Practice and Procedure Deskbook* § 75 (2002).

[4] Microsoft's reliance on *OSRecovery, Inc. v. One Groupe International, Inc.*, 380 F. Supp. 2d 243, 246 (S.D.N.Y. 2005), is misplaced.  *OSRecovery* concerns the plaintiffs' burden to make the prima facie showing of their *acquisition* of the claim.  The case does not support Microsoft's contention that Novell must prove non-assignment of an admitted right.

at \*3-\*4.  As shown below, neither the express terms of the APA nor the extrinsic evidence satisfies Microsoft's "burden of showing that [Novell] is not the real party in interest."  *Lexington*, 2003 WL 22205614, at \*1.

### A.   The APA Unambiguously Did Not Transfer The Applications Claims

The Court has a "'duty to enforce the intentions of the parties as expressed in the plain language of the [APA's] covenants.'"  *Young v. Wardley Corp.*, 182 P.3d 412, 415 (Utah Ct. App. 2008) (citation omitted).  The Court should determine the intent of the contracting parties by "first look[ing] to the writing alone."  *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 975 (Utah 2009).  The Court is to consider extrinsic evidence only if "the parties [*to the contract*] offer opposing interpretations that are reasonably supported by the contract's language."  *United States v. Dunn*, 557 F.3d 1165, 1172 (10th Cir. 2009).  With or without resorting to extrinsic evidence, the Court determines whether the APA is unambiguous as a matter of law.  *Giusti*, 201 P.3d at 975.

Novell has shown that, by its plain terms, the APA conveyed to Caldera the "DOS Products or Related Technology," which are precisely defined.  The APA uses the same defined terms to describe the transfer of claims:[5]  Novell assigned claims "associated directly or indirectly with any of the DOS Products or Related Technology."[6]

The APA excluded from transfer any "products or technologies," such as Novell's business applications, that were "not developed primarily as components of [the] DOS Products."[7]  By the time of the Caldera transaction, Novell had sold to Corel some of its applications, such as WordPerfect and Quattro Pro, but still owned other applications, such as GroupWise and

---

[5] APA §§ 2.6, 2.11, 2.14 (Opening Ex. 13); *see also id.* §§ 2.4, 2.15, 2.17.

[6] *Id.* § 3.1.

[7] *Id.* § 2.11.

PerfectWorks; it carved all of these applications out of the Caldera transaction.  Nothing within the four corners of the APA suggests that Novell *included* claims associated with the *excluded* products. The only interpretation "reasonably supported by the contract's language," *Dunn*, 557 F.3d at 1172, is that Novell transferred the DOS products and claims, but excluded the applications products *and claims.*

Microsoft represented to the Court, however, that numerous deponents would "address issues concerning Novell's intent and motives, including the precise meaning of the contracts between Novell and Caldera, the scope of the antitrust causes of action assigned to Caldera, and the extent of Novell's involvement in Caldera's case against Microsoft."[8]  The Court granted Microsoft an opportunity to determine through discovery "how the term 'indirectly' in the assignment from Novell to Caldera is construed."[9]  Every witness presented by either party now attests to Novell's answer to the Court's question.

### B.    Extrinsic Evidence Confirms That The Contracting Parties Did Not Intend To Transfer The Applications Claims

As Novell has shown, "[h]onoring the contractual intent of the parties [to the contract] is the central objective of contract law."[10]  Microsoft's efforts to determine the intent of the parties consisted of exactly one deposition.  **Mr. Frankenberg** flatly rejected Microsoft's assertion that there was a broad transfer of claims or that he intended to assign anything other than the DR-DOS

---

[8] *See* Microsoft's Mem. in Opp'n to Novell's Mot. for Summ. J. on Six Defenses (Aug. 22, 2008) at 22.

[9] Order (Aug. 26, 2008).

[10] Jody S. Kraus & Robert E. Scott, *Contract Design and the Structure of Contractual Intent*, 84 N.Y.U. L. Rev. 1023, 1025 (2009).

claims:[11]  "What I know is what the intent was, and the intent was to sell DR DOS, at that time

known as NDOS, to Caldera with the right to sue for acts committed in competition with sales of

DR DOS."[12]

> Mr. Frankenberg gave essentially the same testimony in *Caldera*:

> Q: Was there a discussion of the value of the claims being supposedly
>    transferred as a result of the sale of the DOS business?

> A: Yes.

> . . . .

> Q: And what claims did that include?  Did that also include application
>    claims, or did that – is that only related to DOS?

> A: The discussion was only about DOS, because we were selling DOS, not
>    selling the application.[13]

> Mr. Frankenberg could not have been more clear.  In response, Microsoft takes out of

context his reference to claims based on "Microsoft's 'activities' in 'the operating system

marketplace'" (Microsoft's Opp'n and Cross-Mot. (Nov. 13, 2009) ("Mem.") at 11 (citing Dep. of

R. Frankenberg (Mar. 25, 2009) 46-47)).  Mr. Frankenberg was not attesting to an assignment of

claims for harms to the applications, and Microsoft "grossly misrepresent[s]"[14] his testimony.  In

---

[11] Dep. of R. Frankenberg (Mar. 25, 2009) 136:15-139:12, 161:9-14 (attached as Exhibit 34 to the Affidavit of Alex Hassid in support of this brief (Dec. 14, 2009)).  Exhibits attached to this Affidavit will be cited as "(Reply Ex. __)."

[12] *Id.* at 164:2-6.

[13] Dep. of R. Frankenberg, *Caldera* (Oct. 2, 1998) 283:11-286:3 [MS-PCA 1153208-421] (Reply Ex. 35).

[14] Microsoft is no stranger to "quot[ing] . . . language entirely out of context" with the intent of misleading the court.  *Caldera, Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1312 (D. Utah 1999). The *Caldera* court reprimanded Microsoft for having "grossly misrepresented" authority with the intent of leading the court to believe that the prior court "held something it did not."  *Id.*

two separate depositions over a span of ten years, he vehemently denied that the present claims were assigned.[15]

Three additional witnesses whom Microsoft conspicuously chose not to depose now corroborate the testimony of Mr. Frankenberg. First, **Mr. Graf** was the sole attorney representing Caldera in the DOS transaction. He attests that during the negotiations, the parties discussed transferring only "claims for the injuries that Microsoft caused to Novell's DR DOS business"; that Novell's business applications were never discussed; that claims concerning Novell's business applications "were neither contemplated as part of the conveyance nor actually conveyed to Caldera"; and that "[a]ny suggestion that the Asset Purchase Agreement conveyed claims for harm to Novell's applications would be contrary to the parties' intentions and what I and my client, Caldera, understood was actually being conveyed."[16]

Mr. Graf responds to the Court's question about the meaning of the word "indirectly" as used in the language of assignment. He testifies that because the transaction "was completed fairly quickly" and "[t]here was little time to perform due diligence," he "determined that using the word 'indirectly' in the Asset Purchase Agreement would better protect Caldera's rights to all claims associated with *the products actually conveyed*."[17] He confirms that "[n]either party contemplated that claims 'directly or indirectly' related to 'the DOS Products or Related Technology' would include Novell's antitrust claims for harm to its business applications."[18] Mr. Graf explained all of

---

[15] *See* Dep. of R. Frankenberg (Mar. 25, 2009) 46:23-24, 135:15-139:12, 161:9-14, 163:25-164:6 (Reply Ex. 34); Dep. of R. Frankenberg, *Caldera* (Oct. 2, 1998) 285:24-286:3 (Reply Ex. 35).

[16] Affidavit of Paul Graf (Nov. 25, 2009) ¶¶ 2, 3.

[17] *Id.* ¶ 3 (emphasis added).

[18] *Id.*

this to Microsoft's attorneys when they interviewed him in July 2008.[19]  Having previewed his

testimony, Microsoft chose not to depose him or any other witness from Caldera.

Second, **Mr. Bradford** is Novell's former Senior Vice President and General Counsel,

with particular responsibility for corporate transactions.  He was personally responsible for

obtaining value for Novell's DOS claims, through litigation or assignment.  He retained Mr. Hill to

investigate Novell's DOS claims and eventually to help find a buyer for the business and associated

claims.  Mr. Bradford believed that Novell "also had a potential private antitrust lawsuit against

Microsoft for damages caused to WordPerfect," and that "Novell could 'piggyback' antitrust claims

for damage Microsoft caused to Novell's Business Applications onto an antitrust suit for damages

that Microsoft caused to Novell's DOS business."[20]

Microsoft bases many of its present speculations on Mr. Bradford's consideration of

"piggybacking" the claims.  Of course, to show that Novell *considered* piggybacking the claims is

not the same as showing that Novell *actually* packaged them together for sale to Caldera, nor that

Novell considered them a "'convenient unit for trial purposes.'"[21]  Mr. Bradford rejects Microsoft's

speculation.  The "idea [of piggybacking claims] was later dismissed" and Novell "thought of, and

dealt with, the DOS claims and the Business Applications claims as distinct antitrust claims."[22]

Further, Mr. Bradford, like Mr. Graf, answers the Court's question about the language of

assignment.  According to Mr. Bradford, "Microsoft's speculation that the 'directly and indirectly'

---

[19] *Id.* ¶ 4.

[20] Affidavit of David Bradford (Dec. 9, 2009) ¶ 9.

[21] Mem. at 48 (quoting *Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999)).

[22] Bradford Aff. ¶ 9.

language should be interpreted to encompass Novell's antitrust claims against Microsoft for damage

caused to Novell's Business Applications business . . . makes no sense."[23]

> First of all, to my knowledge, no one from Novell or Caldera ever construed
> the "directly or indirectly" language to include any claims relating to
> Novell's Business Applications business. The "directly and indirectly"
> language was included because the parties believed there may have been
> potential causes of action concerning certain patents that were transferred that
> related to the DOS operating system. Furthermore, to my knowledge, the
> *parties never discussed an interpretation such as Microsoft's or even
> discussed antitrust claims concerning damage caused to Novell's Business
> Applications business.*[24]

Third, **Mr. Hill** testifies that he and Mr. Bradford discussed the DR-DOS claims as early

as 1993, when the FTC was investigating Microsoft's conduct against DR-DOS, which was long

before Novell owned the business applications.[25]  In the spring of 1995, Mr. Bradford asked

Mr. Hill to draft a complaint to redress the harm done to Novell's DR-DOS business and to estimate

the damages.[26]  Mr. Hill does not recall discussing Novell's applications claims with Mr. Bradford;

nor does he recall any discussion of such claims at a Board of Directors meeting that he attended in

April 1995,[27] when the Board voted not to proceed with the DR-DOS lawsuit.

Mr. Hill became involved again in 1996,[28] when he and Mr. Bradford discussed Novell's

DR-DOS claims.[29]  Mr. Hill "understood that the litigation was to concern the injuries that

Microsoft caused to the DR DOS business."[30]  He and the other attorneys with whom he was

---

[23] *Id.* ¶ 23.

[24] *Id.* (emphasis added).

[25] *See* Affidavit of Stephen J. Hill (Dec. 4, 2009) ¶ 3.

[26] *See id.* ¶¶ 4, 5.

[27] *See id.* ¶¶ 8-10.

[28] *See id.* ¶¶ 12-13.

[29] *See id.* ¶ 13.

[30] *Id.*

working "gave no consideration, and made no proposal, to pursue claims or damages [for] injuries that Microsoft may have caused to Novell's applications (or NetWare) business."[31]

After Mr. Hill learned that Novell was selling the DR-DOS business and claims to Caldera, he met with Ray Noorda and Ralph Yarro of the Canopy Group, the principal shareholder of Caldera, and Bryan Sparks, Caldera's CEO.[32]  "During our meetings with Mr. Noorda, Mr. Yarro and Mr. Sparks, we had no discussion of any claims Novell might have had for injuries to its applications business."[33]  After Caldera retained Mr. Hill to pursue the DR-DOS claims that Caldera was in the process of acquiring, he "revise[d] the draft Novell complaint to state the same DR DOS claims that Novell had, but to state them on behalf of our client, Caldera."[34]  Mr. Hill specifically refutes Microsoft's speculation (Mem. at 11) about the meaning of his declaration in *Novell v. Canopy*, where he testified that he brought on behalf of Caldera the "same claims" that he drafted on behalf of Novell:  "In my prior Declaration, . . . I was referring only to claims based on injury to DR DOS."[35]

Mr. Hill also rejects Microsoft's speculation (Mem. at 15, 30) that Caldera's request for injunctive relief shows that it owned the applications claims.  According to Mr. Hill:  "That is incorrect. . . . [W]e asked for that relief because DR DOS had to support the same APIs as MS-DOS in order to be competitive."[36]  As Mr. Hill explains, "[a]t no time did we ever discuss bringing claims relating to Novell's applications business.  We understood that the Asset Purchase

---

[31] *Id.*

[32] *Id.* ¶ 14.

[33] *Id.*

[34] *Id.* ¶ 16.

[35] *Id.*

[36] *Id.*

Agreement conveyed an interest only in claims for injury to DR DOS. . . . [T]here was never a suggestion from anyone that the claims Caldera had acquired included anything but claims for injury to DR DOS."[37]

Mr. Hill explains that he included the reference to applications in the April 1995 draft because Novell was in both the applications and NetWare businesses at the time.[38]  He "included language regarding both businesses as a basis for requesting information regarding APIs as one of the requested remedies," but "[u]ltimately, we did not include the discussion of Novell's NetWare and applications businesses in the Caldera complaint because Caldera did not own those businesses or claims associated with them."[39]

Finally, as Caldera's litigation counsel, Mr. Hill reviewed the APA's assignment language, so "we would know what claims Caldera purchased so we could include them in the complaint."[40]

> At all times, I understood the claims Caldera purchased to be for harm to Novell's, and thus Caldera's, DR DOS business, not for harm to Novell's business applications.  No one at Caldera ever told me Caldera had purchased Novell's antitrust claims for harm to Novell's business applications, and no one at Novell ever told me Novell had an interest in selling those claims to Caldera.  Our job was to assert all claims that Caldera purchased, and we did exactly that when we pursued all claims relating to DR DOS.[41]

---

[37] *Id.* ¶ 17.

[38] *Id.* ¶ 8.

[39] *Id.*

[40] *Id.* ¶ 19.

[41] *Id.* ¶ 20.

In short, "[w]e did not bring the applications claims because, based on our discussions with officers of both Novell and Caldera and our understanding of the Asset Purchase Agreement, they were not transferred to Caldera."[42]

### C. Microsoft Is Barred From Disputing The Meaning The Parties Have Attached To The Contract

"Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."  Restatement (Second) of Contracts § 201(1), at 83 (1981).  Since Novell and Caldera agree that the APA did not convey Novell's applications claims, Microsoft cannot be heard to offer a contrary interpretation.  *See, e.g.*, *Am. Cas. Co. v. Baker*, 22 F.3d 880, 887 (9th Cir. 1994) (rejecting third-party interpretation that was inconsistent with the parties' shared meaning); *Sunbury Textile Mills, Inc. v. Comm'r*, 585 F.2d 1190, 1196 (3d Cir. 1978) (same); *Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89, 98 (D. Mass. 1994) (same); *KKSN, Inc. v. Rogers*, No. 92-1611-FR, 1993 U.S. Dist. LEXIS 7059, at *6 (D. Or. May 25, 1993) (Opening Ex. 2) (same); *Joplin Enters. v. Allen*, No. C91-1035C, 1992 U.S. Dist. LEXIS 20762, at *3 (W.D. Wash. Dec. 15, 1992) (Opening Ex. 1) (same); *Ins. Corp. of Am. v. Dillon, Hardamon & Cohen*, 725 F. Supp. 1461, 1464-65 (N.D. Ind. 1988) (same); *see also James v. Zurich-American Ins. Co.*, 203 F.3d 250, 255-58 (3d Cir. 2000) (where parties to a contract reflected their mutual intent by their course of dealing, a nonparty could not use extrinsic evidence to prove a different intent); *Syndia Corp. v. Gillette Co.*, No. 01 C 2485, 2002 WL 548843, at *5 (N.D. Ill. Apr. 11, 2002) (where the court determines the contracting parties' intent, a nonparty cannot prove a different understanding).

---

[42] *Id.* ¶ 21.

In *Baladevon*, for example, the court considered affidavits from both contracting parties and determined that "the undisputed evidence as to both the contracting parties' subjective intent" controlled the interpretation of the contract terms, barring consideration of a third party's contrary interpretation. 871 F. Supp. at 97-98. Microsoft's attempt to distinguish *KKSN* and *Joplin Enterprises* (Mem. at 37), where the court reached the same result, is not valid; as in those cases, the record here includes affirmative evidence of the parties' mutual understanding of the contract.[43] Under these and other cited cases, Microsoft cannot attack the contracting parties' mutual understanding.

In response to this black letter law, Microsoft argues (Mem. at 36) that Utah would not follow the Restatement (Second) of Contracts § 201, which restates the reasoning of the cited cases. In fact, the Tenth Circuit has predicted that the Utah Supreme Court would apply § 201. *See Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 834 n.6 (10th Cir. 2005). More to the point, no Utah court has ever allowed a stranger to challenge the meaning that the parties have given their contract. Further, the distinction that Microsoft draws between objective and subjective theories of contract interpretation is meaningless here, where there is nothing for the Court to interpret.[44] Under either theory, "if the parties agree on meaning, the court need not, in reality, interpret that language at all," but simply enforce the mutual intent of the contracting parties as they express it to the Court.[45] As the court reasoned in *Insurance Corporation of America*, "[i]f the parties agree on what they meant, who is the court to step in and begin asking questions, when its ultimate goal is to enforce the

---

[43] *See* Bradford Aff. ¶¶ 11, 23-24; Graf Aff. ¶¶ 2-3.

[44] Even when the parties to the contract disagree, "[i]t is only in exceptional cases that the application of [objective versus subjective] standards leads to different results . . . ." Restatement (First) of Contracts § 227 cmt. b (1932).

[45] 11 Richard A. Lord, *Williston on Contracts* § 31:1, at 258 (4th ed. 1999).

parties' intent?  And should the parties not receive the benefit of their bargain?  Of course they should!"  725 F. Supp. at 465.

###        D.        Microsoft's Interpretation, If Considered At All, Is Unreasonable

Microsoft has never plausibly explained how claims for injuries to the *retained* applications products are "directly or indirectly related" to the *assigned* DOS products.  Among its frequently changing positions, Microsoft has argued that Novell assigned "all claims arising out of Microsoft's allegedly anticompetitive conduct in the . . . PC operating systems [market]" (Mem. at 2), but the contract attributes no significance to that formulation.  The APA defined the transferred "DOS Products" and "Related Technology" *without reference to the markets in which the products competed*.[46]  Market definitions, like treble damages, are peculiarities of antitrust law; they are not mentioned in the APA, and when interpreting the contract, there is no reasonable basis to choose one unmentioned peculiarity of antitrust law over another.  Microsoft might as well argue that Novell assigned all claims for treble damages.

More recently, Microsoft contends (Mem. at 1-2) that "[t]he unambiguous language of the Asset Purchase Agreement encompasses Novell's present claims, which arise out of conduct that allegedly harmed DR DOS and which concern products (WordPerfect and Quattro Pro) that Novell closely linked to DR DOS during the relevant time period."  Microsoft's latest formulation is not supported by a single word of the APA or, as we show below, extrinsic evidence.  Nor can Microsoft identify any "conduct that allegedly harmed DR DOS and which concern[s]" Novell's

---

[46] *See* APA §§ 2.6, 2.11, 3.1 (Opening Ex. 13).  Microsoft also argues that the applications are "directly or indirectly" related to the DOS Products because the applications supposedly were injured by the same conduct in the same market during the same period of time.  Mem. at 23-24. We show below, in disposing of the preclusion defenses, that the present claims arose out of different conduct in a different market during a different period of time.

applications.  As shown below, in the discussion of res judicata, Novell was out of the DOS

business before Microsoft committed its first anticompetitive act against a Novell application.[47]

### E.   Microsoft's Evidence, If Considered At All, Does Not Support Its Interpretation

Microsoft has no evidence to support its speculations about the assignment of claims,

nor to rebut the testimony of Novell's four witnesses.  Microsoft offers no testimony from either

party to the APA; no extrinsic documents showing an affirmative intent to include the applications

claims in the Caldera transaction; no evidence of any discussion between Novell and Caldera about

the possibility of transferring the applications claims; no evidence that Novell and Caldera adopted

any of Microsoft's various interpretations of the APA; and no evidence of any disagreement

between Caldera and Novell as to the meaning of the assignment.[48]

Lacking evidence of contractual intent, Microsoft cites only pre- or post-contract

documents that are not relevant to determining what Novell and Caldera intended when they

executed the APA.  Microsoft's evidence shows only that Novell owned various products, including

DR-DOS, NetWare, and the applications; that it had claims associated with each product; and that

from time to time it *considered* negotiating, prosecuting, or assigning the claims in various

combinations.[49]  None of Microsoft's evidence satisfies its burden of proving that Novell *actually*

---

[47] *See infra* pp. 31-33.

[48] Microsoft's Settlement Agreement with Caldera does not show that Caldera acquired the claims at issue here (*see* Mem. at 35).  Caldera obviously could settle only the claims it owned; thus, Caldera released only the claims it "had or has," including "without limitation the Novell Claims" that it *actually acquired*.  Settlement Agreement, *Caldera* (Jan. 7, 2000) [NOV00114048-58] (Opening Ex. 24; also attached as Exhibit 2 to Aff. of Steven L. Holley in Supp. of Microsoft's Cross-Mot. for Summ. J. (Nov. 13, 2009) (hereinafter "Microsoft Ex. __")).  Nothing there suggests that the present claims were among the acquired claims.

[49] *See, e.g.*, Novell Draft Compl. (D. Utah Apr. 1995) [NOV00110568-604] (Reply Ex. 36; Microsoft Ex. 10); Mem. from D. Bradford to the Novell Board of Directors (Apr. 12, 1995) (Reply

assigned the claims at issue.  For example, the complaint to the European Commission in 1993 pre-dates Novell's acquisition of the applications and cannot possibly establish a "close link[]" (Mem. at 29) between the DOS and applications claims.

In April 1995, Novell did contemplate, as Microsoft pointlessly asserts (Mem. at 5), injunctive relief on behalf of its applications business,[50] proving only that Novell *owned* a claim at the time, not that Novell *assigned* it at some later time.  Similarly, there are Novell documents that refer to the possibility of bringing a single antitrust claim against Microsoft (*see, e.g.*, Mem. at 29, 32), but that possibility does not mean that Novell actually packaged all of its claims together and sold them to Caldera.  Many of the cited documents are expressly limited to the DR-DOS business, and necessarily contemplate a single claim,[51] while many other documents – including some cited by Microsoft – identify multiple, independent causes of action.[52]  In a memorandum to Novell's Board of Directors, Mr. Bradford writes:  "Novell faces a decision on what to do with several major antitrust cases it has against Microsoft Corporation,"[53] and in a letter to Bill Gates, Mr. Frankenberg

---

Ex. 37; Microsoft Ex. 9); Letter from R. Frankenberg to B. Gates (June 23, 1995) [NOV 00545722-24] (Reply Ex. 38; Microsoft Ex. 14).

[50] *See, e.g.*, Mem. from D. Bradford to the Novell Board of Directors (Apr. 12, 1995) (Reply Ex. 37; Microsoft Ex. 9); Mem. from D. Bradford to the Novell Board of Directors (Apr. 27, 1995) [NOV-B03731397-98] (Reply Ex. 39; Microsoft Ex. 11).

[51] *See, e.g.*, Mem. from D. Bradford to the Novell Board of Directors (Apr. 12, 1995) (Reply Ex. 37; Microsoft Ex. 9); E-mail from D. Bradford to R. Frankenberg (May 9, 1996) [NOV00109228] (Reply Ex. 40; Microsoft Ex. 18); Mem. from Novell Vice President R. Hicks to D. Bradford (Apr. 23, 1996) [NOV00129214-17] (Reply Ex. 41; Microsoft Ex. 19); Minutes of Novell Board of Directors Meeting (May 23, 1996) [NOV00119903-05] (Opening Ex. 8; Microsoft Ex. 20); Mem. from S. Hill to D. Bradford (May 23, 1996) [NOV 00486926-27] (Reply Ex. 42; Microsoft Ex. 21).

[52] *See, e.g.*, Mem. from D. Bradford to the Novell Board of Directors (Nov. 18, 1994) [NOV00418617-19] (Reply Ex. 43; Microsoft Ex. 7); Letter from R. Frankenberg to B. Gates (June 23, 1995) (Reply Ex. 38; Microsoft Ex. 14).

[53] Mem. from D. Bradford to the Novell Board of Directors (Nov. 18, 1994) [NOV00418617-19, at 17] (Reply Ex. 43; Microsoft Ex. 7).

separately complains of Microsoft's monopolization of the desktop operating systems market and its attempted monopolization of the software applications market.[54]

Additionally, Novell's limited cooperation with Caldera in prosecuting the DR-DOS claims,[55] and Novell's supposedly "obfuscated" interest in the outcome, are not relevant to determining whether Novell included the applications claims in the assignment, as Microsoft seems to suggest (Mem. at 14-15).  Novell's interest in the DOS litigation proves only that Novell assigned the *DOS* claims, and does not support Microsoft's speculation that Novell "obfuscated" the additional assignment of applications claims.  Microsoft's discovery did not reveal a single "obfuscated" fact that is relevant to this motion.

Further, Mr. Hill rejects the contention (Mem. at 15, 30) that Caldera sought injunctive relief for the benefit of Novell's applications business.  He testifies that Caldera sought injunctive relief only for DR-DOS.[56]  Caldera omitted the applications claims from its action because, Mr. Hill explains, it did not own them.[57]  In the face of this testimony, Microsoft cannot raise an issue of fact by continuing to speculate (Mem. at 34 n.7) about what "Caldera may have thought" or what "Novell may have decided" about the applications claims that Caldera supposedly acquired but did not prosecute.

Finally, Microsoft's partial quotation (Mem. at 15) of statements by Stephen Susman, a Caldera attorney arguing in favor of Novell's intervention in the *Caldera* litigation, omits his admitted ignorance of Novell's business.  He said, "I personally am not familiar with Novell's

---

[54] Letter from R. Frankenberg to B. Gates (June 23, 1995) [NOV 00545722-24, at 23] (Reply Ex. 38; Microsoft Ex. 14) ("The magnitude of the legal *claims* are substantial." (emphasis added)).

[55] *See, e.g.*, Hill Aff. ¶¶ 22-25; Bradford Aff. ¶¶ 25-28.

[56] *See* Hill Aff. ¶ 16.

[57] *Id.* ¶¶ 17, 20.

business, but I did think they had an interest in the injunctive relief as well as the monetary relief, and I think they have an interest in the injunctive relief because it affects their business as a competitor of Microsoft, and I mean in the software applications business."[58]  Microsoft claims that this uninformed attorney was seeking an injunction in 1998 to remedy Novell's complaints about the namespace extensions, but when Mr. Susman spoke, Novell no longer owned WordPerfect or PerfectOffice, and *had no use for the extensions*, which in any event were re-published, and *available without injunction*, by 1996.[59]

Without any support in the APA or the extrinsic evidence, Microsoft has failed to meet its burden of proving that Novell assigned its applications claims to Caldera.  The Court should therefore enforce the plain meaning of the APA as endorsed by both contracting parties; find that Novell owns the applications claims; and strike all defenses based on the false premise.

## II.        MICROSOFT'S PRECLUSION DEFENSES FAIL

Microsoft asks the Court to bar claims that were *excluded* from the assignment to Caldera, solely because Caldera settled the claims that were *included* in the assignment. No authority supports such an extreme result.  While the judicial opinions and scholarly commentaries on res judicata are vast, and often describe multi-element tests that lead to complex litigation, the answer here is quite simple:  nothing done by Caldera could possibly affect Novell's rights in claims that were not part of its contractual relationship with Caldera.  In all the vast literature of res judicata, no authority, ever, has suggested that nonparty preclusion could apply in that manner.

---

[58] Hearing Tr., *Caldera* (July 16, 1998) [NOV00106687-99] ("Hearing Tr., *Caldera*") at 21:15-20 (Opening Ex. 20; Microsoft Ex. 40).

[59] *See* Alepin Rebuttal Rep. at 22 (Reply Ex. 44).

Further, Microsoft waived any defense based on the contention that the Caldera transaction improperly split a single claim.  When Microsoft deposed Mr. Frankenberg in *Caldera*, Microsoft learned that Novell did not assign the applications claims to Caldera and was treating them separately.[60]  If Microsoft really believed that Novell improperly split an indivisible cause of action, it had several options.  It could object to Caldera's maintenance of the action on a supposedly split claim;[61] it could require Novell's joinder;[62] or it could assent.[63]  "To protect the [defendant] against multiple actions in a case of partial assignment, . . . [this rule] entitles him to require joinder of all [parties with an interest in the split claim].  This protection is limited by its reason:  it is not available if the [defendant] has assented to the partial assignment."[64]

Microsoft chose to assent.  Having received notice in *Caldera* of the transaction that supposedly split the claim, and having failed to object or to join Novell, Microsoft cannot complain now.  Novell is free to litigate the present claims, *even if* Microsoft could show that they are the "same claims" that Caldera previously settled.[65]  In any event, we show below in Section B.2 that they are not the "same claims."

---

[60] Dep. of R. Frankenberg, *Caldera* (Oct. 2, 1998) 283:11-286:3 (Reply Ex. 35).

[61] "A judgment for or against the partial assignee does not preclude the assignor from bringing an action on the unassigned portion of the [claim].  The [defendant], may, however, object to an action being maintained on the partial assignment unless all persons holding interests in the original [claim] are joined as parties."  Restatement (Second) of Judgments § 55 cmt. c, at 70 (1982).

[62] *See* Restatement (Second) of Contracts § 326(2) (1981).

[63] *See id.* § 326(2), § 326 cmt. c.

[64] *Id.* § 326 cmt. c, at 42.

[65] *See id.*; *see also In re Fine Paper Litig.*, 632 F.2d 1081, 1091 (3d Cir. 1980) ("When the [defendant] has notice of an assignment by the plaintiff – and the assignee is not joined – a judgment for or against the [defendant] will not bar a later suit by the assignee.").

### A.    Microsoft Has Abandoned Collateral Estoppel

Microsoft has not responded to Novell's arguments concerning collateral estoppel, effectively conceding that the defense is defective and should be stricken.

### B.    Res Judicata Does Not Bar Novell's Present Claims

The Court also should strike the defense of res judicata, because Microsoft cannot establish an exception to the rule against nonparty claim preclusion, nor show that this case involves the same cause of action raised in *Caldera*.  *See Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 210-11 (4th Cir. 2009), *petition for cert. filed*, 78 U.S.L.W. 3099 (U.S. Aug. 26, 2009) (No. 09-247).

### 1.    Microsoft Cannot Establish an Exception to the Rule Against Nonparty Preclusion

Generally, a nonparty to a suit has not had a "'full and fair opportunity to litigate,'" and applying res judicata to the nonparty thus "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'"  *Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 (2008) (citation omitted).  Microsoft concedes that Novell was not a party to the *Caldera* action; in fact, Microsoft blocked Novell's attempt to intervene.  Unless Microsoft can establish one of the six exceptions to the general rule against nonparty claim preclusion, the Court should strike the defense.  *See id. at* 2172-73.  Microsoft previously invoked three of the *Taylor* exceptions, but in its latest brief, Microsoft abandons its argument that Novell assumed control of the *Caldera* litigation. Two of the *Taylor* exceptions remain at issue.  Neither applies.

### a.    Caldera did not adequately represent Novell

To establish "adequate representation," Microsoft must show, first, that Caldera's interests in its prior action were the "same" interests that Novell asserts here, and additionally, either that the *Caldera* court employed special procedures to protect Novell's present interests or

that Caldera understood itself to be acting in a representative capacity with respect to the present claims.  With respect to each of these elements, Microsoft's argument is fatally based on the premise that Novell assigned the present claims to Caldera.

As the Supreme Court explained in *Taylor*, "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with *the same interests* who [wa]s a party' to the suit."  *Id.* at 2172 (emphasis added) (alteration in original) (citation omitted).  Even Microsoft admits that the interests of Novell and Caldera were aligned in the prior action *only to the extent of the assignment*:  "by retaining a substantial stake in *the claims it assigned* to Caldera, Novell's interests in the *Caldera* litigation were indistinguishable from Caldera's" (Mem. at 40 (emphasis added)).  When it prosecuted the DOS claims, Caldera had no interest at all, much less the "same interest" that Novell had, in the applications claims.  Absent assignment of the present claims, Microsoft's argument fails.

Microsoft thus focuses on Novell's and Caldera's shared interest in the DOS claims, which is not relevant.  But even with respect to those claims, Microsoft is judicially estopped from arguing now that Novell's interest was more than "really remote."[66]  The indistinguishable opinion in *General Auto Service Station LLC v. City of Chicago, Illinois*, 319 F.3d 902, 906 (7th Cir. 2003), bars Microsoft's "flip-flop."  The defendant there successfully opposed plaintiff General Auto's motion to intervene in a prior action between defendant and another plaintiff, Whiteco, as Microsoft did with respect to Novell in *Caldera*.  The Seventh Circuit estopped defendant from arguing in the later action that General Auto and Whiteco were in privity in the prior action, as Microsoft argues here about Novell and Caldera.  According to Judge Easterbrook's opinion, "having persuaded the state court that Whiteco and General Auto should be treated as distinct entities, [the defendant] now

---

[66] Hearing Tr., *Caldera* at 29:20 (Opening Ex. 20; Microsoft Ex. 40).

seeks to persuade us that they are (or should be treated as) the same entity.  Once again this flip-flop is barred by the doctrine of judicial estoppel."  *Id.*

Microsoft's attempts to evade judicial estoppel and perpetrate its "flip-flop" are wrong on the facts and law.  Microsoft was neither "[u]naware" nor "ignorant of the true facts about Novell's participation" in *Caldera* (Mem. at 41-42) when it successfully took its prior, inconsistent position.  Only one "obfuscated" fact has come to light since the hearing in 1998 when Microsoft blocked Novell's intervention:  Caldera was obligated to prosecute the claims it acquired from Novell.  Microsoft has not explained how prior knowledge of this fact would have caused it to proceed differently in that case.  Further, judicial estoppel is not limited to punishing a fraud upon the prior court, as Microsoft asserts (Mem. at 42); its purpose here is to prevent fraud upon *this* Court.  In *Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996), the Fourth Circuit barred the plaintiff from disputing facts that he confessed in a related criminal case, because he was "attempt[ing] . . . to gain unfair advantage in *this action*."  *Id.* at 225 (emphasis added).

To prevent Microsoft from gaining an unfair advantage in this action, the Court should estop Microsoft from arguing that Novell had a significant interest in *Caldera*.  As Microsoft demonstrated there:  "I think [Novell's interest] is an accounting interest, . . . and this is my understanding of [the APA], is they get a percentage of revenues, and [recovery from the litigation] is one source of revenues, so it[']s *really remote* . . . . The truth is *Novell left the scene*, it sold the business, it transferred the documents, and it retained this residual accounting interest."[67]  The *Caldera* court agreed.  "Novell does not share the risks of the litigation as they unfold.  Novell becomes the recipient of the benefit."[68]  Novell may have been "indirect[ly] injur[ed]" if the

---

[67] Hearing Tr., *Caldera* at 29:16-30:3 (emphasis added) (Opening Ex. 20; Microsoft Ex. 40).
[68] *Id.* at 9:8-9.

"litigation [did not] come out as Novell would wish [it] to, but they are not involved in the litigation, they are not participating, they are sharing the risk like a grubstake."[69]

Even under Microsoft's own authority, *Hunt v. Enzo Biochem, Inc.*, Nos. 06 Civ. 170(SAS) et al., 2009 WL 1683990 (S.D.N.Y. June 15, 2009), Novell's "grubstake" does not support the application of res judicata.  In *Hunt*, the court barred a group of investors from prosecuting their fraud claims because they partly funded and played an integral role in a "virtually identical" case between a similarly situated plaintiff and the same defendant, and even had the right to veto any settlement of the prior action.  That power over the settlement was critical to the court's holding.  *See id.*  Here, Novell did not fund Caldera's action; Novell and Caldera never conferred about litigation strategy; Novell was not involved in the settlement of Caldera's action; and Novell certainly had no right to veto the settlement.  Mr. Bradford did not even know the amount of the settlement until after the agreement was executed.[70]  As the *Caldera* court found, Novell was not "in the position of making the strategic and tactical decisions on the case."[71]

Microsoft's failure to show the "same interest" defeats the assertion of adequate representation.  Equally fatal is Microsoft's failure to show either a "special procedure" or a specific type of "understanding of the parties" in the prior action.  The *Caldera* court provided no procedure of any kind, "special" or otherwise, that would have allowed either Caldera, which did not own the claims, or Novell, which was not a party, to raise the applications claims in Caldera's prior action.  Nor can Microsoft prove that Caldera was acting as a trustee or fiduciary, or was otherwise invested

---

[69] *Id.* at 9:10-13.

[70] Bradford Aff. ¶¶ 25-28; Hill Aff. ¶¶ 22-25.

[71] Hearing Tr., *Caldera* at 11:25-12:2 (Opening Ex. 20; Microsoft Ex. 40).

by law or consent, with the authority to raise Novell's unassigned claims in the prior action, as necessary to establish an understanding of representative capacity.[72]

### b. Novell and Caldera were not in privity with respect to the applications claims

The remaining *Taylor* exception at issue is privity based on a preexisting substantive legal relationship.  Microsoft argues (Mem. at 39) that "by virtue of the substantive legal relationship that arose from the contract assigning the claims that *were* transferred," Novell and Caldera were somehow in privity for the claims that "Novell did *not* transfer to Caldera" (emphasis added).  Microsoft has not cited a single case applying such a broad conception of privity.[73]  Under *Taylor*, the privity associated with an assignment is limited to the claims that were actually assigned.[74]  Thus, in *Esquire Trade & Finance, Inc. v. CBQ, Inc.*, 562 F.3d 516, 520-21 (2d Cir. 2009), the Second Circuit held that under *Taylor* a party who took an assignment of certain liabilities was not in privity with respect to other liabilities that were not assigned.

Because Microsoft cannot establish any exception to the rule against nonparty claim preclusion, Novell's present claims are not barred.

### 2. Microsoft Has Not Met Its Burden of Establishing That Novell Is Raising the "Same Claim" That Caldera Raised

We have shown that Microsoft waived all defenses based on the contention that the assigned DOS claims and the unassigned applications claims are one indivisible claim that could

---

[72] *See* Restatement (Second) of Judgments § 41 (1982).  The *Taylor* Court cited this section of the Restatement when it recognized the doctrine of adequate representation.  128 S. Ct. at 2172-73.

[73] *Pelt v. Utah*, 539 F.3d 1271 (10th Cir. 2008), and *Nationwide Mutual Fire Insurance Co. v. George V. Hamilton, Inc.*, 571 F.3d 299 (3d Cir. 2009), do not hold that a contract creates privity for matters outside the contract.

[74] *See* Restatement (Second) of Judgments § 55 (1982).  The *Taylor* Court cited this provision in recognizing the doctrine of substantive legal relationships.  128 S. Ct. at 2172.

not be split.  There is thus no reason for the Court to consider Microsoft's contentions about the claims' supposed similarities.  We show below that the claims are in any event entirely distinct.

The Fourth Circuit has adopted the transactional approach of the Restatement (Second) of Judgments in determining whether there is an identity of claims.  *See Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999).  A claim will be barred only if it "'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment.'"  *Id.* (quoting *Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir. 1986), and citing Restatement (Second) of Judgments § 24 (1982)).  Whether the transactions or series of transactions are the same is "to be determined pragmatically, giving weight to such considerations as whether *the facts* are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage."[75] In practice, the Fourth Circuit focuses on whether the prior and subsequent cases depend upon "'the same core of operative facts.'"  *See, e.g.*, *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004) (citation omitted).

In *Pittston*, for example, the plaintiff's first case challenged the calculation of premiums charged by a statutory health plan for retired coal miners.  199 F.3d at 699.  The court's determination of the premiums affected the claim for a refund in the second action.  *Id.* at 699-700. The Fourth Circuit determined that, even though the transaction giving rise to the prior case – the miscalculation of the plaintiff's premium – was a "necessary antecedent" to the plaintiff's subsequent case for refunds, the respective transactions were not "'so woven together' that they constitute a single claim," because the second transaction – the subsequent payments that were

---

[75] Restatement (Second) of Judgments § 24(2), at 196 (1982) (emphasis added).

subject to refund in the second case – was "clearly distinct in time, space, and origin." *Id.* at 704-05 (citation omitted).

Here, the facts underlying the DR-DOS claims and Novell's applications claims are even less "woven together." Although both claims arguably involve the same "antecedent" – Microsoft's illegal maintenance of an operating systems monopoly – we show below that they are based on different operative facts, concerning different misconduct that harmed different products in different markets during different periods of time, and do not form a convenient unit for trial.

### a. The "operative" facts in *Caldera* are not operative here

The *Caldera* litigation focused on anticompetitive conduct that began in 1990 and harmed the DR-DOS operating system. The conduct included misleading preannouncements of forthcoming MS-DOS and Windows products, such as false claims beginning in April 1990 that MS-DOS 5.0 would be available to OEMs by September 1990, a full nine months before it was actually on the market, preventing customers from switching to DR-DOS 5.0. *Caldera*, *Inc. v. Microsoft Corp.*, 72 F. Supp. 2d 1295, 1299-300 (D. Utah 1999). In addition to these "vaporware" tactics, Caldera alleged a campaign of "fear, uncertainty, and doubt" ("FUD") against DR-DOS and its then-owner, Digital Research, Inc. ("DRI"). *Id*. at 1300-01. Caldera also asserted that Microsoft's practices in licensing operating systems, including per processor licenses and minimum commitments, locked DR-DOS out of the OEM market. *Id*. at 1301.

Caldera further alleged that in September 1991, after the release of DR-DOS 6.0, Microsoft repeated the same tactics of vaporware, FUD, and per processor licensing agreements, but with more intensity. *Id*. at 1302. Specifically, Microsoft tried to convince OEMs that DR-DOS would be incompatible with Windows 3.1. *Id*. at 1302-03. Caldera claimed that in 1992, Microsoft placed DRI on a "beta blacklist" and intentionally made Windows 3.1 incompatible with DR-DOS.

*Id*. at 1303.  Caldera also alleged that in 1993 and parts of 1994, Microsoft continued its FUD campaign, beta-blacklisting, and vaporware attack against the new owner of DR-DOS, Novell, in its development of Novell DOS 7.0 in competition with MS-DOS.  *Id*. at 1304.

The crux of the DR-DOS claims, *as assigned* by Novell to Caldera,[76] ended in September 1994, when, "as a result of Microsoft's predatory and anticompetitive conduct . . . , Novell announced that it would cease the marketing and development of DR DOS.[77]  Novell had no complaint about Microsoft's acts beyond that date, and Novell should not be held accountable here for Caldera's subsequent allegations of acts that occurred after (to use Microsoft's own words) "Novell left the scene."[78]  As far as Novell was concerned then, and as far as the Court should be concerned now, the operative facts of the claims that Novell assigned to Caldera ended in September 1994.

Contrary to Microsoft's assertions (Mem. at 47), Windows 95, which was released nearly a year after Novell "left the scene," was not at the center of the claims that Novell assigned to Caldera.  In any event, of the nine anticompetitive acts mentioned in paragraph 3 of the amended complaint – which Caldera filed two years after acquiring Novell's claims – only two relate to Windows 95, and they chiefly concern pre-release events occurring in 1994, such as "vaporware"[79] and the early announcement of the anticompetitive tying of DOS to Windows.[80]

---

[76] *See* First Am. Compl., *Caldera* at 12-21, ¶¶ 36-63 [MS-PCA 1125082-116] (Opening Ex. 16).

[77] *Id.* at 21.

[78] Hearing Tr., *Caldera* at 30:1 (Opening Ex. 20; Microsoft Ex. 40).

[79] Specifically, Caldera claimed that Microsoft leaked information that Chicago, Microsoft's codename for Windows 95, would be released in 1993 or 1994 and that Novell's DOS operating system would not run on it.  *Caldera*, 72 F. Supp. 2d at 1304.

[80] First Am. Compl., *Caldera* at 3 (Opening Ex. 16).

In sum, the nucleus of operative facts in the DOS claims, *as assigned by Novell*,

concerns:

- harms to DR-DOS, while this case concerns harms to business applications;

- anticompetitive conduct prior to September 1994, while this case concerns anticompetitive conduct beginning in October 1994;

- *operating system* licensing practices with *OEMs*, while this case primarily concerns *applications* licensing practices with distributors *other than* OEMs;

- incompatibilities with Windows 3.x, while this case concerns only Windows 95 and Windows 98;

- beta-blacklisting, which is not at issue here;

- FUD, which is not at issue here; and

- tying DOS to Windows, which is not at issue here.

*See Caldera*, 72 F. Supp. 2d at 1297-305.  Novell does not allege here that any one of these

operative facts in the DOS action harmed its office productivity applications.[81]

### b.  The "operative" facts here were not operative in *Caldera*

The first anticompetitive act at issue here occurred in October 1994, *after Novell exited*

*the DOS business*, when Bill Gates issued his infamous e-mail de-documenting the namespace

extensions.[82]  The operative facts relevant to MAPI also occurred after Novell left the DOS

business.  While Microsoft evangelized MAPI (as it evangelized the namespace extensions) in the

early 1990s, it was only in early 1995, after Microsoft succeeded in establishing MAPI as the

---

[81] As Novell's counsel argued on Microsoft's motion to dismiss, "Count One involves injury to WordPerfect's business that was designed to maintain Microsoft's operating system monopoly. . . . [T]he claim does not involve Microsoft's targeting of DR-DOS."  *See* Tr. of Oral Argument on Microsoft's Mot. to Dismiss Novell's Compl. (June 7, 2005) ("June 7, 2005 Tr.") at 44:6-10 (Reply Ex. 45).

[82] It was not until many years later that Novell even learned of Mr. Gates' e-mail, which disclosed the anticompetitive intent behind his decision to de-document the namespace extensions "until we have a way to do a high level of integration that will be harder for the likes of Notes, Wordperfect to achieve, and which will give Office a real advantage."  MX 5117031-32, at 31 (Reply Ex. 46).

*de facto* standard, that Microsoft initiated the conduct at issue.[83]  For example, ISVs first became

aware of Microsoft's unpublished MAPI extensions in March 1995, and Novell's problems with

installation and DLL Hell did not occur until the release of Windows 95.[84]

Likewise, Microsoft did not publicly launch its "Designed for Windows 95" logo

program until September 1994,[85] just as Novell was leaving the DOS business.  Microsoft's denial

of Novell's request for an exemption from the requirement of dual compatibility – the

anticompetitive conduct at issue – occurred later, in March 1995.[86]  Similarly, the anticompetitive

conduct associated with background printing occurred primarily in correspondence between Novell

and Microsoft in 1995, when Novell requested and Microsoft falsely promised certain printing

functionality for Windows 95.[87]

Finally, the nucleus of operative facts supporting Novell's Count VI is comprised

primarily of Microsoft's restraints of trade in the applications markets in the first two quarters of

1995,[88] after Novell left the DOS business.  These restraints occurred mainly among distributors

and resellers participating in rebate programs in the finished goods channel.  The rebate agreements

incentivized *distributors* to resell Microsoft *applications* exclusively, and are distinct from the *OEM*

---

[83] *See* Alepin Rep. at 127-28 (Reply Ex. 47).  Evangelism would not in and of itself give rise to an antitrust claim; it is the later reversal of position that causes the anticompetitive effect.

[84] *See id.* at 138-39.

[85] *See id.* at 144.

[86] *See id.* at 152-55.

[87] *See id.* at 160-62.

[88] *See generally* Novell's Opp'n to Microsoft's Mot. for Summ. J. (Nov. 13, 2009) at 37-49.

agreements at issue in *Caldera*, which were alleged to restrain trade in *operating systems* in an earlier period.[89]

The core of operative facts ends in 1996 with respect to most of Novell's applications, including WordPerfect, Quattro Pro, and PerfectOffice, when those products were sold to Corel. With respect to GroupWise, which Novell retained, the core of operative facts continues through the release of Windows 98 and into at least 1999.

The DR-DOS claims that Novell owned and later assigned to Caldera did not turn in any way upon even one of the facts at issue here.

### c.      The alleged harms are different

Another crucial difference between the two cases is in the alleged harms.  The DOS claims that Novell assigned to Caldera concerned harm to Novell's former operating systems business, which competed in the DOS market; as far as Novell was concerned, those harms stopped accruing in September 1994, when Novell "left the scene."  The claims here concern harms to Novell's distinct applications business; these harms started to accrue only after Novell left the DOS business, when in October 1994, Mr. Gates withdrew the namespace extensions and began a series of acts that harmed the applications.

### d.      The evidence at trial will be different

A trial of the applications claims would require different evidence and witnesses, spanning different periods of time, as compared to the evidence presented in the prior DOS action. For example, much of the evidence involving the DR-DOS claims consisted of e-mails and

---

[89] *See* Compl., *Caldera* ¶¶ 75-81 [NOV00125439-67] (Opening Ex. 5); First Am. Compl., *Caldera* ¶¶ 86-92 (Opening Ex. 16); *see also* Consolidated Stmt. of Facts, *Caldera* (Apr. 28, 1999) [MS-PCA 1134046-244, at 116-30] (Reply Ex. 48).

memoranda from 1990 to 1993,[90] whereas in the current case, much of the evidence relates to

anticompetitive conduct that took place in 1994 and 1995.[91]

Additionally, Novell's witnesses here, such as developers Greg Richardson and Adam

Harral, worked in Utah, where Novell's office productivity applications were primarily developed

during 1994 and 1995.  In contrast, many of the witnesses in *Caldera* worked in England, where

DR-DOS was primarily developed during an earlier period of time.  John Constant, the Product

Development Manager for DR-DOS, who identified many of the intentional incompatibilities

Microsoft created to sabotage DR-DOS in the early 1990s, was based in Hungerford, England,

along with most of the other DR-DOS developers.[92]

Other DOS witnesses, such as Richard Williams, a former President and CEO of DRI,

who testified about the harm caused by Microsoft's per processor licenses, preannouncements, and

incompatibilities, left Novell by the spring of 1992,[93] years before Novell acquired its business

---

[90] Caldera's nearly 200-page Consolidated Statement of Facts, which was submitted in support of its responses to Microsoft's numerous motions for summary judgment, cites only a relatively small number of documents dated after 1993.  *See* Consolidated Stmt. of Facts, *Caldera* (Reply Ex. 48).

[91] *See generally* Alepin Rep. at 90-105, 127-55, 158-65 (Reply Ex. 47).

[92] Dep. of J. Constant, *Caldera* (May 8, 1998) 6:23-8:22, 9:21-24 [MS-CCPMDL 000000388120-321] (Reply Ex. 49); Decl. of J. Constant, FTC (Jan. 11, 1992) ¶¶ 29-44 [LW 0028360-93, at 81-88] (Reply Ex. 50); Dep. of S. Tucker, *Caldera* (July 16, 1997) 19:2-6, 27:15-22, 70:1-4, 75:12-17 (Reply Ex. 51).

[93] In Mr. Williams' Declaration before the FTC, he concludes that by the spring of 1991, DRI could not survive due to Microsoft's anticompetitive conduct in the DOS market in 1990 and 1991 and that the merger with Novell was essentially a last ditch effort to save the company.  *See* Decl. of R. Williams, FTC (Jan. 15, 1993) [LW 0028169-245, at 239] (Reply Ex. 52).

> I had seen the OEM channel seriously restricted; I had seen the promise and
> potential reward of a significant new product breakthrough smashed by
> preannouncement; I had seen our encouraging success in the retail channel
> brought to a screeching halt. . . . I felt that my options were either to get out
> of this [DOS] market and find another market niche where we would not
> draw so much attention from MS, to try to go public, or to be acquired by a
> company that had the resources to better withstand these constant blows.

applications.  He and most of the other witnesses on the DOS claims, such as Novell's former

President and CEO, Ray Noorda (who left Novell shortly after its merger with WordPerfect), and

Novell's former Director of OEM Relations, Richard Dixon (who worked at DRI prior to the

acquisition), had nothing to do with Novell's business applications.[94]

**e.     Microsoft cannot show that the claims are the same**

Microsoft has not cited a single authority applying res judicata where the facts and

harms are so distinct (*see* Mem. at 44).  Microsoft's authorities are easily distinguished.  In *Harnett*,

the court barred a fraud claim that was based on the same corporate merger and spin-off at issue in a

prior fraud case against most of the same defendants.  800 F.2d at 1314-15.  In *Anyanwutaku v.*

*Fleet Mortgage Group, Inc.*, 85 F. Supp. 2d 566, 571-72 (D. Md. 2000), the court barred plaintiff

from claiming for the second time that the same foreclosure upon the same property was unlawful.[95]

None of the facts cited by Microsoft (Mem. at 43-48) is sufficient to establish the degree

of similarity that even its own authorities would require.  First, contrary to Microsoft's contention

(Mem. at 48), it is quite easy to disassociate claims for harm to DR-DOS from claims for harm to

office productivity applications.  WordPerfect was not a "component of" DR-DOS nor a "Related

Technology" under the APA.[96]  The only relationship between DR-DOS and WordPerfect was the

---

*Id.* at 237-38.

[94] *See* Dep. of R. Frankenberg (Mar. 25, 2009) 7:5-10, 7:17-19, 40:13-18 (Reply Ex. 34)
(Mr. Noorda resigned shortly after Mr. Frankenberg started at Novell in March 1994); Decl. of
R. Dixon, FTC (Jan. 11, 1992) [LW 0028321-54, at 22] (Reply Ex. 53); Dep. of R. Dixon, *Caldera*
(Apr. 6, 1998) 8:22-9:25 [MS-PCA1151616.001-.300] (Reply Ex. 54) (Mr. Dixon's work during the
relevant time period focused on embedded systems).

[95] The same core of operative facts "'can manifest itself into an outpouring of different claims,'"
leading to different harms, evidence, and measures of relief.  *Pueschel*, 369 F.3d at 355 (citation
omitted); *see also* Restatement (Second) of Judgments § 24 cmt. c (1982).

[96] *See* APA § 2.11 (Opening Ex. 13).

fact that some versions of WordPerfect were written for *Microsoft's* DOS, and coincidentally could run on DR-DOS, at least during 1993 and 1994, when DR-DOS was a viable clone.  There is no evidence that the success of DR-DOS hinged on the ubiquity of Novell's office productivity applications, and no basis to consider such evidence, if it existed, relevant to deciding res judicata.[97] In fact, Novell does not allege here that there was any harm to any application written for *any* DOS. All of the applications at issue were written for *Windows 95*, and all of the harm they suffered took place *after* Novell discontinued its marketing and support of DR-DOS.

Second, neither Novell's counsel nor its expert in antitrust economics, Dr. Noll, ever credited Microsoft's contention that Novell's applications claims are "closely linked" with DR-DOS, or that Novell's business applications were designed as "complements" to DR-DOS (*see* Mem. at 2-3, 47).  As counsel previously advised the Court, Novell's present claims are "not related to DOS at all," and "it was not part of Novell's strategy to combine the Word Perfect applications with DR-DOS."[98]  The present case concerns only Novell's business applications for Windows 95. Any DOS-based applications that Novell might have wished to distribute with DR-DOS are not at issue here; and any wish to distribute such applications with DR-DOS would not mean, in any

---

[97] Novell does allege that Microsoft engaged in an anticompetitive scheme; however, Novell never contended that its claims here "were all of a piece" with the DOS claims (Mem. at 48).  Novell's Complaint asserts that Microsoft had a "single anticompetitive objective, namely the destruction of Novell *and its office productivity applications* in order to . . . maintain its monopoly in the PC operating systems market . . . and each pattern, practice, and overt act by Microsoft alleged *herein* took place as part of that single continuous campaign."  Compl. ¶ 22 (emphasis added).  Novell never alleges that the same operative facts that harmed its applications also harmed DR-DOS. Microsoft's reliance on *Crystal Import Corp. v. AVID Identification Systems, Inc.*, 582 F. Supp. 2d 1166 (D. Minn. 2008), is thus misplaced.  There, the prior and subsequent cases alleged the *same* operative facts underlying the defendant's fraud in procuring the *same* patent.  *Id.* at 1168-69, 1171-72.

[98] June 7, 2005 Tr. at 48:25-49:3 (Reply Ex. 45).

event, that claims concerning the distinct harms to the distinct products formed a single core of operative facts.

Dr. Noll draws no such conclusion.  He recognized that Novell's acquisition of DR-DOS posed a "serious potential threat[]" to Microsoft's monopoly power;[99] but he never suggested that the business applications were "closely linked" with DR-DOS or designed as "complements" to DR-DOS.  Nor did Dr. Noll ever suggest that the potential of PerfectOffice to become a middleware threat "hinged on Novell's ownership of DR DOS," as Microsoft contends (Mem. at 47 (citing Dep. of R. Noll (Sept. 10, 2009) at 136)).  Dr. Noll stated only that PerfectOffice became a greater threat to the Windows monopoly in conjunction with other products that he broadly categorized as "middleware platforms" or "cross platform" technologies.[100]  While PerfectOffice worked in conjunction with many other middleware and cross-platform technologies to threaten Microsoft's operating systems monopoly, PerfectOffice was not released until *three months after Novell discontinued marketing and developing DR-DOS*.[101]

Third, Microsoft cites (Mem. at 46-47) Novell's reliance on the "same 'applications barrier to entry' theory" raised in the *Caldera* litigation, but ignores the differences in the facts concerning the anticompetitive conduct that raised the barrier in the two cases.  Virtually every claim concerning Microsoft's maintenance of its operating systems monopoly, including the claims of Netscape, Sun/Java, and IBM, necessarily addressed the applications barrier to entry in some way.  Here, Novell owned different businesses at different times, and each business was destroyed at different times and in different ways; the fact that the destruction of each business strengthened

---

[99] *See* Noll Rep. (May 1, 2009) at 7-8, 89 (Reply Ex. 55).

[100] *See* Dep. of R. Noll (Sept. 10, 2009) at 135:14-20 (Reply Ex. 56).

[101] Alepin Rep. at 49 (Reply Ex. 47).  Nor was a version of PerfectOffice ever released for any DOS operating system.

Microsoft's monopoly does not mean that all acts of destruction, occurring in different periods of time and perpetrated against different products, give rise to only one claim.  The cases cited by both parties focus on the facts of the cases, not on a shared "antecedent," such as Microsoft's desire to protect its monopoly, which led Microsoft to destroy dozens of businesses, including the DOS and applications businesses that Novell coincidentally owned for a briefly overlapping period of time.  *See, e.g.*, *Pittston*, 199 F.3d at 704.  It is the specific acts perpetrated by Microsoft to raise the barrier that are relevant here, *see id.*, and Microsoft cannot show that the acts are the same.

Fourth, even if antitrust markets were relevant to analyzing res judicata, Caldera and Novell defined the markets differently.  Caldera accused Microsoft of maintaining separate monopolies in a "DOS Market" and a separate "GUI Market,"[102] because in the earlier period of time at issue in *Caldera*, character-based systems such as MS-DOS and DR-DOS were dominant, and graphical user interfaces such as GEM and Windows were often sold separately, at least until the tying of DOS and Windows with Windows 95.  Here, as in the Government's 1998 case against Microsoft, the relevant market is the "Intel-compatible PC operating systems" market, which is broader than either the DOS or GUI markets.[103]  Even if the markets were identically defined in the two cases, they would amount only to similar "antecedent[s]," which under *Pittston* still would not allow for the application of res judicata where the facts of the cases are so different.

Fifth, Microsoft asserts that Caldera sought relief "to protect *both* DR DOS *and* the Novell office productivity applications," including an injunction requiring disclosure of "the namespace extension APIs at issue in count I of this action" (Mem. at 43).  According to Mr. Hill,

---

[102] *See* Compl., *Caldera* ¶¶ 57-60 (Opening Ex. 5); *see also* First Am. Compl., *Caldera* ¶¶ 64-71 (Opening Ex. 16).

[103] *See* Compl. ¶¶ 24-26.

the assertion is false.[104]  In fact, Caldera did not file its complaint until July 1996, *after Novell sold the applications that needed the namespace extensions*.  By February 1998, when Caldera amended its complaint, Microsoft had re-published the namespace extensions.

Sixth, Microsoft contends that Mr. Bradford thought that the applications and DOS claims would "form a convenient unit for trial purposes" and that treating the claims as a unit would "conform[] to the parties' expectations or business understanding or usage" (Mem. at 48 (citations omitted)).  Mr. Bradford wrote the cited memorandum in November 1994, when he did not know of the facts at issue here; that was barely a month after the first of the anticompetitive acts at issue, and well before Novell realized the effect of that act, or knew of any of the acts involving MAPI, the Windows 95 Logo program, or the print processor.[105]  Mr. Bradford always considered the claims to be distinct and ultimately abandoned any plan to bring them together.[106]  Mr. Hill has testified that, as he prepared the DOS claims, he never contemplated bringing the applications claims.[107]

Just as importantly, Microsoft acknowledged in the *Caldera* action that the claims were separate.  Microsoft asked Mr. Frankenberg, "Did that [assignment] also include application claims, or did that – is that only related to DOS?"[108]  When Mr. Frankenberg testified that Novell retained

---

[104] *See* Hill Aff. ¶ 16.

[105] Novell did contemplate in 1995 seeking injunctive relief that would prospectively guarantee equal access to and disclosure of APIs.  *See* Novell Draft Compl. (D. Utah Apr. 1995) (Reply Ex. 36; Microsoft Ex. 10); Mem. from D. Bradford to the Novell Board of Directors (Apr. 12, 1995) (Reply Ex. 37; Microsoft Ex. 9).  Novell also complained about Microsoft's refusal to fix certain bugs, but this conduct is not "at the heart" of Novell's Count I.  Mem. at 30-31 (citing Letter from R. Frankenberg to B. Gates (June 23, 1995)).  In fact, none of this conduct is at issue at all.

[106] Bradford Aff. ¶ 9.

[107] Hill Aff. ¶¶ 7, 20, 21.

[108] Dep. of R. Frankenberg, *Caldera* (Oct. 2, 1998) 285:24-286:3 (Reply Ex. 35) (Mr. Frankenberg replied that "[t]he discussion was only about DOS, because we were selling DOS, not selling the application.").

the applications claims, Microsoft did not complain of claim-splitting, but allowed the action to proceed as Caldera aligned it.  As we have seen throughout the litigation of these defenses, Microsoft's own conduct in the prior action is fatal to its positions here.

## <u>CONCLUSION</u>

Novell respectfully requests the Court to grant Novell's motion for summary judgment and deny Microsoft's cross-motion.  The Court should strike Microsoft's fourth (estoppel), fifth (waiver), twelfth (accord and satisfaction), thirteenth (res judicata), and fourteenth (collateral estoppel) affirmative defenses.


Dated:  December 14, 2009          Respectfully submitted,

By:  _____/s/_____
     Jeffrey M. Johnson (Bar No. 09328)
     David L. Engelhardt
     James R. Martin
     DICKSTEIN SHAPIRO LLP
     1825 Eye Street NW
     Washington, DC  20006-5403
     Telephone:  (202) 420-2200
     Facsimile:  (202) 420-2201

     R. Bruce Holcomb
     ADAMS HOLCOMB LLP
     1875 Eye Street NW, Suite 810
     Washington, DC  20006
     Telephone:  (202) 580-8820
     Facsimile:  (202) 580-8821

     *Attorneys for Novell, Inc.*