# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP. ANTITRUST LITIGATION<br><br>This Document Relates to:<br>*Novell, Inc.* v. *Microsoft Corporation*,<br>Civil Action No. JFM-05-1087 | MDL Docket No. 1332<br>Hon. J. Frederick Motz<br><br>Oral Argument Requested |

## MICROSOFT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052
Phone: (425) 706-8080
Facsimile: (425) 936-7329
rwallis@microsoft.com
steveaes@microsoft.com

Mark M. Bettilyon
RAY QUINNEY & NEBEKER
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145
Phone: (801) 532-1500
Facsimile: (801) 532-7543
mbettilyon@rqn.com

G. Stewart Webb, Jr.
(Fed. Bar. No. 00828)
VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, Maryland 21202
Phone: (410) 244-7565
Facsimile: (410) 244-7742
gswebb@venable.com

David B. Tulchin
Steven L. Holley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Facsimile: (212) 558-3588
tulchind@sullcrom.com
holleys@sullcrom.com

*Attorneys for Microsoft Corporation*

January 4, 2010

## **TABLE OF CONTENTS**

                                                                                                                                                                   **Page**

ARGUMENT ............................................................................................................................. 2

    I.     Novell Sold Its Present Claims to Caldera ............................................................. 2

    II.    Alternatively, *Res Judicata* Bars Novell's Present Claims ..................................... 9

CONCLUSION ....................................................................................................................... 15


Case 1:05-cv-01087-JFM   Document 112   Filed 01/04/10   Page 3 of 19

## TABLE OF AUTHORITIES


                                                              Page(s)

CASES

*Ahmad v. Furlong*,
  435 F.3d 1196 (10th Cir. 2006) ................................................................................6

*Baladevon, Inc. v. Abbott Labs., Inc.*,
  871 F. Supp. 89 (D. Mass. 1994) ..............................................................................6

*Bishop v. Bartlett*,
  575 F.3d 419 (4th Cir. 2009) ....................................................................................4

*Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*,
  207 P.3d 1235 (Utah 2009) .......................................................................................6

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ....................................................................................3

*Ensley v. Cody Res., Inc.*,
  171 F.3d 315 (5th Cir. 1999) ....................................................................................4

*Esquire Trade & Finance, Inc. v. CBQ, Inc.*,
  562 F.3d 516 (2d Cir. 2009) ...................................................................................11

*Flying J Inc. v. Comdata Network, Inc.*,
  405 F.3d 821 (10th Cir. 2005) ..................................................................................6

*In re Fine Paper Litig.*,
  632 F.2d 1081 (3d Cir. 1980) .................................................................................13

*In re Rodeo Canon Dev. Corp.*,
  362 F.3d 603 (9th Cir. 2004) ....................................................................................4

*Novell, Inc. v. Canopy Group, Inc.*,
  92 P.3d 768 (Utah Ct. App. 2004) ..........................................................................11

*Novell, Inc. v. Microsoft Corp.*,
  505 F.3d 302 (4th Cir. 2007) .....................................................................1, 3, 5, 10

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) .........................................................................9, 12, 13

*Pueschel v. United States*,
  369 F.3d 345 (4th Cir. 2004) ...........................................................................2, 9, 14

*Rawoof v. Texor Petroleum Co.*,
  521 F.3d 750 (7th Cir. 2008) ....................................................................................4


- ii -

## TABLE OF AUTHORITIES
*(Continued)*

**Page(s)**

*RMA Ventures Cal.* v. *SunAmerica Life Ins. Co.*,
   576 F.3d 1070 (10th Cir. 2009) ...................................................................................4

*Sears* v. *Riemersma*,
   655 P.2d 1105 (Utah 1982) ..........................................................................................6

*Sprint Commc'ns Co.* v. *APCC Services, Inc.*,
   128 S. Ct. 2531 (2008) ...............................................................................................12

*Taylor* v. *Sturgell*,
   128 S. Ct. 2161 (2008) ...............................................................................................12

*Utah Shared Access Alliance* v. *Carpenter*,
   463 F.3d 1125 (10th Cir. 2006) ...................................................................................4

*Zinkand* v. *Brown*,
   478 F.3d 634 (4th Cir. 2007) .....................................................................................12

### RULE

Fed. R. Civ. P. 17 .................................................................................................................4

### OTHER AUTHORITIES

II E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 7.9 (3d ed. 2004) ....................8, 9

18A Charles A. Wright et al., FEDERAL PRACTICE & PROCEDURE § 4454 (2d ed. 2009) .............12

RESTATEMENT (SECOND) OF CONTRACTS § 201 (1981) ..................................................6

RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981) ..................................................6

RESTATEMENT (SECOND) OF JUDGMENTS § 41 (1982) ...................................................12

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE MICROSOFT CORP.<br>ANTITRUST LITIGATION<br><br>This Document Relates to:<br>*Novell, Inc.* v. *Microsoft Corporation*,<br>Civil Action No. JFM-05-1087 | MDL Docket No. 1332<br>Hon. J. Frederick Motz<br><br>Oral Argument Requested |

## MICROSOFT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT

Seeking to avoid the plain meaning of the contract at issue on this motion, Novell in its December 14 opposition brief ("Novell Opp.") points to extrinsic evidence supposedly showing that its "applications claims" were not among the claims it assigned to Caldera in 1996. (Novell Opp. at 1, 4-11.) This misses the point entirely. Even assuming that Novell never sold its "applications claims" (*i.e.*, claims for harm to WordPerfect and Quattro Pro resulting from Microsoft's allegedly anticompetitive conduct in purported markets for word processing and spreadsheet applications), those claims—which Novell asserted in counts II through V of its complaint—are barred by the statute of limitations and have been dismissed. *Novell, Inc.* v. *Microsoft Corp.*, 505 F.3d 302, 322-23 (4th Cir. 2007).

The question now before the Court is whether the claims asserted in counts I and VI, which "are predicated on the theory that Microsoft's conduct injured competition in the market for PC operating systems," 505 F.3d at 306, were among the claims that Novell assigned to Caldera. That question is readily resolved by the plain language of the contract (the "Asset Purchase Agreement"), which transferred to Caldera all claims "associated directly or indirectly" with Novell's PC operating systems.

Counts I and VI are also barred by the doctrine of *res judicata*. Novell takes the untenable position that it should be allowed to split a single cause of action into multiple claims, litigate some of those claims through its proxy (Caldera) and, after collecting on those claims, bring another lawsuit on the remainder. As the Fourth Circuit has held, such claim splitting would "frustrate the goals of *res judicata*" and is thus impermissible. *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004). In this action, Novell alleges that Microsoft engaged in strikingly similar anticompetitive conduct in the same market during the same time period as Caldera alleged in the suit it prosecuted in the late 1990s. *Res judicata* bars Novell's effort to litigate the same cause of action a second time.

## ARGUMENT

### I. Novell Sold Its Present Claims to Caldera

In the Asset Purchase Agreement, Novell sold to Caldera all claims "associated directly or indirectly" with DR DOS, a PC operating system. (Asset Purchase Agreement § 3.1, attached as Ex. 1 to the Affidavit of Steven L. Holley in Support of Microsoft's Cross-Motion for Summary Judgment, sworn to on November 10, 2009 ("Holley Aff.").) Novell narrowly interprets this assignment to include only claims for harm to DR DOS—an interpretation that ignores the plain language of the contract, which states that claims "associated directly or indirectly" with DR DOS were assigned to Caldera. (Microsoft Mem. at 24.) The term "indirectly," which Novell pretends is not in the Asset Purchase Agreement (*see* Novell Opp. at 3-4), means that Novell sold claims for all Microsoft conduct that allegedly injured competition in the PC operating system market in which DR DOS competed. (*See* Microsoft Mem. 23-28.)

When properly construed, the assignment includes Novell's present claims, which seek to recover damages for harm allegedly sustained by Novell's office productivity

applications as a result of Microsoft's allegedly anticompetitive conduct in the same PC operating system market in which DR DOS competed—conduct that Novell says occurred during the time period when Novell owned both DR DOS and its office productivity applications.

The theory of Novell's case is that Microsoft's allegedly anticompetitive conduct directed at WordPerfect and Quattro Pro strengthened the applications barrier to entry that protected Microsoft's PC operating system monopoly because "Novell's applications' loss of market share could in turn lead to a decrease in demand for the competing operating systems that support these applications."[1] *Novell*, 505 F.3d at 309. Under this theory, a decrease in demand for competing operating systems resulting from Microsoft's allegedly anticompetitive conduct in the PC operating system market would not only diminish the value of Novell's applications, which were available on a variety of operating systems including DR DOS, but would also reduce demand for DR DOS itself. Novell's claims are thus at least "indirectly associated" with DR DOS because they allege harm to competition in the PC operating system market in which DR DOS competed, and therefore the conduct at issue in counts I and VI—if it actually

---

[1] Remarkably, Novell now concedes that this theory of harm to competition in the PC operating system market is wrong, admitting that "[t]here is no evidence that the success of DR-DOS hinged on the ubiquity of Novell's office productivity applications." (Novell Opp. at 32.) In other words, Novell concedes that Microsoft's allegedly anticompetitive conduct directed at WordPerfect and Quattro Pro did not cause harm to competition in the PC operating system market. Novell's antitrust economics expert, Roger Noll, has made the same concession. (*See* Microsoft's Memorandum in Support of Its Motion for Summary Judgment, October 7, 2009 ("Microsoft S. J. Mem.") at 26-29.) Of course, claims under Sections 1 and 2 of the Sherman Act require harm to competition in the relevant market, *see Dickson* v. *Microsoft Corp.*, 309 F.3d 193, 206, 211-12 (4th Cir. 2002), requiring that this Court grant Microsoft's other motion for summary judgment.

occurred—necessarily harmed DR DOS. As this Court stated in its August 26, 2008 Order resolving a discovery dispute:

> Counts I and VI assert claims for harm allegedly caused by Microsoft to Novell's application software products for the purpose of obtaining and maintaining Microsoft's monopoly power in the Intel-compatible operating systems market. DOS was a competitor in that market, and it too may thus also have been harmed by Microsoft's alleged anti-competitive conduct against Novell's application software products. Therefore, depending upon how the term "indirectly" in the assignment from Novell to Caldera is construed, it may be that the claims asserted by Novell in Counts I and VI are "associated directly or indirectly with any of the DOS Products or Related Technology."

(Order of August 26, 2008, attached as Ex. 32 to Holley Aff.)

Novell fails to show that its present claims do not arise out of conduct that allegedly injured DR DOS.[2] Novell asserts that Microsoft's allegedly anticompetitive conduct, which Novell says began in October 1994 (Novell Opp. at 27), could not have harmed DR DOS because Novell had "discontinued its marketing and support of DR-DOS" by then. (*Id.* at 32.) Regardless of its marketing strategy, Novell still owned DR DOS until July 1996, and the value of DR DOS would necessarily have been affected by anticompetitive conduct that hindered the

---

[2] Novell wrongly contends that it need make only a prima facie showing that it retained the present claims and is thus a real party in interest, at which point the burden shifts to Microsoft to show that Novell's right to recover has been extinguished. (Novell Opp. at 2.) The real-party-in-interest rule set forth in Fed. R. Civ. P. 17(a) is a prudential standing requirement, *RMA Ventures Cal. v. SunAmerica Life Ins. Co.*, 576 F.3d 1070, 1073 (10th Cir. 2009); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008); *In re Rodeo Canon Dev. Corp.*, 362 F.3d 603, 607 (9th Cir. 2004); *Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999), and the law is clear that a plaintiff bears the burden of establishing prudential standing. *Bishop v. Bartlett*, 575 F.3d 419, 423-24 (4th Cir. 2009); *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1137 (10th Cir. 2006). That burden never shifts to the defendant. *See Bishop*, 575 F.3d at 424.

product's ability to compete in the PC operating system market.[3] After acquiring DR DOS from Novell, Caldera continued to market DR DOS and the product generated revenue through at least September 1997. (Caldera Am. Compl. ¶ 63, attached as Ex. 30 to Holley Aff.) Under the theory Novell advanced to save counts I and VI from being barred by the statute of limitations, the anticompetitive conduct alleged in counts I and VI would have decreased demand for DR DOS by decreasing demand for WordPerfect and Quattro Pro.[4] Accordingly, Novell's remaining claims are "associated indirectly" with DR DOS and were assigned to Caldera.

Although Microsoft's interpretation of the assignment is consistent with its plain meaning, Novell contends that this interpretation must be disregarded because Novell and Caldera "agree that the [Asset Purchase Agreement] did not convey Novell's applications claims." (Novell Opp. at 11-13.) According to Novell, "[w]here the parties have attached the

---

[3] Further, it is simply not true that Novell had ceased marketing DR DOS by October 1994. Although Novell announced that it was exiting the DR DOS business in September 1994 (Novell Opp. at 26), it "continued to make some sales of the DR DOS product following the announcement." (First Amended Complaint, *Caldera, Inc. v. Microsoft Corp.* (D. Utah February 12, 1998) ("Caldera Amended Compl.") ¶ 62, attached as Ex. 30 to Holley Aff.) Moreover, it was not until November 16, 1995 that Novell announced that, effective February 1, 1996, it would stop providing complimentary telephone support to DR DOS users, although it continued to provide installation, configuration, and usability telephone support for DR DOS on a fee-for-service basis after that date. http://www.novell.com/news/press/archive/1995/11/pr95265.html

[4] Novell also makes much of the fact that this action concerns versions of WordPerfect and Quattro Pro that were written for Windows 95, not DR DOS. (Novell Opp. at 32.) That, of course, is irrelevant under Novell's own theory of the case, which posits that the applications barrier to entry protecting Microsoft's PC operating system monopoly could be threatened by successful applications that "could perform well on a variety of operating systems." *Novell*, 505 F.3d at 308. Novell claims that Microsoft harmed WordPerfect and Quattro Pro for Windows 95 so that those applications would lose market share, which would "in turn lead to a decrease in demand for the competing operating systems that support[ed]" the versions of WordPerfect and Quattro Pro that were compatible with those other operating systems. *Id.* at 309. Novell does not deny that both WordPerfect and Quattro Pro were available for DR DOS, nor does it deny that a version of its office productivity suite, PerfectOffice, could have been developed for DR DOS.

same meaning" to a contract, a nonparty to the contract "cannot be heard to offer a contrary interpretation." (*Id.* at 11.) This argument fails for several reasons.

*First*, Utah has never adopted the purported rule of law on which Novell relies (set forth in Restatement (Second) of Contracts § 201(1)), a rule that adopts a subjective standard of contract interpretation. (*See* Microsoft Mem. at 36.) Novell extrapolates from the Tenth Circuit's prediction that the Utah Supreme Court would adopt *different* Restatement provisions to argue that the Utah Supreme Court would also adopt § 201(1).[5] (Novell Opp. at 12.) This speculation is unnecessary: The Utah Supreme Court has held that Utah adheres to the rule that interpreting a contract requires "giving an objective and reasonable construction to the contract as a whole." *Sears v. Riemersma*, 655 P.2d 1105, 1107-08 (Utah 1982). There is no reason whatsoever to speculate that the Utah Supreme Court will overturn the *Sears* decision.

*Second*, even if Restatement (Second) of Contracts § 201(1) were the law in Utah, it would not apply here. That provision is only relevant where a court seeks to resolve the meaning of an ambiguous contract term. *See Ahmad v. Furlong*, 435 F.3d 1196, 1203 (10th Cir. 2006); *Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89, 98 (D. Mass. 1994) ("[T]he undisputed evidence as to both the contracting parties' subjective intent controls the interpretation of the ambiguous contract terms."). This comports with the principle that "[w]here the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009) (citation omitted). Here, both parties

---

[5] The case upon which Novell relies, *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821 (10th Cir. 2005), predicts that the Utah Supreme Court would apply Restatement (Second) of Contracts §§ 201(2) and 202(3)(b) (which the court erroneously refers to as "201(3)(b)"). *Id.* at 833-34, 837. The Tenth Circuit said nothing at all about § 201(1), the provision at issue here.

agree that the terms of the Asset Purchase Agreement are unambiguous. (*See* Novell Opp. at 3-4.) Accordingly, any extrinsic evidence of subjective intent—from Novell or Caldera—should be disregarded.

*Finally*, even if extrinsic evidence of the parties' subjective intent were relevant, the contemporaneous evidence demonstrates that the assignment was intended to encompass other PC operating system market claims that relate to DR DOS—such as the claims asserted in counts I and VI. (Microsoft Mem. at 28-35.) Novell seeks to show that the present claims were excluded from the assignment by submitting affidavits from two participants in the contract negotiations (David Bradford and Paul Graf) and the lawyer who served as Novell's longtime outside counsel and later represented Caldera in its lawsuit against Microsoft (Stephen Hill). Novell's affidavits—prepared more than 13 years after the fact—do not establish that the claims asserted in counts I and VI were excluded from the assignment.

At most, Novell's affidavits are directed at the point that Novell and Caldera did not specifically contemplate back in 1996 the claims now asserted in counts I and VI. That would not be surprising in view of the fact that those claims (which allege that competition in the PC operating system market was adversely affected by Microsoft's allegedly anticompetitive conduct directed at Novell products that competed in other markets) were artificially constructed to take advantage of the Clayton Act tolling provision triggered by the federal government's 1998 antitrust action against Microsoft. (*See* Microsoft S. J. Mem. at 24.) Rather, it appears that at the time of the assignment, Novell believed it had only two claims: one for harm to Novell's PC operating system (DR DOS) arising out of Microsoft's alleged monopolization of the PC operating system market, and a second for harm to Novell's office productivity applications (WordPerfect and Quattro Pro) arising out of Microsoft's alleged monopolization of purported

markets for word processing and spreadsheet applications.[6] Under those circumstances, it is entirely unremarkable that, as David Bradford says, Novell and Caldera never "discussed antitrust claims concerning damage caused to Novell's Business Applications business" in connection with the sale of DR DOS.[7] (Affidavit of David Bradford, sworn to on December 9, 2009, ¶ 23; *see also* Affidavit of Paul Graf, sworn to on November 25, 2009, ¶ 3 ("Neither party contemplated that claims 'directly or indirectly' related to 'the DOS Products or Related Technology' would include Novell's antitrust claims for harm to its business applications.").) This changes not at all the language of the contract, which covers the sale of all claims associated directly or indirectly with Novell's PC operating system.[8]

Thus, even if Novell and Caldera did not specifically negotiate over the claims asserted in counts I and VI—perhaps because such unprecedented claims (for harm to products that do not compete in the market in which competition was allegedly injured) were too unusual to be anticipated by any person involved with the transaction—that does not mean that those claims were not included in the assignment. "In many disputes arising out of contemporary business transactions, . . . the parties gave little or no thought to the impact of their words on the case that later arose." II E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 7.9 (3d ed. 2004).

---

[6] *See, e.g.*, Letter from Robert J. Frankenberg to William H. Gates, June 23, 1995 at 2, attached as Ex. 14 to Holley Aff.

[7] Even if Novell retained "applications claims"—*i.e.*, claims for harm to WordPerfect and Quattro Pro arising out of Microsoft's allegedly anticompetitive conduct in purported markets for office productivity applications—when it sold DR DOS to Caldera, those claims—which were asserted in counts II through V of the complaint in this action—have been dismissed.

[8] In other words, Novell is now stuck with the results of its own contortions. By inventing its peculiar claim that injury to Novell's office productivity applications harmed competition not in the market(s) in which those applications competed but in an entirely different market, Novell has placed the claims asserted in counts I and VI squarely within the purview of the 1996 assignment to Caldera.

In such cases, a court interpreting the language of a contract has "no choice but to look solely to a standard of reasonableness." *Id.* The only reasonable interpretation of the language of the assignment here encompasses the claims asserted in counts I and VI.

## II.   Alternatively, *Res Judicata* Bars Novell's Present Claims

Even if the claims asserted in counts I and VI were not assigned to Caldera, they are independently barred by the doctrine of *res judicata*. (*See* Microsoft Mem. at 37-49.) There can be no dispute that, under the doctrine of *res judicata*, a judgment on the merits in a prior suit resolving claims brought by a party or its privy bars any subsequent suit by the party "based on the same cause of action." *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 210 (4th Cir. 2009). This is so as long as the later claims "arise out of the same transaction or series of transactions or the same core of operative facts" as the claims asserted in the prior suit. *Pueschel v. United States*, 369 F.3d 345, 355 (4th Cir. 2004).[9] Under this standard, the claims asserted in counts I and VI are precluded by Caldera's prior lawsuit against Microsoft.

Both sets of claims arise out of the same core of operative facts. The claims asserted in *Caldera*, and those asserted here, allege that Microsoft engaged in anticompetitive conduct that adversely affected competition in the PC operating system market during the period from June 1994 to March 1996, and both sets of claims arise out of strikingly similar conduct, including Microsoft's alleged manipulation of its operating system APIs to render them incompatible with Novell's products. (Microsoft Mem. at 27, 43-47.) Both lawsuits complain of

---

[9]   The Fourth Circuit's observation that a single core of operative facts "can manifest itself into an outpouring of different claims" (*see* Novell Opp. at 31 n.95 (quoting *Pueschel*, 369 F.3d at 355)) is precisely Microsoft's point. Although Novell's present claims and the claims asserted in the *Caldera* action are in some sense "different," they arise out of the same core of operative facts and, thus, are all part of the same cause of action.

Microsoft's licensing agreements with OEMs,[10] and Microsoft's Windows 95 operating system is central to both lawsuits.[11] In addition, Caldera's action sought injunctive relief requiring Microsoft to disclose its operating system APIs—relief expressly designed to benefit Novell's applications.[12] (*Id.* at 30-31.) Although Novell now characterizes the scope of its present action as narrow (Novell Opp. at 25-27), the complaint it filed in this action shows otherwise. In that complaint, which Novell has never sought to amend, Novell alleges that its claims are part of a "single continuous campaign" by Microsoft (dating to "at least the early 1990s") to "slaughter" Novell in order "to maintain its monopoly in the PC operating systems market." (Novell Compl.

---

[10] Novell's complaint and its prior representations to this Court are clear that the only Microsoft licensing practices of which Novell complains are Microsoft's licenses with OEMs, the same agreements that were at issue in the *Caldera* action. Novell's complaint references "OEMs" 74 times and dedicates more than six pages to a discussion of licensing practices in "the OEM channel." (Novell Compl. ¶¶ 113-31, attached as Ex. 31 to Holley Aff.) Indeed, Novell succeeded in convincing the Fourth Circuit that this case involved Microsoft's PC operating system monopoly as "leverage that it used to impose restrictive and exclusionary agreements on OEMs." *Novell*, 505 F.3d at 309. Novell's current assertion to the contrary (Novell Opp. at 27) is revisionist history.

[11] The *Caldera* action alleged that Microsoft's release of Windows 95 in August 1995 (while Novell still owned DR DOS) was, in and of itself, anticompetitive. (First Amended Complaint, *Caldera* (D. Utah February 12, 1998) ¶ 61, attached as Ex. 30 to Holley Aff.) Although Novell now contends that this was not among the claims it assigned to Caldera (Novell Opp. at 26), Novell did not renounce its share of the *Caldera* settlement attributable to this claim relating to Windows 95.

[12] It is irrelevant that by the time the *Caldera* action was filed in July 1996, such relief may have come too late to benefit Novell's applications. (*See* Novell Opp. at 34-35.) The salient fact is that the requested relief was identical to the relief Novell planned to seek in its April 1995 draft complaint against Microsoft, which sought disclosure of Microsoft's operating system APIs in order to "limit Microsoft's ability to leverage its desktop PC monopoly position in a manner that gives it an unfair advantage in the network operating system and desktop PC applications markets." (Memorandum from David R. Bradford to the Novell board of directors, April 12, 1995 at 1, attached as Ex. 9 to Holley Aff.) That such relief would have been directly applicable to Novell's central allegation in this case—Microsoft's alleged withholding of technical information regarding the namespace extension APIs—further demonstrates that the two actions arise from the same core of operative facts.

¶ 22, attached as Ex. 31 to Holley Aff.; *see also* Declaration of Roger G. Noll, May 1, 2009 at 7-10, 89 ("Microsoft engaged in numerous anticompetitive acts that were aimed at a variety of competing products, ranging from operating systems, middleware to applications, many of which were not aimed at Novell."), attached as Ex. 5 to Holley Aff.) There is nothing "narrow" about such a theory of competitive harm, and Novell should not be permitted to walk away from the blunderbuss allegations of its complaint when they prove inconvenient to its arguments opposing *res judicata*.

Finally, Novell's present claims are predicated on the same applications barrier to entry theory that was asserted in the *Caldera* action. In fact, the applications barrier to entry provides the only nexus between Novell's claims of harm to its office productivity applications and the PC operating system market at issue in both lawsuits. This, too, confirms that the claims in the two lawsuits arise out of the same cause of action. (Microsoft Mem. at 47-48.)

Novell also offers no effective response to Microsoft's showing that Novell and Caldera were in privity. *First*, the contractual agreement by which Caldera was obligated to sue Microsoft and share the proceeds of that lawsuit with Novell constituted a "substantive legal relationship" that placed Novell and Caldera in privity with respect to the *Caldera* litigation. (Microsoft Mem. at 39-40.) Contrary to Novell's assertion, Microsoft need not show that "Novell and Caldera were somehow in privity for the claims that Novell did not transfer to Caldera."[13] (Novell Opp. at 23 (emphasis and quotation marks omitted).) Microsoft need show

---

[13] The case upon which Novell relies, *Esquire Trade & Finance, Inc. v. CBQ, Inc.*, 562 F.3d 516 (2d Cir. 2009), does not support Novell's position. In that case, the party to the later action had not assumed *any* liabilities from the party to the prior action (its alleged privy); the parties had no contractual relationship whatsoever. *Id.* at 520-21. Here, that is not the case: Caldera was contractually obligated to assert Novell's claims against Microsoft. *Novell, Inc. v. Canopy Group, Inc.*, 92 P.3d 768, 770 (Utah Ct. App. 2004).

only that Novell and Caldera were in privity with respect to the prior action and that the present claims are "based on the same cause of action." *Ohio Valley Environmental Coalition*, 556 F.3d at 210. Microsoft has done so.

*Second*, Caldera "adequately represented" Novell in the *Caldera* litigation. Novell is wrong when it claims that Microsoft has failed to establish that Novell and Caldera shared the "same interests" in the *Caldera* litigation.[14] (*See* Novell Opp. at 20-22.) The relevant test requires (a) that the parties' interests be merely "aligned," not coextensive, and (b) that the party to the earlier suit "understood [itself] to be acting in a representative capacity." *Taylor v. Sturgell*, 128 S. Ct. 2161, 2176 (2008). Here, where Caldera was legally obligated to assert Novell's claims against Microsoft on Novell's behalf, those requirements are plainly met. (Microsoft Mem. at 40-41.) Caldera was acting, in effect, as Novell's assignee for collection[15]— a relationship that is "effective to establish preclusion by representation." 18A Charles A. Wright et al., FEDERAL PRACTICE & PROCEDURE § 4454 (2d ed. 2009); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 41 cmt. b (1982). Again, it does not matter that the claims brought

---

[14] Novell repeats its meritless argument that Microsoft is judicially estopped from arguing that Novell had an interest in the *Caldera* litigation (Novell Opp. at 20-21), again ignoring the inconvenient fact that it too seeks to take a position contrary to the one it took in its motion to intervene in that action. (Microsoft Mem. at 41-42.) Fourth Circuit law is clear that a finding of judicial estoppel is only appropriate where a party has acted in bad faith. *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007). If anything, Novell is the party guilty of bad faith. Microsoft's position with respect to Novell's interest in the *Caldera* litigation would have been quite different had it then been aware of the critical fact that, as Novell now concedes, "Caldera was obligated to prosecute the claims it acquired from Novell." (Novell Opp. at 21.) Novell, on the other hand, has no such excuse for changing its position—it has known the true extent of its interest in the *Caldera* litigation all along.

[15] "Assignees for collection" are "assignees who [bring] suit to collect money owed to their assignors but who promise[] to turn over to those assignors the proceeds secured through litigation." *Sprint Commc'ns Co. v. APCC Services, Inc.*, 128 S. Ct. 2531, 2538-39 (2008).

by Caldera were not the precise claims asserted here, since the two sets of claims are "based on the same cause of action." *Ohio Valley Environmental Coalition*, 556 F.3d at 210.

As a last resort, Novell argues that Microsoft assented to Novell's splitting of its cause of action by failing to join Novell in the *Caldera* action when it purportedly learned of Novell's applications claims. (Novell Mem. at 18.) According to Novell, Microsoft received such notice from the October 1998 testimony of Novell's former CEO, Robert Frankenberg, at his deposition in the *Caldera* action. There, when asked whether the claims assigned to Caldera included "application claims" or "only [claims] related to DOS," Mr. Frankenberg testified that "[t]he discussion was only about DOS, because we were selling DOS, not selling the application." (Deposition of Robert Frankenberg, *Caldera*, October 2, 1998 at 285-86, attached as Ex. 35 to Novell Opp.) That testimony did not come close to putting Microsoft on notice that Novell would bring the claims asserted in counts I and VI. The testimony establishes only that, in Mr. Frankenberg's view, the assignment to Caldera did not include "application claims" but did include claims "related to DOS." This begs the question; as demonstrated above (*see* pp. 2-9, *supra*), the claims asserted in counts I and VI are "related to" (*i.e.*, "associated with") DR DOS, whereas Novell's true "application claims"—counts II through V—have been dismissed as untimely.

In any event, this argument is wholly without merit. As the cases on which Novell relies recognize, assent to claim splitting by assignment can only arise where the defendant is put on notice that the claim has been split. *In re Fine Paper Litig.*, 632 F.2d 1081, 1091 (3d Cir. 1980) ("When the [defendant] has notice of an assignment by the plaintiff—and the assignee is not joined—a judgment for or against the [defendant] will not bar a later suit by the assignee."). Even if a single passing reference in a deposition could be sufficient to put a

defendant on notice that a cause of action has been split—and Novell has cited no authority to support that proposition[16]—Mr. Frankenberg's testimony came nowhere close to providing the requisite notice that Novell would years later dream up claims as unprecedented as counts I and VI. Anyone reading the Asset Purchase Agreement would understand that all of Novell's claims relating to competition in the PC operating system market were being assigned to Caldera. Microsoft was never notified that Novell was retaining certain claims relating to competition in that market, and Microsoft certainly never consented to such claim splitting.

---

[16] *Cf. Pueschel*, 369 F.3d at 356 (finding that defendant had consented to claim splitting by stating in summary judgment motion in prior action that plaintiffs' present claims were "not part of [the prior] lawsuit").

## CONCLUSION

The Court should grant Microsoft's cross-motion for summary judgment and dismiss counts I and VI of Novell's complaint.

Respectfully submitted,

By: _____
G. Stewart Webb, Jr.
(Fed. Bar. No. 00828)

Richard J. Wallis
Steven J. Aeschbacher
MICROSOFT CORPORATION
One Microsoft Way
Redmond, Washington 98052
Phone: (425) 706-8080
Facsimile: (425) 936-7329
rwallis@microsoft.com
steveaes@microsoft.com

Mark M. Bettilyon
RAY QUINNEY & NEBEKER
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145
Phone: (801) 532-1500
Facsimile: (801) 532-7543
mbettilyon@rqn.com

VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, Maryland 21202
Phone: (410) 244-7565
Facsimile: (410) 244-7742
gswebb@venable.com

David B. Tulchin
Steven L. Holley
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Phone: (212) 558-4000
Facsimile: (212) 558-3588
tulchind@sullcrom.com
holleys@sullcrom.com

*Attorneys for Microsoft Corporation*

January 4, 2010